**Lauren C. Regan**, OSB # 970878
Email: lregan@cldc.org
**Marianne Dugan**, OSB # 932563
Email:  mdugan@cldc.org
**Cooper Brinson**, OSB # 153166
Email: cbrinson@cldc.org
CIVIL LIBERTIES DEFENSE CENTER
1430 Willamette Street, #359
Eugene, OR  97402
Telephone:  541.687.9180
Fax: 541.804.7391

        Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION

| | |
|---|---|
| HASHEEM BOUDJERADA; KELSIE LEITH-BOWDEN; DAMON COCHRAN-SALINAS; ERIN GRADY; TYLER HENDRY; and KIRTIS RANESBOTTOM;<br><br>        Plaintiffs,<br><br>    v.<br><br>CITY OF EUGENE, a municipal corporation; SARAH MEDARY; SAMUEL STOTTS; BO RANKIN; and DOES 1-20,<br><br>        Defendants. | Case No. 6:20-cv-1265<br><br>**COMPLAINT**<br><br>Civil Rights (42 U.S.C. § 1983)<br><br>**DEMAND FOR JURY TRIAL** |

        PLAINTIFFS, by and through their attorneys, CIVIL LIBERTIES DEFENSE CENTER,

for their Complaint against Defendants, allege:

## I.  INTRODUCTION

1.        This is a civil rights action arising under Title 42 of the United States Code, Section

1983. Plaintiffs bring this action for damages against Defendants after Defendants violated the

Page 1 -- COMPLAINT

First, Fourth, and Fourteenth Amendment rights of Plaintiffs on May 31, 2020.  In the course of violating Plaintiffs' rights, Defendants, without legal justification, used chemical and impact munitions such as tear gas, rubber bullets, and "foam batons" on an unarmed populace, and arrested people without probable cause; and militarized police marauded around the City terrorizing local residents, and – as a pretext to justify their vicious attacks on local residents and protestors -- the City implemented a series of draconian, unconstitutional curfews.  Plaintiffs now seek compensation for damages caused by those unconstitutional actions, policies, or practices.

2.      On May 25, 2020, George Floyd, an African-American, was killed by a Minneapolis police officer, Derek Chauvin, who knelt on Mr. Floyd's neck for about eight minutes and forty-six seconds. During that time, at least four other officers stood around and watched as Mr. Floyd begged for his life and cried out for his mom. Mr. Floyd's last words were, "please, please, please, I can't breathe."

3.      Several weeks before Mr. Floyd was killed by police, Breonna Taylor, a Louisville, Kentucky, EMT (also African-American), was shot dead by plain-clothes police who broke into her home to execute a no-knock warrant. Police claimed they were looking for two people, but those two people were already in police custody when police executed the warrant and shot Ms. Taylor eight times.

4.      The killing of Mr. Floyd and Ms. Taylor unleashed a torrent of anger and frustration from people across the United States and the world. Millions have protested and demonstrated, calling for an end to white supremacy and the legal, social, political, and economic institutions that uphold and benefit from systemic racism, as well as calling for an end to State violence against all people.

5.      In the U.S., demonstrations have occurred in every state for two months. Many of these demonstrations were attacked by police using a variety of implements, including tear gas grenades, OC spray/pepper balls, rubber bullets, and other projectiles.

6.      Like most cities in the U.S., Eugene, Oregon, was home to several protests and demonstrations in the days after Mr. Floyd was killed. Demonstrations are still occurring in Eugene.

7.      In response to these gatherings, the Eugene Police Department (EPD), like many police departments around the U.S., used indiscriminate, brutal, and excessive force against demonstrators and, in some cases, non-demonstrators that were merely in the vicinity of demonstrations.

8.      The City of Eugene also responded to the demonstrations by implementing a series of draconian unconstitutional curfews. These curfews provided a pretext for law enforcement to maraud around the City in trucks and armored vehicles, shooting chemical and impact munitions at protestors, journalists, passersby, and residences. The unconstitutional curfews also resulted in the arrest of several people who were engaged in activity protected by the First Amendment, exempt from the curfews, or not even in a prohibited area during a time prohibited by the curfews.

9.  Upon information and belief, many of the spent munitions deployed by Defendants against the people were recovered and were found to be over a decade old and expired:



10.  According to manufacturers' guidelines, these expired munitions are unstable and increase the already serious health risks to those exposed to the chemical irritants.

## II.  JURISDICTION AND VENUE

11.  This civil action arises under the Constitution and laws of the United States and this Court therefore has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1342(a).

12.  Venue is properly vested in the Court pursuant to 28 U.S.C. § 1391(b), because the actions giving rise to this complaint took place in the City of Eugene, Oregon, which is in this District, and Defendants are subject to personal jurisdiction in this District.

## III. PARTIES

13.  Plaintiff Hasheem Boudjerada was, at all relevant times, a resident of Eugene, Oregon. Mr. Boudjerada was arrested in Eugene on May 31, 2020, for allegedly violating one of the curfews implemented and enforced by Defendants.

14.    Plaintiff Kelsie Leith-Bowden was, at all relevant times, a resident of Eugene, Oregon.
Ms. Leith-Bowden was assaulted by Defendants on May 31, 2020, as further described herein.

