UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| HASHEEM BOUDJERADA; DAMON COCHRAN-SALINAS; ERIN GRADY; TYLER HENDRY; and KIRTIS RANESBOTTOM, | Case No. 6:20-cv-01265-MK<br>**FINDINGS AND**<br>**RECOMMENDATION** |

               Plaintiffs,

    v.

CITY OF EUGENE; SARAH MEDARY;
WILLIAM SOLESBEE; SAMUEL STOTTS;
BO RANKIN; TRAVIS PALKI; MICHAEL
CASEY; RYAN UNDERWOOD; CRAIG
WRIGHT; CHARLES SALSBURY; and
CHIEF CHRIS SKINNER,

               Defendants.
_____

**KASUBHAI,** United States Magistrate Judge:

      Following events that occurred on May 31, 2020, in Eugene, Oregon during ongoing

protests related to the killings of Breonna Taylor and George Floyd, Plaintiffs filed this civil

Page 1 — FINDINGS AND RECOMMENDATION

rights lawsuit. *See* Second Amended Complaint ("SAC"), ECF No. 78. As relevant to this motion, among the Plaintiffs are three individuals—Hasheem Boudjerada, Erin Grady, and Tyler Hendry (collectively, "Plaintiffs")—who were arrested by Defendants Stotts, Rankin, and Underwood for violating a city-wide curfew imposed by Defendant City of Eugene. *Id*. at ¶¶ 13, 15, 16, 21-25.[1] Plaintiffs allege violations of their First, Fourth, and Fourteenth Amendment rights. *Id*. at ¶ 1. Before the Court is Plaintiffs' Motion for Partial Summary Judgment on the issues of the constitutionality of curfew and whether probable cause existed for Plaintiffs' arrests. For the reasons below, Plaintiffs' Motion for Partial Summary Judgment (ECF No. 98) should be GRANTED in part and DENIED in part.

## BACKGROUND

### I.    May 29-30, 2020

On May 29, 2020, in response to the killings of George Floyd and Breonna Taylor, individuals gathered in downtown Eugene, Oregon to protest. Declaration of Jason Berreth ("Barreth Decl.) Ex. 1 at 3, ECF No. 118. Following a demonstration of around forty people at the "Free Speech Plaza" in the 700 block of Oak Street, the crowd began to move through downtown Eugene at around 8:51 p.m. *Id*. The crowd moved through downtown Eugene with some individuals applying graffiti, lighting firecrackers, and blocking traffic. *Id*. By 9:13 p.m., the size of the group had grown to around 75-100 protestors. Some protestors began throwing glass bottles towards officers, attempting to climb onto the I-205 freeway, and blocking traffic. *Id*. at 4. Westbound traffic on the freeway was closed at 9:34 p.m., but was reopened by 9:54

---

[1] While there are two other Plaintiffs in the case, the Court understands that the matters at issue in Plaintiffs' motion for partial summary judgment concern these three Plaintiffs.

p.m. *Id*. Other protestors surrounded a patrol car, smashed its windows, and punctured its tires.

*Id*. The officer inside escaped unharmed with help from another officer. *Id*.

At around 9:55 p.m., the group had grown to 100-200 protestors who moved south

through downtown Eugene, continuing to light fireworks, apply graffiti, and throw newspaper

boxes in the roadway. *Id*. Police received information that a person was assaulted, and "the

victim appeared to have a seizure and was disoriented." *Id*. at 5. Members of the group started

fires in the roadway and burned the American flag. *Id*. At around 10:41 p.m., someone in the

crowd yelled that somebody had a rifle, but this (and a second similar report) was never verified.

*Id*. Near 11:00 p.m., protestors lit a fire blocking the I-205 freeway eastbound on-ramp. *Id*.

Protestors threw "large traffic barrels and cones" towards police. *Id*.

By 11:31 p.m., the group of protestors grew to around 400-500, some of whom were

"attacking" people and vehicles in the downtown area of W 7th Avenue and Washington Street.

*Id*. at 6. A fire had been lit in the roadway. *Id*. Several businesses at that intersection were

vandalized and looted. *Id*. Police received a report of an armed dispute in the area, though it is

unclear whether that was verified. *Id*. Shortly after midnight, officers deployed gas causing the

group to temporarily disperse and return in smaller numbers to W 7th Avenue and Washington

Street. *Id*.

In the early hours of May 30, groups of protestors continued to light fires in roadways,

loot and damage stores, and "looters" lit a fire inside a Starbucks. *Id*. at 7. There were several

more reports of armed individuals, though it is unclear whether these reports were verified. *Id*

Based on the police report, these incidents appear to have centered within the same several block

area in downtown Eugene. *Id*. Just after 2:00 a.m., police pushed the group away from

downtown, deploying additional gas and eventually dispersing the protestors by just after 3:00

a.m. *Id.* Throughout the evening, several officers suffered minor injuries and two police vehicles were damaged. *Id.* at 2-3.

The next morning, Defendants Eugene City Manager Sarah Medary and Chief Skinner surveyed the damage at W 7th Avenue and Washington Street. Declaration of Ben Miller ("Miller Decl.") Ex. 2 at 4-5, ECF No. 115-5. After consulting Chief Skinner and the city attorney, City Manager Medary declared a state of emergency for the City of Eugene. *Id.*; Declaration of Marianne Dugan ("Dugan Decl.") Ex. 6, ECF No. 104. This declaration was ordered to continue until June 13, 2020 and authorized imposing curfews. *Id.* Additionally, in response to the previous night's events, City Manager Medary ordered a temporary night-time curfew for downtown Eugene beginning May 30, 2020, at 9:00 p.m. until May 31, 2020, at 6:00 a.m. Declaration of Sarah Medary Ex. 1, ECF No. 125-1. With certain exceptions, the curfew disallowed public travel on any public street from High Street to Monroe Street and from 13th Avenue to 4th Avenue ("downtown"). *Id.* The events that took place that evening were "slightly more controlled" than the events of May 29, although at midnight, the curfew was expanded city-wide. Def.'s Resp. Br. 5, ECF No. 114; Declaration of Ryan Nelson ("Nelson Decl.") Ex. 1, ECF No. 120.

