Marianne Dugan, OSB # 932563
Email:  mdugan@cldc.org
Lauren C. Regan, OSB # 970878
Email: lregan@cldc.org
CIVIL LIBERTIES DEFENSE CENTER
1711 Willamette Street, Ste 301 #359
Eugene, OR  97401
Telephone:  541-687-9180

      Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

| | |
|---|---|
| HASHEEM BOUDJERADA; DAMON COCHRAN-SALINAS; ERIN GRADY; TYLER HENDRY; and KIRTIS RANESBOTTOM, | Case No. 6:20-cv-1265-AA |
|             Plaintiffs | PLAINTIFFS' RESPONSE TO DEFENDANT CHIEF CHRIS SKINNER'S MOTION FOR SUMMARY JUDGMENT |
|    v. | |
| CITY OF EUGENE; SARAH MEDARY; WILLIAM SOLESBEE; SAMUEL STOTTS; BO RANKIN; TRAVIS PALKI; MICHAEL CASEY; RYAN UNDERWOOD; CRAIG WRIGHT; CHARLES SALSBURY; and CHIEF CHRIS SKINNER, | ORAL ARGUMENT REQUESTED |
|           Defendants. | |

Plaintiffs hereby respond to the Summary Judgment Motion filed by Defendant Chief

Chris Skinner (Dkt 222).

Because this case has involved multiple phases of briefing, in an abundance of caution

Plaintiffs incorporate by reference their prior briefing and exhibits regarding the retaliation and

probable cause issues, in Dkts 98, 165, and 172.

**INTRODUCTION**

This case concerns the retaliatory enforcement of a city-wide curfew implemented on

May 31, 2020, ostensibly in response to property destruction and violent behavior that occurred at a protest in Eugene two days prior. With only minutes of warning regarding the expanded curfew, each of the Plaintiffs in this case were arrested without reasonable opportunity to comply, or subjected to chemical and impact munitions, even at their homes.

The Court should deny Defendant Skinner's Motion for Summary Judgment. First, there are genuine issues of material fact, and a reasonable jury could find that the Plaintiffs were retaliated against for their First Amendment activity. Second, a reasonable jury could find Chief Skinner liable in his personal capacity for the retaliation, because there was a causal connection between his own culpable conduct and the constitutional violations. Finally, Chief Skinner is not entitled to qualified immunity, because it is well-established that people have a right to be free from retaliatory actions for exercising their First Amendment rights, regardless of the existence of probable cause.

## STATEMENT OF FACTS

On May 31, 2020, six days after the murder of George Floyd and after several days of protesting, Eugene's City Manager Pro Tem, Sarah Medary, implemented a curfew order covering the downtown area of Eugene from 9:00 p.m. May 31 through 6:00 am on June 1. Exhibit 2, Administrative Order No. 21-20-10. Plaintiffs Boudjerada, Hendry, and Grady were a part of a group of demonstrators which had gathered *outside* of the downtown curfew area on the night of May 31. Although this group of protesters was peaceful and in compliance with the curfew in place at the time, the City nonetheless signed an emergency order expanding the curfew city-wide beginning at 11:00 p.m., entirely at Chief Skinner's recommendation. Ex. 1, Medary Deposition, 110723_MedarySarah.TXT-1.pdf, at 33:6-21, 54:3-13.

The emergency order expanding the curfew was signed at 10:49 p.m. Exhibit 4,

Administrative Order No. 21-20-11. Eugene Police Department officers were informed of the expanded curfew over the radio at approximately 10:56 p.m.  Ex. 14, EPD CH4.053120 20-00-17 TO 23-59-40, hereinafter "Radio Communications," at timestamp 1:40:50. Armed with chemical and impact munitions, officers assembled near the group of protesters and informed them of the expanded city-wide curfew just three minutes before 11:00 p.m. Ex. 14, Radio Communications at timestamp 1:41:00 ("Command 7, let's start giving full admonishments. It is now 10:57. I'll advise when we're clear to start gas plans." ).The protesters began to move, with many of them peeling off, the group shrinking in size as they walked. *Id* at timestamp 1:44:54 ("The group's breaking up for the most part. A large contingent still northbound on Patterson from Broadway, but they are at a steady stream leaving the area." "They're southbound." "Copy. If they're leaving the area let's allow that to occur.") Throughout the night, radio reports of the size of the group leaving the downtown area continually and rapidly decreased. *Id.* at timestamp 1:46:20 ("This splinter group is about down to 40 now, from where they were originally marching, they were about 80 or 90."), 1:50:05 ("The group is now southbound on Alder from 13th, probably about 25 still staying in the group.").[1] There is no evidence that this group -- or any of the Plaintiffs -- were engaging in property destruction or any violent behavior.

The arrests began just minutes after 11:00 p.m. and the first admonishment. Body camera footage indicates that at approximately 11:05 , a voice over the radio (which appears by voice pattern to be Klinko) suggested that officers begin making arrests: "If there's an opportunity to make a couple arrests, I think that might be beneficial," to which Sergeant Stotts responded,

---

[1] Campbell Club, which is near campus towards which this group was walking, has 20 members who reside there. Ex. 10, First Ranesbottom Deposition at 13:4-6. There is also another student cooperative house immediately next door.

speaking to the two officers in his vehicle, "which one you want? Just tell me which one you want." Ex. 15, Stotts BWC - INFORMATION-_BOTH_PD_AND_FD___STOTTS_SAMUEL 2___053120_11_57_47.mp4, hereinafter "Stotts BWC" at timestamp 0:10:26 – 0:10:41. Immediately following this exchange, Sergeant Stotts got out of his car, passed several people who were standing still; allowed two people to walk past with a warning; then ordered other officers to grab and arrest Plaintiff Boudjerada as he was walking down the sidewalk away from the downtown area. Ex. 15, Stotts BWC, at timestamp 00:10:59 – 00:11:58. As police grabbed him, Boudjerada stated "I'm literally going home," and explained that he was walking towards his vehicle a few blocks away. *Id.* A few minutes later, at 11:09, Sergeant Stotts approached Plaintiff Hendry as he was walking away from downtown, and yelled "It's curfew! You're under arrest!" Hendry responded "okay, okay," and Sergeant Stotts grabbed him. Officer Underwood tackled him to the ground as Hendry insisted that he was peaceful. *Id.* at timestamp 0:14:11 – 0:14:19; Ex. 3, Underwood Deposition, 110724_UnderwoodRyan.TXT-1.pdf, at 27:21-28:17. After making these arrests, Sergeant Stotts reported back to the radio channel that he had "arrested three more aggressors," despite the fact that it can clearly be seen on his camera footage that neither Boudjerada nor Hendry were behaving aggressively. Ex. 15, Stotts BWC, at timestamp 0:15:01.

