*Sarah Medary*

*Boudjerada v City of Eugene*

*June 30, 2021*



CC REPORTING AND VIDEOCONFERENCING
101 East Broadway, Suite 300
Eugene, OR 97401
541-485-0111
www.ccreporting.com

EXHIBIT 1 - PAGE 1

Sarah Medary

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


HASHEEM BOUDJERADA; DAMON          )No. 6:20-cv-1265-MK

COCHRAN-SALINAS; ERIN GRADY;       )

TYLER HENDRY; and KIRTIS           )

RANESBOTTOM,                       )

              Plaintiffs,        )

    v.                             )

CITY OF EUGENE; SARAH MEDARY;      )

WILLIAM SOLESBEE; SAMUEL STOTTS;)

BO RANKIN; TRAVIS PALKI; MICHAEL)

CASEY; ANTHONY VIOTTO; and RYAN )

UNDERWOOD,                         )

             Defendants.        )


DEPOSITION OF SARAH MEDARY

June 30, 2021

Wednesday

10:04 A.M.

EXHIBIT 1 - PAGE 2

```
1              THE VIDEOTAPED DEPOSITION OF SARAH MEDARY

2       was taken at the Eugene Police Department, 300

3       Country Club Road, Kilcullen Conference Room,

4       Eugene, Oregon, before Sara Fahey Wilson, CSR,

5       Certified Shorthand Reporter in and for the State of

6       Oregon.

7

8                         APPEARANCES

9       For the Plaintiffs:

10           Ms. Marianne Dugan

11           Ms. Lauren C. Regan

12           CIVIL LIBERTIES DEFENSE CENTER

13           158 East 14th Avenue

14           Eugene, Oregon 97401-4334

15           541-687-9180

16           mdugan@cldc.org

17           regan@justicelaworegon.com

18

19      For the Defendants:

20           Mr. Ben Miller

21           CITY OF EUGENE ATTORNEY'S OFFICE

22           125 East 8th Avenue, 2nd Floor

23           Eugene, Oregon 97401

24           541-682-8447

25           ben.j.miller@ci.eugene.or.us
```

```
1                        APPEARANCES

2                        (Continued)

3

4    Videographed by:

5         Ms. Claire Maederer - CC Videographer

6

7    Also Present:

8         Yadira Ramirez

9         Jaime Tucker

10        Sarah Alvarez

11

12   Reported by:

13        SARA FAHEY WILSON, OREGON CSR/WASHINGTON CCR

14        EUGENE       541-485-0111

15        TOLL FREE    800-344-0983

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT 1 - PAGE 4

```
 1                            INDEX

 2

 3   WITNESS......................................PAGE

 4   SARAH MEDARY

 5        BY MS. DUGAN                              6

 6

 7   EXHIBITS.....................................PAGE

 8   Exhibit 1      Handwritten Notes             11

 9   Exhibit 2      May 30, 2020, Email           17

10   Exhibit 3      Declaration                   18

11   Exhibit 4      May 31, 2020, Email           25

12   Exhibit 5      Executive Order               32

13   Exhibit 6      May 31, 2020, Email           33

14   Exhibit 7      May 31, 2020, Email           38

15   Exhibit 8      June 1, 2020, Email           40

16   Exhibit 9      Interrogatory Responses       42

17

18   MARKED TEXT..............................PAGE/LINE

19   None.

20

21

22

23

24

25
```

EXHIBIT 1 - PAGE 5

```
 1                    THE VIDEOGRAPHER:  We are on the
 2      record.  Today is Wednesday, June 30th, 2021.  The
 3      time is 10:04 a.m.  This is the deposition of Sarah
 4      Medary in the matter of Boudjerada, et al., versus
 5      City of Eugene, et al.
 6                    Our court reporter is Sara Fahey
 7      Wilson.  My name is Claire Maederer, and I'm CC
 8      Reporting's remote video technician.
 9                    At this time I'd like to ask counsel
10      to identify themselves and who they represent, and
11      then the reporter will swear in the witness.
12                    MS. DUGAN:  Marianne Dugan for the
13      plaintiffs.
14                    MS. REGAN:  Lauren Regan for the
15      plaintiffs.
16                    MR. MILLER:  Ben Miller for the
17      defendants.
18
19                    SARAH MEDARY,
20       having been first duly sworn to testify the truth,
21         the whole truth, and nothing but the truth, was
22                 examined and testified as follows:
23      / / /
24      / / /
25      / / /
```

EXHIBIT 1 - PAGE 6

```
 1                     EXAMINATION

 2   BY MS. DUGAN:

 3        Q.    Good morning, Ms. Medary.  I'm Marianne

 4   Dugan.  I represent the plaintiffs in the Boudjerada

 5   versus the City of Eugene case.

 6               And could you state your full name.

 7        A.    Sarah Jane Medary.

 8        Q.    Okay.

 9               Are there any factors that could affect

10   your memory right now like medication or your

11   ability to understand questions?

12        A.    No.

13        Q.    Okay.

14               Have you ever participated in a deposition

15   before?

16        A.    Yes.

17        Q.    How many, about?

18        A.    I feel like maybe two.  It's been a really

19   long time.

20        Q.    Okay.

21        A.    Yeah.

22        Q.    What was the context?

23        A.    One was a landlord/tenant issue that I was

24   one of the tenants that got called.  Many years ago.

25   The other was -- I feel like there was a City of
```

EXHIBIT 1 - PAGE 7

1    Eugene deposition around a union issue.  I just

2    can't remember if it was a deposition or if it was

3    just a meeting.

4        Q.    That's fine.  Okay.

5              No police issues in depositions before?

6        A.    No.

7        Q.    Okay.

8              Or at trial?

9        A.    Not that I recall.  I mean, yeah.

10       Q.    And have you ever testified at a trial?

11       A.    I don't think so.

12       Q.    Okay.

13             And I'm sure your attorney has explained

14    this, but if you don't understand one of my

15    questions, please let me know and I'll try to

16    clarify.  And when you answer, please say yes or no

17    as opposed to shaking your head or nodding your head

18    so that the court reporter can get your answer down

19    correctly.

20       A.    Okay.

21       Q.    And did you review any documents to

22    prepare for today's deposition other than

23    communications with your attorney?

24       A.    I communicated with him, and I looked at

25    the interrogatory.  I just reread that.  Looked at

EXHIBIT 1 - PAGE 8

```
 1    the emergency declaration.
 2         Q.    The original one and the ones following,
 3    or any particular one?
 4         A.    The original one.
 5         Q.    I guess only one was actually the
 6    emergency declaration.  Right?
 7         A.    Yeah.  Yeah.
 8         Q.    And other than attorneys, who have you
 9    discussed this litigation with, if anybody?
10         A.    You mean like discussed in terms of, like,
11    reviewed information, or just said, Hey, I'm going
12    to be deposed today?
13         Q.    Substantively, yeah, as far as --
14         A.    Yeah.  Nobody.
15         Q.    Okay.
16               Have you -- let's see.  What's your
17    current job title?
18         A.    City manager.
19         Q.    And at one point you were interim city
20    manager?
21         A.    Yeah.  It's technically called pro tem.
22         Q.    Pro tem?
23         A.    Yeah.
24         Q.    And how long was that?
25         A.    From October -- I think it was the 19th --
```

EXHIBIT 1 - PAGE 9

Sarah Medary

1      through mid June.

2          Q.    Okay.

3                October 19th of twenty --

4          A.    2019, yeah.

5          Q.    -- nineteen to mid June of --

6          A.    2020.

7          Q.    How long -- let's see.

8                What was your job title before you were

9      the pro tem in October of 2019?

10         A.    Public works director.

11         Q.    And how long were you there?

12         A.    Two years.

13         Q.    That was with the City of Eugene?

14         A.    Yes.

15         Q.    And how long overall have you worked with

16     the City?

17         A.    Just over 25 years.

18         Q.    All right.

19               When you first started with the City of

20     Eugene what was your job title?

21         A.    Parks Specialist 2.

22         Q.    And what other job titles have you had at

23     the City?

24         A.    Parks Specialist 3.  Program -- I was the

25     Erosion Prevention Program Specialist.  Engineering

EXHIBIT 1 - PAGE 10

```
1    Permit Supervisor.  Parks Maintenance Supervisor.

