*Ryan Underwood*

*Boudjerada v City of Eugene*

*July 1, 2021*



CC REPORTING AND VIDEOCONFERENCING
101 East Broadway, Suite 300
Eugene, OR 97401
541-485-0111
www.ccreporting.com

EXHIBIT 3 - PAGE 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


HASHEEM BOUDJERADA; DAMON          )No. 6:20-cv-1265-MK

COCHRAN-SALINAS; ERIN GRADY;       )

TYLER HENDRY; and KIRTIS           )

RANESBOTTOM,                       )

            Plaintiffs,            )

    v.                             )

CITY OF EUGENE; SARAH MEDARY;      )

WILLIAM SOLESBEE; SAMUEL STOTTS;   )

BO RANKIN; TRAVIS PALKI; MICHAEL   )

CASEY; ANTHONY VIOTTO; and RYAN    )

UNDERWOOD,                         )

            Defendants.            )


DEPOSITION OF RYAN UNDERWOOD

July 1, 2021

Thursday

2:51 P.M.

EXHIBIT 3 - PAGE 2

Ryan Underwood

```
1              THE DEPOSITION OF RYAN UNDERWOOD was taken

2     at the Eugene Police Department, 300 Country Club

3     Road, Kilcullen Conference Room, Eugene, Oregon,

4     before Sara Fahey Wilson, CSR, Certified Shorthand

5     Reporter in and for the State of Oregon and

6     Washington.

7

8                       APPEARANCES

9     For the Plaintiffs:

10         Ms. Marianne Dugan

11         Ms. Lauren C. Regan (By Zoom)

12         CIVIL LIBERTIES DEFENSE CENTER

13         158 East 14th

14         Eugene, Oregon 97477-4334

15         541-687-9180

16         mdugan@cldc.org

17         lregan@justicelaworegon.com

18

19    For the Defendants:

20         Mr. Ben Miller

21         CITY OF EUGENE ATTORNEY'S OFFICE

22         125 East 8th Avenue, 2nd Floor

23         Eugene, Oregon 97401

24         541-682-8447

25         ben.j.miller@ci.eugene.or.us
```

EXHIBIT 3 - PAGE 3

```
 1                        APPEARANCES

 2                        (Continued)

 3

 4   Videographed By:

 5        CLAIRE MAEDERER - CC REPORTING

 6

 7   Also Present:

 8        MS. SARAH ALVAREZ

 9

10   Reported by:

11        SARA FAHEY WILSON, OREGON CSR/WASHINGTON CCR

12        EUGENE       541-485-0111

13        TOLL FREE    800-344-0983

14

15

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT 3 - PAGE 4

```
 1                          INDEX

 2

 3    WITNESS......................................PAGE

 4    RYAN UNDERWOOD

 5         BY MS. DUGAN                            6

 6

 7    EXHIBITS.....................................PAGE

 8    Exhibit 1         Eugene Police Department      14

 9                      Policy 1203

10    Exhibit 2         Arrest Report                 21

11    Exhibit 3         Diagram                        35

12

13    MARKED TEXT..............................PAGE/LINE

14    None.

15

16

17

18

19

20

21

22

23

24

25
```

Ryan Underwood

```
 1                    THE VIDEOGRAPHER:  We are on the
 2    record.  Today is Thursday, July 1st, 2021.  The
 3    time is 2:51 p.m.  This is the deposition of Ryan
 4    Underwood in the matter of Boudjerada, et al.,
 5    versus the City of Eugene, et al.
 6                    Our court reporter is Sara Fahey
 7    Wilson.  My name is Claire Maederer, and I'm CC
 8    Reporting's remote video technician.
 9                    At this time I'd like to ask counsel
10    to identify themselves and whom they represent, and
11    then the reporter will swear in the witness.
12                    MS. DUGAN:  Marianne Dugan for the
13    plaintiffs, and with me is Sara Alvarez, also an
14    attorney for Civil Liberties Defense Center, for the
15    plaintiffs.
16                    MR. MILLER:  Ben Miller for the
17    defendants.
18
19                    RYAN UNDERWOOD,
20     having been first duly sworn to testify the truth,
21      the whole truth, and nothing but the truth, was
22              examined and testified as follows:
23    / / /
24    / / /
25    / / /
```

EXHIBIT 3 - PAGE 6

Ryan Underwood

