*Damon Cochran-Salinas*

*Boudjerada v City of Eugene*

*September 15, 2021*



CC REPORTING AND VIDEOCONFERENCING
101 East Broadway, Suite 300
Eugene, OR 97401
541-485-0111
www.ccreporting.com

EXHIBIT 5 - PAGE 1

Damon Cochran-Salinas

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


HASHEEM BOUDJERADA; DAMON        )No. 6:20-cv-1265-MK

COCHRAN-SALINAS; ERIN GRADY;     )

TYLER HENDRY; and KIRTIS         )

RANESBOTTOM,                     )

              Plaintiffs,        )

    v.                           )

CITY OF EUGENE; SARAH MEDARY;    )

WILLIAM SOLESBEE; SAMUEL STOTTS; )

BO RANKIN; TRAVIS PALKI; MICHAEL )

CASEY; ANTHONY VIOTTO; and RYAN  )

UNDERWOOD,                       )

              Defendants.        )


DEPOSITION OF DAMON COCHRAN-SALINAS

September 15, 2021

Wednesday  1:00 P.M.


        THE DEPOSITION OF DAMON COCHRAN-SALINAS was

taken at Ironwood, Michigan, before Eleanor Knapp,

RPR-CSR, Certified Shorthand Reporter in and for the

State of Oregon, by videoconference.

EXHIBIT 5 - PAGE 2

```
 1                      APPEARANCES

 2

 3    For the Plaintiffs:

 4         CIVIL LIBERTIES DEFENSE CENTER

 5         158 East 14th Avenue

 6         Eugene, Oregon 97401-4334

 7         541-687-9180

 8         BY:  MS. MARIANNE DUGAN

 9         mdugan@cldc.org

10         (Appearing by videoconference.)

11

12    For the Defendants:

13         CITY OF EUGENE ATTORNEY'S OFFICE

14         125 East 8th Avenue, 2nd Floor

15         Eugene, Oregon 97401

16         541-682-8447

17         BY:  MR. BEN MILLER

18         ben.j.miller@ci.eugene.or.us

19

20    Also Present:  Ms. Jamie Iboa

21                   Ms. Sara Flinn

22

23    Court Reporter:  Ms. Eleanor Knapp, RPR-CSR

24

25    Video Technician:  Ms. Nicole Ash
```

EXHIBIT 5 - PAGE 3

Damon Cochran-Salinas

3

```
 1
 2
 3                              INDEX
 4
 5    WITNESS.....................................PAGE
 6    DAMON COCHRAN-SALINAS
 7         BY MR. MILLER                          4
 8
 9    EXHIBITS.................................MARKED
10    Exhibit 1  Response to First Request for    14
11               Production to Cochran-Salinas
12    Exhibit 2  Plaintiff Cochran-Salinas's      19
13               Response to Interrogatories
14    Exhibit 3  Cochran-Salinas's Response to    23
15               Second Set of Interrogatories
16
17
18
19
20
21
22
23
24
25
```

EXHIBIT 5 - PAGE 4

Damon Cochran-Salinas

1          VIDEO TECHNICIAN:  We are on the

2    record.  Today is September 15th, 2021.  The time is

3    12:59 p.m.  This is the video-recorded deposition of

4    Damon Cochran-Salinas in the matter of Boudjerada

5    vs. City of Eugene.  Our court reporter is Eleanor

6    Knapp.  My name is Nicole Ash.  I'm CC Reporting's

7    remote video technician.  Would you please swear in

8    the witness.

9

10          DAMON COCHRAN-SALINAS,

11    having been first duly sworn to testify the truth,

12    the whole truth, and nothing but the truth, was

13    examined and testified as follows:

14

15                    EXAMINATION

16    BY MR. MILLER:

17        Q.    Good afternoon.  My name is Ben Miller.

18    I'm one of the attorneys for the City of Eugene.

19    I'm here to take your deposition today.  This is

20    Jamie Iboa.  She's the risk claims manager who is

21    kind of monitoring the litigation.

22          So thank you for coming in and

23    rescheduling when we had you earlier.

24          You've been put under oath, and that is

25    the same --

EXHIBIT 5 - PAGE 5

```
 1                  (Sara Flinn admitted to the

 2                   deposition.)

 3    BY MR. MILLER:

 4         Q.    You've been put under oath, and that's the

 5    same oath you would be put under if you are called

 6    to testify in court later.  Do you understand that?

 7         A.    I do.

 8         Q.    And as a -- you know, this is sort of my

 9    only chance to get to talk to you and ask you

10    questions.  If I ask a question poorly or you don't

11    understand it, will you let me know?

12         A.    I will.

13         Q.    All right.  I'm sure your attorney has

14    gone through with you some of the basic rules of the

15    deposition, but I'll just highlight a couple.  One

16    is that we need to be careful not to talk over each

17    other because -- so it's clear where my question

18    ends and where your answer begins.  Okay?

19         A.    Yes.

20         Q.    And the other is that things like nods of

21    the heads, other, you know, signals, huh-uhs don't

22    show up on a transcript.  So if you do those things,

23    I'll just ask for clarification.  Not trying to be

24    rude.  Just trying to make sure we have a clear

25    record on what your answers are.  Okay?
```

**EXHIBIT 5 - PAGE 6**

Damon Cochran-Salinas

6

1        A.     Okay.

2               (Reporter interruption.)

3    BY MR. MILLER:

4        Q.     So as you can tell, we are going to have,

5    at the end of the day, a written transcript of the

6    deposition and of your sworn testimony.  And there's

7    a recording that's being made as well.  You're aware

8    of that?

9        A.     I am aware.

10       Q.     And I can use those tools in a couple of

11   different ways.  The first is that rather than

12   calling you later as a witness, I can use that

13   transcript, for example, as direct evidence of what

14   your testimony would be.  Does that make sense?

15       A.     It does.

16       Q.     And similarly, if you testify later and I

17   think that something you say then is inconsistent

18   with what you tell me today, I can use that

19   transcript to point out that inconsistency and ask a

20   judge or jury to disbelieve you.  Do you understand

21   that?

22       A.     I do.

23       Q.     So for that reason, I want your best

24   information, but I don't want you to guess.  It's

25   okay if you don't know things or you have to refer

EXHIBIT 5 - PAGE 7

1    to a document.  Just give me your best truthful

2    answer.  Is that fair?

3         A.    That's fair.

4         Q.    All right.  Similarly, it's not an

5    interrogation.  If you want to take a break, consult

6    with your attorney, get water, that's okay.  If a

7    question is pending, please answer it first and then

8    we can go out.  All right?

9         A.    All right.

10         Q.    Anything that would interfere with your

11    ability to have a deposition today?

12         A.    No.

13         Q.    So, for example, are you on any sort of

14    medication that could impact your ability to recall?

15         A.    No.

16         Q.    Without telling me any communications with

17    your attorney, what have you done to prepare for

18    your deposition today?

19         A.    I simply just reviewed my statement before

20    coming here.

21         Q.    And when you say your statement, do you

22    know what particular document you reviewed?

23         A.    In particular I reviewed a document that

24    was a compilation of emails from -- one of them

25    specifically was from a board of directors at the

```
 1     SCA, and it had two people giving testimonies.  And
 2     one of those testimonies was mine.
 3          Q.    All right.
 4          A.    So I simply reviewed that.
 5          Q.    All right.  And other than that, did you
 6     review any other recordings?
 7          A.    I did review one Zoom recording.
 8          Q.    What was that?
 9          A.    That was a meeting with attorneys and
10     clients.
11          Q.    Was it somebody else's deposition or was
12     this --
13          A.    No.
14          Q.    Okay.  So have you either attended
15     remotely or watched any of the other depositions
16     that have been taken in this case?
17          A.    No.
18          Q.    And to prepare for your deposition, did
19     you review any video that would have been taken on
20     the night of May 31st, 2020?
21          A.    No.
22          Q.    In preparation for your deposition, did
23     you review a copy of your complaint, the actual
24     lawsuit that was filed?
25          A.    I don't know specifically.
```

EXHIBIT 5 - PAGE 9

1       Q.    In preparing for your deposition, other

2    than your attorneys, have you spoken to anybody else

3    about your deposition or your anticipated testimony?

