*Hasheem Boudjerada*

*Boudjerada v City of Eugene*

*May 5, 2022*



CC REPORTING AND VIDEOCONFERENCING
101 East Broadway, Suite 300
Eugene, OR 97401
541-485-0111
www.ccreporting.com

EXHIBIT 8 - PAGE 1

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


HASHEEM BOUDJERADA; DAMON          )No. 6:20-cv-1265-MK

COCHRAN-SALINAS; ERIN GRADY;       )

TYLER HENDRY; and KIRTIS           )

RANESBOTTOM,                       )

    Plaintiffs,        )

  v.                           )

CITY OF EUGENE; SARAH MEDARY;      )

WILLIAM SOLESBEE; SAMUEL STOTTS;)

BO RANKIN; TRAVIS PALKI; MICHAEL)

CASEY; RYAN UNDERWOOD; CRAIG       )

WRIGHT; CHARLES SALSBURY; and      )

CHIEF CHRIS SKINNER,               )

    Defendants.        )


DEPOSITION OF HASHEEM BOUDJERADA

May 5, 2022, Thursday

3:00 P.M.

THE DEPOSITION OF HASHEEM BOUDJERADA was taken at CC Reporting & Videoconferencing, 101 East Broadway, Suite 300, Eugene, Oregon, before Eleanor Knapp, RPR-CSR, Certified Shorthand Reporter in and for the State of Oregon.

EXHIBIT 8 - PAGE 2

```
 1
 2                      APPEARANCES
 3
 4    For the Plaintiffs:
 5         CIVIL LIBERTIES DEFENSE CENTER
 6         158 East 14th Avenue
 7         Eugene, Oregon 97401-4334
 8         541-687-9180
 9         BY:  MS. MARIANNE DUGAN
10         mdugan@cldc.org
11
12    For the Defendants:
13         CITY OF EUGENE ATTORNEY'S OFFICE
14         125 East 8th Avenue, 2nd Floor
15         Eugene, Oregon 97401
16         541-682-8447
17         BY:  MR. BEN MILLER
18         ben.j.miller@ci.eugene.or.us
19
20
21    Reported by:  Eleanor Knapp, RPR-CSR
22
23
24
25
```

EXHIBIT 8 - PAGE 3

Hasheem Boudjerada

3

```
1                        INDEX
2
3    WITNESS.....................................PAGE
4    HASHEEM BOUDJERADA
5         BY MR. MILLER                         4
6
7    EXHIBITS.................................MARKED
8    Exhibit 1  Second Amended Complaint        6
9    Exhibit 2  Boudjerada's Response to Defendant 16
10              Skinner's Interrogatories
11   Exhibit 3  Boudjerada's Response to Defendant 21
12              Salsbury's Interrogatories
13   Exhibit 4  Response to Defendants Wright's,  22
14              Salsbury's and Skinner's First
15              Request for Production
16              Second Request for Production
17
18
19
20
21
22
23
24
25
```

EXHIBIT 8 - PAGE 4

4

```
 1                  HASHEEM BOUDJERADA,

 2     having been first duly sworn to testify the truth,

 3     the whole truth, and nothing but the truth, was

 4     examined and testified as follows:

 5

 6                    EXAMINATION

 7     BY MR. MILLER:

 8         Q.    Good afternoon.  My name is Ben Miller.

 9     I'm one of the attorneys for the defendants in this

10     case.  I deposed you earlier, I think back in

11     September.  Do you remember that?

12         A.    Yeah, like last year.

13         Q.    Yes.  And please correct me, it's

14     pronounced Boudjerada?

15         A.    Boudjerada, yeah.

16         Q.    I will do my best.  So thank you for

17     coming out today.  You understand the deposition

18     today is sort of limited to allegations and defenses

19     and claims regarding some newly added defendants.

20     Do you understand that?

21         A.    Yes.

22         Q.    So we are not going to repeat everything

23     that happened before.  At your last deposition, I

24     gave you some instructions or talked through the

25     rules of the deposition.  Do you remember that at
```

EXHIBIT 8 - PAGE 5

Hasheem Boudjerada

```
 1   all?
 2       A.    Vaguely.  I feel like I can -- I'll be
 3   okay.
 4       Q.    Do you want me to go through them again?
 5       A.    If you want to.
 6       Q.    I'm happy to, just so it's clear.  Sure.
 7       A.    Yeah.
 8       Q.    So you were put under oath today.  It's
 9   the same oath that you would be put under if you
10   testify later at court.  Do you understand that?
11       A.    Yes.
12       Q.    So there's a couple of ways that I can use
13   this deposition.  You see that there's a court
14   reporter who is taking down a written transcript of
15   my questions and your answers.  Do you understand
16   that?
17       A.    Yes.
18       Q.    And I can use that transcript as direct
19   evidence rather than calling you as a witness to say
20   this is what Mr. Boudjerada would testify to.  Do
21   you understand that?
22       A.    Yeah.
23       Q.    And I can also use it as impeachment if I
24   think that you tell me something today that's
25   inconsistent with something you testify to later on.
```

EXHIBIT 8 - PAGE 6

6

1    Do you understand that?

2        A.    Yes.

3        Q.    And so for that reason, you know, I want

4    your best answers from your own personal knowledge.

