*Samuel Stotts*

*Boudjerada v City of Eugene*

*June 30, 2021*



CC REPORTING AND VIDEOCONFERENCING
101 East Broadway, Suite 300
Eugene, OR 97401
541-485-0111
www.ccreporting.com

EXHIBIT 9 - PAGE 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


HASHEEM BOUDJERADA; DAMON        )No. 6:20-cv-1265-MK

COCHRAN-SALINAS; ERIN GRADY;     )

TYLER HENDRY; and KIRTIS         )

RANESBOTTOM,                     )

            Plaintiffs,          )

    v.                           )

CITY OF EUGENE; SARAH MEDARY;    )

WILLIAM SOLESBEE; SAMUEL STOTTS;)

BO RANKIN; TRAVIS PALKI; MICHAEL)

CASEY; ANTHONY VIOTTO; and RYAN )

UNDERWOOD,                       )

            Defendants.          )


DEPOSITION OF SAMUEL STOTTS

June 30, 2021

Wednesday

2:04 P.M.

EXHIBIT 9 - PAGE 2

```
 1            THE DEPOSITION OF SAMUEL STOTTS was taken

 2     at the Eugene Police Department, 300 Country Club

 3     Road, Kilcullen Conference Room, Eugene, Oregon,

 4     before Sara Fahey Wilson, CSR, Certified Shorthand

 5     Reporter in and for the State of Oregon and

 6     Washington.

 7

 8                        APPEARANCES

 9     For the Plaintiffs:

10          Ms. Marianne Dugan

11          Ms. Lauren C. Regan (By Zoom)

12          CIVIL LIBERTIES DEFENSE CENTER

13          158 East 14th

14          Eugene, Oregon 97477-4334

15          541-687-9180

16          mdugan@cldc.org

17          regan@justicelaworegon.com

18

19     For the Defendants:

20          Mr. Ben Miller

21          CITY OF EUGENE ATTORNEY'S OFFICE

22          125 East 8th Avenue, 2nd Floor

23          Eugene, Oregon 97401

24          541-682-8447

25          ben.j.miller@ci.eugene.or.us
```

EXHIBIT 9 - PAGE 3

```
1                        APPEARANCES

2                        (Continued)

3

4    Videographed By:

5         CLAIRE MAEDERER - CC REPORTING

6

7    Also Present:

8         SARAH ALVAREZ

9

10   Reported by:

11        SARA FAHEY WILSON, OREGON CSR/WASHINGTON CCR

12        EUGENE        541-485-0111

13        TOLL FREE    800-344-0983

14

15

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT 9 - PAGE 4

Samuel Stotts

4

```
1                        INDEX

2

3   WITNESS......................................PAGE

4   SAMUEL STOTTS

5        BY MS. DUGAN                           6

6

7   EXHIBITS.....................................PAGE

8   Exhibit 1        Defendant Samuel Stotts'    33

9                    Response to Plaintiffs'

10                   First Set of Interrogatories

11                   to Samuel Stotts

12  Exhibit 2        Arrest Report               33

13

14  MARKED TEXT..............................PAGE/LINE

15  None.

16

17

18

19

20

21

22

23

24

25
```

ccreporting.com

EXHIBIT 9 - PAGE 5

Samuel Stotts

5

```
 1                      THE VIDEOGRAPHER:  Okay.  We are on
 2    the record.  Today is Wednesday, June 30th, 2021.
 3    The time is 2:04 p.m.
 4                      This is the deposition of Samuel
 5    Stotts in the matter of Boudjerada, et al., versus
 6    City of Eugene, et al.
 7                      Our court reporter is Sara Fahey
 8    Wilson.  My name is Claire Maederer, and I am CC
 9    Reporting's remote video technician.
10                      At this time I'd like to ask counsel
11    to identify themselves and who they represent, and
12    then the reporter will swear in the witness.
13                      MS. DUGAN:  Marianne Dugan for the
14    plaintiffs.
15                      MR. MILLER:  Ben Miller for the
16    defendants.
17
18                      SAMUEL STOTTS,
19     having been first duly sworn to testify the truth,
20        the whole truth, and nothing but the truth, was
21            examined and testified as follows:
22    / / /
23    / / /
24    / / /
25    / / /
```

EXHIBIT 9 - PAGE 6

Samuel Stotts

6

```
 1                        EXAMINATION
 2    BY MS. DUGAN:
 3         Q.    Good afternoon.
 4         A.    Hello.
 5         Q.    Is it Sergeant Stotts?
 6         A.    Yes.
 7         Q.    Okay.
 8               And what's your middle name?
 9         A.    Edwin.
10         Q.    And you sat through the deposition of
11    Officer Rankin.  Correct?
12         A.    I did.
13         Q.    Are there any factors like medication that
14    could affect your memory or your ability to
15    understand questions?
16         A.    No, ma'am.
17         Q.    Okay.
18               If you don't understand one of my
19    questions, please let me know and I'll try to
20    rephrase it.
21         A.    Okay.
22         Q.    If you are going to say yes or no in an
23    answer, please nod your head or shake your head so
24    the -- don't nod your head or shake your head -- so
25    the court reporter gets it down.
```

EXHIBIT 9 - PAGE 7

Samuel Stotts

```
 1        A.     Okay.
 2        Q.     Did you review any documents to prepare
 3   for today's deposition?
 4        A.     Yes.
 5        Q.     What did you review?
 6        A.     The interrogatories, if I pronounced that
 7   correctly --
 8        Q.     Right.
 9        A.     -- and my police report.
10        Q.     Okay.
11               Did you look at your body cam footage?
12        A.     Bits and pieces, yes.
13        Q.     Do you remember which parts?
14        A.     Parts of some of the contacts and arrests.
15        Q.     Okay.
16               What is your current job title?
17        A.     I'm a patrol sergeant.
18        Q.     With the EPD?
19        A.     Yes.
20        Q.     And how long have you been with EPD?
21        A.     Since 2011.
22        Q.     What was your job title when you were
23   hired?
24        A.     A patrol officer.
25        Q.     And when did you become sergeant?
```

EXHIBIT 9 - PAGE 8

```
 1        A.    About three years ago.

 2        Q.    Who promoted you, or who was involved with

 3   that?

 4        A.    The chief at that time, I believe it was

 5   our interim chief that we had.  It was before

 6   Skinner arrived.

 7        Q.    Okay.  All right.

 8              And have you been a police officer

 9   anywhere else?

10        A.    No.

11        Q.    What other jobs have you had in your

12   career?