15.    Plaintiff Damon Cochran-Salinas was, at all relevant times, a resident of Eugene, Oregon
and a member of the Student Cooperative Association ("SCA") and lived at the SCA property
known as the "Campbell Club" on Agate Street. Mr. Cochran-Salinas's person and home were
assaulted by Defendants on May 31, 2020, as further described herein.

16.    Plaintiff Erin Grady was, at all relevant times, a resident of Eugene, Oregon. Ms. Grady
was arrested in Eugene on May 31, 2020, for allegedly violating a city-wide curfew implemented
and enforced by Defendants.

17.    Plaintiff Tyler Hendry was, at all relevant times, a resident of Eugene, Oregon. Mr.
Hendry was arrested in Eugene on May 31, 2020, for allegedly violating a city-wide curfew
implemented and enforced by Defendants.

18.    Plaintiff Kirtis Ranesbottom was, at all relevant times, a resident of Eugene, Oregon and
a resident of the SCA's Campbell Club. Mr. Ranesbottom's person and home were assaulted by
Defendants on May 31, 2020, as further described herein.

19.    Defendant City of Eugene is a political subdivision of the State of Oregon. The Eugene
Police Department is a department or division of the City. Upon information and belief, each
person who made arrests, deployed tear gas or other chemical munitions, or fired other
projectiles on May 31, 2020, was an agent or employee of the City of Eugene. On information
and belief, each and every decision to indiscriminately arrest and to deploy chemical munitions
and other projectiles at Plaintiffs was the result of a policy decision of the City of Eugene.

20.    Defendant Sarah Medary is the City Manager for the City of Eugene and an Oregon
resident. In consultation with the Eugene City Council (then as Pro Tem City Manager), Medary

> **Commented [CB1]:** Hendry's arresting officer is listed as "R. Underwood." I found a detective Ryan Underwood with EPD, but nothing else (via google search)…seems odd a detective would make the arrest. Should we name or wait?

> **Commented [LR2R1]:** Wait. Ive heard of him and them making arrests for sure..esp of activists—I think he's jttf type

made the final decision to declare a state of emergency and imposed a curfew with input from

the Police Chief and staff in the field.

21.     Defendant Samuel Stotts is a Sergeant employed by the Eugene Police Department. Sgt.

Stotts arrested Plaintiff Grady on May 31, 2020.

22.     Defendant Bo Rankin is a police officer employed by the Eugene Police Department.

Rankin arrested Plaintiff Boudjerada on May 31, 2020.

23.     Defendant Does 1-20, inclusive, are unidentified sworn law enforcement officers who

committed the acts and omissions set forth in this Complaint, or supervised or ratified those acts

and omissions as agents or employees of Defendant City of Eugene. Plaintiffs do not currently

know the true names and/or capacities of Defendants sued herein as Does 1 through 20, and

therefore initiate suit against said Defendants by such fictitious names. Plaintiffs will amend this

complaint to allege their true names and capacities when ascertained. Plaintiffs are informed and

believe and, therefore, allege that each of the Doe Defendants is legally responsible and liable for

the incidents, injuries, and damages herein set forth, and that each of said Defendants

proximately caused said incidents, injuries, and damages by reason of their negligence, breach of

duty, negligent supervision, management, or control, violation of constitutional and legal rights,

or by reason of other personal, vicarious or imputed negligence, fault, or breach of duty, whether

severally or jointly, or whether based upon agency, employment, or control or upon any other act

or omission. Plaintiffs will ask leave to amend this complaint to insert further allegations when

such facts are ascertained.

24.     In doing the acts and/or omissions alleged herein, Defendants, and each of them, acted

within the course and scope of their employment.

25.     In doing the acts and/or omissions alleged herein, Defendants, and each of them, acted

under color of authority and/or under color of law.

Page 6 -- COMPLAINT

26.     In doing the acts and/or omissions alleged herein, Defendants, and each of them, acted as the agent, servant, or employee, and/or in concert with, each of the other Defendants.

### IV. BACKGROUND

27.     On May 29, 2020, the people gathered throughout the City of Eugene in response to the killings of George Floyd and Breonna Taylor.

28.     In the evening of May 29 and the early morning hours of May 30, a small number of people damaged property at or near West 7th Avenue and Washington Street in Eugene.

29.     The City of Eugene and EPD pointed to the incidents of property damage that occurred on May 29th and the early hours of May 30th, 2020 to justify six sweeping unconstitutional curfews in the days that followed May 29-- three curfews with limited application and three curfews that applied city-wide -- and the use of various chemical and impact munitions against the people, including Plaintiffs.

30.     On May 31, 2020, the City of Eugene "enacted a temporary nighttime curfew in downtown Eugene from 9:00 p.m . . . through 6:00 a.m. June 1." "The curfew appli[ed] to the area from High Street to Monroe Street and from 14th Avenue to 4th Avenue." That curfew was announced on EPD's Facebook page a little after 6:30 p.m. on May 31. Not all residents of Eugene use or monitor Facebook.

Page 7 -- COMPLAINT



Area subject to the downtown administrative curfew on May 31, 2020.

31.    "This [curfew] was extended to apply citywide at 11:00 p.m.."[1] EPD's Facebook page announced the curfew at 11:08 p.m. Many people in Eugene did not receive any notice of the curfews.