## II.    May 31, 2020

On Sunday, May 31, a planned rally and march of around 7,000 people took place. Def.'s Resp. Br. 6, ECF No. 114. The group gathered at the federal courthouse then marched to Alton Baker Park. Nelson Decl. Ex. 2 at 2, ECF No. 121. During the march, police dispatch received several calls related to the protest. *Id.* Officers responded to one report of people jumping on a vehicle. *Id.* Police dispatch also received information about a person with a firearm, a person with a metal baton, and a person with a whip in or around the crowd. *Id.*

Following the march to Alton Baker Park, after the rally had ended at around 3:45 p.m., approximately 400-500 people "broke off and headed toward the downtown core area." *Id*. at 3. Members of the group carried "heavy backpacks," bottles, and were communicating via radios. *Id*. A vehicle drove past some officers in the area and attempted to use pepper spray on their police vehicle. *Id.* A crowd formed around the officers, and the officers retreated from the scene. *Id.*

At around 5:00 p.m., police dispatch received a report of two gunshots heard near the area of W 11th Avenue and Charnelton Street downtown. *Id*. at 3. It does not appear that report was verified by police. Near the intersection of W 5th Avenue and Washington Street, the group—then estimated at round 1,000 people—encountered a man who pulled out an unloaded rifle on the crowd. *Id.* A few protestors fought with the man and took the rifle from him. *Id.* Eventually the crowd gave the rifle back to the man's wife and the couple drove away from the area. *Id.*

One officer called the organizer of the march that day, Brita Rogers, who at around 5:30 p.m. confirmed that the march was over and reported that she encouraged participants to go home and not cause destruction as there had been on the previous nights. *Id.* at 14. She expressed concern to the officer about the remaining group's intent and told the officer that she had heard from unknown sources that they overheard discussions that members of the crowd intended to participate in riot behavior. *Id.* The crowd continued to march through downtown, growing to around 1,400 people. *Id*. at 4. The group gathered at the federal courthouse just after 6:00 p.m. *Id*. at 4.

In response to these events, City Manager Medary instituted a temporary nighttime curfew from May 31 at 9:00 p.m. until June 1 at 6:00 a.m. for downtown Eugene ("the

Downtown Curfew"). Dugan Decl. Ex. 2, ECF No. 104. The curfew restricted travel on any public street or place in downtown Eugene, and included exceptions for credentialed media, people seeking emergency care, people fleeing dangerous circumstances, sheltering in place, traveling to and from employment, or making commercial deliveries. *Id.*

At around 7:00 p.m., the protestors that had gathered at the federal courthouse began "peacefully dispersing," leaving about 20 people. Nelson Decl. Ex. 2 at 4, ECF No. 121. The group then grew again to around 45 people, some of whom were "pounding on light poles with metal rods and hammers." *Id*. at 4. Members of the group obstructed roadways in the downtown area and one protestor threw an unknown substance at a police vehicle and struck it with a hammer, causing damage. *Id*. at 4-5. The group was reportedly loud and aggressive, surrounding police vehicles. Police officers deployed tear gas in response. *Id.*

At around 8:30 p.m., there were still several small groups of protestors in the campus and downtown area. *Id*. at 5. One man fired paintball rounds at officers, resulting in damage to the officers' patrol car. *Id.* At 9:15 p.m. people were leaving downtown Eugene, and detectives and officers monitored the several small groups remaining in the area. *Id.* Officers noted one person with a rod up their sleeve and some protestors exchanging unknown items from backpacks. *Id.* at 6.

By around 10:12 p.m. there were two groups of protestors remaining, including one crowd of around 30 people gathered in the parking lot of Whole Foods and another group of approximately 35 people near 13th Avenue and High Street. *Id.* An officer reported to dispatch that a man with a rifle and a pistol was walking toward Whole Foods. *Id.* By around 10:29 p.m., the group near High Street went into the downtown Eugene area and officers ordered the group

to disperse based on violation of the Downtown Curfew. *Id.* Following the order, officers deployed tear gas and detained six people while the remaining group left downtown Eugene. *Id.*

By around 10:37 p.m., the two groups combined in the Whole Foods parking lot, forming a group of about 60 people. *Id.* A citizen called in to police dispatch to report that they had heard that the group might attempt to go onto the Ferry Street Bridge. *Id.* Dispatch sent officers to the Ferry Street bridge to ensure that "the group did not attempt to enter the bridge or stop traffic." *Id.*

Around the same time, at around 10:30 p.m., Chief Skinner, relying on the reports of that evening and his experience as a public safety officer, recommended to City Manager Medary that she institute a city-wide curfew ("City-Wide Curfew") immediately. Miller Decl. Ex. 5, ECF No. 115; Declaration of Chief Chris Skinner at ¶¶ 4-5, ECF 124. In his recommendation for the City-Wide Curfew, Chief Skinner expressed particular concern for potential violence and the importance of the Ferry Street Bridge as a critical resource for infrastructure and medical personnel. Miller Decl. Ex. 10 at 9, ECF No. 115-10. Chief Skinner told City Manager Medary that activity was occurring outside the Downtown Curfew boundaries and protestors "were engaged in activities that indicated more violence was possible" such as "hammering on light poles." Miller Decl. Ex. 5 at 6, ECF No. 115-5.