Plaintiff Erin Grady was at the protest that night volunteering for a jail support collective. Ex. 11, First Grady Deposition, 110873_GradyErin090721C-1.pdf, at 58:10-24, 64:14-65:10. At approximately 11:15 according to body camera footage, she and a friend approached EPD officers and asked for the names of those who had been arrested so they could follow up and offer support. Ex. 15, Stotts BWC, at timestamp 00:19:56 – 00:21:40. Sergeant Stotts refused, and also refused to allow the women to approach the arrestees to ask them themselves. *Id.* He

told the two women that they needed to leave or they would be arrested. *Id.* At this point, Grady did not know about the city-wide curfew. Ex. 11, First Grady Deposition, at 67:10-14. Nonetheless, the two women turned and walked away. As they were walking away, they attempted once more to call out to the arrestees once more to ask their names. Ex. 15, Stotts BWC, at timestamp 00:19:56 – 00:21:40. Sergeant Stotts then said to another officer "Take her," and the officers ran past several other bystanders who were out on the sidewalk and grabbed Ms. Grady and her friend as they were walking away, placing them under arrest. *Id.*

Throughout Officers Stotts' body camera footage, numerous bystanders who are lingering on the street after the city-wide curfew was announced are either given warnings or ignored entirely. *Id*. at timestamp 0:12:56, 0:21:22-26. In fact, two people who *thanked* the cops were simply told "If you have any issues, tell us" and "You're welcome," rather than being warned they would be placed under arrest if they did not get inside, let alone arrested. *Id*. at timestamp 00:24:10, 00:24:34.

Plaintiffs Chochran-Salinas and Ranesbottom both participated in the protests on May 31 prior to the city-wide curfew being announced. Ranesbottom had returned home prior to the city-wide curfew being announced, and Cochran-Salinas returned home when he heard the announcements of the expanded curfew and made it home without incident. Ex. 10, First Ransebottom Deposition, 110872_Ranesbottom.TXT-1.pdf, at 43:22-46:20; Ex. 5, First Cochran-Salinas Deposition, 110872_Cochran-Salinas.TXT-1.pdf*,* at 31:10-32:23, 33:25-35:1. Both were both residents of the Campbell Club, a Student Cooperative Housing residence located near the University of Oregon campus. Ex. 12, Ranesbottom Declaration*,* Ranesbottom decl as filed.pdf, ¶ 2. At approximately 11:20 p.m. on May 31, several EPD officers shot chemical and impact munitions at the residence while Ranesbottom was inside and Cochran-

Salinas was sitting on the porch. *Id.* ¶ 11. While sitting on the porch, Cochran-Salinas saw a friend of the Campbell House residents running towards their porch, and tried to help him get inside. Ex. 5, First Cochran-Salinas Deposition, at 32:24-33:6. He also witnessed another person running down the street, yelling "Please don't shoot, I'm going home." *Id.* at 33:7-13. Officers nonetheless shot chemical and impact munitions at both people, as well as towards the Campbell House residence, hitting both people as well as the residence itself, causing damage to the front door and causing tear gas to enter the residence. Ex. 12, First Ranesbottom Declaration*,* ¶ 14; Ex. 5, First Cochran-Salinas Deposition*,* at 16-20, 51:2-52:2, 55:2-18.

As Chief of the Eugene Police Department, Defendant Skinner had supervisory authority over all of the officers who conducted these arrests and munitions deployment towards protesters and residences. In addition to recommending the curfews themselves (which City Manager Medary accepted without question), Skinner actively participated in authorizing the enforcement actions that took place on May 31. During the events in question, Chief Skinner was off-site with Captain Klinko. Ex. 6, Klinko Deposition, 110940_KlinkoEric-1-1.pdf, at 13:9-12. Although Klinko was technically given the title of "incident command" for the events of May 31, he testified in his deposition that he and Skinner made decisions together throughout the night: "And in all fairness, the chief and I were co-located, so we were almost co-incident commanders if you will. Obviously, though, he's the chief and he's my boss, so while I may have been labeled incident commander -- or more appropriately labeled incident commander, many of those decisions were made in tandem." *Id.* at 26:22 – 27:3.

In his deposition, Chief Skinner testified that the decision to use "certain strategies and tools" in the field was "communicated up through the incident commander" (in this case Klinko, co-located and making decisions "in tandem" with Skinner), and that he (the Chief) must

authorize the use of gas: "What I can tell you is that if there is a use of gas, I'm made aware of that and -- with a strong recommendation. And so I – it's – some would say then it ends up being an authorization when I'm – because I have the ability to say no . . . . And so in the sense of being an authorization, I would say then that was my authorization, yes." Ex. 7, Skinner deposition, at 56:12-22.

Throughout the night of May 31, Captain Klinko was communicating via radio and text message with the officers conducting arrests and deploying chemical and impact munitions against protesters. *See generally* Ex. 14,  Radio Communications; *see also* Ex. 6, Klinko Deposition, at 17:4-18:6. Officers would ask Klinko whether there was permission to deploy gas, and Klinko would confirm authorization. Ex. 14, Radio Communications, at timestamp 1:41:00 (Klinko: "I'll advise when we're clear to start gas plans,"), 1:46:56 ("Martin: Permission to fire some fire – or, pepperballs towards … just at the street, not at anybody, to hopefully disperse this group? Klinko: Martin, that's affirmative."). Captain Klinko at times also recommended making arrests: *Id*. at timestamp 1:44:03 (Klinko: "Any ability to go in and make a strategic arrest?"); Ex. 6, Klinko Deposition, at 51:3-10. Captain Klinko also communicated blanket authorization to use gas around campus against protesters: "You're clear to use gas to keep them off campus," seemingly without any attempt to ascertain whether any of the people heading towards campus in fact lived or parked their cars on campus. Ex. 14, Radio Communications, at timestamp 1:51:10.