2    Park Operations Manager.  Natural Resource

3    Operations Manager.  Recreation Division Manager.

4    Assistant City Manager.  Planning and Development

5    Executive Director.  I think that's all.

6         Q.    Okay.

7               When did you become the Assistant City

8    Manager?

9         A.    I think John hired me in 2008.

10        Q.    Okay.

11              And that was John who?

12        A.    Ruiz, R-U-I-Z.

13        Q.    Who hired you, or the how did the process

14   work for you to become pro tem city manager?

15        A.    The city manager retired, and under the

16   city charter the Mayor has the responsibility to

17   appoint a pro tem city manager, and so I was

18   appointed by Lucy Benez.

19        Q.    And then when you became the city manager

20   in mid June of last year, was that also an

21   appointment by Lucy Benez?

22        A.    No.  That was a vote by the Eugene city

23   council.

24        Q.    Okay.

25              Do you hold any professional licenses?
```

EXHIBIT 1 - PAGE 11

```
 1        A.     No.  I am a certified coach, but I don't
 2   think that's what you're looking for.
 3        Q.     Okay.
 4               Are you on any boards of directors?
 5        A.     Yes.  I'm on the United Way board and
 6   recently on the Onward Eugene board.
 7        Q.     What educational degrees do you have?
 8        A.     I have a bachelor's of science in
 9   horticulture.  I have a bachelor of arts in
10   landscape architecture.  And I have a master's in
11   organizational leadership.
12        Q.     When did you get the master's?
13        A.     2010.
14        Q.     Okay.
15               Have you had any training in legal issues
16   specifically like, for example, Constitutional
17   issues, First Amendment, the rights of protesters,
18   any of those types of civil rights issues?
19        A.     Not that I recall.
20        Q.     Okay.
21                   MS. DUGAN:  Let's make this Exhibit 1.
22                   (Deposition Exhibit Number 1
23                    marked for identification.)
24   BY MS. DUGAN:
25        Q.     So -- so looking at what's been marked as
```

EXHIBIT 1 - PAGE 12

Sarah Medary

1    Exhibit 1, is that your handwritten notes?

2        A.    Yes.

3        Q.    It's dated May 30th, 2020, State of

4    Emergency.  Did you take these notes during an

5    in-person meeting or by -- during phone discussions?

6    Or how was -- how did you meet with these people

7    that are listed?

8        A.    They were all by phone call.

9        Q.    Okay.

10             And can you tell me what the purpose was

11   of this list of phone discussions with these folks?

12       A.    What do you mean by "what's the purpose of

13   the list"?

14       Q.    Why did you make this list?

15       A.    Oh.  Well, I was -- I knew, like, through

16   the state of emergency that the intent is to try to

17   talk to all of the city counselors that I can.  And

18   I was sitting outside with my cell phone, and I just

19   thought I should try to write down everything I

20   heard so that when I could circle back with the

21   Mayor I could just kind of let her know what I had

22   heard.

23       Q.    Okay.

24             Do you remember what time of day you were

25   doing these phone calls?

EXHIBIT 1 - PAGE 13

Sarah Medary

1        A.    I can't remember what I exactly wrote in

2    the interrogatory, but it was pretty much after I

3    had toured downtown and I got back home, so I had

4    had a conversation with the Mayor somewhere in

5    that -- before noon, and then I made these phone

6    calls I think over the next couple of hours.

7        Q.    Okay.

8             And that was on the 30th of May 2020?

9        A.    Yes.

10       Q.    Other than these handwritten notes, do you

11   have any other handwritten notes about the events of

12   May 29th through June 1st of 2020?

13       A.    No, not that I recall.

14       Q.    Okay.

15       A.    I think you already -- I think I would

16   have already given those to you.

17       Q.    Yeah.  I mean, I have emails, I've got a

18   couple of texts.  This was the only handwritten note

19   so my question was just about that.

20       A.    Yeah.

21       Q.    Okay.  All right.

22             So looking at this note, Alan -- and I

23   take it that's Alan -- is it Zelenka?

24       A.    Yes.

25       Q.    It says (reading):  Not the entire

EXHIBIT 1 - PAGE 14

Sarah Medary

14

```
 1        city.
 2               Okay.  What did that mean?
 3        A.    He had an interest in it actually being --
 4    if I remember correctly, I think he said he was
 5    trying to -- asked me some questions about why I
 6    wasn't doing the entire city.
 7        Q.    What did you respond to that question?
 8        A.    I think what I wrote was this exact thing,
 9    that we were going to be very -- like, our plan was
10    to keep it very centered in where we thought we
11    might have an issue, and that if we needed to, we
12    could always expand that.
13        Q.    Okay.
14               Do you remember if anybody else you called
15    had any concerns about it being not the entire city
16    one way or another, that they wanted it to be the
17    entire city or they wanted it not to be the entire
18    city?
19        A.    Let me just read this really quickly.
20        Q.    Sure.  Yeah.
21               (Pause.)
22        A.    Yeah.  So I feel like the majority of
23    people, including Alan, were very supportive of it
24    being a limited scope as a start.
25        Q.    Okay.
```

EXHIBIT 1 - PAGE 15

15

```
 1        A.    I think he asked me some questions about
 2   it just -- and I was just writing like, you know --
 3   I don't remember why exactly I wrote that note.  But
 4   the purpose -- both Emily and Betty were very much
 5   like, okay, mixed feelings.  Like, Emily said she
 6   had mixed feelings.  Betty had mixed feelings but
 7   also said if it's necessary she supported it.  So I
 8   think both of them would have been more supportive
 9   of it being the narrow area.
10        Q.    Okay.  Let's see.
11              Chris -- sorry.  Who is Chris -- what's
12   the last name of Chris?
13        A.    Pryor.
14        Q.    Pryor?  That's right.
15              It says (reading):  Out-of-towners
16     hate society.
17              Do you remember what that was about?
18        A.    I mean, my memory is that he was talking
19   about just, like -- there at the time there were
20   some people that thought there were rumors that
21   people were coming from Portland or they weren't
22   from here.  I don't remember the hate society piece.
23   I don't even know if that's actually what that says.
24        Q.    Yeah.  Probably shouldn't have put words
25   into your mouth.
```

EXHIBIT 1 - PAGE 16

Sarah Medary

1        A.     Yeah.

2        Q.     Do you think -- do you think it could say

3    something else?  I'm looking at your T's.  I think

4    that's a T?

5        A.     I'll just keep thinking about that because

6    it may just kind of pop out at me.

7        Q.     Okay.

8               So other than Chris Pryor, who do you

9    remember ever telling you that there was a concern

10   that out-of-towners might be coming to the city

11   during this period of time?

12       A.     Yeah, the only person who ever really

13   talked about it in any, like, for more than, like, a

14   minute was Greg Evans, and that wasn't on this day.

15   And I think it was in my interrogatory.  It was

16   probably the next day that he had a concern he had

17   heard that maybe there were people coming from

18   Portland.

19       Q.     Okay.

20              So Black Lives Matter protesters, or

21   counter protesters, or both?

22       A.     He didn't say.  He just said he had heard

23   that people might be coming from Portland and --

24   yeah.

25       Q.     Did anybody ever tell you there was a

EXHIBIT 1 - PAGE 17

Sarah Medary