```
 1                    EXAMINATION
 2   BY MS. DUGAN:
 3       Q.    Good afternoon.  Is it Detective
 4   Underwood?
 5       A.    Yes, ma'am.
 6       Q.    And what is your middle name?
 7       A.    Joseph.
 8       Q.    And what's your badge number?
 9       A.    699.
10       Q.    Let's see.
11             Are you taking any medications or are
12   there other factors that could affect your ability
13   to remember events or to understand my questions?
14       A.    No.
15       Q.    And have you participated in a deposition
16   before?
17       A.    Yes.
18       Q.    How many times?
19       A.    I believe one.
20       Q.    Do you remember what it was?
21       A.    I used to be a child abuse investigator,
22   and it was a part of my job before trial to attend
23   depositions.
24       Q.    Okay.
25       A.    I recall being at one.
```

EXHIBIT 3 - PAGE 7

Ryan Underwood

```
 1        Q.    And did you ever have to testify at trial
 2   in a civil matter?
 3        A.    Yes.
 4        Q.    Child abuse?
 5        A.    Yes, ma'am.
 6        Q.    Okay.
 7              Anything else?
 8        A.    No.
 9        Q.    If you don't understand any of my
10   questions -- one of my questions -- let me know and
11   I'll rephrase it.  If you're going to answer yes or
12   no, please make sure to say that out loud rather
13   than just nodding or shaking your head.
14        A.    Okay.
15        Q.    And I believe you sat through Officer
16   Viotto's deposition and also the depositions this
17   morning?
18        A.    Yes, ma'am.
19        Q.    And yesterday?
20        A.    Yes, ma'am.
21        Q.    Yeah.  Okay.
22              Did you review any documents or body
23   camera footage to prepare for today's deposition?
24        A.    Yes.
25        Q.    What did you review?
```

EXHIBIT 3 - PAGE 8

Ryan Underwood

8

```
 1        A.    I reviewed my police report, my body
 2   camera, the interrogatories, and the administrative
 3   order.
 4        Q.    And other than your attorney, who have you
 5   discussed this lawsuit with?
 6        A.    No one.
 7        Q.    And how long -- don't tell me anything you
 8   said, but how long did you spend preparing with your
 9   attorneys for this deposition?
10        A.    I don't have a number.
11        Q.    Hours?
12        A.    Maybe.
13        Q.    And when was that?  Very recently?
14        A.    I watched body camera this week and
15   reviewed my report over the last couple months.
16        Q.    And then you sat with the attorney for a
17   period of time?
18        A.    Yes, ma'am.
19        Q.    How long?
20        A.    I don't know.
21        Q.    Was it yesterday?
22             MR. MILLER:  Counsel, how is this
23   likely to lead to the discovery of admissible
24   evidence?
25             MS. DUGAN:  I'm just interested in how
```

EXHIBIT 3 - PAGE 9

Ryan Underwood

```
1    much people have prepared for the deposition.

2        A.   I don't have a number on how long I spent

3    with my attorney.

4    BY MS. DUGAN:

5        Q.   You don't remember?

6        A.   No.

7        Q.   Let's see.

8             What is your current job title?

9        A.   I am a detective with the Eugene Police

10   Department.

11       Q.   And how long have you worked with the EPD

12   overall?

13       A.   I was hired in June 2017.

14       Q.   And have you been a detective the whole

15   time?

16       A.   No.  I started being a detective January

17   2020.

18       Q.   Okay.

19            And what was your position before that?

20       A.   Patrol officer.

21       Q.   And have you worked for any other police

22   department?

23       A.   Yes.

24       Q.   Where have you worked?

25       A.   I worked as a patrol deputy for the
```

EXHIBIT 3 - PAGE 10

Ryan Underwood

```
 1    Hillsboro County Sheriff's Office in Tampa, Florida.

 2         Q.    What period of time was that?

 3         A.    March 2015 to June 2017.

 4         Q.    And anywhere else as a police officer?

 5         A.    No.

 6         Q.    And what other jobs, if any, have you had

 7    as an adult?

 8         A.    I was a child abuse investigator for the

 9    Hillsboro County Sheriff's Office before my time in

10    law enforcement.