4       A.    I spoke to my partner very briefly, just

5    mentioning that I had one today.

6       Q.    And in the last hour or so have you spoken

7    with Kirtis Ranesbottom about what his testimony

8    was?

9       A.    No.

10       Q.    Have you ever had a deposition taken

11    before?

12       A.    No.

13       Q.    And I think you've answered this, but have

14    you ever attended a deposition before?

15       A.    No.

16       Q.    What is your full name?  And I'll ask you

17    to spell it so we have the correct spelling for the

18    court reporter.

19       A.    First name Damon, D-A-M-O-N.  Middle name

20    Edward.  Last name Cochran-Salinas.  That's

21    C-O-C-H-R-A-N, hyphen, S-A-L-I-N-A-S.

22       Q.    Thank you.  Have you ever had any other

23    prior legal name?

24       A.    No.

25       Q.    What is your date of birth and place of

EXHIBIT 5 - PAGE 10

Damon Cochran-Salinas

10

```
1    birth?
2         A.    October 12th, 1999, in Arlington, Texas.
3         Q.    And can you just generally describe all
4    your places of residence since birth?
5         A.    Texas and Oregon.
6         Q.    I don't need a lot of detail, but can you
7    tell me, for example, I was born in Arlington,
8    Texas, grew up there, you know, moved to Portland,
9    and then moved down to Eugene.  Just a little more
10   detail.
11        A.    I was born in Arlington, raised in Denton
12   and Irving and Mansfield areas in Texas.  Moved out
13   to Corvallis, Oregon, and eventually settled in
14   Eugene.
15        Q.    How long have you been in Eugene?
16        A.    I've been in Eugene for just about three
17   years now.
18        Q.    Where is your residence currently?
19        A.    1670 Alder Street.
20        Q.    That's the Campbell Club?
21        A.    Yes.  Correct.
22        Q.    How long has that been your residence?
23        A.    For about two years.
24        Q.    Prior to that was there somewhere else you
25   lived in Eugene?
```

EXHIBIT 5 - PAGE 11

```
 1         A.    Yes.

 2         Q.    Where was that?

 3         A.    I lived in a dorm.

 4         Q.    Do you remember which one?

 5         A.    Hamilton.

 6         Q.    What is your educational history?

 7         A.    I have a diploma from high school, and I

 8    am currently studying music in college right now and

 9    about on my third year of credits.

10         Q.    Do you have a declared major?

11         A.    I had a declared major of percussion

12    performance, but I'm currently in the midst of

13    changing that to music technology.

14         Q.    Do you have any professional

15    certifications?

16         A.    No.

17         Q.    Would you tell me your criminal history,

18    if any?

19         A.    Don't have any.

20         Q.    What is -- what is your employment

21    history?

22         A.    Very little employment history.  I worked

23    with Walama Restoration Project.  I've done lots of,

24    like, independent contracting, like, landscaping,

25    farming.  That's the most of what I do.  Currently
```

EXHIBIT 5 - PAGE 12

```
1    I'm doing some moving labor.
2         Q.    Other than this case, do you have any
3    other litigation history?
4         A.    Can you define "litigation"?
5         Q.    Sure.  Have you ever sued anybody else
6    before?
7         A.    No.
8         Q.    Have you ever been sued by somebody else
9    before?
10        A.    No.
11        Q.    In this case, when did you first decide to
12   sue?
13        A.    I don't remember exactly.  It was
14   somewhere around a few months after it happened.
15   There was some discussions.  And I was kind of
16   hesitant at first, but I decided to do it.
17        Q.    Were those discussions with attorneys or
18   were they other folks who were not attorneys?
19        A.    They were not attorneys.
20        Q.    Tell me about those discussions.
21        A.    Those discussions were basically I don't
22   agree with the way that that night was handled and I
23   would like to speak up about it.  And there was
24   support from a couple of friends that were just,
25   like, "Yeah, do it if you want."
```

EXHIBIT 5 - PAGE 13

Damon Cochran-Salinas

13

| | |
|---|---|
| 1 | Q.    Who did you have those discussions with? |
| 2 | A.    I had one conversation with Kirtis.  And I |
| 3 | don't remember the other friend. |
| 4 | Q.    What's your current phone number? |
| 5 | A.    972-765-1919. |
| 6 | Q.    Is that the phone number you had in May of |
| 7 | 2020? |
| 8 | A.    Correct. |
| 9 | Q.    Do you have any other phone numbers? |
| 10 | A.    No. |
| 11 | Q.    Who is your phone provider? |
| 12 | A.    AT&T. |
| 13 | Q.    What brand and model is your current |
| 14 | phone? |
| 15 | A.    iPhone 8. |
| 16 | Q.    Is that the same phone that you had in May |
| 17 | of 2020? |
| 18 | A.    Correct. |
| 19 | Q.    And has anything happened to that phone in |
| 20 | terms of any catastrophic failure of it, for |
| 21 | example? |
| 22 | A.    No.  It was lost for a while, but it came |
| 23 | back. |
| 24 | Q.    Has it needed to be repaired between May |
| 25 | of 2020 and the present? |

EXHIBIT 5 - PAGE 14

1       A.    No.

2       Q.    And so it should contain -- since it was

3    the same phone, it should contain information going

4    back at least to May of 2020.  Is that correct?

5       A.    Correct.

6                (Deposition Exhibit Number 1

7                 marked for identification.)

8    BY MR. MILLER:

9       Q.    I've handed you what's marked as

10   Exhibit 1.  And do you at least generally recognize

11   this document?

12      A.    I do.

13      Q.    All right.  And this was your response to

14   a request for documents that I sent to you through

15   your attorney.  Is that correct?  Is that a yes?

16      A.    Yes.  Sorry.

17      Q.    That's okay.  So I want to turn to page 4.

18   Focus your attention on Request Number 15, and read

19   that to yourself and let me know when you're done.

20      A.    Okay.

21      Q.    So you indicate in the response that

22   you're going to produce any responsive documents to

23   Request Number 15.  Right?

24      A.    Uh-huh.

25      Q.    Is that a yes?

EXHIBIT 5 - PAGE 15

Damon Cochran-Salinas

15

1        A.    Yes.

2        Q.    And so what emails, correspondence, or

3   notes have you located to be produced in this case?

4        A.    Specifically those emails that I mentioned

5   earlier.

6              There is a group of photos that contains

7   the physical evidence of, like, leftover bullets and

8   pepper residue and the damaged door hinge.  And so

9   those are kind of, like, a direct documentation of

10  my claim.

11       Q.    And these are all documents that you

12  reviewed earlier today or in the last day -- day or

13  so.  Is that correct?

14       A.    Yes.

15       Q.    Did you search your phone to determine

16  whether you had any responsive emails about the

17  events of May 31st, 2020?

18       A.    Yes.

19       Q.    And did you locate any?

20       A.    No.

21       Q.    What search terms did you use?

22       A.    I just looked up, like -- stuff like -- I

23  mean, pretty much anything with my email with that

24  is with my attorney, so that's just between us.

25       Q.    Right.  Now, I understand -- are you part

EXHIBIT 5 - PAGE 16

1    of a group chat on Signal with the Campbell Club?