5    But if I ask a question that you don't understand or

6    you want me to clarify it, please do that.  Is that

7    okay?

8        A.    Yes.

9        Q.    You are doing a really good job of it.  We

10   need to make sure we are not speaking over each

11   other, and we try to speak slowly so the court

12   reporter can take everything down.  Okay?

13       A.    Sounds good.

14       Q.    Anything that would impact your ability to

15   participate in the deposition today?

16       A.    Not that I'm aware of.

17       Q.    I just want to get an update on -- I don't

18   have your -- in front of me.  Since September of

19   last year, have you changed residences?

20       A.    Should be 4995 Whiteaker Street.  I

21   believe it's the same.

22       Q.    And that's your residence now?

23       A.    Yes.

24               (Deposition Exhibit Number 1

25                 marked for identification.)

EXHIBIT 8 - PAGE 7

1    BY MR. MILLER:

2        Q.    All right.  I'm going to hand you what's

3    marked as Exhibit 1.  And do you recognize this at

4    least generally as the Second Amended Complaint in

5    this case?

6        A.    I believe so, yeah.

7        Q.    And at a high level, the changes in this

8    complaint from the one that we were here about

9    before were to add three new defendants and some

10   allegations related to them:  Craig Wright, Charles

11   Salsbury, and Chief Skinner.  Do you understand

12   that?

13       A.    Yes.

14       Q.    And my understanding is that you yourself

15   are not bringing a claim against Craig Wright.  Is

16   that correct?

17       A.    Not that I'm aware of, no.

18       Q.    Do you agree that you are not bringing

19   that claim?

20       A.    Yeah.  I don't know who that is

21   specifically.

22       Q.    So your claims are against -- the new

23   claims are against Charles Salsbury and Chief

24   Skinner.  Correct?

25       A.    I think so.

EXHIBIT 8 - PAGE 8

Hasheem Boudjerada

1      Q.    I'm not trying to trip you up.

2      A.    I'm just, yeah, nervous.

3      Q.    Sure.  All right.  I want to talk about

4   some of the new allegations in here.  If you could

5   turn to page 7 of that document?  If you would look

6   at just the paragraph numbered 27 and read that to

7   yourself and let me know when you're done.

8      A.    Okay.

9      Q.    Have you ever met Lieutenant Salsbury?

10     A.    I don't recall.  If I had, it would have

11  been here in the deposition.  Other than that, no.

12     Q.    So have you ever -- other than if he was

13  present at a deposition, have you ever seen

14  Lieutenant Salsbury?

15     A.    Not that I can remember.

16     Q.    Have you ever spoken with Lieutenant

17  Salsbury?

18     A.    No.

19     Q.    Have you ever heard Lieutenant Salsbury

20  speak to anybody else?

21     A.    Not that I remember.  Not that I know

22  specifically, if you know what I mean.

23     Q.    Sure.  What personal information do you

24  have about Lieutenant Salsbury's actions on May 31st

25  of 2020?

EXHIBIT 8 - PAGE 9

Hasheem Boudjerada

9

```
 1        A.    None.

 2        Q.    What did you say?

 3        A.    Nothing.  Personally.

 4        Q.    If you look at paragraph 27, I'm

 5   summarizing here, but it indicates that Lieutenant

 6   Salsbury authorized arrests.  Do you see that?

 7        A.    Yes.

 8        Q.    What did Lieutenant Salsbury do to

 9   authorize arrests?

10        A.    I'm assuming what you said, he authorized

11   it.

12        Q.    Do you know any more detail than that?

13        A.    No.

14        Q.    And what did -- under paragraph 27, what

15   did Lieutenant Salsbury do to authorize use of force

16   directly or through delegation?

17        A.    What do you mean?

18        Q.    If we look at paragraph 27 of your

19   complaint, it says -- and I'm summarizing -- but

20   that Lieutenant Salsbury authorized the use of force

21   directly and through delegation.  Do you see that in

22   paragraph 27?

23        A.    Yes.

24        Q.    And all I want to know is, what

25   information do you have about that?  What did he do
```

EXHIBIT 8 - PAGE 10

Hasheem Boudjerada

1    to do that?

2        A.    I don't know.

3        Q.    All right.  If you could look at

4    paragraph 28 and read that to yourself.

5        A.    Okay.

6        Q.    Have you ever met with Chief Skinner?

7        A.    No.

8        Q.    Have you ever seen Chief Skinner?

9        A.    I mean, I've seen him.

10       Q.    When was that?

11       A.    I mean, I feel like I've seen him probably

12   on KVAL and then, like, YouTube videos and stuff

13   relating to it.