13        A.    I was a loss prevention manager.  I worked

14   shipping and receiving.  And my parents own a

15   janitorial service so I worked as a janitor.

16        Q.    Okay.

17              Where did you do loss prevention?

18        A.    In Redding, California, at Idaho Falls,

19   Idaho.

20        Q.    Do you have any professional licenses?

21        A.    What do you mean?

22        Q.    A contractor?  A teacher?  Nothing like

23   that?

24        A.    No, no, no contractor.  No teacher.

25        Q.    Okay.
```

Samuel Scott

9

```
 1                Are you on any boards of directors?

 2       A.    For -- no, no, I'm not.

 3       Q.    Do you have a -- any post high school

 4   degrees?

 5       A.    No.

 6       Q.    Have you had any training in any legal

 7   issues involving protesters?  First Amendment

 8   rights?

 9       A.    What do you mean "legal issues"?  You said

10   training in legal issues.

11       Q.    Right.  The Constitutional rights of

12   protesters?

13       A.    Oh, yeah.

14       Q.    Tell me about that.

15       A.    Well, we've received training for

16   Constitutional rights, search and seizure.

17       Q.    So the Constitutional rights of

18   protesters, First Amendment, have you had that sort

19   of training?

20       A.    I don't recall that title.

21       Q.    Okay.

22             Do you recall the subject?

23       A.    Well, we've -- I've had training for

24   Constitutional rights.  I don't recall any of the

25   specific details --
```

EXHIBIT 9 - PAGE 10

Samuel Scotts

1      Q.    Well --

2      A.    Do you have a specific class you want to

3  ask me about?

4      Q.    First Amendment, the rights of protesters?

5      A.    Not that I can recall right now.

6      Q.    Okay.  Thank you.

7            Do you have any text messages or notes --

8  handwritten notes -- about the events of May 29th to

9  June 1st of 2020?

10     A.    No, ma'am.

11     Q.    Okay.

12           Have you had training in de-escalation

13  tactics?

14     A.    Yes.

15     Q.    Tell me about that.

16     A.    We've received training on how to speak

17  with people in the public; how to try to ascertain

18  if they are having a mental episode or maybe on

19  narcotics, how to recognize that; how to try

20  different tactics and give people opportunities to

21  calm down themselves or bring in other services, if

22  we can, to try to calm them down.

23     Q.    And, let's see, have you had any trainings

24  from Officer -- Sergeant Solesbee?

25     A.    He's the supervisor for our training

EXHIBIT 9 - PAGE 11

1    department.

2        Q.    So has he given you direct -- has he

3    himself given you trainings?

4        A.    Not that I recall -- you mean like him

5    standing next to me and telling me what to do?

6        Q.    Yes.

7        A.    Not that I recall.  As a supervisor that's

8    -- usually I'm with a training officer who is giving

9    me some type of direction.

10        Q.    Have you been involved with Chief

11    Skinner's goal of "21st Century policing," as he's

12    called it?

13        A.    What do you mean being "involved"?

14        Q.    Has he engaged you in any way in helping

15    make that happen?

16        A.    I don't have any meetings personally with

17    Skinner -- or Chief.  He comes to in-service and he

18    would brief us on what different plans, different

19    things are, but I haven't attended any meetings or

20    been part of any conference call, or anything like

21    that.

22        Q.    Okay.

23            Have you had any recent, in the last, say,

24    two years, training in when and how to use kneeling

25    on somebody's body as a use of force?

EXHIBIT 9 - PAGE 12

1       A.    We have defensive tactics training.  I

2    don't recall the last date that I attended.  It

3    would be in my training record.  If you have that

4    handy, we can look at that.

5       Q.    Has any of that type of training changed

6    since the killing of George Floyd?

7       A.    That our DT has changed?

8       Q.    Uh-huh.

9       A.    I don't recall -- I don't do the

10   curriculum for the DT training.  That would be for

11   the DT team to state if something has changed or

12   not.

13      Q.    But, I mean, you haven't yourself heard --

14   been told, We're going to give you guys new training

15   based on things we've learned from --

16      A.    I have -- no, nobody has come out and said

17   to me, "Hey, we have a new training."  We show up to

18   training and they show us what they want to train us

19   in and we go from there.

20      Q.    Have you been trained to know the elements

21   of what constitutes riot?

22      A.    I've seen that, yeah, because it's part of

23   the statute that we -- that we have to enforce.

24      Q.    And do you recall the elements as you sit

25   here?

EXHIBIT 9 - PAGE 13

```
1          A.     When I go to that, I bring out my legal
2     book, and that's what I refer to when I go in.  That
3     way I have -- we cover those elements there.  So
4     many people and different acts that have to be
5     performed.
6                    THE WITNESS:  Is that too fast?
7                    THE REPORTER:  It's quiet for some
8     reason.  I don't know what it is.  You guys are
9     not --
10                   THE WITNESS:  Sorry.
11                   MS. DUGAN:  You might be under the --
12                   THE REPORTER:  Maybe so, yeah.
13                   THE WITNESS:  I apologize.
14                   MS. DUGAN:  -- air conditioner.
15                   THE WITNESS:  I thought for a second I
16    might be talking too fast.  I'll slow down.
17    BY MS. DUGAN:
18         Q.     On May 31st, 2020, do you recall seeing
19    anybody you thought was engaged in riot?
20         A.     I think there was a lot of activity like
21    that out there, yeah.
22         Q.     You saw it yourself?
23         A.     Yeah.
24         Q.     Give me an example.
25         A.     Well, there were -- I saw windows being
```

EXHIBIT 9 - PAGE 14