32.    The curfew did "not apply to credentialed media, people seeking emergency care, fleeing dangerous circumstances, sheltering in place, traveling to and from employment or making commercial deliveries."[2]

33.    "Violating the city's curfew order is a misdemeanor offense and is punishable by a fine up to $500 or confinement in jail up to 100 days, or both fine and imprisonment."[3]

34.    The City lacked legal authority to impose or declare punishment for violation of this curfew order.

---

[1] https://www.eugene-or.gov/civicalerts.aspx?aid=4397
[2] https://www.eugene-or.gov/CivicAlerts.aspx?AID=4392&ARC=9123
[3] https://www.eugene-or.gov/civicalerts.aspx?aid=4397

Page 8 -- COMPLAINT

35.    Since May 29, 2020, there have been protests and demonstrations in Eugene nearly every day and night, demanding much needed radical changes to local, state, and federal justice systems, including demands to defund and disarm police and to dismantle the legal, social, political, and economic institutions that benefit and perpetuate white supremacy and State violence. There is no reason to believe that these protests and demonstrations will stop any time soon.

36.    Throughout the evening of May 31, 2020, the Doe Defendants marauded the streets of Eugene in armored vehicles and trucks, firing chemical and impact munitions from their vehicles and on foot at people who posed no physical threat to person or property, including some of the Plaintiffs, as discussed further herein. The Doe Defendants also fired projectiles at and into homes without any legal justification, causing significant damage to residential properties and their residents, including the properties of the Student Cooperative Association and the SCA's residents, as described herein.

37.    Defendant Does attacked people, including Plaintiffs, who were not in violation of the curfew, did not pose any threat to the Doe officers or to any person or property, and were lawfully exercising their First Amendment rights. These people sustained physical and psychological injuries, as discussed below.  The violent actions of the police also put the people of Eugene in fear, and gravely chilled them in their lawful constitutional rights to assemble, petition their grievances, and protest.

38.    Prior to the curfew, the Defendants declared some gatherings as "unlawful" assemblies, ignoring the constitutional requirements to make or enforce such declarations.

39.    Regardless of the legal status of the curfews (as will be determined by this Court), the Doe Defendants also attacked and arrested people at places and during times where either 1) no curfew was in effect, 2) it was not reasonable to expect people to be aware of the curfew, or 3)

Page 9 -- COMPLAINT

people were not given an opportunity to obey the curfew by leaving and/or going home if they had one; and where the Doe Defendants lacked any reasonable or legal basis to use projectiles and crowd control measures, and lacked probable cause for arrest.

40.     Broadly stated, there were three locations/incidents in which Defendants violated the rights of Plaintiffs as set forth in detail below:

**BROADWAY AND OLIVE STREET/10TH AVENUE and WILLAMETTE STREET**

**(Plaintiff Kelsie Leith-Bowden)**

41.     On May 31, 2020, at or around 8:20 p.m., some of the Doe Defendants fired chemical and impact munitions at unarmed, nonviolent protestors near the intersection of Olive Street and West 10th Avenue, causing significant injuries to protestors and passersby. At around 8:20 p.m., Defendant Does exited their vehicles and deployed tear gas cannisters towards the people exercising protected rights. Several protestors stood with their hands up, chanting "hands up, don't shoot." Despite their pleas, Defendant Does fired a multitude of chemical and impact munitions at the protestors. As protestors dispersed, Defendant Does chased the protestors, firing several rounds of chemical and impact munitions at the fleeing protestors. The protestors were not in violation of either of the two curfews that were set to take effect later that evening.

42.     Plaintiff Kelsie Leith-Bowden was one of the protestors present at or near 10th and Olive when police used chemical and impact munitions against the her and other people. Ms. Leith-Bowden was on a public sidewalk with her hands up, chanting "hands up, don't shoot." She also carried a sign that read: "HANDS UP DON'T SHOOT" and "We live in a world where trained cops can panic and act impulsively but untrained civilians must remain calm with a gun in their face."

43.     Defendant Does, after firing one volley of chemical or impact munitions, announced: "Stay out of the roadway or gas will be used." Ms. Leith-Bowden continued to stay on the

Page 10 -- COMPLAINT

sidewalk with both of her hands up, chanting "hands up, don't shoot" when Defendant Does shot

directly at her several times with chemical and impact munitions. The projectiles hit her

midsection, and caused Ms. Bowden severe pain and injuries as depicted in these photos:




44.    Ms. Leith Bowden, while in extreme pain, tried to leave the scene. She turned away from

Defendant Does and fled. As she fled with the help of a friend, Defendant Does continued to fire

chemical and impact munitions at Leith-Bowden, hitting her at least once in the back of her leg:



45.    Ms. Leith-Bowden was never placed under arrest, and officers lacked probable cause to arrest her for any crime prior to, during, or after the time she was she was shot by Defendant Does.

46.    As a result of Defendant Does' actions, Ms. Leith-Bowden suffered severe physical and emotional injuries. She was unable to walk or carry out basic tasks without assistance for at least a week after being attacked by Defendant Does. As a result of the injuries caused by Defendants, Ms. Leith-Bowden was unable to work normal hours and was terminated from one of her jobs, while her hours at another job were reduced from 32 hours per week to 10 hours per week. Ms. Leith-Bowden has sought and received medical and mental health treatment for the injuries caused by Defendants.