At 10:49 p.m., City Manager Medary authorized the City-Wide Curfew relying on Chief Skinner's recommendation. Miller Decl. Ex. 5, ECF No. 115; Dugan Decl. Ex. 3, ECF No. 104. Beginning at 11:00 p.m., the City-Wide Curfew restricted travel on any public street or place within the entire city, except for credentialed members of the media, people seeking emergency care, fleeing dangerous circumstances, sheltering in place, travelling to and from employment, or making commercial deliveries. *Id.*

At about 10:57 p.m., dispatch informed officers of the newly ordered City-Wide Curfew and the officers began to make announcements to the crowd that the curfew was in effect city-wide beginning in three minutes. Miller Decl. Ex. 2, ECF No. 115; Declaration of Samuel Stotts Ex. 2, ECF No. 116. Officers announced to the group to disperse the area or be subject to arrest. *Id.* Dash cam and body cam video and audio shows that Sergeant Stotts' vehicle (also containing Defendants Palki and Casey) followed the group for about ten minutes. Stotts Decl. Exs. 2 & 3[2], ECF No. 116. Officers in the audio can be heard discussing what to do about what they perceived to be a distinct group that was not dispersing, although they noted some individuals were dispersing. *Id.* With regard to the perceived group, the officers stated that "unless all these guys live together" they were apparently not dispersing, but would continue to follow and re-evaluate how to proceed. *Id.* About two minutes later, the officers appear to conclude that the group was not exhibiting behavior consistent with dispersal and determined that "strategic arrests" were warranted to facilitate dispersal. *Id.*

At about 11:07 p.m., Sgt. Stotts stopped his patrol vehicle, let out Officers Palki and Casey, and they arrested Plaintiff Hasheem Boudjerada for violating the City-Wide Curfew. *Id.* Following the arrest of Mr. Boudjerada, Sgt. Stotts arrested Plaintiff Tyler Hendry for violating the City-Wide Curfew on the east side of the road. *Id.* At approximately 11:15 p.m., while processing the custodies of Mr. Boudjerada and Mr. Hendry, Sgt. Stotts informed Plaintiff Erin Grady that she was in violation of the City-Wide Curfew. *Id.* While she at first walked away and Sgt. Stotts disengaged with her, she later turned back around to attempt to communicate with the

---

[2] While Defendants included Stotts Ex. 3 among those submitted to the Court, Sgt. Stotts' written declaration fails to mention it. Nevertheless, as Plaintiff included the very same exhibit in Ms. Dugan's declaration, Dugan Decl. Ex. 1, ECF No. 104, there appears to be no dispute as to its authenticity.

individuals under arrest. *Id*. As a result, Sgt. Stotts arrested her for violating the City-Wide

Curfew. *Id.*; Stotts Decl. at ¶ 6, ECF No. 116.

On June 1, 2020, the District Attorney charged Plaintiffs Boudjerada, Grady, and Hendry

in the City of Eugene Municipal Court for violating the City-Wide Curfew. Miller Decl. Ex. 14.

## STANDARD OF REVIEW

Summary judgment is appropriate if the pleadings, depositions, answers to

interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute

as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. *T.W. Elec. Servs.,*

*Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is

such that a reasonable jury could return a verdict for the nonmoving party determines the

authenticity of the dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of

material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the

absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings

and identify facts which show a genuine issue for trial. *Id.* at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all

reasonable doubts as to the existence of genuine issues of material fact should be resolved

against the moving party; and (2) all inferences to be drawn from the underlying facts must be

viewed in the light most favorable to the nonmoving party. *T.W. Elec.*, 809 F.2d at 630.

**DISCUSSION**

Plaintiffs' Motion for Partial Summary Judgment asks the Court to resolve two issues: (1) whether the City-Wide Curfew was unconstitutional under the First Amendment; and (2) whether Plaintiffs' arresting officers lacked probable cause to arrest them.[3]

## III.    Constitutionality of the City-Wide Curfew

Plaintiffs first ask the Court for summary judgment on whether the City-Wide Curfew was an impermissible restriction on speech under the First Amendment.[4] The First Amendment guarantees the right of citizens to protest, including "demonstrations, protest marches, and picketing." *Collins v. Jordan*, 110 F.3d 1363, 1371 (9th Cir. 1996). "The protections afforded by the First Amendment are nowhere stronger" than in the public forum. *Berger v. City of Seattle*, 569 F.3d 1029, 1036 (9th Cir. 2009). Indeed, traditional public forums such as streets and sidewalks have "immemorially been held in trust for the use of the public...for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515, 59 S. Ct. 954, 964, 83 L. Ed. 1423 (1939). Restrictions on speech in public forums are "subject to a particularly high degree of scrutiny." *Collins*, 110 F.3d at 1371, quoting *N.A.A.C.P. W. Region v. City of Richmond*, 743 F.2d 1346, 1355 (9th Cir.1984).

---

[3] Defendants' response includes arguments related to their qualified immunity affirmative defense. However, because Plaintiffs do not seek summary judgment on any particular claim but rather these two specific issues, the question of qualified immunity is irrelevant to the instant motion and is not addressed in this opinion. The Court understands that qualified immunity is at issue in Defendants' pending motions. See ECF Nos. 132, 137, 147.

[4] Plaintiffs also argued that the City-Wide Curfew was unconstitutionally overbroad. However, in response to Defendants' own motions for summary judgment, Plaintiffs withdrew their overbreadth challenge. See ECF No. 172 at 3-4. Accordingly, the Court's analysis is confined to Plaintiff's remaining argument that the curfew was an unconstitutional time, place, and manner restriction.

While the existence of violent protestors among largely peaceable ones can give rise to the need for government to restrict protests, those restrictions must be appropriately limited to protect protestors' First Amendment rights. Imposing a ban on protests—or a curfew which has the same effect—will always be more economical and simpler than policing those protests. But First Amendment rights do not give way simply because they are expensive or difficult to maintain. For the reasons below, applying the relevant constitutional framework, the Court finds that the City-Wide Curfew was a constitutionally impermissible time, place, and manner restriction on protestors' First Amendment rights.