Given the available evidence of how the communications were being conducted, a reasonable jury could conclude that Klinko was communicating Chief Skinner's authorization.

As the night progressed, Captain Klinko asked over the radio whether officers had any "updates or intel of crowds forming or locations." Ex. 14, Radio Communications, at timestamp 1:58:57. An officer responded that "one of the live feeds" showed some people talking about

getting hit by pepperballs and said "Now they're just out here antagonizing police, so, trying to find that group." *Id*. at 1:59:11. Another officer chimed in, "just be advised that a lot of the college kids were voicing their opinion, yelling at the police as well, from their houses." *Id*. at 1:59:33. Shortly thereafter, Sergeant Solesbee reported over the radio channel that he fired "two 40mm at Alder and 16; one hot gas, several pepperball. 16 Hilyard to Alder, one other hot gas; and a hot gas at 17 and Alder. Hilyard and 15, one hot gas and pepperball on both trucks, 1 and 2. Truck 1 on 17 headed to Alder, pepperball." *Id*. at 2:01:40. Campbell Club is located on Alder Street between 16th and 17th Ave. https://www.mapquest.com/us/oregon/campbell-club-12442133.

Reviewing Sergeant Solesbee's actions on that night, Chief Skinner concluded that the Department's policy permitting the utilization of 40-millimeter impact munitions to effect arrest or prevent escape was inadequate at the time and that the organization had failed to adequately train Solesbee on what to do in that situation. Ex. 7, Skinner Deposition (portion under seal), at 93:12-18. Chief Skinner noted in his deposition that no training had been given on how to enforce the curfew. *Id.* at 25:5-8.

## STANDARD

In considering summary judgment motions, including those based on qualified immunity, the court must view the evidence in the light most favorable to the non-moving party and resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986); *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1087 (9th Cir. 2000). The moving party bears the initial burden of producing evidence showing they are entitled to summary judgment, and identifying "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it

believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-330 (1986).

A motion for summary judgment will be granted only if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law, "meaning that no reasonable jury could find for the other party based on the evidence in the record." *Carmen v. Tinkes*, 762 F.3d 565, 566 (7th Cir. 2014); Fed. R. Civ. P 56(c). Where "conflicting inferences may be drawn from the facts, the case must go to the jury." *LaLonde v. County of Riverside*, 204 F.3d 947, 959 (9th Cir.2000). Summary judgment on the basis of qualified immunity is not proper unless the evidence permits only one reasonable conclusion. *Munger*, 227 F.3d at 1087.

## ARGUMENT

### I.     A Reasonable Jury Could Find that the Enforcement of the City-Wide Curfew Was Retaliatory and Therefore Violated the Plaintiff's First Amendment Rights

#### A.     Relevant test

To establish a claim for retaliation in violation of the First Amendment, Plaintiffs must show (1) that they were engaged in a constitutionally protected activity; (2) that the Defendant's actions would "chill a person of ordinary firmness from continuing to engage in the protected activity;" and (3) that "the protected activity was a substantial or motivating factor in [the defendants'] conduct." *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 827 (9th Cir. 2020). *See also Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 770 (9th Cir. 2006); *Sanderlin v. Dwyer*, 116 F.4th 905, 910-11 (9th Cir. 2024).

Defendant Skinner argues that the Plaintiffs' burden is to prove that "desire to cause the chilling effect was a but-for cause of [defendant's] action." Dkt 222 at 12-13 (quoting *Dietrich v. John Ascuaga's Nugget*, 548 F.3d 892, 900-01 (9th Cir. 2008)). While it is true that courts have sometimes framed the plaintiffs' burden in a retaliation case as a but-for causation test, the

history of the caselaw demonstrates that the but-for requirement in fact implicitly contains a burden shift from plaintiff to defendant, with a plaintiff's initial burden being to show that the protected activity was a substantial or motivating factor – as noted in the above-cited case law. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Nieves v. Bartlett*, 587 U.S. 391, 404 (2019) (describing the *Mt. Healthy* test as burden-shifting).

In *Mt. Healthy*, the Supreme Court applied the "substantial or motivating factor" test, but added that the Defendant could then attempt to show "by a preponderance of the evidence that it would have reached the same decision . . . even in the absence of protected conduct." 429 U.S. at 287. Over time, this two-part burden shift has come to be stated as a "but-for" causation test, but only after the burden shifts to the defendant in a retaliation claim. *See Nieves*, 587 U.S. at 422-23 (Sotomayor dissenting). In *Nieves,* Justice Sotomayor explained:

> The plaintiff must first establish that constitutionally protected conduct was a "substantial" or "motivating" factor in the challenged governmental action (here, an arrest). If the plaintiff can make that threshold showing, the question becomes whether the governmental actor (here, the arresting officer) can show that the same decision would have been made regardless of the protected conduct. If not, the governmental actor is liable. In other words, if retaliatory animus was not a "but-for cause" of an arrest, a suit seeking to hold the arresting officer liable will fail for lack of causal connection between unconstitutional motive and resulting harm.

*Id*. (citations omitted).

Thus, it is not accurate at this stage of the case to state that the Plaintiffs have the burden of demonstrating "but-for" causation. Rather, the Plaintiffs' burden is to show that they were engaging in First Amendment protected activity, that the Defendant's actions would chill a person of ordinarily firmness from continuing the protected activity, and that the protected activity was a *substantial or motivating factor* in the Defendant's conduct. If this burden is met, then Chief Skinner -- not the Plaintiffs -- has the burden of showing that he would have taken the same action regardless of the Plaintiffs' First Amendment activity. The Defendant has not made

this showing.