```
 1    concern that people might be coming from Roseburg?
 2         A.    No.
 3         Q.    All right.
 4               This is Exhibit 2.
 5                    (Deposition Exhibit Number 2
 6                      marked for identification.)
 7    BY MS. DUGAN:
 8         Q.    I'll let you read that and then I have a
 9    couple questions.
10         A.    Did you highlight the, "I will expand the
11    curfew"?
12         Q.    Yeah, that's me.
13         A.    Okay.
14         Q.    Sorry.
15         A.    That's fine.
16         Q.    I'm trying to get them to print without
17    highlighting but I think that didn't work very well.
18         A.    Okay.
19         Q.    Okay.
20               So -- first of all, so this is -- this is
21    a  May 30th 4:39 p.m. email to the city councilors
22    and -- let's see -- you -- and then let's make the
23    declaration Exhibit 3.  I had had it attached but I
24    decided to make it separate.
25    / / /
```

EXHIBIT 1 - PAGE 18

```
 1                   (Deposition Exhibit Number 3

 2                    marked for identification.)

 3       A.    Thank you.  And these (indicating) are

 4    your notes?

 5    BY MS. DUGAN:

 6       Q.    Yeah.  I'm sorry.  Give me --

 7       A.    No.  That's okay.

 8       Q.    Give me that one back.

 9       A.    Okay.

10       Q.    I thought I had one more copy.  I don't

11    want to use that one.

12                   MS. REGAN:  I think there's two here.

13                   MS. DUGAN:  Oh, really?

14                   MR. MILLER:  I can share this with

15    her.

16    BY MS. DUGAN:

17       Q.    All right.  So -- okay.

18             So you signed this emergency declaration

19    at 4:00 p.m. on the 30th, and you sent it to the

20    city councilors and you said (reading): I intend

21       to establish a temporary curfew tonight in

22       the downtown area.

23             In the second paragraph you talk about

24       (reading):  If activity starts up in other

25       neighborhoods or parts of town, I will
```

EXHIBIT 1 - PAGE 19

Sarah Medary

1      expand the curfew to that area.

2            I don't see any discussion in that email

3      about potential to expand it city-wide.  Do you

4      remember on the 30th was there any discussion --

5      other than what we just discussed with that phone

6      note list, was there any discussion about expanding

7      city-wide at any point?

8      A.    Yeah, I mean, I think that when I talked

9      to people on the phone, I mean, I obviously had

10     pretty decent conversations with everybody.  And I

11     would say to a person they were all concerned about

12     what had happened on Friday night, and they were all

13     concerned about the safety of Eugene, and they liked

14     the approach of starting small and being responsive

15     if we needed to be, so, I mean, the conversation

16     with Alan and others -- and I feel like now -- I'm

17     sorry that I didn't mention this earlier -- but Greg

18     Evans, who lives out in the Bethel area, also

19     expressed a concern like, What about us if things

20     happen?

21           So it's -- you know, my response to them

22     is, "We'll be reasonable and we'll just take it a

23     step at a time."  So that's why this would be very

24     consistent to the conversations that I had with

25     them, if we're doing it here, and then if we need

EXHIBIT 1 - PAGE 20

Sarah Medary

1    to, we can start it up in other parts of town.

2         Q.    Okay.

3              But explicitly, there was never any

4    explicit statement by you, at least in the email,

5    that it could expand city-wide, correct, in this

6    email.

7         A.    No, definitely not in the email.

8         Q.    Okay.

9              And the exemptions listed in the first

10   paragraph don't include media.  Do you remember why

11   they weren't included?

12        A.    So when we originally sent this out, we

13   hadn't included media.  And we were then contacted

14   -- it wasn't -- it wasn't intentional, it was just

15   how it was, and we got contacted by -- I believe it

16   was Henry Houston of the Eugene Weekly asking about

17   it.  And I got a call from our community relations

18   director saying, "Hey, we're going to get questioned

19   about media."

20             And I said, "Oh, no, I'm okay with media

21   being in there," so we changed it at some point to

22   allow media to be in there.

23        Q.    Okay.

24             Do you remember where you did come up with

25   this list of exceptions, emergency care, fleeing

EXHIBIT 1 - PAGE 21

1    danger, sheltering in place, traveling to and from

2    employment, or making commercial deliveries?

3         A.    I feel like that might have been a

4    recommendation from -- or an initial set of lists

5    from the city attorney.  I'm not sure how it came

6    up.  We were trying to figure out, like, who -- who

7    is going to be in there and who do we not want to

8    unnecessarily displace.

9         Q.    Did you ever consider exempting people

10   traveling to and from their homes?

11        A.    I don't remember having that conversation.

12        Q.    Did you discuss with anybody what would be

13   done to or about people who were traveling to their

14   homes from downtown, say?

15        A.    It's -- I mean, I'd be surprised if we

16   didn't have a conversation about that.  I just don't

17   recall it specifically.  You know, I just don't

18   recall that specifically.

19        Q.    Okay.

20              Did you -- on the 30th, do you remember if

21   you spoke with Chief Skinner about how this would be

22   implemented?

23        A.    Yes, in terms of, you know, recognizing

24   that, what you just said, people are going to be

25   coming and going.  And so my understanding was there

EXHIBIT 1 - PAGE 22

1    would be -- we would be sending out a news release,

2    and there would be announcements, and people would

3    know and, you know, be given their warning like it's

4    been -- There's a curfew in place.  You need to

5    leave -- that people would have an opportunity to do

6    that.

7        Q.    Okay.

8              And did you on this day or the next day at

9    any time during this period talk to the chief about

10   what would be done regarding groups of people that

11   appeared to be walking in a group but might say they

12   are going home, whether they would be allowed to

13   keep walking down the sidewalk?

14             MR. MILLER:  Object to the form of the

15   question.

16             Go ahead.

17       A.    I didn't have any specific -- like, I

18   didn't talk to the chief specifically about how they

19   would handle any given circumstance.  It's his

20   responsibility to -- to enforce the curfew and the

21   order.

22             What I very clearly remember is having a

23   conversation about people are going to like -- how

24   will they know, and so I knew that there would be

25   warnings and that there would be announcements and

EXHIBIT 1 - PAGE 23

1    people would know.

2    BY MS. DUGAN:

3        Q.    Did you talk about how much advanced

4    notice people would have before the curfew went into

5    effect?

6        A.    On each one of the curfews we talked about

7    how much advanced notice there was.  Like,

8    recognizing, like, when does it need to happen.  So

9    we tried to do -- the ones that started, like, that

10   we sent out earlier in the day like this one,

11   gave -- giving people a lot of advanced notice this

12   is what it's going to be.  When this situation

13   shifted in the night and things were happening, we

14   tried to give as much as we could, but the decision

15   was always based on public safety considerations.

16       Q.    Okay.

17             Looking at Exhibit 3, the actual

18   administrative order, do you recall who you

19   consulted with to come up with the findings?

20       A.    The findings that are, like --

21       Q.    A.

22       A.    Okay.  The B and C piece?

23       Q.    Yeah, mainly -- mainly let's talk about A

24   for now.

25       A.    Oh, the code?

EXHIBIT 1 - PAGE 24