11         Q.    That was in Tampa?

12         A.    Yes, ma'am.

13         Q.    Are you involved with the Joint Terrorism

14    Task Force?

15         A.    No.

16         Q.    Let's see.

17               Are you on any boards of directors?

18         A.    No.

19         Q.    Did you go to college after high school?

20         A.    Yes.

21         Q.    Where did you go?

22         A.    I went to several colleges.

23         Q.    Did you get a degree?

24         A.    Yes.

25         Q.    What degree did you get?
```

EXHIBIT 3 - PAGE 11

Ryan Underwood

1      A.    I have a bachelor's degree and a master's

2   degree.

3      Q.    What's the bachelor's in?

4      A.    Criminal justice.

5      Q.    And where did you get that degree?

6      A.    University of Alaska, Anchorage.

7      Q.    And what's the master's in?

8      A.    Public administration.

9      Q.    Where did you get that degree?

10      A.    Jacksonville State University.

11      Q.    And what other colleges have you gone to?

12      A.    University of Alabama.  University of

13   Alaska, Fairbanks.

14      Q.    Do you have -- have you received any

15   training in First Amendment issues, the rights of

16   protesters?

17      A.    I received training during the police

18   academy that dealt with First Amendment rights, and

19   City Attorney Ben Miller also provides legal updates

20   every so often.

21      Q.    Okay.

22            And regarding the events of May 31st,

23   2020, do you have any personal notes, field notes,

24   emails, texts?

25      A.    I recorded an individual's name and a date

EXHIBIT 3 - PAGE 12

Ryan Underwood

1    of birth on a field note but nothing else.

2         Q.    Do you remember which person that was?

3         A.    Tyler Hendry.

4         Q.    And the body cam footage I was given by

5    Mr. Miller associated with you, it's about six

6    minutes long, five and a half minutes long.

7               Does that sound right?

8         A.    Sounds right.

9         Q.    Is that the only body cam footage or

10   in-car video with you between 10:30 p.m. and 11:30

11   p.m., May 31st?

12        A.    I don't know.  I know that there are

13   several body cam videos from that night.  I don't

14   know the time frames, though.

15        Q.    Okay.

16              Do you know why the body cam footage for

17   the body camera was turned at -- the six-minute one

18   -- why it was turned on at the time it was turned

19   on?

20        A.    Yeah.  When I exited my vehicle I thought

21   I had turned on my body camera.  I didn't notice

22   until the arrest that it wasn't turned on and so I

23   immediately turned it on then.

24        Q.    Did you notice that your body camera

25   footage states that it's 6:01:26 a.m. when the

EXHIBIT 3 - PAGE 13

```
1    context of the other arrests -- of the arrest shows

2    that it would have been more like a little after

3    11:00 on May 31st?

4        A.    I think they change that to Zulu time.

5        Q.    Zulu?

6        A.    Uh-huh.  There's a Z at the end of the

7    time.  That dictates a different time frame.

8        Q.    Is that a time zone, or --

9        A.    I think so.  I'm not 100 percent sure.

10       Q.    Okay.

11             Who was involved with handling your

12   hiring, if you remember?

13       A.    That's a decision that's made by multiple

14   people, not just one.  You'd have to talk to the

15   department about that.

16       Q.    Did you interview with anybody in

17   particular?

18       A.    I interviewed with a group panel, but I

19   don't remember who was on there.

20       Q.    Okay.

21             So other than the events of May 29th to

22   June 1st of last year, have you ever been involved

23   with responding to protests?

24       A.    I worked the protests in my detective

25   capacity after that.
```

EXHIBIT 3 - PAGE 14

Ryan Underwood

14

```
1          Q.    After June 1st?

2          A.    Yes.

3          Q.    Not -- nothing before?

4          A.    No.

5          Q.    So when you were -- what time did your

6     shift start on May 31st?  Do you recall?

7          A.    I don't remember.

8          Q.    When you were working on May 31st, were

9     you working as a patrol officer or as a detective?

10         A.    As a detective.

11         Q.    So how is that distinct from being a

12    patrol officer?  What was you -- what were your

13    duties?

14         A.    To assist patrol whenever they needed it.

15         Q.    Were you doing investigative work at the

16    same time?

17         A.    No.

18         Q.    So the word "detective," it doesn't mean

19    being a detective like we untrained people think of

20    it as like somebody on TV who is a detective.  You

21    were just assisting with patrol?

22         A.    Yeah, if they needed it.

23         Q.    Okay.

24               (Deposition Exhibit Number 1

25                marked for identification.)
```

EXHIBIT 3 - PAGE 15

Ryan Underwood