2         A.    Yes.

3         Q.    And did you search that to determine if

4    there were responsive documents?

5         A.    No.

6         Q.    And do those messages still exist on

7    Signal?

8         A.    No.

9         Q.    Why not?

10        A.    Because a different chat was created.

11        Q.    And where is that chat?

12        A.    It's still on Signal.

13        Q.    What is different about it from the one

14   that previously existed?

15        A.    It no longer contains past members that we

16   can't remove from the chat.

17        Q.    And was there correspondence on that group

18   chat about the events of May 31, 2020?

19        A.    No.

20        Q.    And if Kirtis Ranesbottom testified that

21   there was, how would you account for that?

22        A.    That's their testimony.

23        Q.    Now, have you ever sent a text message

24   about the events of May 31st, 2020?

25        A.    I don't remember.

EXHIBIT 5 - PAGE 17

1      Q.    Where would those exist?

2      A.    They would probably be on Facebook

3    Messenger if they existed anymore.

4      Q.    Have you deleted anything from Facebook

5    Messenger relevant to this lawsuit?

6      A.    No.

7      Q.    So we could go back in your Facebook

8    Messenger and determine if there are relevant

9    documents still to this date.  Is that correct?

10      A.    Correct.

11      Q.    Have you searched Facebook Messenger to

12    determine if you have relevant communications?

13      A.    No.

14      Q.    Facebook Messenger, text message, Signal.

15    Do you have an email?  Do you have other methods of

16    communicating with others that you routinely use?

17      A.    No.

18      Q.    So you don't have any other apps that you

19    use for messaging other people?

20      A.    No.

21      Q.    21 on that same page, if you go down to

22    the bottom -- if you could read the request to

23    yourself and let me know when you're done.

24      A.    Okay.

25      Q.    So my question is:  Are you aware whether

EXHIBIT 5 - PAGE 18

1   any photographs or video of you taken between

2   May 29th and June 1st, 2020, exists?

3        A.    I am not aware.

4        Q.    Are you aware whether any photographs or

5   video of you taken between May 29th and June 1st,

6   2020, ever existed?

7        A.    I'm not aware.

8        Q.    And presumably you don't have any

9   photographs from that time period on your phone.  Is

10  that --

11       A.    Correct.

12       Q.    -- correct?  What email addresses do you

13  use?

14       A.    SalinasDamon@gmail.com.

15       Q.    Any others?

16       A.    Sometimes I use DESalinas@me.com.

17       Q.    And do you have an email address

18  associated with school?

19       A.    Yes.

20       Q.    And do you utilize that?

21       A.    Whenever I'm enrolled in school, yes.

22       Q.    Do you know what that is?

23       A.    DamonC@UOregon.edu

24       Q.    Do you have a Facebook profile?

25       A.    Yes.

EXHIBIT 5 - PAGE 19

Damon Cochran-Salinas

1      Q.    Do you happen to know what it's under?

2      A.    Damon Cochran-Salinas.

3      Q.    It's not a pseudonym?

4      A.    No.

5      Q.    What other social media do you have, if

6   any?

7      A.    I've got Tik Tok.  I have a Snapchat,

8   Instagram.  And I've got Spotify and iTunes and all

9   sorts of things.  I'm an artist on a lot of

10  different social media platforms.

11     Q.    Did you utilize Snapchat to communicate on

12  May 31st, 2020?

13     A.    I don't think so.

14              (Deposition Exhibit Number 2

15                marked for identification.)

16  BY MR. MILLER:

17     Q.    All right.  I've handed you what's marked

18  as Exhibit 2, which is labeled Plaintiff

19  Cochran-Salinas's Response to Interrogatories.  And

20  if you turn to the second page, it's dated March

21  17th, 2021.  Do you see that?

22     A.    Uh-huh.

23     Q.    Is that a yes?

24     A.    Yes.

25     Q.    And ordinarily I see these signed by the

EXHIBIT 5 - PAGE 20

1    plaintiff because they have to say under oath it's

2    true and correct.  So what I'm going to ask you to

3    do is read this to yourself, review it, and when

4    you're done, that's the question I'm going to ask,

5    whether it's true and correct.

6         A.    There's one point here where it says Damon

7    Ranesbottom.

8         Q.    That's on Interrogatory Number 4?

9         A.    Uh-huh.  Also, I was not falsely arrested.

10   I was not arrested at all -- in Number 5.

11        Q.    Okay.  So you indicated two different

12   corrections that you would make, one on

13   Interrogatory 4 and one on Interrogatory 5.

14             Other than that, are the answers to these

15   interrogatories true and correct?

16        A.    Yes.

17        Q.    So let's start with Interrogatory 4 since

18   you're there.  Damon Ranesbottom should be Kirtis

19   Ranesbottom.  Correct?

20        A.    I think so.

21        Q.    And jumping down, friend Eric, do you know

22   Eric's last name?

23        A.    I do not.

24        Q.    And the Campbell Club and its residents in

25   the middle, do you know who was a resident of the

EXHIBIT 5 - PAGE 21

1    Campbell Club in May of 2020?

2         A.    I have a rough idea, but I don't recall

3    everyone exactly.

4         Q.    Do you know how many members -- are they

5    members or residents?

6         A.    Members.

7         Q.    Do you know how many members of the

8    Campbell Club there were in May of 2020?

9         A.    Probably -- an estimate of 20.

10        Q.    And is there a document you're aware of

11   where I could determine who was a member of the

12   Campbell Club in May of 2020?

13        A.    Not that I am aware of.

14        Q.    In May of 2020, where was your room in the

15   Campbell Club?

16        A.    I believe I was still in the wing room on

17   the second floor.

18        Q.    So where is -- if I'm facing the building,

19   it's on the second floor -- where is it located?

20        A.    Farthest back, right corner.

21        Q.    Did you -- at the time did you share that

22   room with anyone else?

23        A.    No.

24        Q.    We can go to the first page of Exhibit 2.

25   And my question is going to be about Interrogatory

EXHIBIT 5 - PAGE 22

```
 1    Number 2.  And really, I'm not looking for a legal
 2    response.  I just want to understand, in your own
 3    words, what noneconomic damages are you seeking?
 4         A.    Well, just generally, like, the state of
 5    peace and, like, well-being of my entire community
 6    was disrupted.
 7              You know, we had people in our home trying
 8    to feel safe, and, you know, police were shooting
 9    into an open door while someone's standing on their
10    property, like, in their house, and shooting at our
11    front porch with pepper spray and also releasing
12    tear gas, like, next door at the Lorax, in the
13    alley.  And it's leaking through all the windows.
14    And people just generally were traumatized for a
15    while after that.  So that's the noneconomic damage.
16         Q.    Any other types of noneconomic damage that
17    you're seeking?
18         A.    I guess, besides my community's general
19    well-being, my own as well.
20         Q.    Go ahead.
21         A.    For instance, my first right was infringed
22    upon.  And whenever I even complied with that and
23    went home, I was still shot at.  And that was a very
24    traumatizing experience.  Now anytime I see any sort
25    of authority figure, I'm -- I'm triggered in that,
```

EXHIBIT 5 - PAGE 23

1   and it makes me just not want to be there.  I want

2   to run.  It's very inhibiting.  And -- yeah, just my

3   sense of well-being and peace.

4                    (Deposition Exhibit No. 3

5                     marked for identification.)

6   BY MR. MILLER:

7        Q.    I've handed you what's marked as

8   Interrogatory [sic] Number 3.  If we turn to the

9   third page, is this your conformed signature dated

10  August 16th of 2021?

11       A.    It is.

12       Q.    All right.  And so going back to the first

13  page, if you look at Interrogatory Number 6, the

14  question is really trying to identify -- well, it

15  says, you know, Eugene has a practice, policy, or

16  custom of using curfews to prohibit and prevent mass

17  protests and other activity.