14       Q.    And maybe I'll try to be more specific.

15   So for the events that we are here about, that

16   weekend in May of 2020, did you ever see Chief

17   Skinner that weekend?

18       A.    Not that I recall, no.

19       Q.    Have you yourself ever spoken with Chief

20   Skinner?

21       A.    No.

22       Q.    Have you ever heard Chief Skinner speak?

23       A.    No.

24       Q.    Other than -- other than news reports?

25       A.    No.

EXHIBIT 8 - PAGE 11

1    Q.    What information do you have about Chief

2    Skinner's actions on May 31st, 2020?

3    A.    All I know is that he authorized the

4    arrests and, you know, the use of all the stuff that

5    happened that night.

6    Q.    And without telling me any privileged

7    information, how do you know that?

8    A.    Through my attorney.

9    Q.    And I don't want to know what the

10   conversation was, but what did Chief Skinner do or

11   say to authorize arrests?

12   A.    I don't know specifically what he did, but

13   from my understanding he is the chief of police.  So

14   he authorized it because it was chain of command

15   kind of thing.

16   Q.    Anything else?

17   A.    No.

18   Q.    What did Chief Skinner do to authorize

19   uses of force on May 31st, 2020?

20   A.    I'm not sure how he would go about that.

21   Q.    If we could, turn to page 14.  If you

22   would look at the bottom of paragraph 76 and read

23   that to yourself.

24   A.    Okay.

25   Q.    We may have asked a related question to

EXHIBIT 8 - PAGE 12

1    this, but for paragraph 76, what did Lieutenant

2    Salsbury do to authorize unlawful arrests?

3        A.    I'm assuming he told people -- told

4    officers to arrest people that were out there.

5        Q.    Is that an assumption or do you have

6    knowledge about that?

7        A.    It says Defendant Salsbury authorized.

8        Q.    Right.  But that's your complaint.

9    Correct?

10       A.    Yeah.

11       Q.    And so what I'm wondering is -- and I'm

12   trying to drill down with everybody -- what's the

13   basis of knowledge for that, if you have some?

14       A.    What do you mean?

15       Q.    What personal knowledge do you have that

16   Lieutenant Salsbury authorized unlawful arrests?

17       A.    Well, for one, we didn't have proper time

18   to, you know, disperse and oblige by -- I guess

19   oblige by the curfew.  We were given -- I believe it

20   was, like, three minutes to leave where we were, and

21   we didn't have a clear path to leave so -- if I

22   remember correctly, when you are dispersing

23   protesters, you are supposed to leave, like, a clear

24   path for disperse -- for people to disperse and for

25   people to leave.  And I don't feel like that was

EXHIBIT 8 - PAGE 13

1    done.

2         Q.    What was Lieutenant Salsbury's role in

3    what you just described?

4         A.    I'm not sure about his specific role

5    because I don't know the hierarchy of how, like, all

6    of the -- you know, the chain of command within the

7    police officers, you know.  So I'm not exactly sure

8    his personal, like, actual entire involvement.

9         Q.    What did Lieutenant Salsbury do to

10   unauthorize unlawful arrests via delegation?

11        A.    I don't understand.

12        Q.    You don't understand the question or --

13        A.    Yeah.

14        Q.    Well, it's again paragraph 76 of your

15   complaint.  It says, in part, Lieutenant Salsbury

16   authorized unlawful arrests via delegation.  Do you

17   see that?

18        A.    Yeah.

19        Q.    So I'm just trying to find out from you

20   what you think or you know that he did to do that.

21        A.    Well, the events that happened that night

22   were pretty hazy.  And I don't remember -- you know,

23   everyone had -- the officers had gas masks and stuff

24   on.  So I couldn't identify Salsbury specifically,

25   so I don't know.

EXHIBIT 8 - PAGE 14

1      Q.    Next page, paragraph 77.  Could you just
2  read that to yourself.
3      A.    Okay.
4      Q.    So specific to paragraph 77, what did
5  Chief Skinner do to delegate authority to make
6  arrests?
7      A.    I'm assuming, from my understanding, that
8  he authorized the arrests to be made.
9      Q.    Who did he make that authorization to?
10      A.    I have no idea.
11      Q.    What did he say to make that
12  authorization?
13      A.    I have no clue.  I wasn't there with him.
14      Q.    So is it an assumption, or do you have any
15  personal knowledge at all?
16      A.    I would assume, since he is the head of
17  police, you know, the chief of police that that
18  would be his job to do so.
19      Q.    And I really do want to drill down on
20  this.  So you know that he is the chief of police.
21  Correct?
22      A.    Uh-huh.
23      Q.    Is that a yes?
24      A.    Yes.  Sorry.
25      Q.    And you know that certain officers took

EXHIBIT 8 - PAGE 15

Hasheem Boudjerada

15

1    certain actions you disagree with that night.

2    Correct?

3         A.    Yes.

4         Q.    And all I'm trying to find out is if you

5    have personal knowledge about what the chief did in

6    between there to delegate or authorize those

7    officers to do the things you are complaining about.

8         A.    Not specifics.

9         Q.    Do you have any evidence that Lieutenant

10   Salsbury targeted you or did anything to you because

11   of protected speech activity?

12        A.    Could you repeat that one more time?

13        Q.    Sure.  Do you have any evidence that

14   Lieutenant Salsbury targeted you or did anything to

15   you because of protected speech activity?