```
 1   broken, and there were people that were tumultuous
 2   in the streets and disorderly.
 3        Q.    Where was that?
 4        A.    Various parts of the city.  I don't recall
 5   exactly where.
 6        Q.    At 12th and Patterson did you observe any
 7   riot?
 8        A.    I don't recall offhand exactly.  Like, the
 9   exact location, that's what I was just saying -- the
10   exact location it was at.
11        Q.    Between Whole Foods and 12th and
12   Patterson, that period of time when there were a
13   group of people traveling from Whole Foods to 12th
14   and Patterson, did you observe anything you would
15   call riot?
16        A.    I don't -- I don't recall if I saw it in
17   that moment.  That's what I just said.  In that area
18   I don't recall if it was there.
19        Q.    If you had, you would have written it in a
20   police report?
21        A.    Potentially.  That's what the video
22   footage is for to capture all that to go back later.
23        Q.    As an EPD officer and then a sergeant,
24   have you had any training in how to guard yourself
25   against racial bias?
```

EXHIBIT 9 - PAGE 15

Samuel Scotts

1      A.    Guard myself against it?

2      Q.    Uh-huh.

3      A.    What do you mean?

4      Q.    To know how to recognize it and try to

5    make sure it doesn't happen?

6      A.    Yes.  I've received training for that,

7    yes.

8      Q.    When was that?

9      A.    I don't recall the dates, but I remember

10   that we've received that training.

11     Q.    Do you remember who trained you?

12     A.    I don't recall who that was, no.

13     Q.    Do you remember --

14     A.    It would be in the form.

15     Q.    Do you remember what it would be called on

16   the form?

17     A.    I don't know.  DPSST is the one that puts

18   the titles for those training forms, and it's not

19   always what I would think the name would be.  I've

20   gone to trainings and I'm like, Wait a minute, I

21   didn't think it was called that.  But I don't know

22   what DPSST would call the title.

23     Q.    Okay.

24           Do you recall any racial discrimination

25   training in the last couple years -- two years?

EXHIBIT 9 - PAGE 16

Samuel Scotts

```
 1          A.     Not specific dates, no.

 2          Q.     But you think it might have happened?

 3          A.     Potentially.

 4          Q.     Have you ever before had to work -- other

 5     than May 30th -- or May 29th to June 1st, 2020, have

 6     you ever been involved in enforcing a city-wide

 7     curfew?

 8          A.     No.  I think that was the only time.

 9          Q.     Have you been involved in enforcing any

10     curfew, even local -- localized?

11          A.     There's some juvenile curfew ordinances

12     that we have in the city, but that would be the --

13     that would have been the only case I can think of.

14          Q.     Had you ever arrested anybody for a curfew

15     violation before?

16          A.     I don't recall.  I don't recall.

17          Q.     Did you get any training from the EPD

18     itself in how to enforce a curfew violation?

19          A.     What do you mean?  Like a class before

20     they went into effect?

21          Q.     Yeah.  Or a list of dos and don'ts,

22     protocols, guidelines, policies?

23          A.     Well, we had the instruction of what --

24     when the curfew went into effect, what would

25     constitute a violation of that.
```

EXHIBIT 9 - PAGE 17

Samuel Scotts

1     Q.    Okay.

2           And what --

3     A.    That was what the -- like, list we have of

4   what the exceptions would be.

5     Q.    Okay.

6           So you were just -- you were given the

7   actual administrative order with the list of

8   exceptions?

9     A.    Yes.

10    Q.    And were you given any other guidance on

11  how to know people were heading home as opposed to

12  not heading home?

13    A.    I don't recall any of those specific

14  conversations right now.

15    Q.    Were you told to use your discretion in

16  figuring that out, or just nothing at all?  You

17  weren't told anything?

18    A.    Well, one thing about a police officer is

19  that we have an ordinance, we use our discretion

20  daily.  We talk to people and we try to ascertain,

21  and then you make a decision off the information you

22  have at hand.

23    Q.    And so the people you encountered near

24  12th and Patterson -- you know, I watched your body

25  cam video and there were some folks you told they

EXHIBIT 9 - PAGE 18

Samuel Scotts

1  were under arrest and there's some folks you didn't,

2  you walked right by, and how did you make that

3  distinction?

4      A.    I don't recall right now what was in my

5  head in that moment of why one person or not.  Some

6  people are on private property or near what would be

7  private property that that wouldn't apply or other

8  potential exceptions they may have that I might have

9  perceived.  I don't remember what my perceptions

10  were.

11          If you have a specific person you'd like

12  me to watch in the video, I could try to look at

13  that for you and say, but I don't recall right now.

14      Q.    Well, I'll let you watch the video on your

15  own but --

16      A.    Okay.

17      Q.    -- I'll give you a hypothetical from the

18  video, what I saw, and -- which is as you're going

19  after Penny Grady -- Erin Grady, who is the woman

20  who wanted to take people's names -- do you remember

21  her?

22      A.    Yeah.  I don't know if I'd say going after

23  her.

24      Q.    You were walking towards her and she was

25  walking down the sidewalk.  Do you remember that?

EXHIBIT 9 - PAGE 19

Samuel Scotts

1              MR. MILLER:  Object to the form of

2       the question.  Object, misstates the facts in

3       evidence --

4       BY MS. DUGAN:

5              Q.    Forget the video.  I'm just --

6              MR. MILLER:  Let me make my objections

7       on the record.

8              MS. DUGAN:  I withdraw the question.

9              MR. MILLER:  Please don't interrupt.

10      Okay.

11      BY MS. DUGAN:

12             Q.    All right.

13             So what you recollect from that night,

14      including watching the body cam -- part of your body

15      cam footage -- do you recall going to arrest Erin

16      Grady?

17             A.    Yes.

18             Q.    And when you walked toward her, do you

19      recall walking past a couple people?

20             A.    Are you talking about the first time I

21      walked towards her or the second time?

22             Q.    The second time.

23             A.    Okay.  Well, the reason for the second

24      time was because of the interactions from the first

25      time.  But if you're wanting to skip to that, I

EXHIBIT 9 - PAGE 20

Samuel Scott

```
 1    don't recall offhand some of the people that I
 2    walked past.
 3              I do remember seeing the video there were
 4    a couple that were near an apartment.  I don't
 5    recall if they were on the grass, or on the
 6    property, or on the sidewalk.
 7         Q.    Do you recall losing your body cam camera?
 8         A.    Yeah.  I think when she spun to turn away,
 9    her backpack knocked my camera off my uniform.
10         Q.    Do you remember somebody telling you where
11    it was?
12         A.    Yes.
13         Q.    And where was that person standing when
14    they told you that?
15         A.    Well, the person that I recall was
16    standing in the doorway of an apartment that was
17    standing there.  Because they said they saw somebody
18    pick it up and throw it into the bushes, and they
19    lived there.
20         Q.    Do you remember the address?
21         A.    I don't recall.
22         Q.    Do you remember somebody on the street
23    with a mask on as you walked by headed toward Erin
24    Grady?
25         A.    I don't recall, no.
```

EXHIBIT 9 - PAGE 21

Samuel Scotts

1      Q.    Who lifted his hand like (indicating)

2   this?

3      A.    I don't recall.

4      Q.    So on May 31st were you the head of a

5   team?

6      A.    I was a sergeant.  I was assigned to go

7   out, yes.

8      Q.    What was the name of your team?  Did it

9   have a number?

10      A.    I don't recall.  It could have been 1, 2,

11   or A, or B, or I don't recall.

12      Q.    Team 6?

13      A.    Could have been.  We had multiple nights

14   of these.

15      Q.    Okay.

16            The team number would change depending --

17   I mean, it's not a team that's a standardized --

18      A.    Correct.

19      Q.    -- list of people?

20      A.    That probably was the first and only time

21   I've had that number, so it's -- yeah.

22      Q.    Okay.

23            Were you the only sergeant on that team?

24      A.    Maybe.  I don't recall.  Some nights we

25   had two sergeants.  Because I remember one night I

EXHIBIT 9 - PAGE 22

Samuel Scott

22

```
1    had a sergeant -- another sergeant in the vehicle

2    with me -- but I don't recall if that was that

3    night.