### 353 EAST BROADWAY to 14th AND PATTERSON STREET

### (Plaintiffs Boudjerada, Cochran-Salinas, Hendry, Grady, and Ranesbottom)

47.    On May 31, 2020, at or around 10:57 p.m., at or near the East side of the parking lot of 353 E. Broadway (Whole Foods) in Eugene, Oregon, Defendants confronted several people, including Plaintiffs Boudjerada, Cocharan-Salinas, Hendry, Ranesbottom, and another individual. At this time, demonstrators (including Plaintiffs) were outside of the limited curfew zone imposed by Defendants.

Page 12 -- COMPLAINT

48.    At or just before 10:57 p.m., protestors were told by Defendants that the parking lot was private property and that they must move or face arrest.

49.    Protestors, including Plaintiffs, complied with Defendants' orders and moved to the public sidewalk.

50.    Immediately thereafter, at 10:57 p.m, Doe Defendants informed protestors, including Plaintiffs, via loudspeaker announcement, of the City-wide administrative curfew that was set to take effect three minutes later, at 11:00 p.m. This was the first notice of the unconstitutional curfew given to people in the area.

51.    This announcement failed to give Plaintiffs and others adequate time or directions on how to comply with the unconstitutional curfew in that moment, though some, including the Plaintiffs, attempted to comply and began walking to their home (where, as discussed below, they were attacked by Defendant Does).

52.    With less than three minutes warning, Defendant Does announced that if anyone was outside after 11:00 p.m., they would be subject to arrest or chemical and impact munitions.

53.    Defendants' threat to deploy -- and ultimate deployment of-- chemical and impact munitions against people, including Plaintiffs, on May 31, constituted cruel and unusual punishment. Defendants' extrajudicial punishment of people was far more extreme than any lawful sentence or punishment that could have been imposed for violating the curfew order (if the curfew order was constitutional).

54.    Protestors, including Plaintiffs Boudjerada, Cochran-Salinas, Ranesbottom, Hendry and another person immediately left the area for fear of arrest or violent attack by Defendants.

55.    Protestors, including Plaintiffs, attempted to leave the area by walking down East Broadway toward Patterson Street.

Page 13 -- COMPLAINT

56.     Defendant Does followed the protestors, including Plaintiffs, in an armored vehicle resembling a military tank (Lenco Bearcat).

57.     Shortly after 11:00 p.m. Defendant Does started shooting protestors with chemical and impact munitions. Multiple people were shot with their hands up, yelling "I'm going home, please don't shoot." Many people who were leaving the area were shot in the back.

58.     Plaintiffs Boudjerada, Hendry, and another person were walking on the sidewalk at or around 11:20 p.m. on Patterson St. when they were violently tackled and arrested by Defendant Does, including Defendant Rankin, for allegedly violating the curfew. As the curfew itself was unconstitutional, Defendants' seizure of Boudjerada and Hendry was likewise unconstitutional and violated Plaintiffs' clearly established rights under the First, Fourth, and Fourteenth Amendments to the U.S. Constitution.

59.     Boudjerada and Hendry were transported and held in the Lane County jail for approximately fifteen hours during the COVID-19 pandemic.  All criminal charges filed were dismissed soon thereafter.

60.     Plaintiff Erin Grady was also present near Patterson Street around the time of the arrest of Boudjerada and Hendry.

61.     Grady is a crisis worker with the White Bird Clinic in Eugene, Oregon. At all times relevant to this Complaint, Grady was volunteering as part of a "jail support" team that worked to ensure that all people arrested during the course of protesting were tracked, their emergency contacts notified, had transport from the jail when they were released, and were able to meet the other needs that arise for arrestees while they are detained.

62.     On May 31, 2020, at about 11:00 p.m., Ms. Grady and other jail support volunteers were present near 12th Avenue and Patterson Street in Eugene. The volunteers received a message that a group of protestors were being detained and possibly arrested near their location.

Page 14 -- COMPLAINT

63.    Grady was aware of the limited curfew that went into effect at 9:00 p.m. The area that Ms. Grady was present in was not subject to the limited curfew.

64.    Ms. Grady was never notified of any official order regarding a city-wide curfew.

65.    Grady and the other volunteers walked down a public sidewalk on Patterson Street toward the group being detained, hoping to get their names and contact information. Grady and her group stood about eight to ten feet away from the detained protestors. Grady explained to Defendant Doe officers, including Defendant Stotts, who she was and why she was present on the sidewalk.

66.    Defendant Doe(s), including Defendant Stotts responded by ordering Grady to leave the sidewalk. Grady explained that she was on a public sidewalk, outside of the curfew zone, and that she and the other volunteers had a right to be on the sidewalk. Doe Defendant(s), including Defendant Stotts, then told Grady that a city-wide curfew was in effect and that she and the other volunteers needed to leave immediately.

67.    Grady and the volunteers complied with the order and began walking back to their vehicle. As they were walking back, one of the volunteers again tried to ask the people being arrested for their names. Due to the distance between her and the group being arrested, the volunteer had to raise her voice to ask for the names.

68.    Immediately after she asked for the names, Doe Defendants, including Defendant Stotts, charged at Grady and the other volunteer and arrested them for violating the city-wide curfew.

69.    Defendant Stotts arrested Grady for violating the curfew order.

70.    Grady was held in the Lane County jail for approximately fifteen hours during the COVID-19 pandemic. Ms. Grady was unable to make any phone calls until around 9:00 a.m.. All criminal charges filed were dismissed soon thereafter.