### A.    Appropriate Test

As a preliminary matter, the parties disagree as to the appropriate test this Court should use to assess the constitutionality of the City-Wide Curfew. Plaintiffs rely on the traditional test announced in *Ward v. Rock Against Racism*, under which "the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." 491 U.S. 781, 791, 109 S. Ct. 2746, 2753, 105 L. Ed. 2d 661 (1989) (internal quotations and citations omitted).

Defendants argue that, in light of its "temporary, emergency" nature, the proper test for evaluating the constitutionality of the City-Wide Curfew is "whether the [executive's] actions were taken in good faith and whether there is some factual basis for [the executive's] decision that the restrictions…imposed were necessary to maintain order." Def.'s Resp. Br. at 14, citing *United States v. Chalk*, 441 F.2d 1277, 1281 (4th Cir. 1971).

The Court agrees with Plaintiffs that the traditional time, place, and manner analysis applies to this case. The Ninth Circuit has never adopted the *Chalk* standard and Defendants' arguments that this Court should apply it are unpersuasive.[5]

### B.    Time, Place and Manner Analysis

The government may regulate the "time, place, and manner" of speech so long as the restriction meets three requirements: (1) it must be "justified without reference to the content of the regulated speech," (2) it must be "narrowly tailored to serve a significant governmental interest," and (3) it must "leave open ample alternative channels for communication of the information." *Ward*, 491 U.S. at 791. Plaintiffs do not dispute that the curfew order made no reference to the content of the regulated speech, leaving only the latter two prongs of the test at issue.

### 1.    Narrow Tailoring

A government's restriction on the time, place, and manner of speech must be "narrowly tailored to serve a significant government interest." *Id.* A restriction is "narrowly tailored" if it "targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485, 108 S. Ct. 2495, 2503, 101 L. Ed. 2d 420 (1988). "[T]he stated interest must be served less effectively absent the regulation, and the regulation may not burden substantially more speech than is necessary to further the regulating authority's legitimate interests." *United Bhd. of Carpenters & Joiners of Am. Loc. 586 v. N.L.R.B.*, 540 F.3d 957, 968 (9th Cir. 2008) (internal quotations and citation omitted). Applying that analysis here, the Court

---

[5] Very few other courts have applied *Chalk* in the fifty-two years since it was decided. Most recently, the U.S. District Court for the District of Columbia rejected the *Chalk* standard and noted that it was "of little utility" because it "did not involve the application of [a] curfew to individuals engaged in First Amendment expression" and was instead a freedom of travel case. *See Tinius v. Choi*, 2022 WL 899238, at *8 n. 11 (D.D.C. Mar. 28, 2022).

first looks to the City's stated interest in enacting the City-Wide Curfew, and then determines

whether the scope of the restriction is narrowly tailored to that interest.

The stated reason in the City's curfew order was "to preserve the safety of the public and

prevent the reoccurrence of the violence and destruction described in Paragraphs B and C of

Administrative Order No. 21-20-09." Dugan Decl. Ex. 4, ECF No. 104-3. The paragraphs cited

are from the City's May 30, 2020 emergency declaration, and describe acts of vandalism and

destruction which occurred in downtown Eugene on May 29 and May 30, 2020. Dugan Decl. Ex.

6. ECF No. 104-5. In an email from City Manager Medary to the mayor and city council, she

elaborated that the expansion of the curfew citywide was necessary because "individuals are

congregating outside the boundaries, to include closing the Ferry Street Bridge, which is a

critical route for first responders." Dugan Decl. Ex. 3, ECF No. 104-2. Defendant Medary also

stated that the groups of protestors "continued to escalate throughout the evening [of Sunday,

May 31] and were engaging in activities that indicated more violence was possible." Miller Decl.

Ex 5 at 6, ECF No. 115-5. As an example, she stated that people were "hammering on light

poles." *Id*. Defendant Medary testified that because of the multiple locations of groups of

protestors, it was hard to decide where to expand the curfew: "do you keep doing it, like, here, or

here, or do you just go city-wide, and that's why we made that choice [to expand city-wide]."

Dugan Decl. Ex 5 at 15, ECF No. 104-4.

To sum up, the City's reason for enacting the City-Wide Curfew was to prevent the kinds

of events that had occurred on the previous nights because the May 31 protestors were banging

on light poles, congregating outside the boundaries of the Downtown Curfew, and threatening to

block the Ferry Street Bridge. The curfew order noted that "the required response is not

achievable solely with the added resources acquired through mutual aid or cooperative assistance agreements." Dugan Decl. Ex. 3, ECF No. 104-2.[6]

The Court finds that the City-Wide Curfew was not narrowly tailored to serve the City's stated purpose. In particular, the City (1) improperly relied on past acts of violence as a justification to restrict future speech, and (2) failed to tailor a restriction that targeted and eliminated no more speech than was necessary to protect against its concerns.

First, the Ninth Circuit in *Collins* explicitly held that "the occurrence of limited violence and disorder on one day is not a justification for banning all demonstrations, peaceful and otherwise, on the immediately following day (or for an indefinite period thereafter)." 110 F.3d 1363, 1372. That case involved demonstrations in San Francisco following the acquittals of Los Angeles police officers who severely beat Rodney King. *Id.* at 1367. Although the demonstrations were largely peaceful, "there was also a large not-so-peaceful demonstration" downtown which "led to a number of violent incidents, mostly involving property damage, although a few involved minor injuries, as well." *Id.* None of the injuries were extensive or life threatening, and the principal incidents were confined to an area of about four blocks. *Id.* at 1372. To prevent similar incidents on the following night, the mayor of San Francisco approved an order which authorized police to "take all steps necessary to cause the dispersal and prevent the continuation of any gatherings of people anywhere in the City and County of San Francisco" whenever the police perceived a likelihood of personal or property damage. *Id.* at 1367.