**B.** **A reasonable jury could find that Plaintiffs were engaged in constitutionally protected activities**

The Plaintiffs were engaged in activity protected by the First Amendment when they were participating in a march protesting police violence on May 31, 2020. "Public demonstrations and protests are clearly protected by the First Amendment." *Index Newspapers LLC*, 977 F.3d at 830. In fact, the First Amendment "applies with particular force" to marches and protests, and this is "particularly true where the march takes place in the streets." *Seattle Affiliate of Oct. 22nd Coal. to Stop Police Brutality, Repression & Criminalization of a Generation v. City of Seattle*, 550 F.3d 788, 797 (9th Cir. 2008). *See also Collins v. Jordan*, 110 F.3d 1363, 1371 (9th Cir. 1996) (right to protest on city streets and sidewalks has been protected since "time immemorial," and restrictions on that conduct are "subject to a particularly high degree of scrutiny). Public criticization of the actions of police also clearly falls within the protections of the First Amendment. *See City of Houston v. Hill*, 482 U.S. 451, 461 (1987) (yelling obscenities and threats at a police officer is protected under First Amendment).

The First Amendment freedom of association is also implicated by attempts to disrupt and disperse protests and marches. The First Amendment protects the "freedom to associate with others for the common advancement of political beliefs and ideas." *Kusper v. Pontikes*, 414 U.S. 51, 56-57 (1973). "Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." *NAACP v. Alabama*, 357 U.S. 449, 460 (1958); see also *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ("An individual's freedom to speak . . . and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed.").

That the Plaintiffs were clearly engaged in First Amendment protected activity is not negated by the sudden imposition of the city-wide curfew. *See, e.g., Fortson v. City of Los Angeles*, 628 F. Supp. 3d 976 (C.D. Cal. 2022) ("That [the plaintiff] was not in the crosswalk does not change that Plaintiff was engaged in constitutionally protected activity at the time of the incident."). There was no evidence that any of the Plaintiffs were engaging in violence or property destruction; they were in compliance with the *downtown* curfew they were aware of at the time; and upon learning of the precipitous *city-wide* curfew they immediately took steps to leave and head out from downtown.

Furthermore, a reasonable jury could find that the very manner of enforcing the expanded city-wide curfew against the Plaintiffs -- targeting protestors, resorting rapidly to arrests and use of force, without allowing for a meaningful opportunity for protestors to disperse, ignoring bystanders, and arresting and/or using force against protesters as they tried to return home or even *at* their homes (as with Cochran-Salinas and Ranesbottom, the Campbell Club residents), was substantially motivated by retaliation against the protected First Amendment activity Plaintiffs were engaged in immediately prior to the expanded curfew being implemented and enforced. Defendant cannot dispose of this first prong (that Plaintiffs were engaged in a constitutionally protected activity) by redefining the activity Plaintiffs were engaged in as violating curfew as opposed to the First Amendment activity they had been forced to abandon.

### C.     A reasonable jury could find that Defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity

As for the second prong -- that the Defendant's actions would "chill a person of ordinary firmness from continuing to engage in the protected activity" -- it is well established that retaliatory arrests qualify as actions that would "chill a person of ordinary firmness." *Nieves*, 587 U.S. at 397. Being exposed to tear gas and impact munitions also clearly meets this. *See Index*

*Newspapers*, 977 F.3d at 827 n. 4 (Noting that there would be no good faith reason to dispute that "being shot with less-lethal munitions like pepper balls, tear gas, and paint-marking munitions, being pepper sprayed at close range, or being shoved by a law enforcement officer would chill a person of ordinary firmness from continuing to exercise their First Amendment rights."). The Plaintiffs in the present case were each subject to arrest and/or exposed to tear gas and munitions being shot towards their person or their residence. The second prong is therefore easily met.

### D.    A reasonable jury could find that Plaintiffs' protected activity was a substantial or motivating factor in Defendant's conduct in enforcing the curfew

Finally, there is ample evidence that Plaintiff's First Amendment activity was a substantial or motivating factor in Defendant Skinner's conduct in enforcing the curfew.

Defendant Skinner argues that the Plaintiffs stated in their depositions that they did not have evidence that he retaliated against them. Dkt 222 at 11-12. It is true that Plaintiffs did not cite any *direct* evidence of retaliation against Chief Skinner in their second depositions – which would be a highly unusual situation. The law is clearly established that circumstantial evidence is sufficient to prove retaliatory animus. *Index Newspapers*, 977 F.3d at 827. Indeed, "[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500, 508 n.17 (1957).

Furthermore, while Defendant Skinner cites to statements made in the Plaintiffs' Second Depositions after Chief Skinner was added as a defendant, the Plaintiffs did provide more detailed responses to the same line of questioning in their first depositions, and the same circumstances apply to Chief Skinner in his supervisory capacity. Plaintiff Boudjerada, for

example, described how he was arrested while other people who were doing the same thing as him were not arrested or were given only warnings. Ex. 8, Boudjerada Deposition, at 44:17-45:21. He also referenced the obvious circumstantial evidence, which is the fact that he was protesting immediately before being arrested:

> Q: Okay. And other than that, what we've discussed, any other evidence that you were targeted or retaliated against because of your speech?
>
> A: Other than the fact that we were protesting and I got arrested for protesting, I can't really – I don't know.
>
> Q: At the time you were walking were you still protesting? I thought you said you were going to your vehicle?
>
> A: Yeah, I was going to my vehicle but I was protesting ten minutes before that.

Ex. 8, Boudjerada First Deposition, at 50:9-21. Other plaintiffs similar referenced the available circumstantial evidence for retaliation. *See* Ex. 10, First Ranesbottom Declaration, at 35:3-25 (describing how all of the police at the protest used violence against protesters despite the fact that the crowd was legally and peacefully protesting).

When Sergeant Stotts arrested the woman walking near Plaintiff Boudjerada, she informed officers that she lived at 14th and High St. and was walking towards her home. Sergeant Stotts responded, "you've been warned for hours!" -- despite the fact that the city-wide curfew had been announced less than ten minutes prior. Ex. 15, Stotts BWC at 10:59 (timestamp 23:06:16). In his deposition, Sergeant Stotts clarified, "We've been warning everyone for hours to go home, to get off the streets." Ex. 9, Stotts Deposition, 110723_StottsSamuel.TXT-1-1.pdf, at 49:5-6. This mentality provides circumstantial evidence that would allow a jury to conclude that, even from the time of the initial curfew limited to the downtown area, EPD officers viewed their mandate as breaking up any and all First Amendment protests and demonstrations that night.