```
 1        Q.    Yeah.
 2              Was that just in consultation with
 3     attorneys?
 4        A.    Yes.
 5        Q.    Okay.
 6              On D, on the second page, where you say
 7        (reading):  The emergency described in
 8        paragraphs B and C requires a coordinated
 9        response beyond that which occurs routinely
10        and the required response is not achievable
11        solely with the added resources acquired
12        through mutual aid or cooperative assistance
13        agreements.
14              How did you make that decision?  How did
15     you make that finding?  What steps did you go
16     through?
17        A.    Well, we talked about the Friday night
18     activities, how fast they escalated and the fact
19     that we had to call in extra resources and we were
20     beyond our capacity.  The coming nights there were
21     protests happening in Salem and Portland.  We had
22     been -- I believe we had been contacted for even
23     giving mutual aid out of our own city.  There
24     weren't people to come.
25              So between what police was doing, what
```

EXHIBIT 1 - PAGE 25

1    public works was doing, and the feeling that we were

2    going to quickly be not able to respond and protect

3    the community is -- is what was discussed as part of

4    that.

5        Q.    So other than attorneys, who did you

6    discuss that with?

7        A.    Number D?

8        Q.    Yeah.

9        A.    The chief.  I mean, I discussed it with

10   the Mayor and council but not to give their

11   technical opinions.  I mean, it was mostly the chief

12   and the city attorney.

13       Q.    And then when you spoke with the chief,

14   was that by phone, or in person, or email?

15       A.    Mostly -- the first conversation was in

16   person, and then by phone, a conference call.

17       Q.    All right.  Let's make this 4.

18                  (Deposition Exhibit Number 4

19                   marked for identification.)

20   BY MS. DUGAN:

21       Q.    I'll let you read that.

22       A.    Yeah.  Yeah.

23       Q.    Okay.

24             And just for efficiency, I've printed your

25   email along with --

EXHIBIT 1 - PAGE 26

Sarah Medary

```
 1          A.     That's fine.

 2          Q.     -- this response by Greg Evans?

 3          A.     Yeah.

 4          Q.     So your email, May 31st, 6:14 p.m., you

 5     wrote that you had yourself attended the Black Lives

 6     Matter protest and march in downtown Eugene.

 7                 And then you note that (reading):

 8          We still have a very large group in downtown

 9          with threats to property and dangerous

10          activities.

11                 What were those threats to property and

12     dangerous activities?

13          A.     I'd have to go back and look specifically

14     at what I wrote in the interrogatory, but I can say

15     as I recall that was the day that there were -- they

16     were blocking traffic at Washington/Jefferson.

17     There was -- somebody had fired a shot in the crowd.

18     Somebody else had gotten out of a car with a -- with

19     an AR -- I think that's what it was -- and there was

20     just -- I feel like there was -- there was graffiti

21     happening.  Like, it was -- it felt like it was

22     ramping up, and that was what I had understood.

23                 I wasn't there at that intersection.  I

24     believe I got a call from one of our councilors who

25     was there, Emily Semple, who was very, very
```

EXHIBIT 1 - PAGE 27

1    concerned about what she was seeing.

2        Q.    Okay.

3            Those two incidents you mentioned, those

4    were counter protesters.  Correct?

5        A.    I don't know.

6        Q.    You were -- what were you told about

7    that -- about those incidents?

8        A.    I was just told that there was -- I just

9    -- really honestly, I don't know that anybody said

10    it was a counter protestor.  Maybe they did.  It was

11    a shot -- I don't know who shot the -- sorry.  If

12    you have my interrogatory, it would be great.  I

13    could just look at that really quick.

14        Q.    Okay.  We can get to that.

15            Looking at Mr. Evans' response, he says

16        (reading):  I totally agree, Sarah.  We saw

17        white supremacists mixed in the crowd at

18        Alton Baker Park as of the 4:30 p.m.  I think

19        they want a confrontation with law

20        enforcement.

21            So does that refresh your memory about

22    whether there was any discussion of counter

23    protesters versus protesters being involved?

24        A.    So, I mean, I'm not saying that -- I'm

25    seeing this email that you put in front of me that

EXHIBIT 1 - PAGE 28

Sarah Medary

1  Greg said that.  I don't recall.  And as I said
2  before I, wasn't taking any sort of technical advice
3  from city councilors so I didn't pass this email
4  onto the police chief.  This was just an interaction
5  with him and I.
6          So when I was in the moment and learning
7  from the chief what was happening, he never said
8  "There's a counter protester firing a shot."  It was
9  just, "there was a shot fired and somebody had an
10  AR."
11          I recall they were in a Jeep, so you can
12  make assumptions about who drives a Jeep and who's
13  in the -- who has an AR, but that specific
14  conversation I don't recall happening.
15      Q.    Okay.
16          And I think you had already said that you
17  didn't discuss with the chief how he was going to go
18  about enforcing the curfew at all?
19      A.    Correct.
20      Q.    And why not?
21      A.    Because I don't have any sort of public
22  safety certifications.  I'm a landscape architect.
23  And I trust him and his team to -- to do enforcement
24  and to know how to plan for that and to . .
25      Q.    Well, you came up with the list of

EXHIBIT 1 - PAGE 29

1    exceptions.  Did you consult him to make that list,

2    or was that your idea?

3                  MR. MILLER:  Objection.  Asked and

4    answered.

5                  Go ahead.

6    BY MS. DUGAN:

7        Q.    Well, you can clarify if you could.

8        A.    Okay.  Yeah.  What I said before was what

9    I recall is that this list was a recommended list

10   from the city attorney.

11       Q.    Okay.

12                 And you didn't question that or research

13   that yourself or come up with any other exceptions

14   other than the media which you added later?

15       A.    I don't recall -- I didn't do the

16   research.  I just saw the list.  It felt, like,

17   reasonable.  I knew people were trying to meet the

18   intent of keeping it safe but limiting, like -- also

19   trying to balance people's rights to gather, so it

20   was trying to be very reasonable.

21                 And as I said, like, as soon as somebody

22   said, "What about the media?," I was like, "Of

23   course.  That's -- happy to have them there."

24       Q.    Okay.

25                 So going back for a second to Exhibit 3,

EXHIBIT 1 - PAGE 30

1     the May 30th executive order, you -- in part D you

2     had made a finding that the required response was

3     basically beyond the capacity.  What was your

4     understanding regarding the number of police that

5     were actually available, how many patrol and

6     supervisors were available?

7               Was there any sort of limit on that that

8     you were aware of as far as everybody who's employed

9     by the EPD being available?

10     A.     I didn't have a specific conversation

11     about number of staff available.  I had a

12     conversation with the chief about whether or not we

13     were going to be able to respond if things continued

14     the way they did Friday night, and the answer was

15     "no."

16     Q.     Okay.

17               So it sounds like you basically deferred

18     to the chief on those concerns?

19     A.     Correct.

20     Q.     Did the chief tell you how many officers

21     had been called out on Friday night, the 29th?

22     A.     I don't recall him telling me a number.

23     Q.     Okay.  Okay.  Sorry.

24               Going back to Exhibit 4, the next to last

25     paragraph of your email you say (reading):