```
1    BY MS. DUGAN:
2        Q.    This is -- showing you Exhibit 1, it's the
3    Eugene Police Department's policy regarding
4    body-worn video.
5            On page 2 -- let's see -- it's 1203.4
6    policy -- it states that the officers
7        (reading):  All sworn uniform personnel
8        should ensure the body-worn video system
9        is functioning properly and check to ensure.
10           And (b) is (reading):  Correct date
11       and time stamp.
12           Did you check every time, every day, when
13   you went on duty, check the date and time?
14       A.    That's not something that you check on the
15   body camera.
16       Q.    Where do you check it?
17       A.    If you were to record a video, you can
18   then go check it on there, but I don't have any way
19   to change that or address that.  That's a time thing
20   with Axon.
21       Q.    Okay.
22           So this thing about Zulu, who told you
23   that that was a Zulu time?
24       A.    I think I remember hearing about it in
25   passing.
```

EXHIBIT 3 - PAGE 16

1    Q.    Was that a cause of confusion for anybody?

2    A.    No.

3    Q.    How would one know how to translate that

4    time to Pacific Standard?

5    A.    The internet.  I don't know.

6    Q.    On page 3, Policy 1203.7.1, Required

7    Recording (as read):  Officers must use the

8        BWV system to record any of the following for

9        its entire duration of a list of things.

10            So if I understand you correctly, you knew

11    that you should have turned on your camera when you

12    left the vehicle but you accidentally did not?

13    A.    I wouldn't say that I did not.  I,

14    generally speaking, always turn on my body camera

15    when I exit the vehicle if I'm going to make contact

16    with someone or I'm in a situation that could

17    potentially lead to that.  It just didn't happen to

18    turn on.

19    Q.    Is there a light or something indicating

20    when it's on?

21    A.    I believe so.

22    Q.    And did you see that the light -- did you

23    think the light was on, or did you not check?

24    A.    I don't remember.

25    Q.    Okay.

EXHIBIT 3 - PAGE 17

Ryan Underwood

```
 1                 So on May 31st starting at, say, a quarter
 2      to 11:00 p.m. who was your supervisor?
 3           A.    Sergeant Dorman.
 4           Q.    Dorman, D-O-R-M-A-N?
 5           A.    Yes.
 6           Q.    And were you in a vehicle with him?
 7           A.    No.
 8           Q.    Were you in your own vehicle -- were you
 9      in a vehicle?
10           A.    I was in a vehicle.
11           Q.    And just you?
12           A.    No.  With a group of other detectives.
13           Q.    Okay.
14                 What type of vehicle were you in?
15           A.    An undercover vehicle.
16           Q.    And why were you in an undercover vehicle?
17           A.    Because that's what was -- that's what we
18      were told to drive.
19           Q.    Who told you to drive that?
20           A.    Sergeant Dorman.
21           Q.    And were you in uniform?
22           A.    Yes.
23           Q.    And who else was in the vehicle with you?
24           A.    Detective Peterson, Detective Kaiser, and
25      Detective White.
```

EXHIBIT 3 - PAGE 18

Ryan Underwood

```
1          Q.    And were they all in uniform?

2          A.    Yes.

3          Q.    Let's see.

4                Where was Sergeant Dorman during --

5    between 10:45 p.m. and 11:30 p.m.?

6          A.    I don't know.  You'd have to ask him.

7          Q.    Okay.

8                So he wasn't with your group in another

9    vehicle?

10         A.    He was.  I just don't know where he was

11   at.

12         Q.    Okay.

13               You weren't following him or vice versa?

14         A.    No.

15         Q.    Were you following anybody else, or

16   just --

17         A.    No.

18         Q.    Okay.

19               What do you recall between 10:45 p.m., May

20   31st, and 11:30 p.m. -- what do you recall in terms

21   of any directives you were given or orders you were

22   given?

23         A.    I don't recall any.

24         Q.    When do you remember hearing that the

25   curfew was going to be city-wide?  What time?
```

EXHIBIT 3 - PAGE 19

Ryan Underwood

1    A.    I don't recall.  I would say maybe 10:50,

2    10:55, possibly.  I'm not 100 percent sure.

3        Q.    And was there -- did you hear any

4    confusion on the radio or in your own vehicle

5    regarding the timing, whether it was going to be

6    midnight or 11:00?

7        A.    No.

8        Q.    Did your vehicle -- probably not because

9    it was undercover -- but did anybody give notice to

10   anybody in the public --

11       A.    No.

12       Q.    Okay.

13             Did you hear admonishments being given to

14   the public about the curfew?

15       A.    Yes.

16       Q.    About the city-wide curfew?

17       A.    Yes.

18       Q.    What were people being admonished to do?

19       A.    I don't recall what the exact verbiage

20   was.

21       Q.    And when you heard about the curfew

22   expanding city-wide, do you recall where your

23   vehicle was, approximately?

24       A.    I don't.

25       Q.    Did you -- were you near the Whole Foods

EXHIBIT 3 - PAGE 20

Ryan Underwood

1    at any time?

2         A.    Yes.

3         Q.    And what did you observe people doing at

4    Whole Foods?

5         A.    I observed a large crowd that was chanting

6    and throwing objects at police.

7         Q.    What kind of objects?

8         A.    I don't remember.

9         Q.    Did any of the objects hit police?

10        A.    I don't know.

11        Q.    Other than objects being thrown, did you

12   see any behavior that you felt was violent?

13        A.    Throwing objects at others is violent.

14        Q.    I said other than that, did you see

15   anything that you thought was violent?

16        A.    Not other than that, no.

17        Q.    Did you see anybody fighting physically

18   with anybody else?

19        A.    No.

20        Q.    Did you see anybody damaging property in

21   any way?

22        A.    No.

23        Q.    I'll get your report.

24              MS. DUGAN:  This is 3?

25              THE REPORTER:  2.

EXHIBIT 3 - PAGE 21

Ryan Underwood