18            My question to you is:  What -- what

19  curfews are you complaining about in your lawsuit?

20       A.    Specifically, they instituted a curfew

21  that would happen after three minutes at 11:00 p.m.

22  on May 31st.

23       Q.    Are there any other curfews from other

24  days that you are complaining about in your lawsuit?

25       A.    No.

EXHIBIT 5 - PAGE 24

1        Q.    And do you personally know how the City of

2   Eugene trains its police employees?

3        A.    I do not.

4        Q.    Do you personally know how the City of

5   Eugene supervises its police employees?

6        A.    I do not.

7        Q.    The complaint makes some allegations about

8   the use of chemical and impact munitions against

9   crowds.  When you're complaining about that, is it

10  about events on May 31st or are there any other days

11  that you take issue with?

12       A.    In this case I am specifically testifying

13  against the night of May 31st.

14       Q.    Are you aware of other instances where the

15  Eugene police used chemical and impact munitions

16  against crowds?

17       A.    Yes.

18       Q.    When was that?

19       A.    I don't recall all the times.

20       Q.    Can you recall one time?

21       A.    Not a specific date.

22       Q.    Did you witness this?

23       A.    Yes.

24       Q.    Where did you witness it?

25       A.    I witnessed it right by the library.  It

EXHIBIT 5 - PAGE 25

```
1    was about midday.  What I witnessed specifically was
2    a cop driving by.  And we had been gathering on the
3    sidewalk.  And there was a group of cops telling us
4    to go, and so we started walking down the sidewalk.
5    And then another car drove in really fast with some
6    cops on -- like, on the outside of the vehicle, and
7    they started shooting pepper rounds at our feet.
8    And then some people got hit with tear gas.  That's
9    when I started running away.
10        Q.    Was that earlier on the day of May 31st?
11        A.    I believe that was, actually.
12        Q.    Are there any other -- so I know -- we're
13   going to get through all of the different things
14   that happened on May 31st.  But I just want to
15   understand, when you talk about EPD, Eugene Police
16   Department, using chemical and impact munitions, is
17   there another day that's at issue or another event
18   that you are thinking of or is it just what occurred
19   on May 31st?
20        A.    For this case I am thinking of just what
21   occurred on the 31st.
22        Q.    Do you have personal knowledge of the
23   Eugene Police Department using chemical and impact
24   munitions against crowds on other days?
25        A.    Yes.
```

EXHIBIT 5 - PAGE 26

1      Q.    What is that personal damage?

2      A.    They oftentimes -- they will use rubber

3   bullets and not bounce them off the ground and just

4   shoot them directly at people, which I know is not

5   protocol.

6           I have also personally witnessed a gas can

7   that was expired by multiple years which I know

8   creates cyanide in expired gas cans whenever it's

9   released.

10          And, yeah, I just know that the police

11   have a pattern of using too much force, I think.

12      Q.    Other than May 31st, when has the Eugene

13   Police Department used too much force?

14      A.    I don't recall specific dates.

15      Q.    Were you witness to anything -- any events

16   of the Eugene Police Department where you perceived

17   them to use excessive force outside of May 31st?

18      A.    A couple of protests, yes.

19      Q.    When did those occur?

20      A.    Sometime after.  Within a month.

21      Q.    And so later in June.  Or was it July?  Do

22   you know?

23      A.    I think it was sometime around late June.

24      Q.    You believe that the Eugene Police

25   Department, as opposed to another jurisdiction,

EXHIBIT 5 - PAGE 27

1    deployed gas on protesters at some point later in

2    June in the summer of 2020.  Is that your testimony?

3         A.    That is what I believe.

4         Q.    And you were physically -- you were

5    present for that?

6         A.    I was present for police releasing tear

7    gas, yes.

8         Q.    Where did that occur?

9         A.    That occurred -- it occurred by the

10   library and by the city hall.  And it occurred

11   outside Whole Foods.  And there was a bridge-like

12   intersection on a highway.  I don't -- I don't

13   remember where it was.

14        Q.    So you believe in June of 2020 Eugene

15   Police Department deployed gas on protesters outside

16   of the library, at Whole Foods, and around a bridge.

17   Do I have that correctly?

18        A.    Yes.

19        Q.    And you were a witness to all of these.

20   Correct?

21        A.    Correct.

22        Q.    Presumably there's records of those things

23   that somebody has.  Correct?

24        A.    Probably.

25        Q.    And those all occurred after May 31st,

EXHIBIT 5 - PAGE 28

1    2020.  Correct?

2        A.    Yes.

3        Q.    Are there any events that occurred before

4    May 31st, 2020, where the Eugene Police Department

5    used chemical or impact munitions on crowds?

6        A.    I'm not aware.

7        Q.    What evidence suggests that the individual

8    defendants who you are suing intended to retaliate

9    against you because of your speech?

10       A.    Can you repeat the question?

11       Q.    Sure.  What evidence suggests that the

12   individual defendants -- so the individual police

13   officers you're suing -- intended to retaliate

14   against you because of your speech?

15       A.    Can you define my "speech"?

16       Q.    Yeah.  So your speech, your viewpoint.

17   It's your First Amendment activities.

18       A.    Okay.  I suppose the fact that especially

19   on May 31st there was a city curfew, but we were

20   respecting the curfew boundaries.  And then an

21   emergency curfew got called in whenever they didn't

22   like what was happening.  And so that was used as a

23   way to just kind of just clear it out instead of

24   letting the protest continue.  Yeah.

25       Q.    And are you aware what the individual

EXHIBIT 5 - PAGE 29

1   defendants in this case did to bring about a curfew,

2   if anything?

3       A.    No.

4       Q.    No, you are not aware?

5       A.    No.  We were just sitting on the sidewalk.

6       Q.    Did any of the individual defendants in

7   this case tell you that they were targeting you

8   because of your speech?

9       A.    No.

10      Q.    Did you ever speak with a police officer

11  on May 31st, 2020?

12      A.    No.

13      Q.    Did you ever overhear a police officer say

14  anything that indicated they were discriminating

15  against anyone because of their speech or message?

16      A.    No.

17      Q.    No, you didn't?

18      A.    No, I did not.

19      Q.    What recordings, if any, are you aware of

20  that depict the events of May 31st, 2020?

21      A.    I'm not aware of any.

22      Q.    Are you aware of any live streams that

23  were depicting the events of May 31st, 2020, as they

24  were going on?

25      A.    I'm not aware of them, but I did see one

EXHIBIT 5 - PAGE 30

1    person with a phone live-streaming.

2        Q.    Were you live-streaming on May 31st, 2020?

3        A.    No.

4        Q.    So I want to start on May 29th of 2020,

5    which was that Friday.  And my understanding is that

6    there was an organized event at the Free Speech

7    Plaza that later -- folks moved down, and then there

8    was property damage that occurred around the Five

9    Guys on 7th, kind of in that area.

10            So were you out on May 29th, 2020, at any

11   of those events?

12       A.    No.

13       Q.    Where were you on May 29th, 2020?

14       A.    I don't know.

15       Q.    When did you first learn that there had

16   been property damage in the downtown area that

17   occurred on May 29th, 2020?

18       A.    During the next day.

19       Q.    Do you remember how you learned that?

20       A.    I remember looking at a news story on my

21   phone.

22       Q.    Did you go down there to observe the

23   damage?

24       A.    No.

25       Q.    What else did you do on the next day,

EXHIBIT 5 - PAGE 31

1    Saturday, May 30th, 2020?

2        A.    Probably pretty much like any other day

3    for me.  Make music.