16        A.    No evidence per se.

17        Q.    What about for Chief Skinner?  Same

18   question.

19        A.    No.

20        Q.    Why should a jury award punitive damages

21   against Lieutenant Salsbury?

22        A.    What's punitive damages?

23        Q.    Punitive damages are essentially damages

24   meant to punish a defendant for conduct.

25        A.    Because the conduct was unlawful and

EXHIBIT 8 - PAGE 16

Rasheem Boudjerada

16

```
 1    unconstitutional.

 2         Q.    Is that his conduct or others'?

 3         A.    What do you mean?

 4         Q.    Are you -- well, you said the conduct was

 5    unlawful.  So I'm asking, what you are describing,

 6    was it Lieutenant Salsbury's conduct or others'

 7    conduct?

 8         A.    I think it was just the general what was

 9    going on at the time was not correct.

10         Q.    But what I guess I'm interested in is for

11    whatever you think Lieutenant Salsbury did that

12    evening, why should a jury award punitive damages

13    against him personally?

14         A.    Because he did those things, even if he

15    was ordered to.  I mean, he's a police officer and

16    he should know the law and know, you know, how he

17    should be acting accordingly.

18         Q.    I'll mark this as Exhibit 2.

19               (Deposition Exhibit Number 2

20                 marked for identification.)

21               I've handed you your response to Defendant

22    Skinner's interrogatories.  Do you see that?

23         A.    Yes.

24         Q.    Do you recognize this document at least

25    generally?
```

EXHIBIT 8 - PAGE 17

1      A.    Yes.

2      Q.    And if you turn to the third page, is that

3  your signature?

4      A.    Yes.

5      Q.    I'm going to ask you about Interrogatory

6  Number 1.  And if you want to just read that to

7  yourself, and then let me know when you're done.

8      A.    Okay.

9      Q.    So for Interrogatory Number 1, is there

10  any other information that's responsive to this

11  interrogatory that exists that isn't listed here or

12  is otherwise covered by a privilege?

13      A.    Not that I'm aware of, no.

14      Q.    And so what information do you believe

15  Malik McClain has about the claims, defenses, and

16  issues set forth against Chief Skinner?

17      A.    I'm not sure.

18      Q.    What information do you believe Joshua

19  McKnight has about the issues, claims, and defenses

20  set forth against Chief Skinner?

21      A.    I'm not sure of that as well.

22      Q.    Do you know both of those individuals?

23      A.    I know them through the process of this,

24  but not outside of that.

25      Q.    Were they near you at the time of your

EXHIBIT 8 - PAGE 18

1    arrest?

2         A.    Yes.

3         Q.    And have you spoken to them about their

4    observations?

5         A.    In what sense?

6         Q.    About whether they observed your arrest.

7         A.    I don't recall at the moment.  I don't

8    think so.

9         Q.    For Interrogatory Number 1, is there

10   anything you need to do to supplement this

11   interrogatory?

12        A.    Not that I'm aware of.

13        Q.    Why don't you read Interrogatory Number 2

14   -- it starts on that page and goes to the next --

15   and let me know when you're done -- and the

16   response.

17        A.    Okay.

18        Q.    Do you have any information responsive to

19   this interrogatory -- or does any information

20   responsive to this interrogatory exist that's not

21   covered by privilege?

22        A.    Not that I'm aware of, no.

23        Q.    We just spent some time earlier talking

24   about paragraph 28 in the Second Amended Complaint

25   which this interrogatory refers to.  Correct?

EXHIBIT 8 - PAGE 19

1         A.    I believe so.

2         Q.    Yeah.  Do you need to supplement your

3    response to this interrogatory?

4         A.    Not that I'm aware of, no.

5         Q.    Interrogatory Number 3, if you would take

6    a look at that.

7         A.    Okay.

8         Q.    And do you need to -- I believe we also

9    spent some time talking about paragraph 77 a minute

10   ago.  Do you need to supplement your response to

11   Interrogatory Number 3 in any way?

12        A.    Not that I'm aware of, no.

13        Q.    And does any information -- well, I think

14   we asked you that so -- okay.  I'll move on.

15   interrogatory Number 4, would you read that to

16   yourself and then let me know when you're done.

17        A.    Okay.

18        Q.    Do you need to supplement your answer to

19   Interrogatory Number 4 in any way?

20        A.    No.

21        Q.    So it remains true that force was not used

22   against you.  Correct?

23        A.    What do you mean by that?

24        Q.    So in the answer to Interrogatory

25   number 4, the first sentence, would you read that

Hasheem Boudjerada

1    out loud for the record?

2        A.    The answer?

3        Q.    Yeah.

4        A.    (Reading):  Plaintiff Boudjerada does

5    not allege that force was used against him.

6    Paragraph 88 of the S.A.C. does not relate to

7    Plaintiff Boudjerada.

8        Q.    So looking at the first sentence, it says

9    you don't allege that force was used against you.

10   Correct?

11       A.    It says that.  Yes.

12       Q.    And does that remain true?

13       A.    I mean, they used force against me and

14   everyone else.