4         Q.    Okay.

5              And how many people -- how many officers

6    did you have on your team?

7         A.    It varied.  Sometimes it was four.

8    Sometimes it was six.  Sometimes it was me and one

9    other person.  Sometimes there's teams of two, so it

10   varies.

11        Q.    So you don't remember at the time you

12   arrested Ms. Grady who was on your team?

13        A.    I don't recall, no, how many total.

14        Q.    And how did you communicate with your

15   team?

16        A.    Verbally.  Sometimes direct or with a

17   radio.

18        Q.    Radio?  So if you were in the car it was

19   by radio?

20        A.    Sometimes we had teams that were in

21   different vehicles so then that would be radio.  The

22   people in the car it would just be verbally.

23        Q.    Right.

24        A.    Yeah.

25        Q.    Okay.
```

EXHIBIT 9 - PAGE 23

Samuel Scotts

23

```
1              And who was your superior on the evening
2     of May 31st, 2020?
3         A.    If I recall correctly, I believe that
4     would have been Lieutenant Salsbury, but it's -- I
5     believe so.
6         Q.    And how would you communicate with
7     Lieutenant Salsbury?
8         A.    Via radio or -- yeah, probably radio
9     because everybody heard it.
10        Q.    What was the other option?
11        A.    Sometimes it would have been personally,
12    but I don't think that I was in close proximity to
13    him.  Some events later on -- I don't think that it
14    was that night -- he was on scene with us so it
15    would have been verbally.
16        Q.    Okay.
17              And was Lieutenant Salsbury one of the
18    incident commanders?
19        A.    He might have had that title.  I don't
20    recall it.
21        Q.    Do you remember what the command
22    objectives were for that night?
23        A.    To try to keep people safe, keep the city
24    safe.  Persons are our first priority and then
25    property after that.
```

EXHIBIT 9 - PAGE 24

24

1        Q.    Do you remember if -- what the event
2    objectives were?
3        A.    Not exactly.  We've, again, had numerous
4    events since then, and which one to say verbatim, I
5    would, I'm sure, get it wrong.
6        Q.    Do you remember anything in the command
7    intent or event objective of allowing the community
8    to exercise their Constitutional rights?
9        A.    Yeah, possibly.  I don't recall.  If you
10   have it in front of you, I can review that if you'd
11   like.
12       Q.    Well, I mean, this is just a summary.
13   This is Dr. -- Doctor -- Sergeant Ryan Nelson's
14   incident review so I'm not sure that's going to help
15   you kind of post hoc?
16       A.    And I don't think he was there.
17       Q.    Yeah, he wasn't.
18             And do you recall the rules of engagement
19   for that evening?
20       A.    Not offhand, no.
21       Q.    Do you recall any distinction between
22   allowing people to be on sidewalks as opposed to on
23   the streets?
24       A.    Not offhand, no.
25       Q.    So what vehicle were you in?  Were you in

EXHIBIT 9 - PAGE 25

Samuel Scotts

25

```
1    a marked police car?
2         A.   I believe I was in a marked SUV, I
3    believe, yes.
4         Q.   Let's see.
5              Did you yourself have any gas -- tear gas,
6    pepper balls, or other projectile?
7         A.   I wasn't pepper ball trained or anything
8    at that time.  I don't have any projectiles we
9    throw, or --
10        Q.   Okay.
11             What was your understanding of how the
12   process went of getting a city-wide curfew in
13   effect?
14        A.   Honestly, I have no idea.  That's way
15   above what I do as a sergeant.  I apologize but,
16   yeah, I don't have any input with that, or nobody
17   came to ask me anything about that.
18        Q.   Oh, I didn't think you were going to have
19   ant control over it, but what's your understanding
20   of how it happened?
21        A.   That it was a directive given by city
22   management, and we followed it.
23        Q.   And who asked for it?  Was at the chief?
24        A.   Oh, that I don't know.  I don't know.
25        Q.   All right.
```

EXHIBIT 9 - PAGE 26

Samuel Scotts

```
1              And did you have in-car video in your --

2       A.    I believe mine functioned, yes.

3       Q.    And your body cam, was it on earlier in

4   the day in addition to the part that I have which is

5   later in the evening?

6       A.    It could have been.  It just depends on

7   the contact.  It's only required to be on when

8   you're in certain conditions, so it may have been

9   on.  It may not have been on.

10      Q.    Okay.

11            What are the conditions for when you're --

12      A.    If we're going to make an arrest, if we're

13  going to detain somebody, that kind of stuff, then

14  we turn them on.

15      Q.    Okay.

16            Do you know how the time on the recording

17  -- and this is not about yours.  It's about somebody

18  else's -- how that could be wrong, the actual day --

19  time of day?

20      A.    I couldn't say to what that is.  I have no

21  idea.  I don't have access to any of that.  We, as

22  officers, can't change that.  That's all an

23  Axon-controlled environment so I have no idea.

24      Q.    Okay.

25            So the May 31st daytime event was a
```

EXHIBIT 9 - PAGE 27

1    planned protest.  Correct?

2         A.    I don't recall.  It could have been.

3         Q.    You don't recall being briefed on that

4    beforehand?

5         A.    I don't recall if it was a planned

6    protest, if it was a spontaneous thing.  Like I

7    said, we had several that came that we -- I've had

8    numerous protests that I've dealt with since then so

9    I don't recall which one that was.

10        Q.    Right.  Okay.

11              So May 31st doesn't stand out for you at

12   all in your memory compared to May 29th, 30th, June

13   1st?

14        A.    Well, I worked all of them so there's

15   memories from each one, and they were all very

16   similar of things being thrown at you, and things

17   that are said, and things that were done, so they

18   kind of meld.  So to say -- I do recall certain

19   events, so I recall arresting the people that were

20   walking up to us and interjecting in what we were

21   doing when we were doing our job, but I don't recall

22   some of the segregation to that of what event --

23   like, what briefing was which or who said what what

24   day.  That would be very different for me a year and

25   a half ago on top of three days that were very

```
1    intense and very dynamic.