Page 15 -- COMPLAINT

71.    As the curfew order itself was unconstitutional, Grady's seizure by Defendants was, likewise, unconstitutional. Even if the curfew order was constitutional, Grady was complying with Defendant Does' orders and her arrest constituted an unlawful seizure. Upon information and belief, Defendant Stotts arrested Ms. Grady because he perceived her to be a part of the protestors or as punishment for the actions of another volunteer that was exercising their First Amendment rights. In either case, Defendants, including Defendant Stotts, violated Ms. Grady's First, Fourth, and Fourteenth Amendment rights when they arrested her for violating the administrative curfew.

72.    As a result of their arrests, Plaintiffs lost wages in an amount to be determined.

### ALDER STREET BETWEEN 16th AND 17th/ CAMPBELL CLUB and LORAX PROPERTIES

**(Plaintiffs Cochran-Salinas and Ranesbottom)**

73.    Plaintiffs Cocharan-Salinas and Ranesbottom were part of the group that vacated the Whole Foods parking lot when ordered to do so by Defendant Does. Both are residents of the Campbell Club. At some point, they were separated, after being subjected to gas from canisters and pepperballs.

74.    After the city-wide curfew announcement, Cochran-Salinas and Ranesbottom separately walked toward their Campbell Club home at 1670 Alder Street. Ranesbottom arrived before Cochran-Salinas and went up to his room. When Cochran-Salinas arrived home, he sat on the front porch and smoked a cigarette. At this time, there were no police present in the immediate vicinity of the Campbell Club.

75.    As Cochran-Salinas was sitting on the porch at about 11:20 p.m., Defendant Does arrived in front of the residence and started shooting various chemical munitions, rubber bullets, and foam bullets at the residence. Simultaneously, another person was running by the house, yelling

Page 16 -- COMPLAINT

"please don't shoot, I'm going home." Another person, a friend of Campbell Club residents, was
running towards the Campbell Club porch.

76.      Defendant Does nevertheless continued shooting, hitting both people twice in the back
and hitting the residence several times.

77.      Plaintiff Kirtis Ranesbottom is also a resident of the Campbell Club and was in their[4]
room when they heard chemical/impact munitions being fired at their residence. They exited
their room and came to the front door of the residence. Cochran-Salinas and Ranesbottom
opened the front door to help the person who was running to the door, and Defendant Does
continued to shoot at the front door. As they were helping the other person get inside, an impact
munition struck the top hinge of the door, cracking the wood door frame and damaging the
residence.

78.      Defendants' actions damaged the Campbell Club. Besides breaking the door hinge, the
chemical munitions fired at the windows of the residence caused the residence to fill with
harmful chemicals, causing pain, discomfort, and injury to Cochran-Salinas and other residents
of the Campbell Club.

79.      At or around the same time, Defendant Does, without any reasonable or legal basis, also
shot several chemical and impact munitions directly at the doors and windows of the property
next to the Campbell Club, the Lorax residence. The munitions caused damage to the residence
and injury to the residents. A resident of the Lorax opened the front door after Defendant Does
had shot several rounds of chemical and impact munitions and observed one Doe Defendant
pointing a gun at the front door. The resident closed the door. Then, a Defendant Doe threw a

_____

[4] Ranesbottom uses they/them pronouns.

Page 17 -- COMPLAINT

chemical canister toward the house. The house filled with tear gas, causing injuries to the residents and damaging the property.

80.     Remnants of the chemical and impact munitions were left behind by Defendant Does at the Campbell Club and the Lorax.

81.     Doe Defendants' indiscriminate and malicious use of chemical and impact munitions at the student residences was without provocation or legal justification and violated Plaintiffs' rights under the First, Fourth, and Fourteenth Amendments to the U.S. Constitution.

## VI.     CAUSES OF ACTION

### FIRST CLAIM:
### MUNICIPAL AND SUPERVISORY LIABILITY (*Monell* - 42 U.S.C. § 1983)
### (First, Fourth, and Fourteenth Amendments to the U.S. Constitution)
### <u>By all Plaintiffs against the City of Eugene</u>

**Count 1: Municipal Liability – Curfews Violating Plaintiffs' First and Fourteenth Amendment Rights**

82.     Plaintiffs reallege each and every paragraph in this Complaint as if fully set forth here.

83.     The City of Eugene has an official practice, policy, or custom of using curfews to prohibit and prevent mass protests and other activity protected by the First Amendment.

84.     There are two curfews challenged by Plaintiffs: the downtown curfew imposed on May 31 at 9:00 p.m. and the city-wide curfew that was imposed at 11:00 p.m..

85.     Defendant Medary implemented each curfew.

86.     The curfew orders were not narrowly tailored to achieve a compelling interest. Nearly all activity -- protesting, assembling, traveling, walking, cycling, or simply being outside – was prohibited during each curfew.

87.     Each curfew prohibited and suppressed far more speech, assembly, and other protected First Amendment activity than necessary.

88.     Each curfew was, in effect, a prior restraint on free speech activity and assembly.

89.     Each curfew lacked adequate notice as to both timing and method of notice to allow residents, including Plaintiffs, time to comply.