---

[6] Although Defendants' response invites the Court to "paus[e] to remember the status of Covid restriction" in the factual overview section of their brief, Defendants' argument does not appear to offer Covid-19 restrictions as an additional reason for the City-Wide Curfew, nor does that reason appear anywhere in the curfew order or Chief Skinner and City Manager Medary's explanations for why the City-Wide Curfew was necessary. The Court therefore does not consider Covid-19 restrictions as part of the government interest to be served by the City-Wide Curfew. *Post-hoc* explanations are unavailing.

In evaluating whether a clearly established right had been violated as part of a qualified immunity analysis, the Ninth Circuit looked to the record to determine whether the prior day's violence could justify the restraint on demonstrations and concluded it did not:

> The law is clear that First Amendment activity may not be banned simply because prior similar activity led to or involved instances of violence. There are sound reasons for this rule. Demonstrations can be expected when the government acts in highly controversial ways, or other events occur that excite or arouse the passions of the citizenry. The more controversial the occurrence, the more likely people are to demonstrate. Some of these demonstrations may become violent. The courts have held that the proper response to potential and actual violence is for the government to ensure an adequate police presence, *see, e.g., Cox v. Louisiana,* 379 U.S. 536, 551, 85 S.Ct. 453, 462–63, 13 L.Ed.2d 471 (1965), and to arrest those who actually engage in such conduct, rather than to suppress legitimate First Amendment conduct as a prophylactic measure. *Kunz,* 340 U.S. at 294–95, 71 S.Ct. at 315–16.

*Id*. at 1372.

The facts here are substantially similar to those in *Collins*, compelling this Court to find that the City-Wide Curfew was unconstitutional. Like the restriction in *Collins*, the curfew here was imposed in part to "prevent the reoccurrence of the violence and destruction" that had occurred on the two previous evenings. Dugan Decl. Ex. 4, ECF No. 104-3. The prior instances of violence were also similar factually between this case and *Collins*; both involved largely peaceful demonstrations with localized instances of property damage and minor injuries. In both cases, the violence was mostly limited to several square blocks in the downtown area, with isolated instances throughout the city. There are no facts which could lead this Court to come to a different conclusion than did the Ninth Circuit in *Collins*.

Defendants acknowledge that *Collins* involved similar facts but contend that it does not control because the court in *Collins* did not apply "traditional constitutional precepts." Def.'s Resp. Br. 20, ECF No. 114. The Court is unpersuaded. In order to address qualified immunity, the Ninth Circuit in *Collins* was necessarily tasked with evaluating whether a constitutional right

was violated in the first instance. *See Robinson v. York*, 566 F.3d 817, 821 (9th Cir. 2009) (to establish qualified immunity, the facts must show that an official's conduct violated a constitutional right) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Although the *Collins* court was not explicit as to what test it was applying, it clearly evaluated whether the stated reason for the restriction justified that restriction; it did so under substantially similar facts to those present here. Moreover, the Ninth Circuit's analysis of *Collins* in *Menotti*—in which the Ninth Circuit distinguished *Collins* on its facts rather than the fact that it did not apply "traditional constitutional precepts"—confirms that the case is relevant to whether a restriction on protestors' First Amendment rights is narrowly tailored. *See Menotti*, 409 F.3d at 1135 n. 43.[7]

Nor is this Court persuaded that *Menotti* compels a different result, as Defendants urge. See Def.'s Resp. Br. 20. In *Menotti*, the Ninth Circuit evaluated the constitutionality of an emergency curfew order prohibiting access to portions of downtown Seattle, Washington, during the 1999 World Trade Organization ("WTO") conference. *Id*. at 1117. Prior to the imposition of the order, Seattle had experienced numerous instances of violence such that "Seattle's streets turned into 'seeming war zones'" and the "disruption of normal city life was so extreme in some locations that it bordered on chaos." *Id*. at 1121-23. There were numerous instances of violence and property damage taking place in the days leading up to the WTO conference, including the use of "Molotov cocktails" in a Gap clothing store, police officers exposed to prolonged assaults without food or water such that one officer suffered a heart attack, and assaults on civilians including WTO delegates. *Id*. at 1120-23. The violent protestors were organized and coordinated. *Id*. at 1123. In response, the City of Seattle crafted a curfew delineating a restricted zone which

---

[7] The Ninth Circuit also considered *Collins* relevant to its analysis of a "time, place, and manner" restriction analysis in *United States v. Baugh*, 187 F.3d 1037 (9th Cir. 1999).

"covered only enough territory for the WTO delegates and the President to move safely from their hotels to the [WTO] convention and lasted only during the conference." *Id*. at 1134.

The Ninth Circuit held that the curfew at issue in *Menotti* was narrowly tailored to serve a significant government interest. In particular, the court explained that "[i]n the context of a massive demonstration with tens of thousands of participants, once a pattern of chaotic violence had been established, it was unrealistic to expect police to be able to distinguish, minute by minute, those protestors with benign intentions and those with violent intentions." *Id*. The court was particularly concerned with the fact that the violent protestors were organized and were "obscured and sheltered by about 50,000 peaceful protestors" and were intentionally using non-criminal protestors to "buffer smaller pockets of protestors engaging in significant criminal acts." *Id*. at 1131-33. The court found that the prior acts of significant and organized violence justified the restrictions which were narrowly tailored to address the threats posed to WTO delegates and world leaders. In so ruling, the court distinguished *Collins* on two bases: (1) that the violence the city faced prior to the restriction was much less severe in *Collins*, and (2) that the restriction was much broader. *Id*. at 1136.