Page 14 -- PLAINTIFFS' RESP. TO DEF. SKINNER'S MO. FOR SUMMARY JUDGMENT

Because direct evidence of improper motive is only rarely available, it is "almost always necessary" to infer such motives from circumstantial evidence. *Mendocino Environmental Center v. Mendocino County*, 192 F.3d 1283, 1302 (9th Cir. 1999). Therefore, the Ninth Circuit has consistently allowed an inference of retaliatory intent when the adverse action comes closely in time after the protected activity.  *See, e.g.*, *Schwartzman v. Valenzuela*, 846 F.2d 1209, 1212 (9th Cir. 1988); *Bell v. Clackamas County*, 341 F.3d 858 (9th Cir. 2003); *Winarto v. Toshiba Am. Elecs Components, Inc.* Specifically, courts have consistently found that where police use excessive force close in time to anti-police protected speech, an inference is warranted that that the force was used in retaliation to the speech. *See Anti Police-Terror Project v. City of Oakland*, 477 F. Supp. 3d 1066, 1088 (N.D. Cal. 2020) (inference warranted from allegations of "aggressive conduct" by officers, including "shooting a reporter with a rubber bullet"); *Don't Shoot Portland v. City of Portland,* 465 F. Supp. 3d 1150, 1155-56 (D. Or. 2020) (inference warranted from allegations that "officers indiscriminately used force against peaceful protestors on multiple occasions," "fire[d] tear gas canisters as people attempted to leave the protest area," and subjected protestors to "rubber bullets, tear gas, and a flash bang grenade at close range . . . as [they tried] to comply with officers' orders"); *Black Lives Matter Seattle-King Cnty. v. City of Seattle*, 466 F. Supp. 3d 1206, 1214 (W.D. Wash. 2020) (inference warranted from use of "indiscriminate weapons" against all protestors and "excessive amount" of chemical agents).

There is ample circumstantial evidence in this record to support the third prong of the retaliation analysis. Eugene Police Department officers targeted protesters for arrests and the use of munitions shortly after they had been exercising their First Amendment rights by participating in a protest against police violence, despite the fact that they had not themselves partaken in any violence or property destruction, had left the downtown curfew area, and were not given a

meaningful opportunity to return home after the implementation of the city-wide curfew.

As Plaintiff Boudjerada noted in his deposition (and as documented clearly in the Stotts bodycam, Exhibit 15), numerous other people were allowed to go on their way with only a warning, while he was arrested despite trying to comply with the curfew. As discussed *supra*, Plaintiff Grady was grabbed and arrested as she was *walking away*, after making a query that officers seemingly viewed as antagonistic. Ex. 15, Stotts BWC, at timestamp 00:19:56 – 00:21:40. Meanwhile, people who made favorable comments to the police that night were not threatened with arrest whatsoever, despite also violating the curfew order. *Id*. at timestamp 00:24:10, 00:24:34. Plaintiffs Cochran-Salinas and Ranesbottom were targeted *at their home* near campus shortly after officers on the radio warned that "college kids" were "voicing their opinions" and yelling at police from their homes. Ex. 14 at timestamp 1:59:33.

When Sergeant Stotts arrested a person who had been walking near Plaintiff Boudjerada, that person informed officers they lived nearby at 14th and High St. and was walking towards their home. Sergeant Stotts responded, "you've been warned for hours!" despite the fact that the city-wide curfew had been announced less than ten minutes prior. Ex. 15, Stotts BWC at 10:59 (timestamp 23:06:16). In his deposition, Sergeant Stotts clarified, "We've been warning everyone for hours to go home, to get off the streets." Ex. 9, Stotts Deposition, 110723_StottsSamuel.TXT-1-1.pdf, at 49:5-6. This mentality illustrates that even from the time of the initial curfew limited to the downtown area, EPD officers viewed their mandate as breaking up any and all First Amendment protests and demonstrations that night.

Throughout the whole night, the Eugene Police Department seemingly confused and conflated its mandate to enforce an ostensibly neutral curfew with a mandate to target those who had been involved with prior protest activity, despite the fact that none of the arrestees were

suspected of any violence or property destruction. Chief Skinner, as discussed more thoroughly below, actively participated in and sanctioned this activity by (along with Captain Klinko) authorizing the use of chemical munitions minutes after the curfew warning and throughout the night, encouraging "strategic arrests" (again, minutes after the curfew warning) and permitting the blanket use of chemical munitions to keep protesters away from campus.

In *Nieves v. Bartlett*, the Supreme Court held that probable cause usually, but not always, defeats a retaliatory arrest claim. 587 U.S. at 405-06. The Court defined an exception for situations in which officers "have probable cause to make arrests, by typically exercise their discretion not to do so." *Id.* at 406. This exception was warranted because "an unyielding requirement to show the absence of probable cause would pose 'a risk that police officers may exploit the arrest power as a means of suppressing speech.'" *Id.* (quoting *Lozman v. Riviera Beach*, 585 U.S. 87, 99 (2018)). Therefore, when a plaintiff can present objective evidence that they were arrested "when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been," the no-probable-cause requirement does not apply.

Here, the arresting officers did not have probable cause to arrest Plaintiffs Boudjerada, Hendry, and Grady. However, even if the court finds that they did have probable cause, the *Nieves* exception applies, because similar situated individuals who officers did not associate with the anti-police protests were not arrested for curfew violation.

First, as argued in the Plaintiffs' Motion for Partial Summary Judgment (Dkt 98 at 14-19), Eugene Police officers did not have probable cause to arrest Plaintiffs Boudjerada, Hendry, and Grady (all of which charges dropped following their arrest). *See* Def Brief, Dkt 222, at 16. This Court granted the Defendants' summary judgment motion on the Fourth Amendment claim, but ultimately did not determine whether there was probable cause to arrest the Plaintiffs. Rather,

the magistrate found that there was a question of fact as to whether the officers had probable cause to arrest the Plaintiffs, and it was therefore *reasonably arguable* that there was probable cause. Findings and Recommendations, Dkt 192 at 23, 2023 WL 11054157 (D. Or. Sept. 8, 2023) ("Thus, *even if the officers did not have probable cause*, they are entitled to qualified immunity . . . .") (emphasis added). Thus, for the purposes of the retaliation claim, it has not been definitively decided that the arresting agents did in fact have probable cause, and there are questions of material fact as to this point.