```
 1        Similar to last night, I'm prepared to expand
 2        the geographic area as needed and will email
 3        you later this evening, if necessary.
 4               Again, you're not mentioning any -- any
 5   chance that it's going to go city-wide.  Is that
 6   something you did discuss on the 31st with anybody
 7   before declaring a city-wide curfew later that
 8   night?
 9        A.    I don't remember specifically without
10   looking at my list, but throughout this weekend I
11   was talking to all of the councilors with some
12   frequency, either through a text message or a phone
13   call, and these emails, so I don't think there was
14   any question from any of them that after Saturday
15   night we would do it -- potentially another
16   city-wide curfew both Sunday -- yeah, and then on
17   Monday too.  And I talked specifically to the Mayor.
18        Q.    So when you talked to the Mayor, did you
19   mention that it might go city-wide?
20        A.    Yes.
21        Q.    Yes?  But you didn't put that in your
22   email?
23               MR. MILLER:  Objection.
24        A.    No, because --
25               MR. MILLER:  Asked and answered.
```

EXHIBIT 1 - PAGE 32

```
 1                    But go ahead.
 2        A.    No, because as I've said already, we were
 3   trying to limit it as much as possible.
 4        Q.    Okay.
 5                    MS. DUGAN:  Let's make this Exhibit 5.
 6                    (Deposition Exhibit Number 5
 7                     marked for identification.)
 8   BY MS. DUGAN:
 9        Q.    I'm sorry these don't print with a Bates
10   number, but it should be 3467 and -68.  I'm not sure
11   why it didn't print.
12                Okay.
13                So this is the May 31st executive order
14   signed at 6:00 p.m.?
15        A.    Uh-huh.
16        Q.    When -- was it -- did you make the
17   decision right at 6:00 p.m.?  I know that sounds,
18   you know, picky, but I'm just wondering if it was
19   like an hour before, or a minute before, or around
20   the same time you signed it?
21        A.    There were discussions before, but the
22   decision is when I sign it.  I mean, I guess that's
23   when the final decision is actually made.
24        Q.    Yeah.
25                    MS. DUGAN:  Exhibit 6.
```

EXHIBIT 1 - PAGE 33

```
 1                    (Deposition Exhibit Number 6

 2                     marked for identification.)

 3        A.    Yep.

 4   BY MS. DUGAN:

 5        Q.    Okay.  All right.

 6              So this is an email from you to the city

 7   councilors on May 31st at 10:54 saying

 8        (reading):  As I previously communicated as

 9        a possibility, I am extending tonight's

10        curfew city-wide effective 11:00 p.m.

11        Individuals are congregating outside the

12        boundaries to include closing the Ferry

13        Street Bridge, which is a critical route

14        for first responders.  Our community safety

15        is my first priority.  The curfew will be in

16        place until 6:00 a.m.

17              All right.  So this is sent five or six

18   minutes before 11:00 p.m.  When did you actually

19   make that decision?

20        A.    Very -- like, minutes before this based on

21   a phone call I had with the chief.

22        Q.    Okay.

23              Tell me everything you remember about that

24   phone call.

25        A.    He called me and briefed me on what was
```

EXHIBIT 1 - PAGE 34

Sarah Medary

```
1   happening.  He had a lot of concerns and said he
2   felt like we needed to do the city-wide curfew based
3   on how they were congregating outside the
4   boundaries.
5            And I said, "When do you think you it
6   needs to go into effect?"  And I said, "Midnight?"
7            And he said, "No, it needs to be sooner
8   than that."
9            I was like, "11:00?"
10           And he was like, "Yeah."
11           And I said, "Okay, it's 11:00."
12           So that's how that conversation went.
13       Q.   Okay.
14           And what was your discussion with him
15   about how people would be notified?
16       A.   I didn't have a conversation with him
17   specifically about that.
18       Q.   Were you --
19       A.   I mean, we talked about that on Friday
20   night -- or Saturday night -- I'm sorry -- and I
21   assume that carries through the whole weekend.
22       Q.   Okay.
23           And what was your understanding of how it
24   would be communicated from that prior conversation?
25       A.   Similar to how it was before, that, you
```

EXHIBIT 1 - PAGE 35

Sarah Medary

1    know, we would send out a news release, which we

2    did, and then people on the streets would notify,

3    like, "Curfew is in place.  You need to disperse,"

4    or whatever the exact language was.  I can't

5    remember.

6        Q.    And that they would be allowed to travel

7    home?

8        A.    That would be my understanding.

9        Q.    Where you say in your email

10        "individuals are congregating outside

11        the boundaries to include closing the

12        Ferry Street Bridge," what does that mean?

13        A.    They were approaching or on the Ferry

14    Street Bridge, and -- to a point that I feel like

15    they had to -- police had to close it off.  Maybe

16    they had, like, they were all congregated on the

17    bridge.

18            And there were people on other locations.

19    I think Sunday night was the night they were also

20    over in the Valley River area, and there were just

21    different areas so it was hard to decide, Do you

22    keep doing it, like, here, or here, or do you just

23    go city-wide, and that's why we made that choice.

24        Q.    Okay.

25            So did the chief tell you that the

EXHIBIT 1 - PAGE 36

Sarah Medary

1    protesters had closed the Ferry Street Bridge?

2        A.    I don't recall the specifics of that

3    conversation.  I feel like there were -- I remember

4    there was something happening on the Ferry Street

5    Bridge that was of concern and that it was at least

6    temporarily closed because people couldn't get

7    through.  We may have closed it because of that.

8        Q.    So if I understand you correctly, rather

9    than deciding to close the areas where there were

10   actually people congregating, that seemed to be too

11   complicated so you just said city-wide?

12                MR. MILLER:  Objection.

13   Argumentative.

14                Go ahead.

15                MS. DUGAN:  I'm just asking for

16   clarification.

17                MR. MILLER:  I'm just making an

18   objection.

19       A.    Yeah.  There were -- you know, it was --it

20   was really clear that people knew where the

21   boundaries were and they were moving to the outsides

22   of them.  This is how it was being communicated to

23   me.

24                It's also some of what I heard.  If you

25   tuned into one of those Facebook live streams, it

EXHIBIT 1 - PAGE 37

1    was very like, this is the boundary.  Go here.

2            So at some point it was just the resources

3    it would take to continue to respond to multiple

4    boundaries and the numbers of notifications, it felt

5    like the reasonable, responsible thing was just to

6    make it city-wide.

7    BY MS. DUGAN:

8        Q.    And did the chief tell you that there was

9    any violence that was happening?

10       A.    On each of these nights there were

11   different things happening.  Whether it was graffiti

12   or people banging on things, it was, you know --

13   there was -- I mean, yes, but I don't remember

14   specifically a conversation about any particular one

15   incident, especially on this night.  That was just

16   sort of a general theme.

17       Q.    Do you remember any discussion of

18   potentially doing the curfew at 11:30?

19       A.    No.

20       Q.    Do you remember any discussion of making

21   the curfew city-wide earlier than 11:00?  Or was

22   this the only discussion you had about making it

23   city-wide that night?

24       A.    This was -- he called me and told me what

25   was going on, and I pushed back, as I told you, and

EXHIBIT 1 - PAGE 38

```
1    I don't -- I thought I had pushed back to midnight,
2    like, "Can we give people more time?"
3              And he was, like, "No, this is a situation
4    that needs to be stopped."
5              And I trusted him and made it 11:00.  I
6    don't recall if it was 11:30.  I don't remember
7    having any conversations about it being earlier in
8    the night.
9         Q.   Okay.
10             Do you remember him -- did he tell you --
11   did he tell there would be tear gas used?
12        A.   No.
13        Q.   Did he tell you there would be foam batons
14   used?
15        A.   No.
16                  (Deposition Exhibit Number 7
17                   marked for identification.)
18   BY MS. DUGAN:
19        Q.   So this is an email from you at 10:59:26
20   on May 31st.
21        A.   This is not an email from me.  This is an
22   email from --
23        Q.   I apologize.  Sorry.
24             This is an email from your communications
25   person?
```

EXHIBIT 1 - PAGE 39

```
 1        A.    Yeah.