```
 1                    MS. DUGAN:  It's 2?
 2                    THE REPORTER:  Uh-huh.
 3                    (Deposition Exhibit Number 2
 4                     marked for identification.)
 5     BY MS. DUGAN:
 6          Q.    Looking at Exhibit 2, I believe this is
 7     your arrest report regarding Tyler Hendry.  And have
 8     you read this recently?
 9          A.    Yes.
10          Q.    Okay.
11                So on page 2 you say that
12     (reading): Several individuals began blocking
13     traffic by sitting in the middle of the
14     street.
15                Do you remember what street that was?
16          A.    I believe it was the one near Whole Foods.
17          Q.    Okay.
18                So would it have been Broadway?
19          A.    I don't remember.
20          Q.    Do you remember if it was east?  West?
21          A.    It was 8th, I think.
22          Q.    Okay, 8th?
23          A.    I'm not 100 percent sure, though.
24          Q.    Okay.
25                And the -- sorry.  (Reading):  The
```

EXHIBIT 3 - PAGE 22

Ryan Underwood

1      crowd was admonished on multiple occasions

2      and ultimately left the area walking

3      eastbound along Broadway Street.

4           Do you recall if people were on the

5      sidewalk?  Were they on the street?

6      A.    Both.

7      Q.    Do you recall, were they blocking traffic?

8      A.    I don't remember.

9      Q.    Did the protesters ever themselves shut

10     the Ferry Street Bridge down?

11     A.    I don't remember.

12     Q.    You say in the second paragraph that

13     (reading):  After the city-wide curfew was

14     announced, the crowd refused to disperse and

15     continued marching toward the intersection of

16     East 13th Avenue and Patterson Street.

17          When you say they refused to disperse and

18     continued marching, what was your definition of

19     "disperse"?  What would that have looked as opposed

20     to marching?

21     A.    Marching to me is continuing the same

22     direction of travel as the crowd and continuing to

23     chant, versus dispersing meaning everyone kind of

24     goes their separate ways and the crowd disperses and

25     leaves.

EXHIBIT 3 - PAGE 23

1          Q.    And would groups of two or three be

2     considered enough -- a small enough group to be --

3     to constitute dispersing if, like, three people went

4     off one way?

5          A.    I don't know.  I don't know.

6          Q.    Okay.

7               So when they were failing to disperse at

8     the moment they were -- that you're writing about

9     here -- how many different ways were there for

10    people to leave?

11         A.    Multiple.

12         Q.    How many -- there were streets.  They

13    could walk down any of the streets that were nearby

14    them.  There wasn't any other -- were there cars

15    nearby that were parked that people were supposed to

16    get into?

17         A.    I don't know.

18         Q.    Okay.

19               So you go on to say that (reading):

20         At approximately 2310 hours I responded to

21         the intersection of East 13th Avenue and

22         Patterson Street to assist officers as they

23         effected an arrest of multiple individuals.

24         As I provided cover for those officers, I

25         observed an individual . . .

EXHIBIT 3 - PAGE 24

Ryan Underwood

```
 1                Let me stop there, though.

 2                So how did you guys know to drive to East

 3     13th and Patterson?  Did you just follow the crowd?

 4          A.    No.  I heard it over the radio.

 5          Q.    And who was saying that --

 6          A.    I don't know.

 7          Q.    Okay.

 8                And did somebody tell you to provide

 9     cover, or you already knew that was your -- kind of

10     your assignment?

11          A.    That's general officer safety.  Any time

12     officers make an arrest, it's -- especially in this

13     situation -- it's important to provide cover for

14     them so that they could safely do that and safely

15     take this person into custody.