4        Q.    Did you go -- did you attend any protests

5    the night of Saturday, May 30th, 2020?

6        A.    No.

7        Q.    All right.  And how did the curfew on

8    Saturday, May 30th, 2020, impact you?

9        A.    It didn't really impact me.

10       Q.    So May 31st, 2020, I'll have you just walk

11   me through what happened that day.  And then we'll

12   break it down, if that works.

13       A.    Okay.  Yeah.  Don't remember exactly what

14   time, but it was sometime around noon or after.  And

15   there was a protest, and I went to go check it out.

16   And then it was kind of by the library, like what I

17   described with the pepper bullet shooting.

18             And shortly after we scattered, I found a

19   group that was just sitting outside of a church.

20   And we were just trying to kind of gain more people

21   before we decided to actually, like, march and find

22   a bigger group.  And shortly after we headed over --

23   we had heard that there was going to be a gathering

24   at Whole Foods, and so we went there.

25             And we were going to be specifically -- I

Damon Cochran-Salinas

32

```
1   don't remember the exact street, but there is a
2   street that was outside of the city-wide curfew for
3   that night so we could still all go stand there.
4              And then while we were sitting there and
5   protesting, the cops announced that -- and it was
6   approximately 10:57 p.m. when they announced this --
7   that we had three minutes before, like, a city-wide
8   curfew -- so everywhere curfew.  Otherwise we would
9   be subject, quote, to chemical weaponry and
10  projectile weaponry.
11             And so a lot of us stood up, myself
12  included, to start walking down Broadway back home.
13  And there were a few people that stayed, kneeling.
14  I'm not really aware of what happened there.
15             But as I was walking back, suddenly cops
16  were, like, racing past us.  And they started
17  posting up at different locations.  And that's
18  whenever, like, a lot of the crowd was, like, "Oh,
19  gosh, what's happening?"
20             And we all tried to book it a little
21  quicker to home.  And I made it home about 20
22  minutes later.  It was approximately 11:20.  And I
23  was very distressed.
24             And I was just inside the door, about to
25  step out onto the porch and just smoke a cigarette.
```

EXHIBIT 5 - PAGE 33

| 1 | And as I opened the door, I saw a cop car pull in. |
|---|---|

1    And as I opened the door, I saw a cop car pull in.

2    And there was our house friend Eric on the porch

3    trying to seek safety.

4             And I was yelling at him to come inside so

5    that he wouldn't get shot at.  And they started

6    shooting at him on the porch.

7             And at that time I also noticed someone

8    running on the sidewalk right in front of our house.

9    And they had their arms up, and they yelled, "Please

10   don't shoot.  I'm going home."  And then I witnessed

11   them shoot them right in the back, which was very

12   traumatizing for me to see that in -- in a force

13   that's supposed to be protecting us.

14            But I tried to yell at him to come inside,

15   but he kept running.

16            So I let Eric in.  And it was at that time

17   that an officer squared up, and I saw the bullet

18   coming head level.  And I shut the door on it, and

19   it busted the top hinge.  And the door didn't shut

20   properly for a while until we fixed it.

21            But, yeah, and then they stood outside

22   about 30 feet away from the door on the sidewalk and

23   in the street and just sat out there for a few

24   minutes and then eventually took off.

25       Q.    All right.  Thank you.  So we'll break

EXHIBIT 5 - PAGE 34

Damon Cochran-Salinas

```
 1    this down.  So on the 31st you eventually go to --
 2    there was a march earlier that day, and it went from
 3    the federal courthouse to Alton Baker and then back,
 4    more or less.  Did you attend that march?
 5         A.    Yes.
 6         Q.    Okay.  And so what did you do at that
 7    march?
 8         A.    I handed out water for a bit and fruit
 9    snacks.  And I was also yelling profusely with the
10    shouts and the marching.  And I tried to offer a
11    little bit of rhythm support because I'm a
12    percussionist.  Yeah, mainly just trying to be there
13    as a mutual aid and morale, trying to keep the
14    solidarity boosted.
15         Q.    Did you go down to the federal courthouse
16    at the beginning of that rally?
17         A.    I think so, yes.
18         Q.    And did you travel from there to Alton
19    Baker Park?
20         A.    I believe so.
21         Q.    And from Alton Baker Park, did you travel
22    from there back to downtown?
23         A.    Yes.
24         Q.    Did you participate in any of the marches
25    that then occurred around downtown?
```

EXHIBIT 5 - PAGE 35

```
 1        A.    Yes.

 2        Q.    So were you out in the street with the

 3   crowd as they were moving around downtown?

 4        A.    Yes.

 5        Q.    And while that was occurring, did you

 6   observe Eugene police officers?

 7        A.    Yes.

 8        Q.    And what were they doing?

 9        A.    Most of the time they would be driving by

10   really quickly to go somewhere.  And a few times we

11   would get stopped as we would get a bigger group and

12   a bigger group.  That's whenever they would come

13   through and tell us to disperse.  And then if we

14   didn't disperse, that's whenever they would tear gas

15   us and shoot us with pepper bullets mainly.

16        Q.    Where did that occur other than around the

17   LTD station?

18        A.    I believe it was also by the library that

19   day.

20        Q.    Just so we're clear, the library is right

21   next to the LTD station.  Correct?

22        A.    Okay.

23        Q.    I mean, is it?

24        A.    I -- I think so.

25        Q.    Okay.  So is there a location that a crowd
```

1    of people was PepperBalled and tear-gassed other

2    than -- other than there on May 31st, 2020?

3         A.    At the Whole Foods.

4         Q.    At the Whole Foods?

5         A.    And throughout the neighborhoods as the

6    curfew happened.

7         Q.    But at that -- I want to focus -- I really

8    want to focus you on earlier in the day.  You are

9    with a group that's occupying the streets.  Police

10   officers, you see them going by.  Are they doing

11   traffic control?

12        A.    Whenever that happened by the LTD station

13   and the library specifically is what you're asking?

14        Q.    Earlier than that.

15        A.    Earlier than that.  I think some of them

16   were doing traffic control.  I really didn't know

17   what most of them were up to because more often than

18   not they would just be racing by, assumedly to go to

19   a bigger group, you know.

20        Q.    To block a street and make sure your group

21   didn't get hit by a car.  Is that a possibility?

22        A.    I didn't see that happen.

23        Q.    Okay.  Now, while your group was occupying

24   the streets and marching around before you went to

25   the library/LTD station, did you witness any police

EXHIBIT 5 - PAGE 37

1   officers use force on the group?

2       A.    I did not personally witness.

3       Q.    Despite them blocking the streets and

4   being disorderly, did you witness any police

5   officers make arrests out of that group?

6       A.    I witnessed an officer try to make an

7   arrest.

8       Q.    What happened?

9       A.    They got pulled back into the crowd.

10      Q.    And were you present when there was any

11  interaction with somebody with a gun?

12      A.    Yes.

13      Q.    What did you see?

14      A.    I saw a person driving a truck kind of,

15  like, drive through a little bit of the crowd that

16  was walking.  And they, like, pulled out a

17  semi-automatic rifle.  And they were kind of just,

18  like, brandishing it around.

19            And then a couple of people from the crowd

20  were starting to get really, like, I'm going to do

21  something about this if they don't, like, leave.

22  And a lot of us were trying, like, to calm him down.

23            But, yeah, eventually they got pushed

24  away.  And they just drove away.

25      Q.    While this group was marching around

1    through the downtown area before it got to the

2    library/LTD station, did you observe any property

3    damage occur?

4        A.    No.

5        Q.    You didn't observe anybody spray-painting

6    the jail?

7        A.    No.

8        Q.    Did you observe anyone break any windows?

9        A.    No.

10        Q.    So at some point you end up with this

11    other group near the library and LTD station.