15       Q.    All right.  You swore under penalty of

16   perjury that the answers you provided in this

17   interrogatory were true and correct.  Right?

18       A.    Yeah.

19       Q.    And so is it true and correct, as you

20   swore to last month -- or March 9th, that you don't

21   allege force was used against you?

22       A.    That would be correct, I guess.  Yeah.

23                (Deposition Exhibit Number 3

24                 marked for identification.)

25   BY MR. MILLER:

EXHIBIT 8 - PAGE 21

1        Q.    I'll hand you what's marked as Exhibit 3.

2        A.    How many are there, if you don't mind my

3    asking?

4        Q.    I think four.  Not too bad.

5              All right.  This will be pretty close to

6    the same exercise because the answers, I think, to

7    most of these are the same.  If you'd look at

8    Interrogatory Number 1 and read that to yourself and

9    let me know when you're done.

10       A.    Okay.

11       Q.    Do you need to supplement your response to

12   Interrogatory Number 1 in any way?

13       A.    No.

14       Q.    Does any information responsive to this

15   interrogatory exist that's -- other than what's

16   listed here that's not covered by privilege?

17       A.    Not that I'm aware of, no.

18       Q.    Interrogatory Number 2, if you would read

19   that to yourself and let me know when you're done.

20       A.    Okay.

21       Q.    Interrogatory Number 2 talks about

22   paragraph 76, which we talked about earlier in the

23   deposition.  Looking at this interrogatory, do you

24   need to supplement your response in any way?

25       A.    Not that I'm aware of.

EXHIBIT 8 - PAGE 22

```
1          Q.    Does any information responsive to this
2     interrogatory exist that's not covered by privilege?
3          A.    Not that I'm aware of.
4          Q.    And Interrogatory Number 3, if you'd look
5     at that briefly.
6          A.    Yeah.
7          Q.    So do you need to supplement that answer
8     at all?
9          A.    Not that I'm aware of.
10         Q.    So it remains true.  Correct?
11         A.    Yeah.
12                    (Deposition Exhibit Number 4
13                     marked for identification.)
14    BY MR. MILLER:
15         Q.    Okay.  Handing you what's marked as
16    Exhibit 4.  And I want to start with the -- well,
17    you recognize this as your response to the
18    Defendants' Requests for Production?
19         A.    Yeah.
20         Q.    I'm going to start with Request for
21    Production Number 1.  And just read that to yourself
22    and let me know when you're done, the request and
23    the response.
24         A.    Request and the response?
25         Q.    Yeah.  Just read it to yourself.
```

EXHIBIT 8 - PAGE 23

Hasheem Boudjerada

1        A.    Okay.

2        Q.    All right.  So the response indicates, the

3    second part of it, that there are no responsive

4    documents beyond those already produced in discovery

5    by all the parties.  Do you see that?

6        A.    Yes.

7        Q.    Can you be more specific about what

8    documents that have been produced respond or

9    correspond to this RFP?

10       A.    What do you mean by that?

11       Q.    So there's been probably over 9,000

12   documents produced to date, and the federal rules

13   require you to organize and label documents to

14   correspond to categories and requests.  And what I'm

15   wondering is out of those 9,000 documents, which

16   ones are responsive to Request for Production

17   Number 1, if you know?

18       A.    I wouldn't know the specifics.

19       Q.    Can you tell me at all even what you are

20   thinking of that would be responsive to what was

21   requested in Request Number 1?

22       A.    As far as, like, records, photographs,

23   recordings, and things like that?

24       Q.    Yeah.

25       A.    I would assume just the live feed on

EXHIBIT 8 - PAGE 24

1   Facebook.  That's about it that I can think of off

2   the top of my head.

3       Q.    Other than documents that have been

4   produced, do any other documents responsive to this

5   request exist that are not covered by privilege?

6       A.    Not that I'm aware of.

7       Q.    And I don't want to know the substance of

8   them, but do any documents exist that are

9   attorney-client communications or work product that

10  are responsive to the request, just the existence of

11  them?

12      A.    I'm -- I don't understand the question.

13      Q.    Sure.  So it says in the first part of the

14  response "other than privileged attorney-client

15  communications and work product which Plaintiff

16  objects to producing."  Do you see that?

17      A.    Number 1?

18      Q.    Number 1, response.

19      A.    Okay.

20      Q.    And so my question is -- because I didn't

21  get a privilege log that lists out anything, are you

22  aware whether there -- privileged documents

23  responsive to this request actually exist or not?