2         Q.    How long were you on duty that day?

3         A.    Oh, I don't recall.  What was -- the time

4    of arrest was around 11:00?

5         Q.    Yeah.

6         A.    I started my shift at 9:30.

7         Q.    9:30 p.m.?

8         A.    Uh-huh.  Sorry.  Yes.  I said "uh-huh."  I

9    wasn't supposed to do that.

10         Q.    That's okay.

11              Let's see.  Was your team that night

12    called the rapid response team?  Would that have

13    been one --

14         A.    The official name for Eugene has kind of

15    changed.  I think they used to call it a crowd

16    control team back in the day, but that kind of isn't

17    here anymore so I don't -- I don't know what the

18    name was that night.  We didn't have an official

19    response team.  I think people just call it

20    different things for what they hear.

21         Q.    Okay.

22              It wasn't -- sorry -- the crimes unit, was

23    it?

24         A.    No.  That's completely different.  That's

25    an established team of team members that never
```

EXHIBIT 9 - PAGE 29

1    changes.  That's who they are.

2        Q.    Okay.  All right.

3            Did you interact with Sergeant Solesbee

4    that evening at all?

5        A.    Not that I recall.  I'm not part of that

6    unit or anything.

7        Q.    All right.

8            What's your memory of when and how the

9    city-wide curfew was announced?

10       A.    We received direction over the radio that

11   it would be enforced at a certain time, and we began

12   making announcements, some of which from our own

13   car, some of which from other vehicles.

14       Q.    Let's back up.

15           So you don't recall the time -- like, how

16   soon house before 11:00 --

17       A.    Oh, I don't recall, no, exactly, no.

18   Because, again, it was multiple nights.  It happened

19   -- I don't recall which night started at which time.

20       Q.    You don't recall -- were you involved in

21   making sure the public knew that it had been

22   expanded to city-wide?

23       A.    I -- I believe I even made announcements

24   that that had been -- that had been taking effect.

25   I know I did.  Which night that was of those three I

EXHIBIT 9 - PAGE 30

1    don't recall, but I do have memory of using my own

2    PA and announcing to the people around me that that

3    had been pushed to city-wide.  I don't recall which

4    night that was.

5        Q.    And do you recall what the instruction was

6    to the public to do?

7        A.    To leave.

8        Q.    To leave?  To go --

9        A.    Leave the area.

10       Q.    -- go home?

11       A.    Yeah.  Sorry.

12       Q.    Leave what area?  Not leave the city?

13       A.    Well, they would have to leave the city if

14   they don't live in the city.

15       Q.    Okay.

16       A.    Or, yes, return to their residence.

17       Q.    Okay.

18             And how were you determining who was

19   returning to their residence and who wasn't?

20       A.    Well, that depended on our interactions I

21   had.  I can't make that determination for every

22   person we saw that night.

23       Q.    Okay.

24             So do you remember Mr. Boudjerada, or

25   Mr. Hendry, or Mr. McClain?  Do you remember any of

EXHIBIT 9 - PAGE 31

Samuel Scott

1    them?

2        A.    I actually don't know who they are,

3    offhand.  I'd have to -- I'm better with faces than

4    I am with names, so if I saw their face I could have

5    probably a better recollection but -- and I don't

6    know where they live so I couldn't tell you.

7        Q.    But if they said they were going home, how

8    would you determine they weren't going home?

9        A.    I'd have to either talk to them or find

10   out what they may or may not be doing, or where they

11   are going, or maybe how often you've seen them, or

12   since the announcements had been given where they

13   were going.

14       Q.    Okay.

15            So at 12th and Patterson on your body cam

16   you are, at times, going from officer to officer who

17   are each having custody of someone who has been told

18   that they are under arrest.

19            Had you seen any of those people earlier

20   in the evening?

21       A.    Well, I don't recall.  Not right now.  I

22   mean, potentially, but I don't recall a year and a

23   half later.

24       Q.    Well, you watched your body cam videos?

25       A.    I watched bits and piece of it.  I didn't

EXHIBIT 9 - PAGE 32

1    watch all of it.  So I don't know if --

2        Q.    Okay.

3        A.    -- so-and-so was on a video 20 minutes

4    earlier or five minutes earlier.

5        Q.    Well, they weren't on the video?  I'm

6    saying did you -- when you watched the body cam, did

7    you say, "Oh, yeah, I remember seeing that guy

8    earlier"?

9        A.    Like I say, I don't recall.  I could have.

10       Q.    Who did you personally arrest other than

11   Ms. Grady, if anybody?

12       A.    I don't recall.  I mean, there were some

13   people that I helped detain or stop, but I think the

14   only one that I wrote a PC affidavit for and

15   arrested was Ms. Grady.

16       Q.    And do you remember who you assisted with

17   arresting?  You don't remember that?

18       A.    No.

19       Q.    Okay.

20             Did anybody -- did you observe anybody

21   resisting arrest?

22       A.    Not that I recall offhand, but I don't

23   recall -- no, I don't recall offhand.

24                  (Pause.)

25       Q.    Well, let's look at your interrogatories

EXHIBIT 9 - PAGE 33

Samuel Scotts

33

1    and the police report.

2                MS. DUGAN:  Start with 1 again?

3                THE REPORTER:  Yes.

4                (Deposition Exhibits 1 and

5                 2 marked for identification.)

6    BY MS. DUGAN:

7        Q.    So you have Exhibit 1 and Exhibit 2?

8        A.    Yes, I do.

9        Q.    Okay.  All right.

10            So let's look at Exhibit 2 first, the

11   police report.

12                (Pause.)

13            So the first sentence you say

14       (reading):  I was supervising a rapid

15        response team.

16            So is that -- I guess that's what it was

17   called at the time?

18        A.    They were probably calling it that, yeah.

19        Q.    Okay.

20            What did that mean?  What is a rapid

21   response team?

22        A.    They -- I think they just use the

23   terminology from other cities that have an actual

24   team that is set in place to respond to events.  At

25   this time we didn't have an official team in the

EXHIBIT 9 - PAGE 34

Samuel Scotts

1    City of Eugene.

2        Q.    Were your -- were you and your team given

3    training on how to act as a rapid response team?

4        A.    No, not as an official certified rapid

5    response team, no.

6        Q.    Why don't you go ahead read this if you

7    haven't already.  I know you read it yesterday, but

8    let me know if you want to read it all the way

9    through again.

10       A.    Oh, out loud or just read to myself?

11       Q.    No, to yourself.

12       A.    Oh, got you.  No, I think I'm okay.  If

13   you have a specific area you want me to review --

14       Q.    Well, so, I may be wrong but I don't see

15   mention in here of the curfew being made city-wide?

16       A.    Well, just that (reading):  We made

17      numerous announcements throughout the city

18      to inform citizens of the curfew.

19       Q.    Yeah, but that was -- that comes right

20   after the discussion of the curfew that started at

21   9:00, which you then -- which I guess you're

22   inaccurately saying that it was city-wide at 9:00?

23       A.    Well, that we had put in place between the

24   hours of 9:00 p.m. to 6:00 a.m.  I think that was

25   kind of encompassed to know -- the first part was

EXHIBIT 9 - PAGE 35

Samuel Scotts