90.     EPD Chief Chris Skinner said that the May 31 curfew "was not done in a timely fashion to allow for some of the compliance that [the EPD/City] needed."[5]

91.     Any alleged property destruction that occurred May 29, 2020, did not justify the near-total prohibition on public activity. "Banning or postponing legitimate expressive activity because other First Amendment activity regarding the same subject has resulted in violence deprives citizens of their right to demonstrate in a timely and effective fashion." *Collins v. Jordan*, 110 F.3d 1363, 1371-72 (9th Cir. 1996).

92.     Defendants could have used other significantly less-restrictive means of addressing any forms of property destruction that occurred during the protests. Defendants may enforce "other laws at [their] disposal that would allow [them] to achieve [their] stated interests," including the criminal laws prohibiting damage to property and, if necessary as a last resort in narrowly defined circumstances, unlawful assembly. *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 949 (9th Cir. 2011).

93.     The situation here was similar to that addressed by the Supreme Court in *Thompson v. W. States Med. Ctr*, 535 U.S. 357, 373, 122 S. Ct. 1497, 1507 (2002), in which the Court stated: "If the First Amendment means anything, it means that regulating speech must be a last -- not first -- resort. Yet here it seems to have been the first strategy the Government thought to try."

94.     The city-wide curfew order that prohibited all speech and assembly activity in a city of over 170,000 is particularly overbroad, and the Constitution does not permit such a total

---

[5] https://www.oregonlive.com/crime/2020/06/eugene-police-chief-pledges-reaffirmation-to-police-reform-addresses-use-of-surveillance-drone-riot-control-measures-after-week-of-protests-began-with-rioting-looting.html

deprivation of liberty under the circumstances.

95.     Because the curfew orders prohibited virtually all presence and movement in their applicable areas, they failed to allow for ample alternative channels of communication.

96.     People who were supposedly exempt from the curfews were attacked and injured by police.

97.     People, including Plaintiffs, who complied with law enforcement orders regarding the curfew, were nevertheless attacked or arrested by Defendants or as part of Defendants' policy, practice, or custom.

98.     People, including Plaintiffs Boudjerada, Grady, Hendry, Ranesbottom, and Cochran-Salinas were arrested or attacked for alleged violation of the curfew, even when they were in an area where no curfew was in effect; or were not aware there was a city-wide curfew that had just been implemented; or were not given a reasonable opportunity to comply; or were complying with the unconstitutional curfew by either traveling home or being at home.

99.     Many police officers appeared to be gleefully abusing the citizenry they swore to protect and serve as they drove down streets as if they were in a combat zone engaged in warfare.  Their misconduct was particularly disturbing in light of the protests over State violence, police brutality, and the illegal murders of black Americans.

100.    Defendants failed to provide appropriate methods, instruction, or guidance to officers responsible for enforcing the curfew, including how to determine whether a person was exempt from the curfew. This failure resulted in violations of Plaintiffs' and others' rights under the First, Fourth, and Fourteenth Amendments to the U.S. Constitution.

101.    Defendants failed to supervise and train their employees and agents with respect to First Amendment protected activity when such employees and agents are responsible for enforcing the curfews.

102.    The policy, practice, and custom of Defendants City of Eugene and Medary, as well as

their failure to train and supervise employees and agents, regarding the creation, implementation,

and enforcement of the curfews amounts to deliberate indifference to the rights of Plaintiffs.

103.    As a direct and proximate result of the actions and omissions described in this complaint,

plaintiffs incurred economic and noneconomic damages as alleged herein.

104.    The Plaintiffs intend to continue exercising their First Amendment right to protest on the

streets of Eugene. Given that the BLM protests have continued virtually unabated, it is

reasonably foreseeable that the Plaintiffs will once again be subjected to unconstitutional curfews

if the Court does not enjoin that overbroad, illegal practice.

105.    Plaintiffs were required to hire attorneys to represent them in this matter and are thus

entitled to an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

**Count 2: Municipal Liability – Unlawful Practice or Policy Allowing Indiscriminate Use of Force as a Tactic to Disperse Crowds in Violation of First, Fourth, and Fourteenth Amendments**

106.    Plaintiffs reallege each and every paragraph in this Complaint as if fully set forth here.

107.    The City of Eugene has an official policy allowing the use chemical and impact

munitions against crowds or protestors whenever it determines that the crowd or protestors create

a "civil disturbance." This policy permits law enforcement to use indiscriminate force against a

crowd of people in violation of the Fourth Amendment.

108.    Defendants have a policy, practice, or custom of declaring activity protected under the

First Amendment a "civil disturbance." Even if the policy regarding civil disturbances is

constitutional, the actual practice and custom of the City and the Eugene Police Department is to

allow the indiscriminate use of chemical and impact munitions against a crowd even when the

crowd or a majority of the crowd have not committed a crime and do not pose a physical threat

to law enforcement or others.

Page 21 -- COMPLAINT

109.    On May 31, 2020, EPD used chemical and impact munitions on protestors as well as passersby, and journalists, including Plaintiffs Bowden, Cochran-Salinas, and Ranesbottom. Defendant Doe(s) also shot chemical and impact munitions at residences, including the SCA's Campbell Club and The Lorax. Plaintiffs and others did not engage in any behavior that could possibly justify the use of chemical and impact munitions.

110.    The City tacitly and explicitly authorized the indiscriminate use of chemical and impact munitions against protestors and residents of Eugene, including Plaintiffs, on May 31, 2020.