The facts presented here are critically different than those in *Menotti*. The level of violence on May 29-30, 2020 was much more similar to that in *Collins* than in *Menotti*. The written, video, and photographic evidence of prior violence here does not amount to the kind of "war zone" that Seattle experienced in the days leading up to the WTO conference. The events on which the curfew order relies as justification for the City-Wide Curfew in this case did not involve protestors in the tens of thousands. Likewise, there is no indication here (as there was in *Menotti*) that the protestors on May 29-30 were significantly organizing around violent activity or that they were using non-violent protestors as "buffers" or shields to prevent adequate

policing. As explained above, the events preceding the City-Wide Curfew were primarily centered around a few square blocks and did not result in any serious injuries.

Setting aside the events of May 29-30—which for the reasons outlined above cannot provide a basis for the City-Wide Curfew on May 31—none of the remaining rationales can justify the City-Wide Curfew. The reasons City Manager Medary gave in her email to the mayor and city council included the fact that individuals were congregating outside the boundaries of the Downtown Curfew, and that there were indications they intended to block the Ferry Street Bridge, "a critical route for first responders." Dugan Decl. Ex. 3, ECF No. 104-2. First, the imposition of a curfew to apply across the *entire* city is in no reasonable way tailored to a threat towards a very specific geographic place within it. As to the individuals congregating outside the boundaries of the Downtown Curfew, the evidence indicates that the number of protestors at issue was relatively small. *See* Nelson Decl. Ex. 2 at 4, ECF No. 121 (the group that included members "pounding on light poles with metal rods and hammers" was "approximately 45 people."); Nelson Decl. Ex. 2 at 4, ECF No. 12; Dugan Supp. Decl. Ex. 21, ECF No. 166 (a group of 50-75 people marched outside the Downtown Curfew near the Whole Foods store). Moreover, none of the video evidence Defendants and Plaintiffs submitted depict any behavior that would give rise to a concern about extensive city-wide violence. The sole example given by Defendant Medary as indicating violence—that individuals were banging on light poles with metal rods—does not suggest the type and extent of violence Defendants were concerned about.

The evidence here simply does not support a reasonable belief of the kind of imminent or extensive violence that would justify expansion of the curfew to the entire city, but even viewing all evidence in the most favorable light to Defendants, the expansion of the curfew city-wide was not proportional to the perceived threat. The City could simply have expanded the curfew area to

apply to a larger area that would include where the groups were dispersing to. Given the relatively small crowds of protestors, a curfew could have easily been crafted that was tailored to the City's specific concerns. Based on the record before the Court, there are no facts that would support a concern that the small group or groups of protestors posed a threat to the entire geographic area of the city. The City-Wide Curfew was not narrowly tailored to the City's interest in preventing violence and protecting public safety.

2.   <u>Alternative Channels</u>

To pass constitutional muster under the First Amendment, a time, place, and manner restriction on speech must also "leave open ample alternative channels for communication of the message." *Ward*, 491 U.S. at 791. "The Supreme Court generally will not strike down a governmental action for failure to leave open ample alternative channels of communication unless the government enactment will foreclose an entire medium of public expression across the landscape of a particular community or setting" *Menotti v. City of Seattle*, 409 F.3d at 1138 (quoting *Colacurcio v. City of Kent,* 163 F.3d 545, 555 (9th Cir.1998)).

Here, Defendants failed to leave available ample alternative channels of communication. As emphasized above, the public streets are particularly important to the right to protest. *See Hague*, 307 U.S. at 515 (traditional public forums such as streets and sidewalks have "immemorially been held in trust for the use of the public…for purposes of assembly, communicating thoughts between citizens, and discussing public questions"). Defendants' restriction completely foreclosed any use of public forums throughout the entire city for seven hours. Such a complete ban on expression throughout an entire medium—a particularly important one—failed to leave open alternative channels during that time.

Defendants argue that the City-Wide Curfew did leave open ample alternative channels of communication because (1) protestors were free to demonstrate during times when the seven-hour City-Wide Curfew was not in effect, and (2) protestors were free to protest outside of public spaces during that time. The Court is unpersuaded.

First, Defendants cite no authority from which this Court could find that a complete ban on demonstrations in all public forums for *any* period of time can be said to leave open ample alternative channels of communication, much less a seven-hour curfew that applies to an entire city. The Ninth Circuit's prior decisions indicate that it does not. In *Menotti*, for example, the court explained that the ability of protestors to demonstrate immediately across the street from WTO venues satisfied the "ample alternatives" test. 409 F.3d at 1138. Even there, the Court found whether the restriction met that test "a very difficult question." *Id.* If that restriction barely satisfied the "ample alternatives" test, then this one cannot. *See also Baugh*, 187 F.3d at 1044 (a 150-175 yard restriction failed to leave open alternative means for communication). A time-based restriction likewise must leave open alternative means during the hours of that restriction. *See Occupy Fresno v. Cnty. of Fresno*, 835 F. Supp. 2d 849 (E.D. Cal. 2011) ("Although Plaintiffs wish to communicate their views from the park 24 hours a day, the Court concludes that their ability to protest there for 18 hours a day*, and to protest in the surrounding sidewalks for the remaining six hours a day*, provides them with ample alternative channels of communication") (emphasis added).

Moreover, because many people work during daytime hours, nighttime hours are the only times available for protest. The Court is also mindful that, in the context of protests that are a reaction to a recent event, there is an immediacy that distinguishes this from other cases in which the ***time*** of protest matters less. *N.A.A.C.P., W. Region v. City of Richmond*, 743 F.2d at 1356

("[T]iming is of the essence in politics.... [W]hen an event occurs, it is often necessary to have one's voice heard promptly, if it is to be considered at all. A delay of even a day or two may be intolerable when applied to political speech in which the element of timeliness may be important." (internal quotation marks and citation omitted; alterations in *City of Richmond* )). Here, the killings of George Floyd and Breonna Taylor were fresh in people's minds, and protestors in Eugene had an interest in conveying their message of outrage concurrent in time with protests occurring across the country. As Plaintiffs rightly point out, "it was critical to the nationwide character of their message for the residents of Eugene to express their outrage without having to leave the city." Pl. Mot. at 12, ECF No. 98. Delaying speech when citizens have an immediate need to protest fails to leave open ample alternatives for that expression.