As argued in Plaintiffs' Motion for Summary Judgment (Dkt 98 and 165), the arresting officers did not have probable cause to arrest Boudjerada, Hendry, and Grady, because they did not have individualized reason to believe that any of the Plaintiffs were "knowingly" violating the curfew order. Plaintiffs were not given a reasonable opportunity to comply with the curfew order, and arresting officers took no steps to determine whether they were attempting to comply. Rather, the Plaintiffs were grabbed and arrested without sufficient time to return to their homes or vehicles. After Plaintiff Boudjerada was arrested, he explained to his arresting officer that he was trying to get back to his car and comply with officers' demands, and he was told in response that he was a "victim of the circumstances" but that he had "participated" in the events of that day (meaning the protests), and was taken to the jail anyway. Ex. 15, Stotts BWC, at 14:47. Plaintiff Hendry stated on the record that he was attempting to disperse and comply with the curfew orders at the time he was arrested, and also that he was trying to get away from what, in his opinion, had become an unsafe situation. Dkt 13, Hendry First Declaration, ¶¶ 15-16. Plaintiff Grady stated in her deposition that she was not aware of the city-wide curfew at the time that she was arrested. Dkt 11, First Grady Deposition, at 67:10-14. Therefore, the arrested Plaintiffs all lacked the required *mens rea* for a criminal offense, and the officers did not have

probable cause to believe they did have the required *mens rea*.

Second, even if there was probable cause, the *Nieves* exception applies because police officers that night did not arrest or seek to arrest anyone who had not been exercising their First Amendment right to protest. Although a city-wide curfew is an anomaly in Eugene, there is ample bodycam and other evidence from that night indicating that officers specifically targeted those who had participated in protests for arrests, and did exercise their discretion not to arrest other people who had not participated in the protest but were nonetheless violating the curfew order. *See* Ex. 15, Stotts bodycam. Taken as a whole, a reasonable jury could find that the evidence shows that the city enforced the curfew as a pretext to disperse protesters who were otherwise not breaking any laws.

Simply put, a reasonable juror could easily infer from circumstantial evidence -- from the fact that the Plaintiffs had been participating in anti-police protests and then were arrested and/or targeted with chemical and impact munitions without reasonable time to comply and return home (or, in the case of Cochran-Salinas and Ranesbottom, when they had already returned home), while others who had not participated in protest activities were not similarly arrested or targeted for curfew violation -- that the Plaintiffs' protected activity was a substantial or motivating factor in the manner in which the city-wide curfew was enforced. And, as discussed immediately below, a reasonable jury could also find that Chief Skinner, in overseeing and allowing that enforcement activity, is liable for the violation of the Plaintiffs' First Amendment rights.

## II.     A Reasonable Jury Could Find Chief Skinner Liable In His Personal Capacity for the Retaliatory Arrests and Use of Force Against the Plaintiffs

A reasonable jury could find Chief Skinner individually liable for retaliatory enforcement actions taken the Eugene Police Department officers that night, finding that he was well aware of and participated in an enforcement plan that targeted peaceful protesters, knew of the arrests and

"less-lethal" assaults, including the fact that protesters were not given a meaningful opportunity to comply with the curfew prior to being arrested or having munitions used against them. A reasonable jury could also, or in the alternative, find that Chief Skinner authorized the use of chemical munitions targeting protesters before they had time to disperse, and failed to ensure adequate guidance regarding the enforcement of the curfew using munitions.

In other words, a reasonable jury could find a direct causal connection between the Chief's actions and inactions that night and the deprivation of the Plaintiffs' constitutional rights.

Unsurprisingly, Defendant Skinner's Motion for Summary Judgment repeatedly notes that Chief Skinner was not physically present for the arrests and use of force that happened on the ground on May 31, 2020. Dkt 222 at 8 ("He was not physically present at the arrests of those Plaintiffs who were arrested or where any uses of force occurred in their vicinity."), *id*. at 13 ("He was not physically present."). However, the law is clear that a supervisor need not be physically present when an injury occurs in order to be liable. *Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011).

In *Starr*, the 9th Circuit explained that "to be held liable, the supervisor need not be 'directly and personally involved in the same way as are the individual officers who are on the scene inflicting the constitutional injury.'" *Id.* (quoting *Larez v. City of Los Angeles*, 956 F.2d 630, 645 (9th Cir. 1991)). Rather, "a defendant may be held liable as a supervisor under § 1983 'if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Id.* at 1207 (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir.1989)). This causal connection can be established "by setting in motion a series of acts by others" or by "knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should

know," or for "his own culpable action or inaction in the training, supervision, or control of his subordinates." *Id.* at 1207-08 (citations removed).

Additionally, the principle of "integral participation" "extends liability to those actors who were integral participants in the constitutional violation, even if they did not directly engage in the unconstitutional conduct themselves." *Hopkins v. Bonvicino*, 573 F.3d 752, 770 (9th Cir. 2009). Each officer is liable if they had "some fundamental involvement in the conduct that allegedly caused the violation." *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007).

The Ninth Circuit has recognized that a police officer need not personally arrest an alleged offender in order to be liable for the arrest. *Chuman v. Wright*, 76 F.3d 292, 294 (9th Cir. 1996) (citing with approval *Melear v. Spears*, 862 F.2d 1177 (5th Cir. 1989), in which the court recognized that an officer who merely served as backup and remained armed during a search could be an integral participant). Even silently approving of an unconstitutional arrest can give rise to integral participant liability because all a plaintiff must show is that officers "participated in some meaningful way" in the coordinated effort to unconstitutionally arrest a plaintiff. *Boyd v. Benton Cnty.*, 374 F.3d 773, 780 (9th Cir. 2004).