 2        Q.    All right.

 3              You had sent -- okay.  So -- and she's

 4    sending this to Eugene media contacts.  Update:

 5        (reading):  The curfew has been extended

 6        city-wide starting at 11:00 p.m. tomorrow

 7        through 6:00 a.m. tomorrow.

 8              Did you authorize the sending of this

 9    notice to the media?  I don't mean the exact

10    wording, but did you say, Please tell the media?

11        A.    That was our standard operating procedure

12    through the entire weekend.  Anytime we did a curfew

13    we sent out a news release.  So I didn't

14    specifically authorize this but it would have been

15    expected.

16        Q.    Okay.

17              So with less than one-minute warning this

18    is going to the media.  Correct?

19                   MR. MILLER:  Object to the form of the

20    question.

21                   Go ahead.

22    BY MS. DUGAN:

23        Q.    Well, am I misreading that?

24        A.    Yeah.  I mean, it's time stamped so I

25    think that's -- the answer is right there when it
```

EXHIBIT 1 - PAGE 40

```
 1    got sent.

 2         Q.    All right.

 3               (Deposition Exhibit Number 8

 4                marked for identification.)

 5               THE WITNESS:   Thank you.

 6    BY MS. DUGAN:

 7         Q.    This is from the chief and then a

 8    response.  So I'll let you take a look at it because

 9    I know it's not something you wrote so you might

10    want to familiarize yourself with it.

11         A.    Okay.

12         Q.    All right.

13               So does the information that he's

14    conveying -- that Chief Skinner is conveying in this

15    email -- is it similar to what he was telling you

16    the night before when you decide to make this curfew

17    city-wide?

18         A.    Yeah.  There's more detail in this email

19    than he and I spoke about on the phone.

20         Q.    Okay.

21               Well, on the second page in kind of the

22    middle where he says (reading):  A group of

23       protesters, between 50 and 60, at 8th and

24       Mill continued to block traffic, and there

25       were concerns about Ferry Street Bridge
```

Sarah Medary

```
 1        becoming involved.  Police shut down the
 2        bridge.
 3              Does that --
 4        A.    Yeah.
 5        Q.    -- sound like what he might have told you
 6   the night before?
 7        A.    Yeah.  What I recall as I'm reading this
 8   is that that group of 50 to 60 people were -- were
 9   moving up the bridge, and I think the concerns were
10   they were going to get on the bridge and block
11   traffic and, like, not leave, and so they were
12   prevented from doing that.
13        Q.    So we have the email to the media from the
14   night before at 11:59:26, and then, I, of course,
15   know about the --
16        A.    10:59.
17        Q.    Sorry.  10:59.
18              I, of course, know about the Amber alert,
19   or whatever you would call them, on the text
20   messages because I got them myself, and I do have
21   printouts of some of those.  But other than those
22   blasts from the Amber alert text messaging, were
23   there other ways in which the public was given
24   notice of the curfew?
25        A.    So the Amber alerts were on Monday, not
```

```
1    Sunday.  Are you still talking about Sunday or are
2    we talking about Monday?
3         Q.    I think they were both nights?
4         A.    No.  They were just Monday night.
5         Q.    Okay.  Okay.
6              So on Sunday night, how did people get
7    notice of -- other than police telling them on the
8    streets, was there any way the general public was
9    told?
10        A.    Probably the news releases and whatever
11   got shared on social media by -- I feel like the
12   police department was updating social media and
13   announcements by EPD that are in the area that are
14   letting people know there's a curfew.  But the
15   general public?  I'm not sure --
16        Q.    Okay.
17        A.    -- if they are sleeping how they would
18   have known.
19        Q.    Okay.
20                  (Deposition Exhibit Number 9
21                   marked for identification.)
22   BY MS. DUGAN:
23        Q.    So here is your interrogatory responses.
24        A.    Thank you.  That's helpful.
25        Q.    Yeah.  I had a couple questions about
```

EXHIBIT 1 - PAGE 43

Sarah Medary

```
1    this.  Let me find my specific questions.
2              On page 6 of the interrogatories
3    discussing May 31st, you say that you took part in
4    the organized Black Lives Matter protest?
5         A.    Yes.
6         Q.    That was a planned event, correct, planned
7    in advance?
8         A.    Yes.
9         Q.    Okay.
10             Do you remember what time of day that
11   started or what time you were there?
12        A.    I feel like it was afternoon-ish, like
13   3:00 o'clock, 4:00 o'clock, somewhere in there.  I
14   don't remember exactly.  It's in this email.  I
15   think there's one of the emails that say exactly
16   what time.
17        Q.    Okay.
18             And so --
19        A.    I think it was 1:00 o'clock.  It could
20   have been earlier.
21        Q.    Okay.
22             So the whole time you were downtown and
23   attending the event did you see any unlawful
24   activity yourself?
25        A.    I went down and parked at the library,
```

EXHIBIT 1 - PAGE 44

1    walked over to the federal courthouse, and I was

2    there for the main part of the thing.  I didn't go

3    to Alton Baker Park, I didn't follow the march, and

4    I didn't stay downtown.

5              So in that time there was maybe some,

6    like, cars racing around and things like that, but I

7    don't recall seeing anything super specific.

8        Q.    All right.

9              So you say (reading):  As the

10       afternoon and early evening progressed, EPD

11       was concerned about their ability to maintain

12       the safety and lawfulness of the gathering.

13       At around 5:00 p.m., Chief Skinner

14       recommended a curfew in the downtown area.

15             At 5:00 p.m. what was your understanding

16    of the problem with maintaining safety and

17    lawfulness --

18        A.    Uh-huh.  My understanding is that when the

19    events at Alton Baker ended, maybe even before that,

20    a large number of the crowd came back over and was

21    in downtown and they were filling the streets.

22    That's when we had the incident with the person and

23    the AR.

24             So there was a large gathering in

25    downtown.  Some of them were splitting off, and it

EXHIBIT 1 - PAGE 45

Sarah Medary

1  was feeling like it was escalating, is what I

2  understood from the chief.  And we had -- I think I

3  had mentioned earlier I believe that is the same --

4  I had received at least a phone call from Emily

5  Semple that she was down there and she had seen and

6  heard the gun and was really concerned, so it

7  resonated with what he had said as well.

8     Q.    So Emily Semple was concerned about the

9  gun.  Did she ever say she was concerned about the

10  protesters?

11    A.    She -- I mean, she had multiple concerns

12  about all of it.  She had concerns about what was

13  happening.  She had concern about the property

14  damage.  She had concern about our response.  She

15  had -- you know, she was very -- just a concern, I

16  think, for downtown and for everybody to be okay and

17  safe and have their rights, too.  So she's -- she's

18  a mix of all of those things.

19    Q.    Now -- so in your interrogatory response

20  on page 6 to page 7 where you're talking about May

21  31st, correct me if I'm wrong, but you don't mention

22  the gun situation?

23    A.    Yeah, I didn't mention it in here.  That's

24  a miss.

25    Q.    The example you gave was the hammering on

EXHIBIT 1 - PAGE 46

Sarah Medary