16          Q.    So what were you doing to provide cover?

17     What actions did you take to provide cover?

18          A.    I saw that the crowd was just to the south

19     of the officers that were trying to effect an

20     arrest, and so I positioned myself in between the

21     crowd and the group of officers.

22          Q.    Did you tell anybody to leave?

23          A.    Yes.

24          Q.    Stop standing around?

25          A.    I made multiple requests for people to
```

EXHIBIT 3 - PAGE 25

```
 1    leave.
 2         Q.    And did they leave?
 3         A.    One person did not.
 4         Q.    And why wasn't that person arrested?
 5         A.    He was arrested.
 6         Q.    Okay.
 7               Who was that?
 8         A.    Tyler Hendry.
 9         Q.    Oh, okay.
10               So when you said "to the south," I was
11    picturing more towards 13th.  So I'm trying to
12    picture which group --
13         A.    I'm sorry.  I apologize.  To the north.  I
14    apologize.
15         Q.    No.  That's all right.  Now I can picture
16    what you're talk about.
17         A.    I'm sorry.
18         Q.    Okay.
19               (Reading):  As I provided cover for
20          these officers, I observed an individual
21          later identified as Tyler James Hendry.
22               Now, in the video of some other officers
23    it appeared he had a jacket on that said "Canseco"
24    on the back.
25               Do you recall that?
```

EXHIBIT 3 - PAGE 26

Ryan Underwood

1        A.    I don't.

2        Q.    Do you remember any discussions on the

3   radio about somebody named Canseco live streaming?

4        A.    I don't remember that.

5        Q.    You say that he was walking towards you?

6        A.    Yes.

7        Q.    You said -- you say that you advised him

8   to leave on multiple occasions.  So when he was

9   walking towards you, where was he walking from and

10  where -- and where were you, approximately?

11       A.    I believe he was on the street, and he was

12  walking toward me and the officers behind me.

13       Q.    Okay.

14             So he was on the street.  Was he next to

15  the -- was he closer to the hospital parking lot or

16  the other side of the street?

17       A.    I believe he was closer to the hospital

18  parking lot.

19       Q.    And where were you located?

20       A.    Near there.

21       Q.    Near the hospital parking lot side of

22  the --

23       A.    Yeah, so the east side.  I think I have

24  that right this time.

25       Q.    Okay.

EXHIBIT 3 - PAGE 27

Ryan Underwood

1              And then he was walking south toward you

2    down the sidewalk or down the street?

3         A.   Yes.  He -- he was in the street.

4         Q.   He was in the street?  Okay.

5         A.   Yeah.

6         Q.   All right.

7              You say (reading):  Hendry made no

8       attempts to leave the area but, rather,

9       continued walking towards me.  I then

10      observed another police officer advise that

11      Hendry was under arrest and struggled to take

12      him into custody.

13             Who was that other officer?  Do you know?

14        A.   Sergeant Stotts.

15        Q.   Stotts?  Okay.

16             And when you say he was struggling, what

17   do you mean by that?

18        A.   It appeared to me that Mr. Hendry was

19   resisting arrest and so it was difficult for

20   Sergeant Stotts to make the arrest.

21        Q.   Did Sergeant Stotts sit on Mr. Hendry?

22        A.   No.

23        Q.   Did anybody -- did any officer sit on

24   Mr. Hendry?

25        A.   I kind of mounted him but I didn't sit on

EXHIBIT 3 - PAGE 28

Ryan Underwood