12    Correct?

13        A.    Correct.

14        Q.    Do you know approximately what time that

15    occurred?

16        A.    Maybe around like 2:00 or 3:00, but I

17    honestly don't know.

18        Q.    And how long do you think you were there?

19        A.    It was probably about 45 minutes before

20    the scattering actually happened.

21        Q.    I should have asked you this at the

22    beginning.  How good a memory do you think you have

23    of these events?

24        A.    I have a pretty good memory just in

25    general, yeah.  These events are a little traumatic,

EXHIBIT 5 - PAGE 39

1    so sometimes, you know, our brain will push things

2    away.  But things are coming back.

3        Q.    But early afternoon, you're there around

4    -- nearby the LTD station, and you are there for

5    approximately 45 minutes before this encounter with

6    the police.  Is that correct?

7        A.    Correct.

8        Q.    And in that 45 minutes before the police

9    came, what did you observe occurring?

10       A.    I observed that there were a couple of

11   cars, parked police cars, and they were just

12   generally telling us to disperse.

13            But we were shouting back, like, "Please

14   don't shoot," and stuff.

15            And eventually this girl grabbed a hammer

16   and started banging on a utility pole.

17            And then after the 45 minutes happened and

18   the cop drove by and hit the ground with pepper

19   bullets, some more cars drove in, and the girl with

20   the hammer started smashing on the hood.  And they

21   chased her down the alley.  And at that point I was

22   gone.

23       Q.    So in the 45 minutes before the police

24   really arrive and there's this encounter, did you

25   observe anybody blocking the street?

EXHIBIT 5 - PAGE 40

Damon Cochran-Salinas

```
1          A.     No.
2          Q.     And where -- how many people were in this
3     crowd?
4          A.     Approximately 100 or 150.
5          Q.     And your testimony is that they were all
6     on the sidewalk all the time during that 45 minutes?
7          A.     Yes.
8          Q.     And what were they doing on the sidewalk?
9          A.     A lot of us were kneeling, and a lot of us
10    were standing.  And we were chanting.
11         Q.     Were you blocking any pedestrians from
12    transiting that area?
13         A.     If a pedestrian had wanted to walk on that
14    sidewalk, we were probably blocking them, because it
15    was pretty dense.
16         Q.     What -- do you know, were you located at a
17    certain point, a specific spot for most of that
18    time, that 45 minutes?
19         A.     Yeah.  I just remember what it looks like.
20    I don't remember any street names though.
21         Q.     That's okay.  I'm just trying to get at --
22    were you basically at the same place or did you move
23    around a lot?
24         A.     I was basically in the same place.  We
25    were packed pretty tight.
```

EXHIBIT 5 - PAGE 41

Damon Cochran-Salinas

1    Q.    And what -- do you know what building you

2    were closest to or can you describe for me just

3    approximately where you were?

4    A.    I think it was on one of the streets on

5    the outside of the actual transit center.  And then

6    I think the cops were, like, inside the transit

7    center telling us to go.  And there's the street

8    here that the cop drove by and shot.

9    Q.    So we have the LTD transit center which

10   takes up a whole city block approximately.  Right?

11   A.    Yes.

12   Q.    And from there you -- you weren't on one

13   of the sidewalks that was immediate -- that was

14   right next to it.  Correct?

15   A.    I think I was.

16   Q.    So what I'm trying to get at is were you

17   on one there or were you across the street?

18   A.    I'm not sure.

19   Q.    But you are down there in the area.  Are

20   you closer to the LTD bus station or to the library?

21   A.    I'm also not sure on that one.

22   Q.    And what -- before an officer came through

23   with PepperBall, driving through shooting at

24   people's feet, you said -- I think -- that the

25   police had been making announcements.  Is that

EXHIBIT 5 - PAGE 42

42

```
 1    correct?
 2         A.    Correct.
 3         Q.    What were they saying?
 4         A.    They were saying, "Disperse.  You are
 5    unlawfully gathered."
 6         Q.    So they declared an unlawful assembly --
 7         A.    Yes.
 8         Q.    -- and instructed you to disperse.  How
 9    long before they -- the officer drove by did that
10    occur?
11         A.    I estimate around 15 minutes.
12         Q.    So they declared an unlawful assembly,
13    ordered people to disperse.  In the 15 minutes it
14    took for them to finally take action, did anyone
15    disperse?
16         A.    A few people did, yes.
17         Q.    Did you?
18         A.    No.
19         Q.    And an officer comes by, shoots PepperBall
20    at people's faces -- excuse me -- feet.  And then
21    you observed a woman with -- who had been hammering
22    a light pole take the hammer and strike a police
23    vehicle.  Is that correct?
24         A.    Correct.
25         Q.    How many times did she strike it?
```

EXHIBIT 5 - PAGE 43

43

```
 1        A.    At least seven.

 2        Q.    And at about that time it sounds like you

 3   decided to get out of there.

 4        A.    Yes.

 5        Q.    And at that location around the LTD

 6   station, did you personally observe anyone get hit

 7   by a PepperBall?

 8        A.    Yes.

 9        Q.    How many people?

10        A.    I definitely saw two people get hit.

11        Q.    Tell me what you saw.

12        A.    I saw a really big welt right here, and

13   then I also saw someone pull up their shirt and have

14   a welt right here (demonstrating).

15        Q.    And what I'm interested in is less about

16   physical evidence of that, but whether you saw them

17   get hit.  You actually saw the officer shoot them

18   and could tell what they were doing at that time?

19        A.    Yes.

20        Q.    Tell me about that.

21        A.    They had just pulled up with another

22   couple of cars after the first initial shooting.

23   And that's whenever a lot more dispersal started to

24   happen amongst the crowd.

25              And it was also around that time whenever
```

EXHIBIT 5 - PAGE 44

```
 1    I was running away that tear gas was thrown.  And
 2    then I specifically saw at least three cops standing
 3    there and firing into the crowd.
 4         Q.   Do you know who those officers were?
 5         A.   No.
 6         Q.   Were you yourself struck with a
 7    PepperBall?
 8         A.   No.
 9         Q.   Now, the tear gas, was any of that thrown
10    directly at you?
11         A.   I don't think it was thrown directly at
12    me, but it was thrown very near me.
13         Q.   What did you do in response to it being
14    thrown near you?
15         A.   I covered my face and I ran.
16         Q.   Did you suffer any physical effects from
17    the tear gas that was deployed near the LTD station?
18         A.   Yes.
19         Q.   Tell me about that.
20         A.   Very itchy eyes for about a day
21    afterwards.  And I had a very hoarse throat and was
22    coughing for a long time.
23         Q.   Do you know who -- which officer threw
24    that tear gas?
25         A.   I do not.
```

EXHIBIT 5 - PAGE 45

1      Q.    Do you know what it was that they were
2   trying to do or target with that tear gas?
3      A.    I knew that they were trying to get us to
4   disperse.
5      Q.    So you disperse, and you go by a church.
6   Do you know where that church was?
7      A.    I don't remember the street's name.
8      Q.    Was it closer to the Campbell Club than
9   downtown?  Was it in between?
10      A.    It was kind of in between.
11      Q.    And there was another group there.  And at
12   some point you learned that there was going to be a
13   gathering near Whole Foods.  Correct?
14      A.    Correct.
15      Q.    How did you learn that?
16      A.    Someone had received a message and
17   informed the group.
18      Q.    But you weren't getting -- well, were you
19   getting text messages or Facebook Messengers about
20   what was occurring?
21      A.    No.
22      Q.    So you were relying on other people to
23   tell you where to go and what was going on.
24   Correct?
25      A.    Correct.