24      A.    I couldn't tell you at the moment.

25      Q.    Requests, it looks like, 2 through 7 have

EXHIBIT 8 - PAGE 25

Hasheem Boudjerada

25

```
1    the same response, although they ask for different
2    things.  I'd like you to read those to yourself, and
3    then I'll try to combine it and ask about it.
4         A.    You said 2 through 7?
5         Q.    Yeah.
6         A.    Okay.
7         Q.    Okay?
8         A.    Okay.
9         Q.    So for each of these responses in 2
10   through 7, it indicates there's no responsive
11   documents beyond those already produced in discovery
12   by all the parties.  Do you see that?
13        A.    Yes.
14        Q.    And like the first one, my question for 2
15   through 7 is:  What documents are you referring to
16   that are responsive to our RFP 2 through 7?
17        A.    Could you repeat that one more time?
18   Sorry.
19        Q.    My question is:  In RFP 2 through 7, your
20   response says it's documents that have already been
21   produced in discovery.  Right?
22        A.    Yeah.
23        Q.    And I'm trying to narrow down, if you can
24   tell me, what documents already produced in
25   discovery are responsive to Requests 2 through 7.
```

EXHIBIT 8 - PAGE 26

1        A.    I couldn't tell you the specifics.

2        Q.    Do any documents responsive to Requests 2

3   through 7 exist that are not covered by privilege or

4   have not already been produced?

5        A.    Not that I'm aware of.

6        Q.    And 2 through 7 also indicate -- like we

7   talked about on 1 -- that you are objecting to

8   producing privileged attorney-client communications

9   and work product.  Do you see that in the response

10  to each?

11       A.    One more time?

12       Q.    Yeah.  2 through 7 indicate that you are

13  objecting to producing privileged attorney-client

14  communications and work product.  Do you see that?

15       A.    Yes.

16       Q.    And so the question -- I don't want to

17  know the content of any of it -- but do privileged

18  attorney-client or work product documents that are

19  responsive to Requests 2 through 7 exist, to your

20  knowledge?

21       A.    I'm kind of confused on that question.

22  Sorry.

23       Q.    That's okay.  We can break it down.  We

24  are looking at the response that you have on RFPs 2

25  through 7.  Each response is identical.  Correct?

EXHIBIT 8 - PAGE 27

Hasheem Boudjerada

27

```
1        A.    Looks like it.  Yeah.
2        Q.    Each of them begin with saying other than
3   privileged attorney-client communications or work
4   product, which you -- which Plaintiff objects to
5   producing.  Do you see where it says that?
6        A.    Yeah.
7        Q.    For each of them?
8        A.    Yeah.
9        Q.    And all I'm trying to determine is whether
10  you know whether there are actually privileged
11  documents that exist or not.
12       A.    Would a privileged document be something
13  that -- like, one of the Facebook, like, streams
14  that I had or -- would that be one of them?
15       Q.    What you've listed in your response is
16  privileged attorney-client communications and work
17  product.  So I'm assuming --
18       A.    Other than --
19       Q.    Right.
20       A.    Sorry.  Yeah.  So no.
21       Q.    So you're -- I just want to be clear for
22  the record.  So you are not aware of any
23  documents --
24       A.    Yeah.
25       Q.    -- responsive -- there we go.
```

EXHIBIT 8 - PAGE 28

Hasheem Boudjerada

28

```
 1        A.    Sometimes the wording is a little
 2   difficult.
 3        Q.    I know.  Number 8, if you would just read
 4   that to yourself.
 5        A.    Okay.
 6        Q.    So this was asking basically for media
 7   devices that you may have had to document some of
 8   the events from that weekend.  My understanding is,
 9   from the prior deposition, that the phone that you
10   had at the time no longer exists.  Correct?
11        A.    Yeah.
12        Q.    And is that still the case?
13        A.    Yeah.
14        Q.    I just want to make sure you haven't found
15   it or anything.
16        A.    Okay
17        Q.    And there wasn't -- you didn't find
18   another device that would be responsive?
19        A.    No.
20        Q.    So Request 9, if you could read that, and
21   the response, to yourself and let me know.
22        A.    Okay.
23        Q.    So I know that we have the video that you
24   provided, I think after the deposition, that you
25   took --
```

EXHIBIT 8 - PAGE 29

1      A.    Yeah.

2      Q.    -- of events prearrest and then a video of

3   sort of the events -- marching and leading to the

4   arrest.  Correct?

5      A.    Yeah.

6      Q.    So those two.  And I know that there

7   are -- we know that there is a video from the

8   body-worn cameras and others of the officers.