```
1    the downtown area and then it got expanded.  I guess

2    it doesn't have that clarification.  Is what you're

3    asking?

4         Q.    Yeah.  It was confusing.  I see --

5         A.    Oh, I apologize.

6         Q.    Okay.  I guess you're saying -- okay.

7               So you began to encounter protesters that

8    refused to leave the area.  Okay.  And then you --

9    then Ms. Grady and her companion approached you?

10        A.    Correct.

11        Q.    (Reading):  It was evident they were

12           not seeking emergency care, fleeing

13           dangerous circumstances, sheltering in

14           place, traveling to and from employment,

15           or making commercial deliveries?

16        A.    Correct.

17        Q.    When they started walking away, I know

18    that Ms. Grady did yell back one more time that she

19    would like the arrestee's information?

20        A.    Correct.

21        Q.    But isn't it true that when you approached

22    her to arrest her she was walking down the sidewalk

23    away from the arrest scene?

24        A.    Well, I'm sure once she started to see me

25    come to her direction that she turned, then, to get
```

EXHIBIT 9 - PAGE 36

```
1    away to maybe turn and walk away, yes.
2         Q.    But by then she had already violated the
3    law?
4         A.    Well, she actually violated the curfew
5    back when I contacted her the first time --
6         Q.    Right.
7         A.    -- and I had to give her numerous
8    instructions repeatedly.  If you watched the video,
9    I'm sure you heard that, heard that I repeated
10   instructions to leave, that she was violating
11   curfew, and she didn't want to have anything to do
12   with that and continued what she wanted, and we
13   could have arrested her right there.
14        Q.    Uh-huh.
15        A.    So do you agree to that?
16        Q.    And then you allowed her to walk away?
17        A.    Correct.
18        Q.    And then she was walking away when you
19   arrested her.  Is that correct?
20        A.    When she then turned and reengaged and
21   continued, which was then demonstrating to me that
22   she's not going to be able to follow direction we
23   were giving.  She was already given that opportunity
24   once.  She was allowed to leave, basically given a
25   warning, and then she's reengaging, at that point
```

EXHIBIT 9 - PAGE 37

Samuel Scotts

1    we're not going to continue to have this throughout.

2    I made the determination that I was going to arrest

3    her, yes.  Probable cause I had.

4        Q.    So you write that they were standing on

5    the edge of the roadway between a row of parked cars

6    and vehicle traffic that was trying to pass by.

7            Isn't it true that when you arrested them,

8    when you physically contacted them, they were on the

9    sidewalk?

10       A.    By the time I got to them, yes.

11       Q.    So why is it relevant to write down that

12   they were crossing the street and they were on the

13   edge of the roadway between the parked cars and the

14   vehicle traffic?

15       A.    Part of my police report is to give an

16   overview of what's happening.  When I turned around,

17   that's where I saw them so I documented that.

18       Q.    Okay.

19            So vehicle traffic that was trying to pass

20   by, was that problematic?  Was it causing a problem?

21       A.    It could be.

22       Q.    It could be, but was it?

23       A.    Well, I don't know.  I wasn't in those

24   cars that were trying to pass by, but it could be

25   for those drivers that are trying to pass by in the

EXHIBIT 9 - PAGE 38

Samuel Scotts

1   dark and people in dark clothing.  And blocking

2   vehicular traffic is a crime.  It's disorderly

3   conduct.

4       Q.    And how did you determine those cars were

5   not violating the curfew?

6       A.    I didn't contact the cars.

7       Q.    How did you know who to stop and who not

8   to stop?

9       A.    At this point I was -- my focus was

10  Ms. Grady because she was engaging with us, and she

11  had already violated the curfew.  We gave her a

12  warning to allow her to leave.  She chose to

13  reengage us, and that's when I made the

14  determination I was going to arrest her for that.  I

15  had probable cause to arrest her initially that I

16  warned her on, and at this point I made the decision

17  I was going to arrest her, and that was the decision

18  so I was moving to do that.  And then the rest of

19  that is to show what the conditions were when I'm

20  going to make that arrest.

21      Q.    The conditions being you're implying

22  there's some danger there to the public?

23      A.    Well, of course there is.

24             THE REPORTER:  I'm sorry.  You guys

25  are going way too fast.

EXHIBIT 9 - PAGE 39

```
 1                    THE WITNESS:  Oh, sorry.  Sorry about
 2    that.
 3    BY MS. DUGAN:
 4       Q.    You end by saying (reading):  It was
 5       apparent the females were continuing to
 6       violate the emergency curfew order and had
 7       no intention to leave.
 8             Wasn't it true that they were walking away
 9    on the sidewalk when you arrested them?
10       A.    When I made contact, that's -- they were
11    on the sidewalk.  When they began to yell at us and
12    reengage us, they were not on the sidewalk.
13       Q.    We're talking about your last sentence --
14       A.    Yeah.  But I'm clarifying that for you.
15       Q.    -- that they had no intention to leave.
16    That wasn't true at the time you arrested them, is
17    it?
18                    MR. MILLER:  Objection.  Calls for
19    speculation on their intention.
20    BY MS. DUGAN:
21       Q.    Well, that's what you're having to do is
22    speculate about people's intention.  That's the
23    whole thing that's going on here.
24                    MR. MILLER:  Object to the form of the
25    question if there is a question.
```

EXHIBIT 9 - PAGE 40

Samuel Scotts

40

```
1     BY MS. DUGAN:

2         Q.    There is a question.

3               How did you determine what their intent

4     was?