111.    The authorization to use chemical and impact munitions on May 31 was part of a decision-making process "communicated up through chain of command" from officers in the field.[6]

112.    The City, acting pursuant to this policy, practice, or custom, unlawfully used chemical and impact munitions against Plaintiffs and others as alleged throughout this Complaint.

113.    Defendant City of Eugene has failed to properly train its officers, agents, and employees in how to address protests, protestors, mass protests, and has failed to properly train officer's to use an appropriate level of force; and/or has allowed numerous other similar incidents; and/or has a policy or practice of allowing that level of force; and/or has encouraged or acquiesced in this unlawful behavior, and/or tacitly encouraged or acquiesced in it by failing to train, supervise, or discipline their officers, thus evincing deliberate indifference to Plaintiffs' constitutional rights, sufficient to support a verdict that those policies, customs, or practices caused the use of excessive force against Plaintiffs.

---

[6] https://www.oregonlive.com/crime/2020/06/eugene-police-chief-pledges-reaffirmation-to-police-reform-addresses-use-of-surveillance-drone-riot-control-measures-after-week-of-protests-began-with-rioting-looting.html

114.    Defendant City is directly liable to Plaintiffs for its unconstitutional policies, customs, or practices; and/or for failing to properly train its officers.

115.    As a direct and proximate result of the actions and omissions described in this complaint, Plaintiffs incurred economic and noneconomic damages, including lost wages, as alleged herein.

116.    Plaintiffs were required to hire attorneys to represent them in this matter and are thus entitled to an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

**SECOND CLAIM:**

**(First & Fourteenth Amendment – Curfews, Violation of Free Speech and Assembly, 42 U.S.C. § 1983, by all Plaintiffs against Defendants City of Eugene, Medary, and Defendant Does)**

117.    Plaintiffs restate and reallege each and every paragraph of this Complaint as if fully set forth here.

118.    The limited, 9:00 p.m. curfew prohibited all protest and assembly activity within a significant portion of downtown Eugene.

119.    The 11:00 p.m. city-wide curfew order prohibited all protest and assembly activity as well as other protected activity and, as such, is overbroad and unconstitutional.

120.    Each curfew was an unreasonable time, place, and manner restriction on Plaintiffs' First Amendment rights.

121.    Each curfew punished more speech, assembly, and other protected activity than was necessary.

122.    Each curfew chilled or attempted to chill the First Amendment activity of Plaintiffs and others.

123.    Each curfew lacked constitutionally sufficient notice to those subject to or impacted by the curfews, including Plaintiffs.

Page 23 -- COMPLAINT

124.    Enforcement of each of the curfews enacted and implemented by Defendants violated the
First Amendment rights of protestors, journalists, and Eugene residents, including Plaintiffs.

125.    For the Plaintiffs who were arrested for allegedly violating the curfew (Boudjerada,
Grady, and Hendry), such arrests violated those Plaintiffs' Due Process rights under the
Fourteenth Amendment.  Said plaintiffs were placed at additional risk of the COVID-19 virus by
being jailed in a facility that refuses to take adequate health precautions to protect detainees from
contracting the virus.

126.    Plaintiffs who were arrested for allegedly violating the curfew were engaged in activity
protected under the First Amendment when they were detained and arrested by Defendant Does.
Their activity included protesting and walking on a sidewalk.

127.    Defendants violated rights held by Plaintiffs which were clearly established, and no
reasonable person similarly situated to Defendants could have believed that such conduct was
lawful or within the bounds of reasonable discretion. Defendants thus lack qualified or statutory
immunity from suit or liability.

128.    As a direct and proximate result of Defendants' policy and conduct, Plaintiffs were
required to seek medical treatment for their injuries in an amount to be determined at trial, and
will, in the future, be compelled to incur additional obligations for said treatments as a result of
their ongoing pain and suffering. Plaintiffs are entitled to economic and noneconomic
compensatory damages in a sum to be determined at trial.

129.    The actions of Defendants were recklessly indifferent to Plaintiffs' civil rights, and
callously disregarded their safety and health, particularly in light of known risks to the health and
safety of Plaintiffs subject to tear gas and other projectiles and, moreover, the well-known
substantial risks to the health and safety of people exposed to expired tear gas. As such, punitive
damages should be awarded against the individual Defendants in a sum to be determined at trial.

Page 24 -- COMPLAINT

130.     Plaintiffs were required to hire attorneys to represent them in this matter and are thus

entitled to an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

### THIRD CLAIM:

**(First, Fourth & Fourteenth Amendments to the U.S. Constitution – Retaliation, 42 U.S.C. § 1983 against Defendants City of Eugene, Medary, Doe Defendants)**

131.     Plaintiffs restate and reallege each and every paragraph of this Complaint as if fully set

forth here.

132.     Plaintiffs were engaged in constitutionally protected activity when the Doe Defendants,

acting or purporting to act in the performance of their official duties as law enforcement officers,

pursuant to the orders and policies of the City Defendant and Defendant Medary, caused

Plaintiffs to suffer injuries that would chill a person of ordinary firmness from continuing to

engage in that activity. Upon information and belief, those actions and omissions, including the

implementation of the curfews and the violence used to enforce the curfews, were substantially

motivated by a desire to retaliate against Plaintiffs' exercise of constitutionally-protected conduct

as well as a desire to retaliate against Plaintiffs' for the actions of others.