Second, Defendants' contention that the ability of protestors to speak outside the public forum during the seven hours in which the City-Wide Curfew was in effect fails because acceptance of that argument would eviscerate the "ample alternatives" requirement. It is virtually always true that a restriction of speech in the public forum leaves non-public forums available as a means of protest; if the ability to protest on one's own private property—or through social media or other media—could satisfy the ample alternatives test, then any restriction on speech in the public forum would pass constitutional muster under this test. Quoting the Seventh Circuit in his concurring opinion in *Menotti*, Judge Paez explained the fallacy of this logic well:

> "[T]here is no internet connection, no telephone call, no television coverage that
> can compare to attending a political rally in person...." 355 F.3d at 1063. Public
> protests are at the heart of the First Amendment and are critical for incubating
> civic engagement and encouraging spirited debate."

*Menotti v. City of Seattle*, 409 F.3d at 1174 (Paez, J., concurring).

Accordingly, the Court should find that Defendants' City-Wide Curfew failed to leave open ample alternative means of communication. Because the City-Wide Curfew was not

narrowly tailored to a significant government interest and because it failed to leave open ample

alternative channels of communication, it was a constitutionally inadequate time, place, and

manner restriction in violation of Plaintiffs' First Amendment right to protest.

## IV.    Probable Cause

Plaintiffs also move for summary judgment on whether Plaintiffs' arresting officers had

probable cause to arrest Plaintiffs for violating the City-Wide Curfew. Probable cause exists

when "officers have knowledge or reasonably trustworthy information sufficient to lead a person

of reasonable caution to believe that an offense has been or is being committed by the person

being arrested." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) This is an objective

inquiry. *Id.* Moreover, officers "may not disregard facts tending to

dissipate probable cause." *Sialoi v. City of San Diego*, 823 F.3d 1223, 1232 (9th Cir.

2016) (quoting *Lopez*, 482 F.3d at 1073).

Plaintiffs' primary argument on probable cause is that the officers could not have

believed that Plaintiffs had the requisite mental state to commit the crime of curfew violation

under Eugene Code 2.1055(6). Specifically, they argue that the officers could not have believed

Plaintiffs "knowingly" violated the curfew because they were not given proper notice before

being arrested and did not have time to comply. Plaintiffs characterize the officers' basis for

probable cause as "their mere public presence during a hastily imposed citywide curfew." Pl.'s

Mot. 16.

In support of their argument, Plaintiffs analogize this case to that of *Hickey v. City of

Seattle*, 2006 WL 3692658 (W.D. Wash. Dec. 13, 2006), which involved the same Seattle curfew

that was at issue in *Menotti*. In *Hickey*, officers arrested around 200 people in Westlake Park in

Seattle. *Id.* at *1. Various groups had arrived at the park in different ways; some as part of a

protest march, others not. *Id.* It was unclear in the record whether and to whom a dispersal order had been given as these groups approached the park. *Id.* at *2. Without giving an order to disperse to the individuals in the park, the officers arrested them all without making efforts to identify whether any of them knew of the curfew or fell within its exceptions (which included, among other exceptions, business owners/employees and residents within the curfew area). *Id.* at *1-2. The court found under those circumstances that the officers lacked probable cause because (1) they failed to make individualized probable cause determinations as to all 200 individuals arrested, and (2) there was no evidence indicating that the arresting officers had knowledge or a belief that the plaintiffs knew of the curfew or their violation of it. *Id.* at *8. On the latter point, the court clarified that the analysis would be different if the officers had given the group an opportunity to disperse. *Id.* at *9 ("Had the arresting officers given an order to disperse that explained the content of the mayoral emergency order, and had the class members remained in Westlake Park, the officers would have had circumstantial evidence supporting an individualized suspicion that each of the remaining class members were not permitted in the restricted zone and were knowledgeable about their violation").

The facts here depart significantly from those in *Hickey*. First, this is not a "mass arrest" case in which an entire group was arrested without individualized determinations of probable cause. The officers arrested Plaintiffs in particular, they did not sweep up a whole group as the officers in *Hickey* did. Thus, this Court cannot say that the arrests lacked probable cause for failure to make individualized determinations. Instead, the question is whether those individualized determinations were supported by any facts (i.e., whether the jury could conclude that a reasonable officer would have believed they had probable cause that Plaintiffs had committed a crime). Second, this case departs from *Hickey* because Plaintiffs here ***were*** given

orders to disperse. For the reasons explained below, a jury could conclude from the facts present here that the officers reasonably believed that Plaintiffs' actions suggested that they did not intend to disperse and were therefore knowingly in violation of the curfew. [8]

The video evidence depicts the patrol car following what a jury could reasonably conclude was a cohesive group of protestors, announcing the curfew and ordering the group to disperse. Miller Decl. Exs. 2 & 3, ECF No. 116. Given the volume and frequency of the announcements and proximity to the group, a reasonable officer could believe that Plaintiffs heard these announcements, and therefore knew that there was a curfew in effect and that they were in violation of it. In particular, dash and body cam footage shows officers continuing to follow the group beginning several minutes from the start of the curfew. *Id*. When the curfew began, the officers did not immediately begin arresting members of the group. *Id*. Instead, video depicts the police following the group and discussing whether its members appeared to be dispersing or intending to continue violating what the officers believed to be a legal curfew. *Id*. The officers can be heard on the video discussing the possibility that they might be headed to their homes, but noting that "unless all these guys live together…" the officers did not believe they were dispersing. *Id*. The officers can be heard deciding to continue to follow and "re-evaluate" based on the group's behavior. *Id*. In sum, contrary to Plaintiffs' assertion, a jury could reasonably find that the officers reasonably believed that Plaintiffs were aware of the City-Wide

---

[8] Defendants devote much of their briefing on this issue to various admissions made by Plaintiffs during their depositions regarding Plaintiffs' individual knowledge of the curfew. *See* Def.'s Resp. Br. 25-28. But those admissions are irrelevant to probable cause, which depends on what the *officers* knew at the time of arrest, and whether they had reason to believe that Plaintiffs knew of the curfew. *See, e.g. Hickey*, 2006 WL 3692658 at *8 ("[w]hether or not some of the class members knew about the emergency order or knew they were violating it does not answer the question of whether the officers believed that the class members knew they were violating [it]").

curfew and that Plaintiffs were knowingly violating it because they did not indicate an intent to disperse.