Here, viewing the evidence in the light most favorable to the non-moving party, there is sufficient evidence for a jury to find that Chief Skinner is liable in his personal capacity for his participation in the retaliatory arrests and use of force against the Plaintiffs, in violation of their First Amendment rights. A reasonable jury could conclude that, through the radio communications in the command center he was in charge of, the Chief would have heard that arrests were being made within just minutes of the expanded curfew being announced, despite the fact that protestors were walking away from the area where they were given warnings. He

would also have heard that Captain Klinko (in the command center with Skinner) was directing "strategic arrests" at approximately 11:00 p.m., only three minutes after the first warning, and the moment the curfew went city-wide. Ex. 14, Radio Communications, at timestamp 1:44:35.

   Chief Skinner directly authorized the use of tear gas to disperse protesters just minutes after the implementation of the city-wide curfew, and continued to authorize it throughout the night – in fact, he stated in his deposition that he must *always* authorize the use of gas. Ex. 7, Skinner deposition, at 56:12-22. Through Klinko, Skinner issued a blanket authorization to use gas to keep people off campus. Ex. 14, Radio Communications, at timestamp 1:51:10. As discussed *supra* at 5-6, immediately after this authorization, officers shot tear gas and munitions indiscriminately towards the student cooperative housing where Plaintiffs Ranesbottom and Cochran-Salinas lived.

   Chief Skinner also stated that he provided no training in the enforcement of the curfew, and that the Department's training in the use of 40-millimeter impact weapons was inadequate. Ex. 7, Skinner Deposition (portion under seal), at 25:5-8, 93:12-18.

   Based on the radio communications and Captain Klinko's testimony that he and Skinner operated like a "co-incident command" (Ex. 6 at at 26:22 – 27:3), a reasonable jury could find that Chief Skinner was aware that enforcement operations were targeting protesters who had been largely peaceful and in compliance with previous curfew orders, and that protesters were not being given a meaningful opportunity to comply.

   Defendant Skinner attempts to dismiss the supervisory liability theory by pointing out that this Court has already rejected the Plaintiffs' *Monell* claim against Chief Skinner. Dkt 222 at 13. However, the *Monell* analysis is not the same as the analysis of supervisory liability under *Starr v. Baca* and other relevant case law. *Monell* liability attaches to municipalities, not

individuals, and asks whether there was an official "policy or custom" that was unconstitutional. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978). This Court rejected *Monell* liability because it found that the City/Eugene Police Department did not have an "unlawful practice or policy allowing indiscriminate force as a tactic to disperse crowds." Dkt 192 at 16. But for the instant motion, Plaintiffs do not need to prove the existence of an unconstitutional policy or custom. Rather, a reasonable jury could find that on the night in question, Chief Skinner's conduct had a direct causal relationship to the unconstitutional actions of his subordinates.

Thus, while it is true that liability for a § 1983 violation does not attach under a *respondeat superior* theory, a reasonable jury could find that Chief Skinner's involvement went far beyond merely employing officers who violated Plaintiffs' constitutional rights. Rather, they could find that he was an integral participant with direct causal responsibility for the constitutional violations. *See Starr*, 652 F.3d at 1207 (quoting *Sanchez v. Pereira–Castillo,* 590 F.3d 31, 49 (1st Cir. 2009)) ("Although 'Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior,'* supervisory officials may be liable on the basis of their own acts or omissions . . . .").

The Defendants also imply that because Chief Skinner did not personally interact with the Plaintiffs or have any particularized knowledge of their protected speech, he could not have had retaliatory intent. Dkt 222 at 17. But retaliatory animus need not be as individualized as that. Although Chief Skinner did not personally know the individual Plaintiffs and arrestees that night, a reasonable jury could find that he knew that his subordinate officers' actions were targeting people who were (or had just been) participating in a protest against police brutality. *See NAACP v. City of San Jose*, 562 F. Supp. 3d 382, 399-400 (N.D. Cal. 2021) ("Given that the protesters were specifically protesting police misconduct, it is reasonable to allege that the protestors'

viewpoint was a substantial or motivating cause—even if not necessarily the sole cause—behind the defendants' conduct.").

A reasonable jury could find that Chief Skinner's actions that night were an integral part of the chain of events which violated the First Amendment rights of our Plaintiffs who were lawfully protesting police violence.

**III.    Chief Skinner Is Not Entitled to Qualified Immunity, Because the Right to Be Free from Retaliatory Enforcement Was Clearly Established at The Time, Regardless of Whether Probable Cause Existed**

Under one prong of the qualified immunity analysis, the court asks whether the facts allege that a government official's conduct violated a constitutional right, "taken in the light most favorable to the party asserting the injury." *Ballentine v. Tucker*, 28 F.4th 54, 61 (9th Cir. 2022). Under this prong, the facts must be taken in the light most favorable to the nonmoving party. *Robinson v. York*, 566 F.3d 817, 821 (9th Cir. 2009). For the previously discussed reasons, this prong is met in the present case. A reasonable jury could certainly find that the Defendant is liable for violating the First Amendment rights of the Plaintiffs.[2]

Under the next prong, a government official is protected from personal liability only if the rights were not clearly established at the time of the violation. *Ballentine*, 28 F.4th at 64. "To determine if a right was clearly established, '[t]he relevant inquiry is whether, at the time of the officers' action, the state of the law gave the officers fair warning that their conduct was unconstitutional.'" *Id.* (quoting *Ford v. City of Yakima*, 706 F.3d 1188, 1195 (9th Cir. 2013),

---

[2] Although the Supreme Court held in *Saucier v. Katz*, 533 U.S. 194 (2001), that the court need not address this prong if it finds qualified immunity on the other prong, Plaintiffs satisfy both prongs. In addition, Plaintiffs urge this Court to address this formerly "first" prong even if it grants qualified immunity, because otherwise there will not be "clearly established" case law going forward on this issue, in this jurisdiction.

*abrogated on other grounds by Nieves v. Bartlett*, 587 U.S. 391 (2019)).