```
 1    light poles.  Tell me what you had heard from Chief
 2    Skinner about that.
 3        A.    I just remember, you know, basically some
 4    of what he had said in here was just that there were
 5    people starting to -- that had hammers and were
 6    starting to bang on light poles, and I think they
 7    were banging on cars.  It was escalating in the
 8    downtown area.
 9        Q.    Okay.
10              So he conveyed to you there were multiple
11    hammers being used?
12        A.    I don't recall him saying there were
13    multiple hammers.  I just remember him describing
14    kind of the general atmosphere.
15        Q.    So would you agree on Exhibit 8 on the
16    second page, that prior exhibit, at the very top he
17    says (reading):  Some of them began hitting
18        light poles with a hammer --
19              Do you see that?
20        A.    Yes, I see that.
21        Q.    -- (reading):  to make noise.
22              Does that sound like what he told you?  Or
23    do you remember him saying "hammers"?  And I'm sorry
24    to be picky about that, but it sounds like -- to be
25    honest, it sounds like he's either inflating beyond
```

EXHIBIT 1 - PAGE 47

1    what he said in that email or you're misremembering,

2    and I'm trying to figure out which.

3                MR. MILLER:  Object to the form of the

4    question.

5                Go ahead and answer if you know what

6    the question is.

7        A.    You know, we're over a year from this

8    incident.  So I remember him talking about the

9    general atmosphere in downtown, people moving

10   around, the numbers of people in the street, and

11   there was -- I don't remember all the specific

12   details of that conversation so I don't recall him

13   saying hammers or hammer.  I just recall that stood

14   out.

15       Q.    Do you remember the chief stating that

16   there were a small amount of aggressors involved in

17   making trouble?

18       A.    I don't recall him having that detail.

19       Q.    Okay.

20             Let's see.  At some point -- oh, on page 7

21   at the top you say you notified city council and

22   contacts at the University of Oregon.

23             Do you remember why you notified the

24   U of O?

25       A.    Yeah.  I was trying to just give them a

EXHIBIT 1 - PAGE 48

Sarah Medary

1    heads up that the protesters might be moving in

2    their direction and I didn't want them to be --

3    because I knew that, I feel like I should let them

4    know and just be a good partner.

5        Q.    Did you notify them by email or phone?

6        A.    The first night, actually, I emailed them.

7    I probably texted Michael Schill on that night or

8    Matt Roberts.  I may have called them.

9        Q.    All right.

10           And that was because -- is that because

11   the chief had told you that there was a group of

12   people headed to the University?

13       A.    Yeah.  And I feel like that night might

14   have been the night Tre Stewart was also, like,

15   streaming through Twitch, or whatever, and talking

16   about exactly where they were going.

17       Q.    Okay.

18       A.    I didn't watch all of his live streams but

19   every now and then I would turn it on and so I could

20   see and hear what they were doing too.

21       Q.    When you watched that, did you see any

22   violence happening?

23       A.    I saw a lot of chaos happening, you know.

24   And, again, I watched probably 10 minutes of stream

25   periodically.  You know, I was not, like, glued in

EXHIBIT 1 - PAGE 49

Sarah Medary

1    on any of that.

2         Q.    So you didn't see any violent acts?

3         A.    What would you consider a violent act?

4         Q.    What would you consider a violent act?

5         A.    A fist fight, you know, throwing a rock

6    through a window, burning something.

7         Q.    Did you see anything like that?

8         A.    I didn't see that.  I don't specifically

9    recall that.

10        Q.    Did the chief mention anything like that

11   happening?

12        A.    I don't specifically recall that.  I'm not

13   trying to be difficult.  I just think, you know,

14   there was a lot going on.  It's hard to remember it

15   all.

16        Q.    Yeah.  Yeah.

17              Were you ever made aware before midnight

18   or before 11:00 p.m. on the 31st that SWAT was going

19   to be used that night?

20        A.    I didn't -- I was not aware that SWAT was

21   going to be used.  I was informed after the fact

22   that they were.

23        Q.    Were you informed that night?

24        A.    No.  I believe I read it in an email the

25   next morning.

EXHIBIT 1 - PAGE 50

Sarah Medary

1      Q.    Okay.

2            So were you debriefed by the chief --

3    other than the emails that you've sent through your

4    attorney, did he call you and debrief you on what

5    had happened that night on May 31st?

6      A.    So did he call me on -- he wouldn't have

7    called me that night after -- after the curfew.  I

8    don't recall him calling me that night.  I'm sure we

9    talked the next day.

10     Q.    The next day?

11     A.    Yeah.

12     Q.    Is that when he told you that SWAT had

13   been used?

14     A.    No.  I think I read that in an email.

15     Q.    Okay.  You said that.  I'm sorry.

16           Were you surprised to see that SWAT had

17   been used?

18     A.    Surprised isn't the right word.  I mean, I

19   think, you know, I don't -- again, I'm not a public

20   safety professional so I'm learning -- I guess it

21   was a learning for me, like, to understand that that

22   was a tool that they felt they needed to use that

23   night.

24     Q.    So after more details came out about what

25   had happened on the evening of May 31st, did you

EXHIBIT 1 - PAGE 51

```
 1    have any concerns about the force used by the
 2    police, as a city manager?
 3         A.    After the five -- so on Monday?
 4         Q.    Whenever you learned about --
 5         A.    Yeah, I mean --
 6         Q.    Other than Henry Houston, which I know you
 7    had gotten emails from him --
 8         A.    Uh-huh.  Yeah, I called the next morning
 9    about that.
10              So do I have concerns about the use of
11    force?  I mean, I guess you always have hopes that
12    things will be peaceful and that you never have to
13    use force, so the whole event from both directions
14    of us using force and the situation requiring it to
15    were -- were days that I felt sad about.
16         Q.    Okay.
17              Did you ever talk to federal protective
18    services about the events of May 31st -- did you
19    talk to them that day about the protests that were
20    happening?
21         A.    Federal -- who is that?
22         Q.    I don't know.  I mean I know, but they are
23    mentioned in some documents as being -- cooperating
24    with the EPD.  But you didn't yourself have any --
25         A.    No.
```

EXHIBIT 1 - PAGE 52

```
 1        Q.    -- communications?  All right.

 2             Beyond the curfew, did you -- did you or

 3   your office do any other advanced planning for --

 4   regarding the protests of May 31st?

 5        A.    No.

 6                 MS. DUGAN:  I'm going to talk to

 7   Ms. Regan and see if we have any other questions,

 8   and I'll come right back.

 9                 THE VIDEOGRAPHER:  We're off the

10   record at 11:06 a.m.

11             (Recess:  11:06 to 11:13 a.m.)

12                 THE VIDEOGRAPHER:  We are back on

13   record at 11:13 a.m.