```
 1    him.
 2         Q.    When you say you mounted him, I'm not sure
 3    -- what does that mean?
 4         A.    When I went to help effect the arrest, I
 5    threw Mr. Hendry to the ground.  We landed on the
 6    grass area.  And I essentially climbed on top of him
 7    to make an arrest.  Both of my knees were on the
 8    ground, so I was essentially kind of straddling him.
 9         Q.    Was your butt on his body?
10         A.    No.
11         Q.    What was holding him down to the ground,
12    then, other than your behind?
13         A.    Me, I guess.
14         Q.    Your shoulders?  Your legs?
15         A.    I don't know.
16         Q.    Your arms?
17         A.    Arms.
18         Q.    And besides Sergeant Stotts, was there a
19    third officer involved in taking Mr. Hendry into
20    custody?
21         A.    I don't believe so.
22         Q.    Who handcuffed him?
23         A.    I did.
24         Q.    Do you remember a discussion about
25    somebody's glasses being lost?
```

EXHIBIT 3 - PAGE 29

Ryan Underwood

1         A.    Huh-uh.  No.  Sorry.

2         Q.    Do you remember Mr. Hendry apologizing

3    saying he was trying to help somebody?

4         A.    Yeah.  After I asked for his name, he gave

5    me his name, he told me that he was on parole for

6    robbery but that he was just trying to help someone.

7    I took that to mean that he was trying to help the

8    person that was being taken into custody.

9         Q.    Who was that?

10        A.    I don't know.  The individual behind me.

11        Q.    North?

12        A.    South.

13        Q.    South?  Okay.

14              So that would have been the black man,

15   Mr. McClain?

16        A.    I don't know.

17        Q.    You never saw him?

18        A.    No.

19        Q.    Wasn't there another individual north who

20   was walking backwards saying "I lost my glasses"?

21   You didn't observe that?

22        A.    No, I don't -- I wasn't a part of that.

23        Q.    Did you see other people walking on the

24   sidewalk or the street who were not arrested?

25        A.    Yes.

EXHIBIT 3 - PAGE 30

Ryan Underwood

1      Q.    Did you have any understanding of who --

2   who had made the choice about who to arrest and who

3   not to arrest, or why?

4      A.    I'm sorry.  I don't understand your

5   question.

6      Q.    Did you know who had made decisions about

7   who to arrest and who not to arrest?

8      A.    If you're asking me if I've ever been told

9   to arrest someone in particular or someone not in

10  particular, the answer is no.

11     Q.    No.

12           That night did you know if there was a

13  person who had -- an officer -- who had made the

14  decision of which people to arrest out of that

15  crowd?

16     A.    No.

17     Q.    Did you assist with anybody else's arrest?

18     A.    No.

19     Q.    Other than Mr. Hendry, did you see anybody

20  resisting?

21     A.    No.

22     Q.    When you say "resisting," was it passive

23  or static?

24     A.    I don't know.  You'd have to talk with

25  Sergeant Stotts.

EXHIBIT 3 - PAGE 31

Ryan Underwood

1     Q.    Well, I mean, you observed -- you said you

2  observed Mr. Hendry resisting.

3     A.    Uh-huh.

4     Q.    So what kind of things was he doing to

5  resist?

6     A.    I don't know.  You'd have to talk with

7  Sergeant Stotts.

8     Q.    I'm just asking what you observed.

9     A.    I observed him not being compliant in

10  going into handcuffs, and I observed a struggle.

11  And if you want specifics on that, I would talk with

12  Sergeant Stotts because he's the one who would have

13  a better explanation for that than me.

14     Q.    So it sounds like you didn't get a real

15  good view of Mr. Hendry?

16     A.    It was incredibly dark out and there was

17  a lot of people.  So -- and there's no street

18  lights to help with the vision, or view, or

19  anything, so . . .

20     Q.    Isn't there a lot of light from the

21  hospital garage?

22     A.    I don't recall there being.  I could be

23  wrong.  I don't know.

24     Q.    When you saw Sergeant Stotts struggling

25  with Mr. Hendry, how were they facing?  Were they,

EXHIBIT 3 - PAGE 32

```
 1    like -- could you clearly see both of them?  Or
 2    was Sergeant Stotts -- did he have his back to you,
 3    or . . .
 4         A.   I think Sergeant Stotts had his back to
 5    me.  I'm not 100 percent sure.
 6         Q.   When you were at -- on Patterson between
 7    12th and 13th where people were being arrested, did
 8    you recognize any of the arrestees?
 9         A.   No.
10         Q.   Did your group of officers work with the
11    Springfield Police Department that night at all?
12         A.   Did ours?
13         Q.   Yeah.
14         A.   I don't believe so.
15         Q.   Did you work at all with Federal
16    Protective Services?
17         A.   I don't believe so.
18         Q.   Did you hear any discussion of wanting to
19    identify agitators or aggressors in the crowd?
20         A.   No.
21         Q.   So if I understand correctly, you said
22    that before May 29th of last year you hadn't been
23    involved in responding to any protest.  Is that
24    correct?
25         A.   I don't believe so.
```

EXHIBIT 3 - PAGE 33

33