EXHIBIT 5 - PAGE 46

1       Q.    Why did you decide to then go to the Whole

2    Foods as opposed to simply going home?

3       A.    Well, because I'm passionate and I wanted

4    to stand in solidarity.

5       Q.    At that point in time, had anyone told you

6    that there would be a curfew in effect?

7       A.    I was aware that there would be a curfew

8    within specific limits.

9       Q.    So within a specific downtown area, you

10   were aware that a curfew would go into effect.

11      A.    Correct.

12      Q.    And you traveled to Whole Foods because it

13   was outside of those curfew boundaries.  Is that

14   right?

15      A.    Correct.

16      Q.    So you are there at the Whole Foods.  And

17   some individuals go into the street and kneel in the

18   street.  Correct?

19      A.    I don't recall.

20      Q.    All right.  Did you kneel in the street?

21      A.    I kneeled on the sidewalk.

22      Q.    And did you observe police line up in

23   front of one of the entrances to the Ferry Street

24   Bridge?

25      A.    Yes.

EXHIBIT 5 - PAGE 47

1  Q.   And while -- how many people were in this
2  group congregated around Whole Foods?
3  A.   I would estimate a little over a hundred.
4  Q.   Were most of them kneeling or chanting or
5  making noise?
6  A.   Yes.
7  Q.   And was that directed at the police who
8  were lined up?
9  A.   Perhaps some of them directed it at the
10  police, but I think the majority of it was directed
11  for the movement.
12  Q.   And in response to that activity, what did
13  the police do?
14  A.   They stood there for a while.  And then
15  eventually I believe that Whole Foods said that they
16  didn't want anyone on their property, so they
17  relayed that information to us.  So we made sure we
18  weren't in the Whole Foods parking lot at all.
19  And then they declared an unlawful
20  assembly and gave us three minutes before a
21  city-wide curfew would be instated.  And that's when
22  the majority of us got up and left.
23  Q.   So at some point while you were located
24  there, the police make an announcement that there's
25  a trespass letter on file for Whole Foods and to

EXHIBIT 5 - PAGE 48

1    stay off their property.  Correct?

2        A.    Correct.

3        Q.    After that announcement, did you observe

4    anyone go back onto the Whole Foods property?

5        A.    No.

6        Q.    Your testimony is nobody went back onto

7    the property at any time?

8        A.    I didn't see anyone walk out there.

9        Q.    The police then make an announcement that

10   a city-wide curfew is going to go into effect.

11   Correct?

12       A.    Correct.

13       Q.    In response to that, you and others begin

14   to leave.  Correct?

15       A.    Correct.

16       Q.    Tell me your route that you took to get

17   from there to the Campbell Club.

18       A.    My route was on the side of Broadway right

19   there, and I walked from Broadway to Patterson.  And

20   then I walked from Patterson to 16th and then to

21   Alder.

22       Q.    And while you were on that walk, did you

23   observe anyone get arrested?

24       A.    I did not observe anyone get arrested.

25       Q.    While you were on that walk, did you

EXHIBIT 5 - PAGE 49

1    observe anyone get shot by PepperBall?

2        A.    Yes.

3        Q.    Where did that happen?

4        A.    That happened a couple of blocks from the

5    7-Eleven on Broadway.  It was, I think, around

6    Hilyard Street and Broadway.  Still visible from

7    Patterson.  And I saw people that were running and

8    police driving their cars and shooting at people,

9    like, on the side of the vehicles.

10       Q.    For that walk where you went from the

11   Whole Foods to eventually the Campbell Club, were

12   you struck by PepperBall?

13       A.    No.  It was a run.

14       Q.    At that time were you a credentialed

15   member of the media?

16       A.    No.

17       Q.    Were you seeking medical care?

18       A.    No.

19       Q.    Were you traveling to and from employment?

20       A.    No.

21       Q.    Were you making commercial deliveries?

22       A.    No.

23       Q.    Were you sheltering in place?

24       A.    Can you define that?

25       Q.    It's just sheltering in place.  You were

EXHIBIT 5 - PAGE 50

1    traveling back to your house.

2         A.    I was seeking shelter.

3         Q.    Were you fleeing dangerous circumstances?

4         A.    Yes.

5         Q.    What were those?

6         A.    Chemical and projectile weaponry.

7         Q.    And you indicated earlier that that -- at

8    the time they announced the curfew, that wasn't

9    being deployed on you there by Whole Foods though.

10   Correct?

11        A.    Yes.  But after three minutes, once 11:00

12   hit, approximately, they started driving and they

13   started shooting and gassing the people that had

14   stayed there.  And then it moved on into the crowd

15   of people that were going home.

16        Q.    Did any of the individual defendants

17   engage in those activities?

18        A.    I'm not aware.

19        Q.    So you managed to get back to the Campbell

20   Club.  And, for lack of a better term, your -- when

21   you get there, you are unscathed.  You were not

22   arrested and you weren't hit by anything.  Correct?

23        A.    Correct.

24        Q.    And you go inside of the building through

25   the front door.

EXHIBIT 5 - PAGE 51

1        A.      Through the front door.

2        Q.      Correct?  Okay.  It sounds like you're

3    thinking of going back out to smoke a cigarette.  Do

4    I have the time line right?

5        A.      Correct.

6        Q.      And at some point you become aware that

7    Eric is outside of the house.  Is that right?

8        A.      Correct.

9        Q.      How did you become aware of that?

10        A.      With the police driving in really fast

11    down Alder and Eric also biking really fast down

12    Alder and then running onto the porch and screaming.

13        Q.      Where did he leave his bike?

14        A.      He brought it inside.

15        Q.      All right.  And where -- was Eric ever

16    struck by any weapons?

17        A.      Yes.

18        Q.      How many times?

19        A.      I think the number was three for that day,

20    but I'm not sure.

21        Q.      Right out in front of your house, how many

22    times was he hit by anything?

23        A.      I think those were the three.

24        Q.      You think three times?

25        A.      Yeah.

EXHIBIT 5 - PAGE 52

1      Q.    What was he hit by?

2      A.    Pepper rounds.

3      Q.    By whom?

4      A.    The EPD.

5      Q.    And do you know which officer did that?

6      A.    No.

7      Q.    So are you able to see this through a

8  window, or how is it you are able to visually see

9  what's going on?

10      A.    I stepped out onto the front porch getting

11  ready to smoke a cigarette.  So I'm on the front

12  porch with the door open right here.  And that's

13  whenever -- like, the moment that Eric runs up and

14  starts getting shot at.

15          Then right after that I see Eric's

16  actually yelling at the guy that I mentioned before

17  with the hands up yelling, "Please don't shoot.  I'm

18  going home."

19          And so while Eric was running towards the

20  door, we're both yelling at him, like, "Hey, come in

21  here."  But he kept running.

22          And so that's whenever Eric looked at me

23  and was, like, "Open the door," like, "Let me in."

24          And so I opened the door.  And the moment

25  Eric got in -- I was about to close the door, and

EXHIBIT 5 - PAGE 53

1    that's whenever I saw the bullet shooting.  And that
2    was a rubber bullet.  And -- yeah.
3        Q.    Was there another bullet that was intended
4    to take -- to hit Eric?
5        A.    It was probably intended to hit Eric, but
6    it was shot at head level.
7        Q.    All right.  Now, the other person that you
8    indicated you saw get shot in the back with
9    something -- you remember that?
10       A.    Uh-huh.
11       Q.    Yes?
12       A.    Yes.
13       Q.    Do you know who that person is?
14       A.    I have no idea.
15       Q.    Could you tell what they were shot in the
16   back with?
17       A.    It looked like a rubber bullet.
18       Q.    All right.  How many times?
19       A.    Once.
20       Q.    All right.  And what happened to that
21   person?
22       A.    I don't know.  After they shot -- after
23   they got shot, they got up and started running more.
24   And at that point I was trying to get inside.
25       Q.    Other than Eric, did anybody else come in

EXHIBIT 5 - PAGE 54

1    through the front door at or around that time?