9   Correct?

10      A.    Yeah.

11      Q.    Those are all from May 31st, 2020.

12   Correct?

13      A.    Yes.

14      Q.    So do photographs or video of you from the

15   other days in this request, the 29th, the 30th, or

16   June 1st of 2020, do those even exist?

17      A.    Not that I'm aware of, no.

18      Q.    Go ahead and move to 10 on the next page.

19   Let me know when you're done reading that.

20      A.    Okay.

21      Q.    So this request was asking for photographs

22   or videos of gathering or activities on May 29th

23   through June 1st, 2020.  And we just went through

24   the videos that I know you have and produced.  My

25   question is:  Are you aware whether in your

EXHIBIT 8 - PAGE 30

```
 1    possession other photographs or videos of gatherings
 2    or activities on May 29th, 30th, or June 1st exist?
 3         A.    Not that I'm aware of at the moment.
 4         Q.    Request Number 11, if would you read that
 5    to yourself.
 6         A.    Okay.
 7         Q.    We had asked about electronic messages
 8    sent or received by you between those dates earlier.
 9    And I don't believe you were able to locate any
10    with -- the request doesn't say none exist, so I
11    just need to know.  Are you aware of any responsive
12    electronic messages sent or received by you between
13    May 29th and June 1st, 2020, concerning basically
14    the events of this lawsuit?
15              MS. DUGAN:  I'm going to object.  It
16    goes outside the scope of the extended discovery.
17              You can answer.
18         A.    I'm not sure how to answer that.
19    BY MR. MILLER:
20         Q.    Sure.  Well, is there a way I can help you
21    clarify it?
22         A.    Can you ask the question again?  Sorry.
23         Q.    Well, it's -- I mean, the question really
24    is -- if you look at number 11, we are asking for
25    electronic messages, so text messages, messages on
```

EXHIBIT 8 - PAGE 31

```
1    various different types of apps that you either sent

2    or received between these dates, May 29th and

3    June 1st, 2020, that concern the events for which

4    Chief -- Lieutenant Salsbury or Officer Wright were

5    responsible to or -- responding to or responsible

6    for.  And when I'm using those terms, what I'm

7    describing are either the curfews or the police

8    response that had to occur on those dates.  Does

9    that help you answer whether any messages exist?

10        A.    Not that I'm aware of at the moment, no.

11        Q.    Okay.

12        A.    I can produce them if I find it.

13        Q.    Have you looked to see whether you have

14   any responsive text message -- text or other

15   electronic messages?

16        A.    Not specifically concerning this, no.

17        Q.    So for Request 11, you didn't check to see

18   whether you had anything?

19        A.    No, I did, but I -- you know, it's hard to

20   look for a lot of stuff like that.  I don't know.  I

21   didn't find anything that was, like, specifically

22   relative to this.

23        Q.    Do you remember how you did your search?

24        A.    Well, I mean, I couldn't go through my old

25   phone because it broke.  I wasn't on Facebook -- I
```

EXHIBIT 8 - PAGE 32

1    wasn't messaging through Facebook so I don't have

2    any messages on there.  I can't think of anything

3    that I would have.  I didn't really text anyone

4    since I left the house.

5        Q.    And so, because I've got a couple of

6    different answers here, I just want to drill down on

7    this.  So you did conduct a search for responsive

8    electronic messages to number 11, or you didn't

9    because you thought about it and decided you didn't

10   have anything that could be responsive?

11       A.    I just didn't have access to be able to

12   look through the device that would have had it if I

13   had.  But I don't remember having any communications

14   specifically on that day, no.

15       Q.    Numbers 12 and 13 ask about electronic

16   messages sent for -- for other purposes.  If your

17   answer would be the same, that you don't think you

18   communicated and so there wouldn't be anything

19   responsive, would you let me know?

20       A.    You said 12 and 13?

21       Q.    Yeah.  You can read them to yourself.

22   It's just --

23       A.    Okay.

24       Q.    So the question is -- I mean, again, we

25   are asking for electronic messages from that date

Hasheem Boudjerada

1    range.  Are you aware whether any exist that are

2    responsive to RFP 12 or 13?

3         A.    No.

4         Q.    Other than what we discussed, do you have

5    any nonprivileged information about Lieutenant

6    Salsbury's actions from May 31st, 2020?

7         A.    Not that I'm aware of, no.

8         Q.    Other than what we discussed, do you have

9    any nonprivileged information about Chief Skinner's

10   actions on May 31st, 2020?

11        A.    Not that I'm aware of.

12        Q.    What did you do to prepare for the

13   deposition today?

14        A.    I talked to my attorney.

15        Q.    I don't want to know what she said or you

16   talked about.  But other than speaking with her, did

17   you speak to anybody else about the deposition?

18        A.    No.  I mean, I just told them that I was

19   going to it.  But that's it.

20        Q.    Did you speak to Mr. Hendry outside the

21   presence of your attorneys?

22        A.    No.

23        Q.    Did you text or message with Mr. Hendry?

24        A.    No.

25        Q.    Did you review any documents to prepare

EXHIBIT 8 - PAGE 34

1    for your deposition?

2         A.    Briefly looked over a couple of these.

3         Q.    And when you say a couple of these, do you

4    mean some of the exhibits we've put in front of you?

5         A.    Yes.

6         Q.    Did you look at any other documents that

7    weren't exhibits that we put in front of you?

8         A.    Not that I'm aware of, no.

9         Q.    I know that your claim is not against him,

10   but have you ever met Officer Craig Wright?

11        A.    No.

12        Q.    And have you ever spoken with Officer

13   Wright?

14        A.    No.

15        Q.    Have you ever heard him speak?

16        A.    No.

17        Q.    Do you have any personal information about

18   his actions on May 31st, 2020?

19        A.    No.

20               MR. MILLER:  Let's go off the record

21   for a second.

22               (Off-the-record discussion.)

23   BY MR. MILLER:

24        Q.    If you look at Exhibit 1 and turn to

25   page 18.  If you would look at paragraph 94 and just

EXHIBIT 8 - PAGE 35

1    read that to yourself.