5         A.    I determined --

6         Q.    At the time -- at the time you contacted

7     them physically?

8         A.    Well, I think there's a separation there.

9     So at the time --

10        Q.    Well, we've already talked about --

11        A.    Hang on.  I'm trying to answer and you

12    interrupted me.

13        Q.    I'm clarifying my question because you

14    want to go back to the earlier part --

15        A.    No, I'm not.

16        Q.    -- that we already talked about.

17              MR. MILLER:  Wait.  Let her -- let her

18    keep interrupting, and then I will make my

19    objection, and then you can answer.

20    BY MS. DUGAN:

21        Q.    All right.

22              So to clarify my question, I'm talking

23    about the point of contact.  When you contacted them

24    physically, how did you determine that they had no

25    intention to leave?
```

EXHIBIT 9 - PAGE 41

1      A.    Okay.   Thank you.  So what I was trying to

2   refer to is when I turned around and saw them, they

3   weren't on the sidewalk.

4      Q.    I know.

5      A.    But I can't  --

6      Q.    We've already discussed that.  I'm talking

7   about the point of physical contact.

8                 MR. MILLER:  He wasn't done answering

9   his question.  Please stop interrupting the witness.

10                 MS. DUGAN:  He's not answering the

11   question.

12      A.    If you let me finish, I'll explain it to

13   you why, but you interrupt before I can get to that

14   point.

15                 What I'm trying to say is when I turn

16   around, they are in the street.  I can't

17   tele-transport to her, so it took me probably 30

18   seconds to walk to her.  In those 30 seconds, she

19   turned away and began to walk and got on the

20   sidewalk.

21                 If I would have been able to transport,

22   then, yes, ma'am, I would have contacted her right

23   there still in the street and I would have taken her

24   into custody before she walked and got onto the

25   sidewalk.

EXHIBIT 9 - PAGE 42

1          That's what I've been trying to explain to

2     you.

3     BY MS. DUGAN:

4          Q.    Let me ask you another question since you

5     don't seem to understand what I'm trying to ask.

6          A.    Okay.

7          Q.    What I'm trying to ask is when you decide

8     to arrest somebody and then you go to effect --

9     effectuate that arrest --

10         A.    Uh-huh.

11         Q.    -- and the arrest is based on a clear lack

12    of intention to leave, is it not fair to ask whether

13    they -- their intention has now changed and they are

14    leaving?  Why are you, then, arresting them?

15         A.    The crime was committed.

16         Q.    The crime of not intending to leave?

17         A.    No.  The crime of violating the curfew was

18    committed.  They had already violated it by the time

19    I contacted them the first time.  I could have

20    arrested them the first time I made contact.

21              I gave them several warnings, and during

22    that conversation they never made any comment of,

23    "I'm trying to go home.  I'm trying to leave," so

24    there's no input given to me that they are trying to

25    leave.

EXHIBIT 9 - PAGE 43

Samuel Scotts

43

```
 1              It's, "No.  I want to talk to them.  I
 2      want their information."
 3              And it's, "No, you can't have that."
 4              "No, but I want it."
 5              "No, but you can't have it."
 6              "No, but I want it.  I really want it."
 7              That's the contact I'm having.  That's
 8      telling me they have no intent to leave.  And I
 9      further clarified, "You can't have it.  You're in
10      violation.  You need to leave," to the point to
11      where the security guards for the hospital on the
12      sidewalk were laughing at them that they weren't
13      getting it.
14              I still allowed them to leave.  I allowed
15      them to turn and leave.  And if they would have left
16      and never reengaged, they never would have got
17      arrested that night.  I turned --
18      Q.    But they could have -- go ahead.
19      A.      -- back around and went back to my other
20      duties, walking 15, 20 feet away.  They reengage.
21      Q.    Verbally?
22      A.    They turned back around.  Stop there.
23      Leave.  When I turn around, she's not walking away.
24      She's stopped, facing me, calling out again.  That's
25      not walking away.  That's stopped.
```

EXHIBIT 9 - PAGE 44

```
 1              That tells me I've already had this
 2    engagement with them.  I've already instructed them.
 3    I've already warned them, that I didn't have to do,
 4    and she is reengaging.  I made the determination
 5    right then and there, I am not going to keep having
 6    this throughout the night.  I don't have the
 7    resources to keep dealing with people over and over
 8    again.  She was given the ability to leave and
 9    she's not following it.  I am placing her under
10    arrest.  I have that authority.  And I did so.
11         Q.    And you arrested her companion as well?
12         A.    Yes.
13         Q.    Who did not reengage verbally with you?
14         A.    She was with her and she was participating
15    in that, yes.
16         Q.    Do you remember the guy who was holding
17    some sort of energy drink and a cigarette and said
18    he was media, and you said, "Show me your
19    credentials"?
20         A.    Oh, I actually do recall that.  And told
21    him he needed to leave, and he turned around and
22    left.
23         Q.    Right.
24              And you said, "Good luck, buddy."  Why
25    didn't you arrest him?
```

EXHIBIT 9 - PAGE 45

Samuel Scotts

1    A.    Because I gave him the warning like I gave

2  her.

3    Q.    Okay.

4    A.    I allowed them both to leave.

5          I'm glad you brought this up.  There's a

6  difference.  What did he do?  He turned and left.

7  He didn't reengage me.  He didn't come track me

8  down.  He come didn't come try again.  And he left.

9          She walks away.  She reengages.  I made an

10  arrest.

11    Q.    All right.

12          So now let's talk about Mr. Boudjerada,

13  Mr. Hendry, and Mr. McClain.  At some point in your

14  video -- your body cam video -- you discuss, "We got

15  the aggressors."  Do you remember that?

16    A.    I don't recall that offhand, no.

17    Q.    How much of your video did you watch

18  yesterday?

19    A.    Like I said, the contacts for the arrest I

20  made.

21    Q.    Did you watch the part where you go around

22  high-fiving your officers saying, "We got the

23  aggressors.  Good job"?

24    A.    I could have.  I don't recall.

25    Q.    Do you remember thinking that a certain

EXHIBIT 9 - PAGE 46

1    group was aggressors that night?

2        A.    I don't recall which ones were the

3    aggressors.

4        Q.    Do you recall thinking some people were

5    aggressors that night?

6        A.    I don't recall thinking who were the

7    aggressors, no.

8        Q.    That wasn't my question.

9            Do you recall thinking there were some

10   people that were aggressors?

11       A.    There could have been.

12       Q.    Of course there could have been.  I'm

13   asking what you recall.

14            MR. MILLER:  Objection to the form of

15   the question.  Asked and answered.

16       A.    Yeah.  I don't recall that.

17   BY MS. DUGAN:

18       Q.    The answer I'm hearing is I don't recall

19   their names.  You don't recall at all thinking that

20   there were people who were aggressors?

21       A.    I think I actually just said I don't think

22   -- I don't recall thinking of who were the

23   aggressors.  I don't recall that offhand.

24       Q.    You don't recall high-fiving your officers

25   that they got the aggressors?

EXHIBIT 9 - PAGE 47

Samuel Scotts

47