133.     Defendants' retaliation was motivated by evil motive or intent, involved reckless or

callous indifference to Plaintiffs' First, Fourth, and Fourteenth Amendment rights secured by the

United States Constitution, and/or was done so wantonly or oppressively.

134.     As a direct and proximate result of Defendants' unconstitutional actions, including the

implementation and enforcement of the unconstitutional curfews, Plaintiffs suffered injuries

entitling them to recover compensatory and punitive damages.

### FOURTH CLAIM:

**(Fourth and Fourteenth Amendments – Excessive Force and Deliberate Indifference to Health and Safety, 42 U.S.C. § 1983, by Plaintiffs Bowden, Cochran-Salinas, and Ranesbottom against Defendant Doe Law Enforcement)**

Page 25 -- COMPLAINT

135.    Plaintiffs restate and reallege each and every paragraph of this Complaint as if fully set forth here.

136.    By their actions as described herein, Doe Defendant members of law enforcement, under color of statute, ordinance, regulation, custom, or order, subjected Plaintiffs Bowden, Cochran-Salinas, and Ranesbottom, to the deprivation of rights, privileges, or immunities secured by the Constitution, namely, Plaintiffs' rights to freedom from unreasonable seizure by the use of excessive force by using chemical and impact munitions against Plaintiffs or their property.

137.    Defendant Does violated rights held by Plaintiffs which were clearly established, and no reasonable official similarly situated as Doe Defendants could have believed that their conduct was lawful or within the bounds of reasonable discretion. Defendant Doe members of law enforcement thus lack qualified or statutory immunity from suit or liability.

138.    As a direct and proximate cause of the actions described herein, Plaintiffs sustained economic and noneconomic damages, including physical pain and suffering; loss of liberty; damage and/or loss of property, all to an amount to be ascertained according to proof at trial.

139.    The actions of Doe Defendants, as described herein, were malicious, deliberate, intentional, and embarked upon with the knowledge of, or in conscious disregard of, the harm that would be inflicted against Plaintiffs. As a result of this intentional conduct, Plaintiffs are entitled to punitive damages against Defendant Does, in an amount sufficient to punish them and to deter others from like conduct.

140.    Plaintiffs were required to hire attorneys to represent them in this matter and are thus entitled to an award of reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988.

**FIFTH CLAIM:**

**(Fourth Amendment – Unlawful Arrest, 42 U.S.C. § 1983 by Plaintiffs Boudjerada, Grady, and Hendry, against Stotts, Rankin, and Doe Defendants**

Page 26 -- COMPLAINT

141.    Plaintiffs restate and reallege each and every paragraph of this Complaint as if fully set forth here.

142.    Defendants' conduct described in this Complaint violated the clearly established rights of Plaintiffs Boudjerada, Grady, and Hendry to be free from unreasonable seizures, including a right to be free from arrest or detention without reasonable suspicion or probable cause under the Fourth Amendment to the U.S. Constitution.

143.    The unconstitutional curfew orders described herein formed the basis for the arrest of those Plaintiffs.

144.    Because Defendants failed to give adequate notice or otherwise allow people to comply with the curfew orders, Defendants knew or should have known that arresting those Plaintiffs would deprive them of their rights under the Fourth Amendment to the U.S. Constitution.

145.    As a direct and proximate cause of the actions described herein, those Plaintiffs sustained economic and noneconomic damages, including loss of liberty, all to their damage in an amount to be ascertained according to proof at trial.

146.    The actions of the individual defendants were malicious, deliberate, intentional, and embarked upon with the knowledge of, or in conscious disregard of, the harm that would be inflicted upon those Plaintiffs, such that an award of punitive damages is appropriate.

147.    Those Plaintiffs were required to hire attorneys to represent them in this matter and are thus entitled to an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## RELIEF REQUESTED

Plaintiffs respectfully request that this Court:

    a.  Exercise jurisdiction over Plaintiffs' claims and grant each of them a jury trial;

    b.  Award Plaintiffs economic and non-economic damages, including lost wages, in an amount to be ascertained according to proof, and interest on said sums from the date of

Page 27 -- COMPLAINT

judgment;

c.  Award Plaintiffs punitive damages against Stotts, Rankin, Doe Defendant members of
    law enforcement, and Defendant Medary in an amount sufficient to punish them and
    deter others from like conduct;

d.  Award Plaintiffs' reasonable attorney's fees and costs as provided by 42 U.S.C. § 1988;
    and

e.  Grant Plaintiffs such other and further relief as this Court deems just and appropriate,
    (including, if similar government behavior ensues, declaratory and injunctive relief).

DATED: July 31, 2020.

                                     /s/  Lauren Regan
                                    Lauren Regan, OSB # 970878
                                    Email: lregan@cldc.org

                                     /s/  Marianne Dugan
                                    Marianne Dugan, OSB # 932563
                                    Email:  mdugan@cldc.org

                                     /s/ Cooper Brinson
                                    Cooper Brinson, OSB # 153166
                                    Email: cbrinson@cldc.org

                                    CIVIL LIBERTIES DEFENSE CENTER
                                    1430 Willamette Street, #359
                                    Eugene, OR  97402
                                    Telephone:  541.687.9180
                                    Fax: 541.804.7391

Page 28 -- COMPLAINT