Likewise—beyond the officers' belief about the group as a whole—there is evidence from which a jury could conclude that the officers had individualized probable cause[9] with respect to each Plaintiff. First, Sgt. Stotts noted that he believed that Mr. Boudjerada was close enough in proximity to hear the announcements about the curfew. Stotts Decl. at ¶ 4, ECF No. 116. He stated that he believed Mr. Boudjerada to be part of the group and did not give any indication that he was dispersing. *Id*. Officer Rankin likewise testified that he observed Mr. Boudjerada and believed him to be part of a group that was failing to disperse despite warnings. Miller Decl. Ex. 13 at 3, ECF No. 115-13. Upon review of the video footage, which depicts Mr. Boudjerada walking in proximity to the group which Sgt. Stotts' vehicle followed for around ten minutes, the Court cannot say that no reasonable officer would believe under the circumstances that Mr. Boudjerada was not dispersing. While Mr. Boudjerada did state during his arrest that he was on his way home, construing *all* the evidence in the light most favorable to Defendants, there is a genuine issue of material fact as to Defendants' belief that Mr. Boudjerada was not attempting to comply with the curfew order and therefore had the requisite mental state for a knowing violating of the City-Wide Curfew. It is for a jury to weigh what the officers saw against Mr. Boudjerada's statement in order to answer this question.

---

[9] In their reply, Plaintiffs for the first time present the additional argument that the officers lacked probable cause because they failed to inquire about the application of any of the curfew exceptions to the individual Plaintiffs. See Pl. Reply at 14, ECF No. 165. Although courts have broad discretion to consider arguments raised for the first time in a reply, *see Lane v. Dep't of Interior*, 523 F.3d 1128, 1140 (9th Cir. 2008), the Court will not exercise its discretion to do so here. Plaintiffs could have made this argument in its opening brief, in which case Defendants would have had the opportunity to present argument and identify the evidence creating an issue of fact on this issue. The Court will therefore not consider this new argument.

The same is true of Mr. Hendry, who officers likewise believed to be part of a group
which the officers believed was not dispersing. *See* Stotts Decl. ¶ 5, ECF No. 116; Declaration of
Ryan Underwood ¶ 3, ECF No. 122. Officers had further reason to believe Mr. Hendry did not
intend to disperse because, when Officer Underwood asked him to leave, he appeared to walk
towards the officers rather than leaving. *Id*. The officers likewise believed that there was
probable cause to arrest Mr. Hendry for the crime of disorderly conduct in the second degree. *Id*.
A person commits that crime if "with intent to cause public inconvenience, annoyance or alarm,
or recklessly creating a risk thereof, the person… Obstructs vehicular or pedestrian traffic on a
public way." ORS 166.025(2)(a). Video of Mr. Hendry shows him standing and walking in the
bike lane. Miller Decl. Ex. 2 ("ERIK1911video"), ECF No. 115; Stotts Decl. Ex. 3, ECF No.
116. Sgt. Stotts' body cam video shows Mr. Hendry standing ground and taking video from the
bicycle lane in proximity to other arrests that were taking place. Stotts Decl. Ex. 3, ECF No. 122.
The officers did not appear to arrest other individuals that walked away when directly ordered to
disperse. *Id*. Under the totality of these circumstances, there is a genuine issue of material fact as
to whether the officers had probable cause to arrest Mr. Hendry for violating the City-Wide
Curfew and for disorderly conduct.

Finally, Sgt. Stotts states that he believed he had probable cause to arrest Ms. Grady
because she refused to leave the area despite being told there was a curfew and told to leave.
Stotts Decl. ¶ 6, ECF No 116. Sgt. Stotts's body cam provides evidence from which a jury could
reasonably conclude that Ms. Grady knowingly violated the curfew. It depicts Sgt. Stotts talking
with Ms. Grady about the arrests that were taking place and instructing her that she was in
violation of the curfew; he cautioned her that "you can ride in the van with them to the jail, or
you can leave." Stotts Decl. Ex. 3. Ms. Grady then walked away and Sgt. Stotts turned around to

appear to allow her to disperse. *Id*. But the video then depicts Ms. Grady stopped on the sidewalk again and yelling in an attempt to get the arrestees' names. *Id*. Based on that video, there is a genuine issue of material fact as to whether the officers had probable cause to arrest Ms. Grady for a knowing violation of the City-Wide Curfew.

## CONCLUSION

For the reasons above, Plaintiffs' Motion for Partial Summary Judgment (ECF No. 98) should GRANTED in part and DENIED in part. The motion should be granted as to the constitutionality of the City-Wide Curfew, but denied as to whether the officers had probable cause to arrest Plaintiffs.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Federal Rule of Appellate Procedure 4(a)(1) should not be filed until entry of the district court's judgment or appealable order. The Findings and Recommendation will be referred to a district judge. Objections to this Findings and Recommendation, if any, are due fourteen (14) days from today's date. *See* Fed. R. Civ. P. 72. Failure to file objections within the specified time may waive the right to appeal the district court's order. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

DATED this 24th day of May 2023.

s/ Mustafa T. Kasubhai
MUSTAFA T. KASUBHAI (He / Him)
United States Magistrate Judge