There need not be preexisting case law that is factually on-point for a right to be clearly established. *Id.*at 66. Rather, "[a] right can be clearly established despite a lack of factually analogous preexisting case law, and officers can be on notice that their conduct is unlawful even in novel factual circumstances." *Ford*, 706 F.3d at 1195.

The law was clear at the time of Chief Skinner's actions on May 31, 2020, that the Plaintiffs had a right to be free from retaliatory police action, regardless of the existence of probable cause for their arrests. The Ninth Circuit has historically found that this level of generality in existing caselaw is sufficient to put officers on notice of their unconstitutional actions even in novel factual situations. *See, e.g., Sanderlin v. Dwyer*, 116 F.4th 904, 911 (9th Cir. 2024) (clearly established that police officers may not use their authority to retaliate against people for their protected speech); *Ballentine*, 28 F.4th at 64-65 ("[B]inding Ninth Circuit precedent gave fair notice that it would be unlawful to arrest Plaintiffs in retaliation for their First Amendment activity, notwithstanding the existence of probable cause.").

Furthermore, it is well established that the theoretical possibility of a legitimate non-retaliatory justification for officers' adverse actions does not defeat a retaliation claim. *O'Brien v. Welty*, 818 F.3d 920 (9th Cir. 2016) ("We have previously made it clear that there is a right to be free from retaliation even if non-retaliatory justification exists for the defendants' actions); *Capp v. County of San Diego*, 940 F.3d 1046, 1056 (9th Cir. 2019) (favorably quoting *O'Brien*).

Although *Ballentine v. Tucker* was decided after the events in the present case, its analysis of the *Nieves* standard and of the Defendant's qualified immunity claim is instructive in the present case. In *Ballentine*, plaintiffs were members of an organization critical of law enforcement who were arrested for chalking anti-police messages on sidewalks near the police

headquarters. 28 F.4th at 59. The prosecution against plaintiffs was ultimately dropped, but plaintiffs then filed a § 1983 claim against the arresting officers alleging retaliation in violation of their First Amendment rights. *Id.* Applying the *Nieves* standard, the court found that a reasonable factfinder could find that the Plaintiff's First Amendment rights were violated, because other similar situated individuals who did not engage in anti-police speech were not arrested. *Id.* at 61.

The court also found that the officers were not entitled to qualified immunity, because it was clearly established under Ninth Circuit precedent that "it would be unlawful to arrest Plaintiffs in retaliation for their First Amendment activity, notwithstanding the existence of probable cause." *Id.* at 65. The court rejected the defendants' attempts to argue that the facts of then-existing case law were distinguishable from the facts in that case. *Id.* at 66. Regardless of the differing factual circumstances, "any reasonable officer would understand that police action [is prohibited] where it is 'motivated by retaliatory animus, even if probable cause existed for that action.'" *Id.* (quoting *Ford*, 706 F.3d at 1196).

In *Sanderlin v. Dwyer*, the Ninth Circuit rejected a qualified immunity defense to a retaliation claim arising from the use of 40-millimeter munitions to shoot a protester at a protest following the death of George Floyd. 116 F.4th 904, 910-11 (9th Cir. 2024). This protest took place on May 29, 2020, just two days prior to the protest in the present case. *Id.* at 908. The court held that "[i]t is clearly established that police officers may not use their authority to retaliate against individuals for protected speech . . . . If a factfinder determines that [the officer's] actions were retaliatory, then [the officer's] actions would violate clearly established law." *Id.* at 911 (citing *Ford*, 706 F.3d at 1195, *abrogated on other grounds by Nieves v. Bartlett*, 587 U.S. at 139).

Here, as in *Ballentine* and *Sanderlin*, it was clearly established by *Nieves* and other binding Ninth Circuit law that retaliatory police action was a violation of the Plaintiffs' First Amendment rights, regardless of whether probable cause existed for their arrest. A reasonable factfinder could find that the Plaintiffs would not have been targeted if not for their previous engagement in an anti-police protest, and Chief Skinner was on notice by existing caselaw at the time that such retaliatory enforcement was a violation of the Plaintiffs' constitutional rights.

Defendant Skinner's attempt to differentiate the facts of the present case from preexisting caselaw is irrelevant. It is also clearly established by *Starr v. Baca* that a supervisor can be personally liable for the actions of his subordinates where there is a causal connection between the supervisor's own culpable action and the constitutional violation. 652 F.3d at 1207. The fact that this claim is brought against Chief Skinner instead of the arresting officers therefore does nothing to change the fact that Chief Skinner had fair warning that retaliatory police actions taken against the Plaintiffs would be a violation of their rights, and he therefore could be liable for enabling the unconstitutional actions of his subordinates.[3]

## CONCLUSION

There are genuine issues of material fact in the present case which preclude a finding of summary judgment for Defendant Skinner. Furthermore, Chief Skinner is not entitled to qualified immunity, because the right of protestors to be free from retaliatory arrest, regardless of

---

[3] The magistrate in this matter came to a similar conclusion in its findings and recommendations on Defendants' prior motion for summary judgment: "Although Defendants correctly point out that *Johnson* concerned officers on the ground and not city officials imposing a curfew, they do not provide any rationale for why this Court should treat this case any differently on that basis." Dkt 192 at 20, 2023 WL 11054157. The same applies here. The mere fact that the present case can be factually distinguished from existing caselaw does not mean that the law is not clearly established or that Chief Skinner did not have fair warning of the unconstitutionality of his actions.

Page 27 -- PLAINTIFFS' RESP. TO DEF. SKINNER'S MO. FOR SUMMARY JUDGMENT

the existence of probable cause, was well established, as is the right to be free from retaliatory use of force. Based on the foregoing, Plaintiffs respectfully request that the court deny Defendant Skinner's Motion for Summary Judgment.

      Respectfully submitted August 15, 2025.

       /s/ Marianne Dugan
Marianne Dugan, OSB # 932563
Email:  mdugan@cldc.org

Lauren Regan, OSB # 970878
Email:  lregan@cldc.org

CIVIL LIBERTIES DEFENSE CENTER
1711 Willamette Street Ste 301 #359
Eugene, OR  97401
Telephone:  541-687-9180

      Of Attorneys for Plaintiffs

On the brief:  Parker Deighan, Law Clerk