14   BY MS. DUGAN:

15        Q.    All right.

16             So let's see, in his email on June 1st,

17   the chief -- let's see.  This is Exhibit --

18        A.    8.

19        Q.    8?  8.

20             So on page 2, in that kind of middle

21   paragraph, he says (reading):  The mob moved to

22     the sidewalks.

23             When you were watching the live stream,

24   were you -- did it look like a mob to you?  Is that

25   a word you would have used?
```

EXHIBIT 1 - PAGE 53

Sarah Medary

53

```
1        A.    Which paragraph is that?

2        Q.    It's the first full paragraph on the

3   second page.  It's the last sentence.

4        A.    I'm sorry.  I'm not seeing that.  The

5   second --

6        Q.    The page that I've --

7        A.    Oh, so I wasn't watching this particular

8   piece.  I mostly saw Tre Stewart when he was -- the

9   one I was referring to earlier he was -- they were

10  walking words the U of O.  They may have even been

11  on the U of O campus.  And I also saw a little bit

12  of what he did from the parking garage.  He had,

13  like, climbed up in the parkade and was looking back

14  down on -- I think that's Broadway right there.

15            So I didn't -- I did not see this so I

16  don't -- I don't know what it was.

17       Q.    Okay.

18            Did the chief, on May 31st, describe to

19  you that there was a mob?

20       A.    I don't recall him using that word.

21       Q.    Did the chief express any sort of animus

22  towards the people who were walking on the sidewalks

23  toward the University?

24       A.    No.

25       Q.    I'm trying to get a better sense of what
```

EXHIBIT 1 - PAGE 54

Sarah Medary

54

```
1    steps you took before declaring the city-wide curfew
2    with moments of decision-making involved.
3            Did you defer completely to the chief's
4    recommendations, or did you say, "I want to check
5    some facts.  I want to talk to some other folks"?
6        A.    No.  I deferred to the chief.  And it was
7    based on the level of concern in his voice.  And I
8    asked him, "You need to give me your professional
9    opinion on what's going to keep the community safe."
10           And he said, "It needs to happen at
11   11:00."
12           And I believed him, and I made it happen
13   at 11:00.
14       Q.    And on June 1st do you recall why you did
15   not expand the curfew city-wide at any point?
16       A.    There was never a need to.
17       Q.    The chief never asked you to?
18       A.    No.
19       Q.    And the chief didn't ask you for a curfew
20   on June 2nd?
21       A.    No.
22       Q.    So every time the chief asked you for a
23   curfew you gave him the curfew he had requested
24   including the location and the exact times he had
25   asked for.
```

EXHIBIT 1 - PAGE 55

Sarah Medary

1           Is that correct?

2      A.    I relied on his public safety expertise,

3    yes.

4      Q.    And in retrospect, do you have any

5    concerns at this point about those decisions that

6    you made?

7      A.    I made the best decision I could with the

8    information I had at the time.  So it's easy to go

9    back and say, Oh, could we have done this?  Could we

10   have done this?  But I feel really good about how we

11   handled it.

12     Q.    So if in a couple of weeks there was

13   another protest situation and the chief asked you

14   for a curfew, would you want to have any other

15   process in place to do it any differently than you

16   did it last time?

17           MR. MILLER:  I'm going to object to

18   the extent it calls for speculation.

19           Go ahead.

20     A.    Well, we had multiple, multiple, multiple

21   nights of protests after this where we didn't call

22   for a curfew, so we've said publicly that we learned

23   through this process and that as things

24   de-escalated, we changed our tools and we were

25   reasonable and responsible about that.

EXHIBIT 1 - PAGE 56

Sarah Medary

56

```
1              I would be -- if the police -- if the

2     chief was calling and asking for a curfew, even

3     speculatively, I'd have to imagine there was

4     something significant happening of a public safety

5     concern.  I'd have to evaluate that when I got

6     there.

7     BY MS. DUGAN:

8          Q.    Okay.

9              So the process hasn't changed at all.  Is

10    that correct?  The process of obtaining a curfew, or

11    issuing a curfew, issuing an emergency order --

12         A.    I would have to do an emergency

13    declaration.  So not knowing what you're

14    speculating, I don't know if I would or I wouldn't,

15    so it's . . .

16         Q.    Aside from speculation, has anything

17    changed in the city manager's office about that

18    process of issuing an executive order, executive

19    directive, and a curfew?

20         A.    The emergency management plan is the same,

21    our code is the same, and I would use the same brain

22    that I had before.

23         Q.    Okay.

24         A.    Yeah.  There's not a standard operating

25    procedure.
```

EXHIBIT 1 - PAGE 57

Sarah Medary

1     Q.     Okay.

2            So the impact -- I forget what they call

3     it -- the community impact cases that led to -- and

4     are still kind of underway leading to some

5     recommendations for change -- have you been

6     considering those as far as potentially making

7     changes in the process of issuing executive orders,

8     emergency orders, and curfews?

9     A.     We haven't had that discussion yet.  I'm

10    open to that.

11    Q.     Nobody has brought that up with you?

12    A.     No.

13    Q.     Do you -- have you gathered any statistics

14    about the cost of the law enforcement response on

15    May 31st?

16    A.     No.

17    Q.     Have you gathered any statistics about how

18    effective the curfew was on May 31st?

19    A.     I'm not sure what statistics you would

20    look at for that.  Can you give me an example of

21    something?

22    Q.     Number of property damage complaints

23    before and after?  Number of arrests?

24    A.     No, I haven't gathered those.

25    Q.     Whether the arrests were actually

EXHIBIT 1 - PAGE 58

Sarah Medary

58

```
1    prosecuted?  Whether any officer was found to be

2    violating policy during the curfew as far as how

3    they enforced it?

4         A.    I personally have not gathered those

5    statistics.

6         Q.    Have you been reading any of the

7    information that's coming out of the civilian review

8    board meetings?

9         A.    I have not.

10        Q.    When you were studying for your master's

11   degree, did you have any education on how to do city

12   management in coordination with law enforcement?

13        A.    No.

14        Q.    Did you have any training on anything

15   regarding protester rights or First Amendment rights

16   in the context of city management?

17        A.    No.

18              MS. DUGAN:  No further questions.

19              THE WITNESS:  Thanks.

20              THE VIDEOGRAPHER:  All right.  We are

21   going off the record at 11:21 a.m.

22              (The deposition was concluded

23               at 11:21 a.m.)

24                    --o0o--

25
```

EXHIBIT 1 - PAGE 59

```
 1   State of Oregon      )
                          )      ss.
 2   County of Lane       )

 3

 4        I, Sara Fahey Wilson, CSR, a Certified Shorthand

 5   Reporter for the State of Oregon, certify that the

 6   witness was sworn and the transcript is a true

 7   record of the testimony given by the witness; that

 8   at said time and place I reported all testimony and

 9   other oral proceedings had in the foregoing matter;

10   that the foregoing transcript consisting of 58 pages

11   contains a full, true and correct transcript of said

12   proceedings reported by me to the best of my ability

13   on said date.

14        If any of the parties or the witness requested

15   review of the transcript at the time of the

16   proceedings, such correction pages are attached.

17        IN WITNESS WHEREOF, I have set my hand this 13th

18   day of July 2021, in the City of Eugene, County of

19   Lane, State of Oregon.

20

21

22

23   Sara Fahey Wilson, CSR

24   CSR No. 06-0400

25   Expiration Date:  March 31st, 2023
```

EXHIBIT 1 - PAGE 60