```
1          Q.    Okay.
2          A.    And this was -- I only worked May 31st.
3          Q.    You only work May 31st?  Okay.
4                Had -- since then have you --
5                MS. DUGAN:  (To Ms. Alvarez)  Let me
6     talk to you afterwards so I can find out what you
7     were trying to get me to say.
8     BY MS. DUGAN:
9          Q.    Let's see.
10               Do you remember a man who was yelling and,
11    like, throwing his arms in the air and his friends
12    were kind of pulling him away trying to get him to
13    calm down?  Do you remember anything like that?
14         A.    No.
15         Q.    Just because there isn't the body cam, I'm
16    going to have you just draw a diagram of where you
17    were standing when you first --
18         A.    If you watched Sergeant Stotts' body
19    camera, you can see the beginning of that arrest.
20         Q.    Okay.
21               And just because it's so hard to identify
22    officers in that camera -- in that video -- so let's
23    see, let's make this -- let's make this 13th and
24    let's make this Patterson (drawing), whatever.  I'm
25    a terrible drawer.
```

EXHIBIT 3 - PAGE 34

Ryan Underwood

34

```
 1                    And then we'll make this 12th, the
 2       hospital garage, and then there's houses, I guess,
 3       over here (drawing).  Okay.
 4                    So at the time you were -- and let's just
 5       kind of -- for the sake of doing, like, a relative
 6       -- you know, this isn't going to scale, by any
 7       means.  So here (marking) is a person being arrested
 8       and you're providing cover when you first get there.
 9       Right?
10                    You said you were providing cover for
11       somebody -- for other officers?
12            A.    Yes.
13            Q.    Where -- about where were you standing, if
14       you could put an X?
15            A.    (Witness marks.)
16            Q.    Okay.
17                    So you were on the sidewalk?
18            A.    I believe so.
19            Q.    Okay.
20                    And then Mr. Hendry starts approaching you
21       from the north.  Approximately where was he?  You
22       could put an "H" for Hendry.
23            A.    He was on the roadway (marking).
24            Q.    Okay.
25                    And he was headed towards you?
```

EXHIBIT 3 - PAGE 35

Ryan Underwood

```
 1        A.    Yeah.

 2        Q.    Okay.

 3              And then when you saw him struggling with

 4    Sergeant Stotts, put an "S" approximately where that

 5    occurred.

 6        A.    (Witness marks.)

 7        Q.    Okay.

 8              And at that point were you -- had you just

 9    kind of stayed where you were or had you

10    approached --

11        A.    I stayed where I was.

12        Q.    Okay.  Okay.  We'll make this Exhibit 3?

13                   (Deposition Exhibit Number 3

14                    marked for identification.)

15                   MS. DUGAN:  I'm going to take a little

16    break and we'll be right back.

17                   THE VIDEOGRAPHER:  We're going off the

18    record at 3:28 p.m.

19                   (Recess:  3:28 to 3:33 p.m.)

20                   THE VIDEOGRAPHER:  We are back on the

21    record at 3:30 p.m.

22    BY MS. DUGAN:

23        Q.    Okay.

24              The only question I have as a follow-up is

25    did you at any time advise your supervisor that your
```

EXHIBIT 3 - PAGE 36

36

```
 1    body-worn video had not been activated at the

 2    beginning of the public encounter?

 3         A.    I don't remember.

 4         Q.    Do you have a duty to do that?

 5         A.    I believe so.

 6         Q.    And if so, did you send an email, or you

 7    just don't remember?

 8         A.    I don't remember.  I think it's likely

 9    that I did.  I think I might have said it in

10    passing, but I don't remember specifically.

11                   MS. DUGAN:  I have no further

12    questions.

13                   THE VIDEOGRAPHER:  We are going off

14    the record at 3:34 p.m.

15                   (The deposition was concluded

16                    at 3:34 p.m.)

17                        --o0o--

18

19

20

21

22

23

24

25
```

EXHIBIT 3 - PAGE 37

```
1   State of Oregon    )
                       )      ss.
2   County of Lane     )

3

4        I, Sara Fahey Wilson, CSR, a Certified Shorthand

5   Reporter for the State of Oregon, certify that the

6   witness was sworn and the transcript is a true

7   record of the testimony given by the witness; that

8   at said time and place I reported all testimony and

9   other oral proceedings had in the foregoing matter;

10  that the foregoing transcript consisting of 36

11  pages contains a full, true and correct transcript

12  of said proceedings reported by me to the best of my

13  ability on said date.

14       If any of the parties or the witness requested

15  review of the transcript at the time of the

16  proceedings, such correction pages are attached.

17       IN WITNESS WHEREOF, I have set my hand this 13th

18  day of July 2021, in the City of Eugene, County of

19  Lane, State of Oregon.

20

21

22

23  Sara Fahey Wilson, CSR

24  CSR No. 06-0400

25  Expiration Date:  March 31st, 2023
```

EXHIBIT 3 - PAGE 38