2        A.    No.

3        Q.    So you help let Eric in and then, I

4    imagine, barred the door.

5        A.    Yes.

6        Q.    All right.  And officers stood outside for

7    a period of time, but did any come up to the house?

8        A.    There was one officer that walked up,

9    like, a little bit past the sidewalk, a little onto

10    the property.  And so there was one casing there

11    actually where I think he was standing before I got

12    inside.  So we found a casing there and took a photo

13    of it.

14        Q.    And once Eric got inside, did you have any

15    discussion with him about what occurred?

16        A.    No.

17        Q.    Did anybody speak to him about what

18    occurred?

19        A.    No.

20        Q.    So what did you do for the remainder of

21    the night?

22        A.    Well, after I knew that we weren't going

23    to be bothered so much anymore, just kind of made

24    sure that everyone was, like, mentally okay and made

25    sure that I was mentally okay and kind of just took

EXHIBIT 5 - PAGE 55

1   a moment.  Yeah.

2       Q.    Now, you indicated that you thought tear

3   gas came in through cracks in windows or open

4   windows.  Is that correct?

5       A.    Yes.

6       Q.    And the tear gas that did that, do you

7   know where it had been deployed?

8       A.    I believe that it was deployed in the

9   Lorax front yard.

10      Q.    And do you know what it was deployed in

11  response to?

12      A.    I believe that a couple Loraxers were

13  coming outside to see what the commotion was about,

14  and they got told to go back inside.  They were,

15  like, "We live here.  What's going on?"  And then

16  the tear gas.

17      Q.    Is that something you observed or heard?

18      A.    Heard.

19      Q.    After you get in with Eric and close the

20  door, what other -- what, if anything, do you

21  observe EPD officers do the remainder of that night?

22      A.    I don't.

23      Q.    You don't see anything?

24      A.    I don't see anything.

25      Q.    I've seen some pictures that appear to

EXHIBIT 5 - PAGE 56

1    indicate that there was at least one broken window

2    on the Campbell Club -- or a frame that was broken.

3    Is that -- is there at least one?

4        A.    Correct.

5        Q.    How many windows or windowpanes were

6    broken that night?

7        A.    I'm not sure.

8        Q.    And did you see them get broken?

9        A.    I did not really have the time to watch

10   the windows.

11       Q.    I guess -- I mean, what I'm trying to get

12   at is -- I realize it's possible that it was a

13   PepperBall that hit it.  But do you have any reason

14   to believe that it was -- that an officer was

15   targeting the building as opposed to shooting at

16   somebody else and missing?

17       A.    A little bit of reason.  Yeah.  There

18   definitely has been, like, some history between the

19   EPD and the Campbell Club, just, like, with shows

20   and stuff.

21             I don't know.  I'm not aware.  I wasn't

22   there.  But there were a couple of police raids that

23   sounded very unfair.  And there was a moment in time

24   where, like, they had all of our nice sound

25   equipment for a while.  Yeah.

EXHIBIT 5 - PAGE 57

1     Q.    But has that occurred -- did any of those

2   things occur in the last few years?

3     A.    No.

4     Q.    Do you recall any other details of the

5   police encounter on May 31, 2020, that we haven't

6   discussed?

7     A.    No.

8     Q.    What kind of a relationship do you have

9   with Eric?

10     A.    Very minimal relationship.

11     Q.    How often do you interact?

12     A.    Maybe a couple of times a year.

13     Q.    So he is not a close friend?

14     A.    No.

15     Q.    How about the other plaintiffs in this

16   case?  Before May 31st is there any -- did you know

17   any of them other than Kirtis Ranesbottom?

18     A.    No.

19     Q.    And what's the nature of your relationship

20   with those plaintiffs now?

21     A.    Very similar.  I don't really know them.

22   I've seen their names and, you know, had some

23   discussions with our attorneys but --

24     Q.    Any group texts where the attorneys aren't

25   on?

EXHIBIT 5 - PAGE 58

Damon Cochran-Salinas

58

```
 1        A.    No.
 2        Q.    Any other communications where attorneys
 3   aren't on?
 4        A.    No.
 5        Q.    Did you refuse to obey orders given to you
 6   by a police officer on May 31st, 2020?
 7        A.    Well, I suppose whenever I was told to
 8   disperse and I didn't at the LTD district.  So yes.
 9        Q.    Were you struck with a baton?
10        A.    No.
11        Q.    Were you tased?
12        A.    No.
13        Q.    Were you struck with a less-lethal
14   munition?
15        A.    Define "less-lethal munition."
16        Q.    The rubber bullets or foam bullets.
17        A.    No.
18        Q.    And you don't own the Campbell Club.
19   Correct?
20        A.    Well, technically we are all equal members
21   of the same organization that co-owns the Campbell
22   Club.
23        Q.    Were you responsible for any repairs to
24   the property?
25        A.    I did fix the door.
```

EXHIBIT 5 - PAGE 59

1  Q. But were you personally responsible to do

2 that?

3  A. No.

4  Q. How did the June 1st, 2020, curfew impact

5 you?

6  A. It made me disappointed, but it didn't

7 really affect me too severely.

8  Q. What do you ordinarily do between 11:00

9 p.m. and 6:00 a.m.?

10  A. Make music.  Sleep.

11  Q. Are those activities that you typically do

12 in your residence?

13  A. Yeah.

14  Q. Do you know what hiring process Eugene

15 police officers go through?

16  A. No.

17  Q. Do you know what internal policies Eugene

18 police officers are subject to?

19  A. No.

20    MR. MILLER:  Let's take a break, and

21 I'll meet with Jamie.

22    VIDEO TECHNICIAN:  We're going off the

23 record.  The time is 2:19 p.m.

24    (Recess:  2:19 to 2:22 p.m.)

25    VIDEO TECHNICIAN:  We're going back on

EXHIBIT 5 - PAGE 60

Damon Cochran-Salinas

```
 1    the record.  The time is 2:22 p.m.

 2                    MR. MILLER:  Those are all the

 3    questions that I have for you today.  I'll hold the

 4    deposition open only as to any additional discovery,

 5    if any, that gets produced.  But otherwise you're

 6    done.  Thank you for your time.

 7                    THE WITNESS:  Cool.  Thank you.

 8                    MS. DUGAN:  Thank you.

 9                    VIDEO TECHNICIAN:  We're going off the

10    record.  The time is 2:22 p.m.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT 5 - PAGE 61

Damon Cochran-Salinas

61

```
1    State of Oregon    )
                        )        ss.
2    County of Lane     )

3

4        I, Eleanor G. Knapp, CSR-RPR, a Certified

5    Shorthand Reporter for the State of Oregon, certify

6    that the witness was sworn and the transcript is a

7    true record of the testimony given by the witness;

8    that at said time and place I reported all testimony

9    and other oral proceedings had in the foregoing

10   matter; that the foregoing transcript consisting of

11   60 pages contains a full, true and correct

12   transcript of said proceedings reported by me to the

13   best of my ability on said date.

14       If any of the parties or the witness requested

15   review of the transcript at the time of the

16   proceedings, such correction pages are attached.

17       IN WITNESS WHEREOF, I have set my hand this 29th

18   day of September 2021, in the City of Eugene, County

19   of Lane, State of Oregon.

20

21

22   Eleanor G. Knapp, CSR-RPR

23   CSR No. 93-0262

24   Expires:  September 30, 2023

25
```

EXHIBIT 5 - PAGE 62