2         A.    Okay.

3         Q.    All right.  So in part -- I'll break it

4    down.  It says (reading):  Regarding the

5         city-wide curfew, it didn't provide for an

6         exception for people who were trying to get

7         home.

8              Do you see that?

9         A.    Yes.

10        Q.    And what do you believe required the City

11   to provide for such an exception?

12              MS. DUGAN:  Objection.  This goes

13   outside the scope of the existing discovery

14   extension.

15              You can answer the question.

16              MR. MILLER:  Paragraph 94 is a new

17   paragraph.

18   BY MR. MILLER:

19        Q.    So what do you believe required Medary or

20   Skinner to provide such an exception?

21        A.    What do you mean by that?

22        Q.    Well, you read in 94, it says --

23        A.    Yeah.  They did not allow adequate notice.

24        Q.    Well, I'm looking at the first part where

25   it says neither Medary nor Skinner provided for an

EXHIBIT 8 - PAGE 36

Hasheem Boudjerada

1   exception for people who were trying to get home.

2       A.    Yes.

3       Q.    Do you see that?

4       A.    Yes.

5       Q.    Did I read what's in your complaint?

6       A.    Yes.

7       Q.    And what I'm asking you, if you know, is

8   what would have required Medary or Skinner to have

9   to provide for such an exception?

10      A.    What do you mean by required?

11      Q.    Well, you are complaining, in part --

12  you're taking issue with the fact that they didn't

13  provide for it.

14      A.    Yes.

15      Q.    And so what I'm trying to understand, if

16  you know, is what is the source of the requirement

17  that they had to do that?

18      A.    I don't remember the specific laws, but

19  from my understanding they are supposed to give

20  ample time for protesters to disperse and an

21  unobstructed, you know, pathway for them to be able

22  to disperse.

23      Q.    But this is talking about an exception to

24  the curfew for people who were trying to do a

25  specific act, to get home.  Right?

EXHIBIT 8 - PAGE 37

1        A.    Yeah.

2        Q.    That's a little bit different than what

3    you just described.  Correct?

4        A.    Yeah.  Well, it's, like, at first it was a

5    protest.  And then after that they incited the

6    curfew and then everyone was trying to disperse and

7    leave, but weren't given the opportunity to do so.

8        Q.    I'll try to ask it as directly as I can.

9    And I'm not looking for a legal conclusion.  But are

10   you aware of a law that required -- a law or rule or

11   regulation that required Chief Skinner to provide an

12   exception for people whole were trying to get home?

13       A.    Not specifically.

14       Q.    And the next part of that indicates you

15   take issue that they did not allow adequate notice

16   of the curfew.  Do you see that?

17       A.    Yes.

18       Q.    When you say adequate notice of the curfew

19   as used in this paragraph, what do you mean?

20       A.    Three minutes isn't enough time for me to

21   get home.

22       Q.    And this is adequate notice of the curfew

23   coming into -- into place.

24       A.    Uh-huh.

25       Q.    Right?

EXHIBIT 8 - PAGE 38

Hasheem Boudjerada

1      A.    Yeah.

2      Q.    So what is adequate notice?

3      A.    I would imagine that adequate notice would

4  probably be enough time for someone to get from one

5  side of town to another, not a couple of minutes.

6      Q.    Do you have an estimate as to that amount

7  of time?

8      A.    20-ish minutes.

9      Q.    And the last part of 94 talks about

10  adequate time for people to comply by getting home.

11  Do you see that?

12      A.    Uh-huh.

13      Q.    Yes?  Is that a yes?

14      A.    Yes.

15      Q.    Is that what you just described?  Is that

16  the same thing?

17      A.    What I described as adequate time?  Yeah.

18      Q.    All right.  So adequate notice and

19  adequate time, do those mean essentially the same

20  thing?

21      A.    I believe so, yeah.

22            MR. MILLER:  Those are all the

23  questions I have for you.  Thank you.

24            (The deposition was

25            concluded at 3:47 p.m.)

EXHIBIT 8 - PAGE 39

```
 1    State of Oregon    )
                         )     ss.
 2    County of Lane     )

 3

 4         I, Eleanor G. Knapp, CSR-RPR, a Certified

 5    Shorthand Reporter for the State of Oregon, certify

 6    that the witness was sworn and the transcript is a

 7    true record of the testimony given by the witness;

 8    that at said time and place I reported all testimony

 9    and other oral proceedings had in the foregoing

10    matter; that the foregoing transcript consisting of

11    38 pages contains a full, true, and correct

12    transcript of said proceedings reported by me to the

13    best of my ability on said date.

14         If any of the parties or the witness requested

15    review of the transcript at the time of the

16    proceedings, such correction pages are attached.

17         IN WITNESS WHEREOF, I have set my hand this 17th

18    day of May 2022, in the City of Eugene, County of

19    Lane, State of Oregon.

20

21

22    Eleanor G. Knapp, CSR-RPR

23    CSR No. 93-0262

24    Expires:  September 30, 2023

25
```

EXHIBIT 8 - PAGE 40