```
 1        A.    I answered that already and I said I don't
 2    recall that.
 3        Q.    You don't recall that?
 4        A.    No.
 5        Q.    Afterwards did you -- after the arrests
 6    was there a debriefing?
 7        A.    More than likely, yes.  There usually was
 8    on some of those.
 9        Q.    You don't remember?
10        A.    We've had multiple since then.  I don't
11    recall the specific debriefs.
12        Q.    Do you recall an issue about how the PC
13    reports were going to be prepared and that they were
14    being sent by email?
15        A.    That could have been.  That would make
16    sense.
17        Q.    Was that, like, a form?  Was that what was
18    going on?
19        A.    What do you mean?
20        Q.    Like a pre-filled form and people just put
21    in names and dates and times?
22        A.    That could have been.  A lot of forms in
23    the department are pre-filled out and you just put
24    in the specific information for that -- that event.
25        Q.    Do you recall there was a desire to not
```

EXHIBIT 9 - PAGE 48

Samuel Scotts

1    let people get to the campus?

2         A.    I don't recall which -- no, I don't recall

3    offhand, no.

4         Q.    Do you recall who you were with in your

5    vehicle?

6         A.    Yeah.  I believe I had a couple other

7    officers that were in there.  Yeah, I think so.

8         Q.    Do you recall their names?

9         A.    I think I had Officer Palki and Officer

10   Casey with me in my vehicle.

11        Q.    Do you remember any confusion on the radio

12   traffic about whether the curfew was going into

13   effect at 11:00 as opposed to 12:00?

14        A.    I don't recall that, no.

15        Q.    Do you remember command wanting to try to

16   figure out who the instigators were and try to

17   arrest them?

18        A.    Not offhand, no.

19        Q.    Do you remember anybody being hostile on

20   the walk from Whole Foods to 12th and Patterson?

21        A.    No.

22        Q.    Do you remember saying on your body cam

23   video, "you've been warned for hours" -- when one of

24   the people sitting on the ground being arrested was

25   complaining that they lived at 11th and High, a

EXHIBIT 9 - PAGE 49

Samuel Scotts

49

```
1    woman, and was wanting to go home, and you said,

2    "you've been warned for hours"?

3         A.    Yes.

4         Q.    What -- warned of what for hours?

5         A.    We've been warning people for hours to go

6    home, to get off the streets.

7         Q.    Well, to get out of the downtown area and

8    then for five, ten minutes to get home?

9         A.    So I would have been referring to the

10   downtown area.

11        Q.    Okay.

12              Well, she was pretty far from the downtown

13   area by then.  Correct?

14        A.    Well, by then, yeah.

15        Q.    So why -- why did you say "you've been

16   warned for hours"?

17        A.    I don't know why I said that.  You're

18   asking what I was referring to.  That's what I was

19   answering.

20        Q.    Do you remember a guy who was backing up

21   with his hands up saying, "My glasses got lost.  I'm

22   walking back with my hands up"?

23        A.    Yes.

24        Q.    Do you remember saying, "You're under

25   arrest"?
```

EXHIBIT 9 - PAGE 50

Samuel Scotts

```
 1          A.    Yes, I think I do.
 2          Q.    Do you remember why you were arresting
 3     him?
 4          A.    I don't recall.
 5          Q.    Do you recall a fellow named Canseco?
 6          A.    I wouldn't know him by the name, no.  I
 7     don't know Mr. Canseco.
 8          Q.    Do you remember being told by dispatch
 9     there was a guy live streaming named Canseco?
10          A.    I don't recall that, no.
11          Q.    Do you remember a guy with a jacket with
12     the words "Canseco" on the back who got arrested at
13     12th and Patterson?
14          A.    No, I don't recall that.
15          Q.    Do you remember saying to one of the
16     arrestees, "You were cussing at us, screaming at us.
17     You said 'burn the punk bitch.'  I told you to leave
18     and you said 'F.'  That's why you're under arrest"?
19          A.    I don't recall that.  I could have.
20          Q.    Do you remember command saying they wanted
21     a scrimmage line at 13th and Alder?
22          A.    I don't recall it as a memory, but if it's
23     there, then I'm sure that's what they requested.
24     There was a lot of radio traffic that night.
25     Sometimes you couldn't hear it.
```

EXHIBIT 9 - PAGE 51

```
 1                    MS. DUGAN:  Okay.  I don't have any
 2       further questions.
 3                    MR. MILLER:  Okay.  Thank you.
 4                    MS. DUGAN:  Thank you.
 5                    THE VIDEOGRAPHER:  We are going off
 6       the record at 2:50 p.m.
 7                    (The deposition was concluded
 8                     at 2:50 p.m.)
 9                         --o0o--
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

EXHIBIT 9 - PAGE 52

```
1    State of Oregon    )
                        )    ss.
2    County of Lane     )

3

4        I, Sara Fahey Wilson, CSR, a Certified Shorthand

5    Reporter for the State of Oregon, certify that the

6    witness was sworn and the transcript is a true

7    record of the testimony given by the witness; that

8    at said time and place I reported all testimony and

9    other oral proceedings had in the foregoing matter;

10   that the foregoing transcript consisting of 51 pages

11   contains a full, true and correct transcript of said

12   proceedings reported by me to the best of my ability

13   on said date.

14       If any of the parties or the witness requested

15   review of the transcript at the time of the

16   proceedings, such correction pages are attached.

17       IN WITNESS WHEREOF, I have set my hand this 13th

18   day of July 2021, in the City of Eugene, County of

19   Lane, State of Oregon.

20

21

22

23   Sara Fahey Wilson, CSR

24   CSR No. 06-0400

25   Expiration Date:  March 31st, 2023
```

EXHIBIT 9 - PAGE 53