*Kirtis Ranesbottom*

*Boudjerada v City of Eugene*

*September 15, 2021*



CC REPORTING AND VIDEOCONFERENCING
101 East Broadway, Suite 300
Eugene, OR 97401
541-485-0111
www.ccreporting.com

EXHIBIT 10 - PAGE 1

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


HASHEEM BOUDJERADA; DAMON          )No. 6:20-cv-1265-MK

COCHRAN-SALINAS; ERIN GRADY;       )

TYLER HENDRY; and KIRTIS           )

RANESBOTTOM,                       )

            Plaintiffs,         )

    v.                             )

CITY OF EUGENE; SARAH MEDARY;      )

WILLIAM SOLESBEE; SAMUEL STOTTS;)

BO RANKIN; TRAVIS PALKI; MICHAEL)

CASEY; ANTHONY VIOTTO; and RYAN    )

UNDERWOOD,                         )

           Defendants.         )


DEPOSITION OF KIRTIS RANESBOTTOM

September 15, 2021

Wednesday

10:00 A.M.


THE DEPOSITION OF KIRTIS RANESBOTTOM was

taken at Ironwood, Michigan, before Eleanor Knapp,

RPR-CSR, Certified Shorthand Reporter in and for the

State of Oregon, by videoconference.

EXHIBIT 10 - PAGE 2

```
 1                    APPEARANCES

 2

 3    For the Plaintiffs:

 4         CIVIL LIBERTIES DEFENSE CENTER

 5         158 East 14th Avenue

 6         Eugene, Oregon 97401-4334

 7         541-687-9180

 8         BY:  MS. MARIANNE DUGAN

 9         mdugan@cldc.org

10         (Appearing by videoconference.)

11

12    For the Defendants:

13         CITY OF EUGENE ATTORNEY'S OFFICE

14         125 East 8th Avenue, 2nd Floor

15         Eugene, Oregon 97401

16         541-682-8447

17         BY:  MR. BEN MILLER

18         ben.j.miller@ci.eugene.or.us

19

20    Also Present:  Ms. Jamie Iboa

21

22    Court Reporter:  Ms. Eleanor Knapp, RPR-CSR

23

24    Video Technician:  Ms. Nicole Ash

25
```

EXHIBIT 10 - PAGE 3

Kirtis Ranesbottom

3

1

2                                INDEX

3

4    WITNESS.....................................PAGE

5    KIRTIS RANESBOTTOM

6          BY MR. MILLER                         4

7

8    EXHIBITS..................................MARKED

9    Exhibit 1  Plaintiff Ranesbottom's          22

10               Response to Interrogatories

11   Exhibit 2  Ranesbottom's Response to        32

12               Second Set of Interrogatories

13   Exhibit 3  Response to First Request for     37

14               Production to Ranesbottom

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 10 - PAGE 4

Kirtis Ranesbottom

4

```
 1                   VIDEO TECHNICIAN:  We are on the
 2     record.  Today is September 15th, 2021.  The time is
 3     10:00 a.m.  This is the video-recorded deposition of
 4     Kirtis Ranesbottom in the matter of Boudjerada vs.
 5     City of Eugene.  Our court reporter is Eleanor
 6     Knapp.  My name is Nicole Ash.  I'm CC Reporting's
 7     remote video technician.
 8                   Would you please swear in the witness.
 9
10                   KIRTIS RANESBOTTOM,
11     having been first duly sworn to testify the truth,
12     the whole truth, and nothing but the truth, was
13     examined and testified as follows:
14
15                        EXAMINATION
16     BY MR. MILLER:
17          Q.    Good morning.  I'm Ben Miller.  I'm one of
18     the attorneys for the City of Eugene.  We are
19     conducting this deposition remotely, so if at any
20     time you have an interruption or you don't hear me,
21     let us know.  Okay?
22          A.    Yes.  Thank you.
23          Q.    Would you state your name and provide the
24     spelling to the court reporter for us?
25          A.    Okay.  The spelling of my full name,
```

EXHIBIT 10 - PAGE 5

Kirtis Ranesbottom

1    middle included?

2        Q.    Sure.

3        A.    Okay.  Kirtis Michael Edward Ranesbottom.

4    That's K-I-R-T-I-S.  Michael is M-I-C-H-A-E-L;

5    Edward, E-D-W-A-R-D; Ranesbottom,

6    R-A-N-E-S-B-O-T-T-O-M.

7        Q.    Thank you.  So you've been put under oath,

8    and that's the same oath you would be put under if

9    you testify in court.  Do you understand that?

10        A.    Yes.

11        Q.    All right.  And I'm going to go through --

12    I'm sure your attorney has spoken to you about some

13    of the rules for a deposition.  I'll go through a

14    couple of those generally.

15            The first is that we just need to answer

16    audibly because nods of the head and huh-uhs aren't

17    going to show up on a transcript.  Does that make

18    sense?

19        A.    Uh-huh.  Yes.

20        Q.    And you're doing a really good job, but we

21    need to be careful not to talk over each other so

22    it's clear where a question ends and an answer

23    begins.  And I'll try to do that.  Is that fair?

24        A.    Yes.

25        Q.    The -- there's -- you know there's a video

EXHIBIT 10 - PAGE 6

Kittis Ramesbottom

6

```
1    that's being taken of this deposition.

2              Sorry.  Can you hear us?

3        A.    I'm sorry.  Are you hearing all of these

4    notifications?

5        Q.    Yes.

6        A.    Sorry about that.  I'll turn the volume

7    down.  Is that better?

8        Q.    Yes.  Somewhat.

9        A.    Hopefully they'll stop.

10       Q.    So this is being video-recorded, and then

11   there's a written transcript that's being created

12   from this deposition.  Do you understand that?

13       A.    Yes.

14       Q.    And so for that reason, you know, if you

15   don't understand one of my questions or you need

16   clarification, let me know and I'll try to ask it in

17   a way that you can either answer or you can tell me

18   you don't know.  Is that fair?

19       A.    Yes.

20       Q.    Because I can use the deposition in a

21   couple of ways.  I can use it as direct evidence

22   rather than calling you as a witness.  Do you

23   understand that?

24       A.    Yes.

25       Q.    And if you testify differently at a later
```

EXHIBIT 10 - PAGE 7

1    time, I can point out what I think is an

2    inconsistency to a judge or a jury and ask them to

3    disbelieve.  Do you understand that?

4        A.    Yes.

5        Q.    It's also not an interrogation.  I know

6    you are remote, but if you need to take a break to

7    use the restroom, get some water, things like that,

8    that's okay.

9        A.    All right.

10        Q.    So just let us know.

11            Anything that would interfere with your

12    ability to participate in the deposition today?

13        A.    No.

14        Q.    All right.  So just as an example, are you

15    on any medication that could impact your memory?

16        A.    No.

17        Q.    All right.  Without telling me what you

18    discussed with your attorney, what did you do to

19    prepare for your deposition today?

20        A.    I went over the documents that were shared

21    with the court, and that's it.

22        Q.    When you say documents shared by the

23    court, I just -- for my benefit -- since we are

24    remote, I just want to understand what those were.

25    Were those -- did those include your interrogatory

EXHIBIT 10 - PAGE 8

1    responses?

2        A.    Could you define "interrogatory"?

3        Q.    Sure.  So it's a -- it's a written

4    document where we send written questions and you and

5    your attorney send back written answers.

6        A.    Okay.  I think I have those documents but

7    did not review them recently.  But I did review them

8    when they were first -- when we first answered those

9    questions, I reviewed them.

10            The documents that I reviewed today before

11   the deposition were the documents that we shared

12   with the court, including some of my social media

13   stuff that I shared on Facebook and pictures of the

14   rubber bullets and some of the damage that was done

15   to the property, the Campbell Club.

16       Q.    Okay.  And did you review a copy of your

17   -- the amended complaint, the actual lawsuit in this

18   case?

19       A.    I believe I did.  I didn't review all of

20   the documents today.  I didn't quite get to all of

21   them, but I believe those were sent to me.

22       Q.    Yeah.  Don't tell your attorney that.

23            But did you review any recordings or any

24   video?

25       A.    No.

Kirtis Ranesbottom

9

1    Q.    And we're remote.  Is anybody else with

2    you in the room?

3    A.    Not in the room, no.  There are two people

4    kind of around in other rooms nearby.  That's my

5    father and his friend.

6    Q.    But they don't have any personal knowledge

7    of what occurred in this case.  Right?

8    A.    No.

9    Q.    All right.  Other than your attorney, did

10   you speak to anyone to prepare for the deposition

11   today?

12   A.    I did not.

13   Q.    And have you ever had a deposition taken

14   before?

15   A.    No, I have not.

16   Q.    Have you ever attended a deposition

17   before, even remotely?

18   A.    No.  The closest is I've watched the

19   recordings of some of the depositions with the

20   police in this case.

21   Q.    Which recordings did you watch?

22   A.    I'm not sure.  I don't remember the names

23   of the officers.

24   Q.    Did you -- do you know whether you watched

25   the recorded deposition of Sergeant Solesbee?

EXHIBIT 10 - PAGE 10

```
 1        A.    I did.

 2        Q.    Did you watch the recorded deposition of

 3   any other officers?

 4        A.    Yes.  I don't remember their names off the

 5   top of my head.

 6        Q.    Can you describe what they looked like

 7   from memory?

 8        A.    One of them was bald.  That's really all

 9   I've got to go on there.

10        Q.    All right.  Have you had any prior legal

11   names?

12        A.    No.

13        Q.    And what's your date of birth and place of

14   birth?

15        A.    July 5th, 1995, in Big Rapids, Michigan.

16        Q.    In sort of a very general sense, can you

17   describe for me all your places of residence, kind

18   of from where you grew up to now?

19        A.    Okay.  Well, I grew up, up until the age

20   of 8, in the state of Michigan in various different

21   towns and counties.  We moved around a lot.

22              Then when I was 8 years old we moved to

23   Arkansas where we resided up until I was age 13,

24   primarily in Holiday Island, Arkansas.

25              Oh, I forgot.  I also lived briefly, for
```

EXHIBIT 10 - PAGE 11

Kirrers Ranesbottom

1    about a year, in Arizona when I was 5 before moving

2    back to Michigan.  Then, like I said, we lived in

3    Arkansas until I was age 13.

4              Then we moved to Chicago, Illinois, where

5    we lived for I think a year.  Yeah, a year.  Then we

6    moved back to Michigan, and we resided there until I

7    was 16.

8              When I was 16 I left my parents' home,

9    moved back to Chicago, and lived with an aunt and

10   uncle for a few years.  Then -- for about two years.

11   Right.

12             Then when I was 18 I moved to California.

13   That's where my parents had moved at that point, so

14   I moved to be near them.

15             Let's see.  I lived in California for a

16   few years.  Then I moved to Oregon about four years

17   ago, and I've lived in -- I've lived in Eugene for

18   three years now, just a little over three years.

19       Q.    And currently where are you physically

20   located?

21       A.    I'm in Ironwood, Michigan.

22       Q.    And how long have you been there?

23       A.    Two months.

24       Q.    And when do you anticipate returning to

25   Oregon?

EXHIBIT 10 - PAGE 12

```
 1          A.    Probably in October or November.

 2          Q.    Of this year?

 3          A.    Yeah.

 4          Q.    And do you still reside -- will you still

 5     reside at the Campbell Club?

 6          A.    Yes, I will.

 7          Q.    So the Campbell Club, is it correct to

 8     characterize this -- is it a collective living space

 9     or how -- how would we characterize it?

10          A.    It's cooperative housing.  So all of us

11     who live in the Campbell Club, we sign membership

12     contracts.  And then we have equal rights and

13     responsibilities in the cooperative in

14     decision-making, how to use the money we bring in

15     from membership fees, things like that.

16          Q.    And is it -- are there -- are there

17     officers or is there -- is there a -- directors?

18     What's the --

19          A.    Yes.  There are officers that serve on the

20     board of directors and hold positions within the

21     organization such as president, vice president,

22     treasurer.  As it happens, I'm the corporate

23     treasurer of the Students Cooperative Association,

24     which is the organization that owns the Campbell

25     Club and two other houses.
```

EXHIBIT 10 - PAGE 13

Kircrls Ranesbottom

1    Q.    And how long have you had that position?

2    A.    For nearly a year.  I was elected last

3    fall in September.

4    Q.    And in the Campbell Club, what are --

5    approximately how many members live there?

6    A.    20.

7    Q.    And are there individual rooms for each

8    person?

9    A.    Yes, there are.

10    Q.    And for, say, since -- well, we'll say,

11    you know, May 29th of 2020, to the present, has the

12    membership of the Campbell Club changed?

13    A.    Yes.  There have been multiple members

14    that have moved out, and multiple new members have

15    moved in from that time.

16    Q.    Are there -- are there records I could

17    look at that would indicate who was a member on

18    May 29th, 2020?

19    A.    Yes, there are.

20    Q.    What record is that?

21    A.    We keep records of all of our membership.

22    So I guess the easiest way to get those would be to

23    contact our office.  But yes, there's records of all

24    the new people moving in.  We keep records of when

25    people move out.  Yes.

EXHIBIT 10 - PAGE 14

Kirrcis Ranesbottom

14

```
1         Q.    Are there records kept of your -- the
2   governing body, of those meetings, like minutes?
3         A.    Yes, there are.
4         Q.    And do those still exist to your
5   knowledge?
6         A.    Yes.
7         Q.    How --
8         A.    Yeah.
9         Q.    How frequently does the governing body
10  meet?
11        A.    The board of directors meets every two
12  weeks.
13        Q.    And describe for me your educational
14  history.
15        A.    Okay.  Well, I dropped out of high school
16  in my senior year.  That was 2013.  Then about three
17  years ago I went back to get my GED.  Got my GED,
18  and then I started attending Lane Community College
19  where I'm still currently enrolled but taking a
20  break because of Covid.
21        Q.    And what -- do you have -- I don't know if
22  it's an announced major or direction of focus?
23        A.    I do.  My declared major is currently
24  nutritional science.
25        Q.    Do you have any other professional
```

EXHIBIT 10 - PAGE 15

Kircis Ranesbottom

```
1    licenses?
2         A.    No, I do not.
3         Q.    Describe for me your criminal history, if
4    any.
5         A.    I don't have any criminal history.
6         Q.    And describe for me in general what your
7    employment history has been.
8         A.    Oh, okay.  Well, I did some fast food jobs
9    when I was a teenager.  Worked for a year in a
10   frozen custard shop when I was 17.
11             When I was 18, I did street canvassing for
12   Green Peace International off and on for a couple of
13   years.
14             I did farm work, like chickens and ducks
15   and gardening, for a few years after that.  Then I
16   went and did some more restaurant work in some more
17   high-class restaurants, most recently an Italian
18   restaurant in Eugene called Mazzi's.
19             I did work at a call center for a little
20   while briefly after moving to Eugene.  I mean very
21   soon after moving to Eugene.  It was Venture Data.
22             I think that about sums it up.
23        Q.    Are you working currently?
24        A.    No, I'm not.
25        Q.    Other than this case, have you ever been a
```

EXHIBIT 10 - PAGE 16

```
 1    plaintiff in any other lawsuit?
 2         A.    No, I have not.
 3         Q.    Have you ever been a defendant in any
 4    other lawsuit?
 5         A.    No, I have not.  When I was 16, I was the
 6    defendant in a lawsuit, which is now no longer on my
 7    record because I was a minor.
 8         Q.    Was that a civil matter or a criminal
 9    matter?
10         A.    I'm not too sure about how the
11    classifications work.
12         Q.    Would you describe --
13         A.    I was --
14         Q.    Sorry.
15         A.    Sorry.  Go on.
16         Q.    Would you describe for me your
17    understanding of what that case was about?
18         A.    Yes.  I was alleged to have broken into a
19    car.
20         Q.    In this case, when did you first decide to
21    sue?
22         A.    Immediately after the events took place.
23    At least the day after.  I would say even, like, the
24    day that it happened the thought occurred to me that
25    I should pursue something legal -- or that I wanted
```

EXHIBIT 10 - PAGE 17

Kircus Ranesbottom

17

```
1    to.  And so I reached out to CLDC within days of May

2    31st.  I want to say within the next couple of days

3    I reached out to them.

4         Q.    Okay.

5         A.    Yeah.

6         Q.    What is your current phone number?

7         A.    That would be 541-619-4004.

8         Q.    And in the last two years, have you had

9    any other phone numbers?

10        A.    No, I have not.

11        Q.    And who is your cell phone provider?

12        A.    I believe it's Verizon.

13        Q.    Was that the case in May of last year?

14        A.    Yes.

15        Q.    What brand and model is your current cell

16   phone?

17        A.    It's an iPhone 5, I believe.

18        Q.    And is that the same phone that you had in

19   May of 2020?

20        A.    Yes, it is.

21        Q.    Without telling me what your attorneys

22   have talked to you about, have you searched that

23   phone to determine if you have responsive documents

24   on it for this case?

25        A.    I did.  And what I found I shared with
```

EXHIBIT 10 - PAGE 18

1    Marianne, who in turn shared it with the court.

2        Q.    Now, I presume -- and correct me if I'm

3    wrong -- that you utilize the text -- the SMS text

4    function on that phone.  Is that correct?

5        A.    Yes.  If that is, like, just the regular

6    texting app that comes with it, yes.

7        Q.    What -- other than calling somebody and

8    the texting app, what other applications do you use

9    to communicate with others?

10       A.    I use Signal, and I use Facebook

11   Messenger.  And I use the Gmail application.  I

12   believe that's it.

13       Q.    Do you have, like, a Twitter handle that

14   you use?

15       A.    Yes, I have one, but I very rarely use it.

16   And I don't believe that I've used it in the past

17   two years.  If I have, I certainly haven't used it

18   to communicate about this case.

19       Q.    How about, do you have an Instagram

20   profile?

21       A.    Yes, I do.  But similarly to the Twitter

22   one, I never use it and would not have used it to

23   communicate about this case.

24       Q.    And you indicated that you do utilize

25   Facebook Messenger.  Correct?

EXHIBIT 10 - PAGE 19

1     A.     That's right.

2     Q.     Have you ever utilized Facebook Messenger

3     to communicate about this case or the events of

4     May 31st, 2020?

5     A.     I'm not too sure off the top of my head.

6     I think so.  I know that we shared some documents

7     with the court that were from Facebook, and I don't

8     recall if any of them were from Facebook Messenger

9     or if they were all just status updates.

10            So to my knowledge, everything that I have

11     communicated about this case on Facebook has been

12     shared with the court already.

13     Q.     And we'll go through those documents.

14     What I -- what I have with those are -- appear to be

15     public-facing posts.  And you understand the

16     difference between a post like that and a message

17     through Facebook Messenger.  Right?

18     A.     Yes, I do.

19     Q.     Have you searched Facebook Messenger to

20     determine whether you have any responsive

21     communications?

22     A.     I have.

23     Q.     And did you find any?

24     A.     I'm not sure.  I don't remember.

25     Q.     Have you ever deleted any communications

EXHIBIT 10 - PAGE 20

1    that were on Facebook Messenger?

2         A.    No, I have not.

3         Q.    Now, did you utilize the text messaging

4    function of your phone to communicate with anyone

5    about the events of May 31st, 2020?

6         A.    I'm not sure.

7         Q.    And do you still have all the text

8    messages that you sent or received on May 31st,

9    2020, or June 1st, 2020?

10        A.    I haven't deleted any of them.  So if

11   there's any relevant communication, they would still

12   be there.

13        Q.    Have you searched those text messages to

14   determine if you have relevant communications?

15        A.    Yes.

16        Q.    And you turned those over to your

17   attorneys if they exist?

18        A.    If I -- if I found them.  Honestly, I have

19   a lot of text messages.  And so I did go through and

20   look for things, but it is possible that I could

21   have missed something.  But --

22        Q.    What --

23        A.    Go ahead.

24        Q.    What search terms did you use?

25        A.    I didn't use any search terms.  I went

EXHIBIT 10 - PAGE 21

1   back and I reread through the messages.  So if I

2   missed something, that would be why, because I was

3   re-reading hundreds, if not thousands, of messages

4   from the past two years.

5       Q.    Did you yourself take any pictures on

6   May 31st, 2020?

7       A.    No, I did not.

8       Q.    Did you yourself record any video on

9   May 31st, 2020?

10      A.    I did not.

11      Q.    And we'll go through some of the records

12  here in a minute, but there were photographs that

13  were produced that I believe depict property damage

14  at the Campbell Club.  Does that sound about sound

15  right?

16      A.    Yes.

17      Q.    Are those photographs -- we'll go through

18  them, but are those photographs you took or somebody

19  else took?

20      A.    Somebody else.  One of my housemates took

21  those photos.

22      Q.    And so do you have any relevant

23  photographs or video on your phone?

24      A.    I do not.

25                  (Deposition Exhibit Number 1

EXHIBIT 10 - PAGE 22

1                    marked for identification.)

2    BY MR. MILLER:

3        Q.    So at this time I'd like to go through

4    your -- it's called Plaintiff Ranesbottom's Response

5    to Interrogatories.  Do you have that in front of

6    you or available?

7        A.    Not in front of me.  I think Marianne sent

8    it to me, so I can pull up the browser and pull it

9    up.

10       Q.    Okay.  If you don't mind.  Thank you.

11       A.    Uh-huh.

12                 THE WITNESS:  Marianne, is that the

13    document that you most recently sent me?

14                 MS. DUGAN:  I -- let's see.  I sent

15    you -- the one I most recently sent you was the PDF

16    with all the documents and photos.  Then yesterday

17    -- or no, last week, maybe, I sent you three

18    responses to discovery, two of which are responses

19    to interrogatories.

20                 Do you need me to send you that again?

21                 THE WITNESS:  Maybe.  I'm looking for

22    it, but maybe that would make it faster.

23                 MS. DUGAN:  Okay.  Let me -- hold on.

24    I sent it yesterday, Kirtis, yesterday morning, but

25    I'll send it again.

EXHIBIT 10 - PAGE 23

Kirtis Ranesbottom

23

```
 1                 THE WITNESS:  Okay.

 2                 MS. DUGAN:  Have you got it?

 3                 THE WITNESS:  Hasn't popped up yet.

 4                 MS. DUGAN:  Let me send you a link and

 5      you can look at it online.  That might be easier

 6      than downloading it.

 7                 THE WITNESS:  Okay.  It popped up.

 8                 MS. DUGAN:  Oh, you got it?

 9                 THE WITNESS:  Yep.

10      A.    Let's see.  Did you say it's Response to

11      Interrogatories?

12      BY MR. MILLER:

13      Q.    Yes.  The one I'm going to talk to you

14      about is a two-page document, and on the second page

15      it's dated, at the bottom, March 17th of 2021.

16      A.    Okay.  I've got it in front of me.

17      Q.    All right.  So we've marked that as

18      Exhibit 1 here in the deposition.  And you have this

19      two-page Response to Interrogatories in front of you

20      now.  Correct?

21      A.    Right.

22      Q.    I'm ordinarily used to seeing a plaintiff

23      sign under oath that the answers to an interrogatory

24      like this are true and correct, but if we turn to

25      the second page, your signature is not -- is not on
```

EXHIBIT 10 - PAGE 24

Kirtis Ranesbottom

1   there.  And so what I'll need you to do is review

2   the interrogatories and the responses just to

3   yourself, and then let me know when you're done and

4   I'll ask you whether they are true and correct.

5        A.    Okay.  Okay.  I'm done reading.

6        Q.    Is Exhibit 1 -- are your responses in

7   Exhibit 1 still true and correct?

8        A.    Yes.  There is one thing that I'm a little

9   confused about.  Actually, if I could have a moment

10  to speak just only with Marianne, I would appreciate

11  that.

12       Q.    Sure.

13               THE WITNESS:  Marianne, do you want to

14  call?

15               MS. DUGAN:  Yeah.  Let's -- Kirtis,

16  you mute and I'll mute.  And then we'll get off

17  screen for a second, and I'll call your cell.

18               VIDEO TECHNICIAN:  Off the record.

19  The time is 10:31 a.m.

20               (Brief recess.)

21               VIDEO TECHNICIAN:  We are on the

22  record.  The time is 10:32 a.m.

23  BY MR. MILLER:`

24       Q.    Okay.  You've had a chance to meet with

25  your attorney.  Do you need to supplement your last

EXHIBIT 10 - PAGE 25

1    answer at all?

2        A.    I'm sorry.  I forgot to unmute.  Could you

3    repeat what you just said?

4        Q.    Sure.  You've had a chance to meet with

5    your attorney.  Do you need to supplement your last

6    answer at all?

7        A.    Yes.  Just one inconsistency I wanted to

8    point out.  In the final response where it says

9    plaintiff seeks only garden variety emotional

10   distress damages stemming from being falsely

11   arrested, that was a mistake.  I was never actually

12   arrested.

13           And then I also wanted to disclose that I

14   am seeing a psychiatrist for ADHD, but that it has

15   no bearing and doesn't affect this case at all.

16       Q.    And so I'm looking -- these are -- what

17   you referenced were answers to interrogatory

18   number 5.  Correct?

19       A.    Yes.

20       Q.    And while you are seeing a psychiatrist

21   for ADHD, it's -- it's not something that was

22   exacerbated or caused by this case.  Is that

23   correct?

24       A.    That's correct.

25       Q.    Other than those things, is there anything

EXHIBIT 10 - PAGE 26

```
 1    else that when you looked over it you thought we
 2    needed -- you needed to supplement because you had
 3    new information?
 4          A.    No.
 5          Q.    All right.  So looking at the first page,
 6    interrogatory number 2, I asked you about
 7    noneconomic damages.  Do you see that?
 8          A.    Yes.
 9          Q.    And I'm -- I'm not interested in sort of a
10    legal answer or anything you've discussed with your
11    attorneys.  But just in your own words, can you
12    describe for me what it is that you are seeking
13    noneconomic damages for?
14          A.    Well, my First Amendment constitutional
15    rights were violated on that day -- and not only
16    mine but the constitutional rights of many others
17    who were at those events.  And so I'm seeking
18    justice because I don't think that people who hold
19    authority in society should be allowed to get away
20    with that kind of behavior.
21                So I'm not really interested in economic
22    compensation, financial compensation, or anything
23    like that.  I just want to make sure that -- that
24    there can be a future in this society where people
25    in authority don't abuse their power in that way.
```

EXHIBIT 10 - PAGE 27

```
 1        Q.    Any other types of noneconomic damages
 2   that you are seeking in this lawsuit?
 3        A.    I'm not sure I quite understand the
 4   question.
 5        Q.    Sure.
 6        A.    Can you rephrase?
 7        Q.    Sure.  I'm used to seeing lawsuits where
 8   somebody is seeking damages for things like
 9   emotional distress, pain and suffering, those types
10   of things.  Are those categories that you are
11   seeking to be compensated for?
12        A.    No.
13        Q.    And if we can turn to the second page,
14   interrogatory number 4, and do you see the
15   responses, the three categories of individuals that
16   are listed there?
17        A.    Yes.
18        Q.    So Damon Cochran-Salinas I will depose
19   later today, so we'll find out his information.
20              Campbell Club and its residents.  You
21   indicated, I think, earlier that I could determine
22   who was a resident of the Campbell Club by at least
23   seeking records.  And there are records that exist,
24   to your knowledge, that would show who was a
25   resident of the Campbell Club on May 31st, 2020?
```

EXHIBIT 10 - PAGE 28

Kirtis Ranesbottom

28

```
1          A.     Yes.  That's correct.

2          Q.     And to your knowledge, were there

3    individuals who were, I guess, guests or visitors to

4    the Campbell Club that were there on May 31st, 2020,

5    that weren't residents?

6          A.     No.

7          Q.     I should clarify for the record.  So

8    that's no, you are not aware of anybody else?

9          A.     Right.  Yeah.  To my knowledge, there were

10   no visitors or guests that day.  Only people who

11   lived there and Eric, who is mentioned in the next

12   line.

13         Q.     And so Eric, who is mentioned in the next

14   line, is this the individual who was ultimately

15   pounding on the door to be let in when he was -- I

16   think after he had been shot with a 40 millimeter?

17         A.     Yes.

18         Q.     And do you know Eric's last name?

19         A.     No, not off the top of my head.

20         Q.     Do you have contact information for Eric?

21         A.     I do not.

22         Q.     And so if -- you know, you're not Facebook

23   friends, for example?

24         A.     No.  No, we're not.

25         Q.     And if you -- do you know -- sorry.  Do
```

EXHIBIT 10 - PAGE 29

1    you know where Eric lives?

2         A.    No, I do not.

3         Q.    Do you have any mutual friends?

4         A.    Yes, I do.

5         Q.    And who is that?

6         A.    Several.  Damon is one of them.  Another

7    housemate of ours, Jasmine Wood, is a mutual friend.

8    I believe that several other people that I live with

9    at the Campbell Club are friends with Eric, but off

10   the top of my head, I couldn't tell you who they

11   are.

12        Q.    So if you were -- if you needed to contact

13   Eric, would you speak to Damon to get his contact

14   information?

15        A.    Yes.

16        Q.    Is there another way that you would go

17   about trying to identify him and contact him?

18        A.    I might ask the other friend that I

19   mentioned, Jasmine.

20        Q.    What information do you believe the

21   Campbell Club and its residents have about the

22   events of May 31st, 2020?

23        A.    I believe that they would have witness

24   testimony to offer.  Several of them were in --

25   like, around to hear the gunshots.  There were --

EXHIBIT 10 - PAGE 30

Kircus Ranesbottom

30

```
1    you know, a lot of us were home and witnessed the
2    events that took place before the shots were fired
3    at the Campbell Club and ran downstairs to see what
4    was happening afterwards, after they heard the
5    shots.
6         Q.    And from memory are you able to tell me
7    who you know was there to witness those events?
8         A.    No.  Besides Damon, I'm not really sure
9    exactly who was there at the time.
10        Q.    Are you aware of any video that any
11   residents of the Campbell Club have that depicts the
12   events of May 31, 2020?
13        A.    No.  No video surveillance, that I'm aware
14   of, of that kind.
15        Q.    I don't want to limit it to video
16   surveillance.  For example, are you aware of any
17   residents that have cell phone video of anything
18   that occurred on May 31st, 2020?
19        A.    No.
20        Q.    And are you aware whether any residents of
21   the Campbell Club have photographs of events that
22   occurred on May 31st, 2020?
23        A.    Not that I'm aware of.
24        Q.    And this individual, Eric, are you aware
25   whether he has any photographs or video depicting
```

EXHIBIT 10 - PAGE 31

1   events on May 31st, 2020?

2        A.    Not that I'm aware of.

3        Q.    Are you aware whether he has any

4   photographs or video depicting any physical injuries

5   that he received on May 31st, 2020?

6        A.    Not that I'm aware of.

7        Q.    Other than the individuals we discussed in

8   interrogatory 4, is there anyone else -- besides the

9   plaintiffs and I suppose the defendants in this case

10  -- anybody else that you are aware of that has

11  personal knowledge about what occurred on May 31st,

12  2020, at and around the Campbell Club?

13       A.    Our neighbors at the Lorax Manner, who are

14  also members of the Students Cooperative

15  Association.  They also were nearby, and it's

16  possible that some of them witnessed what took

17  place.

18       Q.    And is there any one individual from the

19  Lorax who you believe has personal information about

20  what occurred?

21       A.    No, not that I'm aware of.

22       Q.    Other than the Lorax, are there any other

23  neighbors you are aware of who have personal

24  information about what occurred on May 31, 2020, in

25  and around the Campbell Club?

EXHIBIT 10 - PAGE 32

```
 1        A.    No.
 2                   MR. MILLER:  We'll go ahead and mark
 3     this as 2.
 4                   (Deposition Exhibit Number 2
 5                    marked for identification.)
 6     BY MR. MILLER:
 7        Q.    This is the other response to the -- it's
 8     Ranesbottom's Response to City of Eugene's Second
 9     Set of Interrogatories.  Do you have that?
10        A.    Is that a separate document?
11        Q.    Yes.
12        A.    Okay.  One moment.  Okay.  I'm looking at
13     that now.
14        Q.    All right.  And if you turn to page 3 of
15     that document, is that your conformed signature from
16     August 16th of 2021?
17        A.    Yes, it is.
18        Q.    All right.  And I know that your attorneys
19     objected to this for their reasons, but you had a
20     chance to look at this before you signed it -- well,
21     last month.  Is that correct?
22        A.    Yes.
23        Q.    And between last month and now, is there
24     anything that we would need to supplement these
25     responses?
```

EXHIBIT 10 - PAGE 33

Kircus Ranesbottom

33

```
1        A.    Give me a minute to read it over just to
2    make sure.
3        Q.    Sure.
4        A.    Okay.  I gave it a brief read-over.  Would
5    you mind rephrasing the question?
6        Q.    Sure.
7        A.    I want to make sure I answer it
8    accurately.
9        Q.    Sure.  The question is:  Just after doing
10    a brief read-over, is there anything that you think
11    you need to supplement on your responses?
12        A.    No.  Thank you.
13        Q.    So interrogatory number 6 on the first
14    page -- do you see that?
15        A.    One moment.  Yes, I see it.
16        Q.    And you can read it to yourself, but it
17    talks about using curfews to prohibit and prevent
18    mass protests.  Do you see that?
19        A.    Yes.
20        Q.    What events -- when a -- strike that.
21            So when you're making a claim that the
22    city uses curfews to prevent mass protests, what
23    events are you talking about?
24        A.    I'm talking about the events of May 31st,
25    2020.
```

EXHIBIT 10 - PAGE 34

Kirtis Ranesbottom

```
 1        Q.    Any other event?

 2        A.    No.

 3        Q.    All right.  And do you personally know

 4    what the City of Eugene does to train its police

 5    employees?

 6        A.    No.

 7        Q.    Do you personally know what the City of

 8    Eugene does to supervise its police employees?

 9        A.    No.

10        Q.    If you'll turn to the next page,

11    interrogatory number 8, and if you would read the

12    interrogatory to yourself and let me know when

13    you're done.

14        A.    Number 8 you say?

15        Q.    Yes.

16        A.    Okay.

17        Q.    The reference here to the use of chemical

18    and impact munitions, is that for any events other

19    than May 31st, 2020?

20        A.    No events that I'm aware of.  None that I

21    attended.

22        Q.    And if we look at 9 down below there, it

23    basically asks, you know, how the individual

24    defendants discriminated or retaliated against you

25    based upon speech, viewpoint, or association.  Do
```

EXHIBIT 10 - PAGE 35

Kircus Ranesbottom

35

```
1    you see that?

2         A.    Yes.

3         Q.    And just in your own words, why do you

4    think Sergeant Solesbee discriminated or retaliated

5    against you based upon those considerations?

6         A.    Well, it wasn't only Officer Solesbee, but

7    all of the police who were present at the protest,

8    specifically across the street from the library that

9    day, on May 31st.

10              It was a peaceful protest.  There was no

11   violence happening.  It was completely -- completely

12   legal.  It took place before the curfew was enacted,

13   and nobody was acting outside of their

14   constitutional freedoms of speech and right to

15   assembly.

16              And the police who were present used

17   violence against us, everybody who was there at that

18   protest.  They were shooting at people with the -- I

19   don't know what the actual classification of them

20   was.  We were calling them rubber bullets, but I

21   think they were called foam bullets or something

22   like that.

23              But the point is nobody there was doing

24   anything illegal, and the police were hurting

25   people.
```

EXHIBIT 10 - PAGE 36

1    Q.    And I understand your complaint about the

2    actions that they took.  Did -- did any officer at

3    any point on May 31st, 2020, say something to you to

4    indicate that you were being targeted because of

5    your viewpoint?

6    A.    No.

7    Q.    Did any officer on May 31st, 2020, say

8    something to you to indicate you were being targeted

9    because of your association?

10   A.    No officer on that day said anything to me

11   individually.

12   Q.    All right.  And so your belief that you

13   were retaliated against -- and others -- for their

14   speech activity has to do with use-of-force

15   decisions that officers made.  Is that a fair

16   characterization?

17   A.    Yes.  That's correct.

18   Q.    And specific to Sergeant Solesbee, do you

19   have any evidence that he was targeting you because

20   of your speech, viewpoint, or association?

21   A.    Only -- only my testimony as somebody who

22   was there.  That's the only evidence that I have in

23   that regard.

24   Q.    And so that -- we'll get to that.  But

25   that's going to be testimony about the actions that

EXHIBIT 10 - PAGE 37

```
1    he took.  Correct?
2         A.    Right.
3         Q.    And we'll get to all that.  But of the
4    actions that he took, why do you think they showed
5    he was retaliating against you personally?
6         A.    I never believed that this was about me
7    personally.  I never thought that I was being
8    targeted as an individual.
9         Q.    Well, what about the actions that Sergeant
10   Solesbee took indicate that he was targeting
11   somebody because of -- somebody or a group because
12   of their speech?
13        A.    Because nobody was doing anything illegal.
14   All that anybody there was doing was protesting
15   peacefully, legally.  All anyone was doing was
16   speaking.  So there was no other -- there's nothing
17   else that they could have been trying to stop.
18   There was no crime being committed.
19                   MR. MILLER:  We'll mark this as
20   Exhibit 3.
21                   (Deposition Exhibit Number 3
22                    marked for identification.)
23   BY MR. MILLER:
24        Q.    This is a Response to Defendant City of
25   Eugene's First Request for Production to Plaintiff
```

Kirtis Ranesbottom

```
1    Kirtis Ranesbottom.  Do you have that document
2    available?
3         A.   One moment.  What is it called?
4         Q.   Response to Defendant City of Eugene's
5    First Request for Production to you.
6         A.   Okay.  Got it.
7         Q.   So turning to page -- it's 4, request for
8    production number 15, do you see that?
9         A.   Yes.
10        Q.   All right.  Have you produced all
11   responsive documents at this point?
12        A.   Yes.
13        Q.   And other than privileged emails with your
14   attorney, do you have any other emails that discuss
15   the events of May 31st, 2020?
16        A.   No, I don't believe I do.
17        Q.   And, I mean, you said, "I don't believe
18   so."  I've got to follow up on that.  Have you
19   searched your email to determine if you have
20   responsive documents?
21        A.   Yes.
22        Q.   And you found that you didn't?  Because
23   none have been produced to me, I'll represent.
24        A.   Yeah, that's -- that's correct.  I did
25   search my emails, and I didn't find anything
```

EXHIBIT 10 - PAGE 39

1    relevant to this case.

2         Q.    What emails do you utilize?

3         A.    I'm not sure I understand the question.

4         Q.    Sure.

5         A.    Could you rephrase?

6         Q.    How many email addresses do you have?

7         A.    I have four.

8         Q.    What are they?

9         A.    EarthCommunityOutreach@gmail.com;

10   K.Ranesbottom@gmail.com; KirtisRane@gmail.com; and

11   RanesbottomK@my.lanecc.edu.

12        Q.    And have you searched all four of those

13   email addresses to determine whether you have any

14   responsive documents to this lawsuit?

15        A.    Not all four of them, no.  The reason

16   being that I knew I would not use my school email to

17   talk about anything relating to the case.  And the

18   K.Ranesbottom email I hardly use for anything, so I

19   knew I wouldn't have used it to talk about the case.

20        Q.    If you could down to request for

21   production number 21.

22        A.    Okay.

23        Q.    Do you see that?

24        A.    Uh-huh.

25        Q.    Is that a yes?

EXHIBIT 10 - PAGE 40

Kirtis Ranesbottom

1      A.    Yes, I see it.

2      Q.    All right.  So the question is:  Do any

3  photographs or video of you taken between May 29th

4  and June 1st, 2020, exist?

5      A.    I'm sorry.  Could you repeat your

6  question?

7      Q.    Yes.  The question is:  Do any photographs

8  or video of you that were taken between May 29th and

9  June 1st, 2020 -- do those photographs or video

10  exist?

11      A.    Not that I'm aware of.

12      Q.    All right.  Are you aware, from any

13  source, any video or photographs of the police

14  actions that occurred -- let me go back.  We'll kind

15  of break this up.

16          So as I understand your claims in this

17  case, they primarily relate to two different events.

18  One of them was downtown near the LTD bus station.

19  Is that correct?

20      A.    Yes.  That's correct.

21      Q.    And the other principal event was at and

22  around the Campbell Club after 11:00 later that

23  night.  Is that correct?

24      A.    Yes.  That's correct.

25      Q.    All right.  And for the first event at and

EXHIBIT 10 - PAGE 41

```
 1    around the LTD bus station, are you aware of any

 2    video or photographs that depict what occurred there

 3    from any source?

 4         A.    No, I'm not sure -- I'm not aware of any.

 5         Q.    And for the second category, the events

 6    that occurred at and around the Campbell Club after

 7    11:00 on May 31st, 2020, are you aware of any

 8    photographs or video that depict what occurred then

 9    from any source?

10         A.    No, except for the pictures that we took

11    afterwards that were shared with the court.

12         Q.    Okay.  So as an example, does -- do -- do

13    your building -- does your building have a security

14    camera?

15         A.    No, it does not.

16         Q.    Does it have a Ring doorbell?

17         A.    No.

18         Q.    Are you personally aware of any security

19    footage from other buildings in the area that may

20    have depicted the events of May 31st, 2020?

21         A.    I'm not aware of any -- of any videos.

22    However, it is possible that the sorority next door

23    has captured some of it, although I doubt the videos

24    would still exist.  I know that our office reached

25    out to them and asked them for the surveillance
```

EXHIBIT 10 - PAGE 42

1    tapes but never got a response so . . .

2         Q.    So I want to start with May 29th of 2020.

3    So that was the Friday of that weekend.  Did you go

4    out to -- to the -- to protest on that night?

5         A.    No, I did not.

6         Q.    What did you generally do on May 29th,

7    2020?

8         A.    I stayed at home and -- that I can

9    remember, I didn't do anything significant, really.

10   I probably watched TV or maybe played games.

11   Mundane everyday activities.

12        Q.    And just as an example, did you watch any

13   live-streaming of other -- either protest or riot

14   activity occurring on May 29th, 2020?

15        A.    It's possible that I did.  However, I

16   don't remember.

17        Q.    When do you think you first learned that

18   there had been some property destruction that

19   occurred on May 29th, 2020?

20        A.    I know I was aware of it as it was

21   happening that night.

22        Q.    And from what sources were you aware of

23   it?

24        A.    I don't recall.  However, I can say that

25   it was most likely Facebook that I was following my

EXHIBIT 10 - PAGE 43

1     friends' posts and news updates that were being

2     posted there.

3         Q.    Who do you believe you were following?

4         A.    It's really impossible to say.  I wouldn't

5     recall that.

6         Q.    Do you know anybody personally who was out

7     on May 29th, 2020, and was a witness to some of the

8     property destruction or riot activity?

9         A.    No, nobody that I'm aware of.

10        Q.    So the next day, May 30th of 2020, what

11    did you do that day, that Saturday?

12        A.    Once again, I can't remember exactly where

13    I was that day, but I know that I didn't -- I didn't

14    leave home.

15        Q.    And so, for example, did you travel down

16    to observe any damage that had occurred from the

17    prior night?

18        A.    No, I did not.

19        Q.    And on May 30th, 2020, did you ever become

20    aware that a curfew was being put in place?

21        A.    No, I was not aware.

22        Q.    So we'll break it down, but walk me

23    through generally what you did on May 31, 2020.

24    That's Sunday.

25        A.    Okay.  So I never planned on going to a

EXHIBIT 10 - PAGE 44

```
1    protest that day, so I began the day as I would any

2    other -- during Covid, anyway -- not doing much at

3    all.  Probably watched some TV, played some video

4    games, social media.

5              And, let's see, it was somewhere between

6    7:00 and 8:00, I believe, that I got messages in our

7    Campbell Club group chat on Signal that there was

8    some violence happening downtown, specifically that

9    there were white nationalists that were targeting

10   people of color.  And I knew that several people

11   that I knew -- well, one person, for the sake of

12   being accurate -- one person specifically who is a

13   person of color that I know and am friends with was

14   downtown.

15             So when I heard that people of color were

16   being targeted, I became alarmed for their safety.

17   And so myself and a group of my housemates drove

18   down to the protest just to be there and be with our

19   friends and make sure that, you know -- you know,

20   that if anything did happen that we could defend

21   them.

22             No violence of that nature did occur.  But

23   we got to the park downtown -- can't even remember

24   the name of that park.  The one that's just a few

25   blocks away from the library.  I know that's not
```

EXHIBIT 10 - PAGE 45

1    very specific, but that's not really that relevant.

2           There was a group of protesters who were

3    leaving the larger protest.  I think it was at Alton

4    Baker, and I think that one was kind of fizzling

5    out.  But we met up with these -- this group of

6    protesters -- none of whom I knew.  They were all

7    strangers to me.  But they were talking about

8    continuing the protest and moving it down by the

9    library.  And so we, like, followed them, me and my

10   group of housemates that I went there with.

11          We got down to across the street from the

12   library.  This was, I believe, 8:00 -- not 8:00 but,

13   like, sometime between 8:00 and 9:00.  And I was

14   there for between five and ten minutes when the

15   police announced on loud speakers or a megaphone,

16   whatever it's called, that there was going to be a

17   curfew, which to me was news.  I didn't know about

18   any curfew prior to that.

19          And they told us that we had to move, it

20   was an unlawful assembly, that we couldn't protest

21   there.  So myself and all of the rest of the

22   protesters started moving down the street, not

23   having made a decision about where to go next.

24   There was no organization to it, but everybody

25   started moving because the police were starting to,

1    like, block off the streets and block off that whole

2    section of streets there, that whole intersection.

3    And they looked pretty militant and angry.

4              So the protesters and I started moving

5    down the street, and that is when the police started

6    to shoot at us with the foam bullets and throwing

7    tear gas canisters.

8              So at that point I ran away.  After

9    shielding myself from the foam bullets, I ran away

10   from the tear gas.  At that point I was separated

11   from my friends, and so I walked around the block a

12   couple of times looking for them.  Couldn't find

13   them.  And I knew that the curfew was about to

14   start, so I went home.

15             I got home before the curfew started.  I'm

16   not sure exactly what time, but I know that it was

17   -- it was before the curfew started.  And I went to

18   my room, played some video games, and didn't come

19   downstairs again until I heard the shots fired in

20   front of our house.

21             So when I heard that, I ran downstairs to

22   see what was happening.  And there was a bit of a

23   commotion.  A lot of my other housemates were the

24   same as me, running downstairs looking scared and

25   confused.  And Eric was in the house looking scared

EXHIBIT 10 - PAGE 47

1    and confused.  And -- well that is about all that I

2    remember.

3         Q.    Okay.  Thank you for that.  That's good.

4         A.    You're welcome.

5         Q.    So I'll kind of break down some of the

6    questions I have.  We'll try to do it

7    chronologically as best I can.

8              You talked about a Signal group chat with

9    the Campbell Club.  Do you remember that?

10        A.    Yes.

11        Q.    And this is something through the Signal

12   app that you have access to because you're on part

13   of a group chat.  Is that correct?

14        A.    That's right.

15        Q.    And this message indicated that some

16   individuals of color may be targeted for violence

17   downtown essentially.  Is that correct?

18        A.    Yes.

19        Q.    And that -- that's what spurred you and

20   others to then travel down there to act as advocates

21   or to help with the situation.  Correct?

22        A.    Correct.

23        Q.    Do you know what time you received that

24   Signal message?

25        A.    No.  I believe it was sometime around 7:00

EXHIBIT 10 - PAGE 48

Kittel Ranesbottom

48

```
1    or 8:00.  Sometime between.
2         Q.    Does that message still exist?
3         A.    I don't think so.  It's possible, but I
4    believe that most messages on Signal are set to
5    disappear after a certain time.  So quite a bit of
6    time has taken place; I don't think that those
7    messages would still exist.
8         Q.    On the Campbell Club group chat on Signal,
9    has there ever been any communication about what
10   occurred on May 31st, 2020?
11        A.    Not that I recall.
12        Q.    So the -- according to your complaint, the
13   house was shot by -- by rubber bullets.  Correct?
14        A.    Right.
15        Q.    And there was, you know, at least a friend
16   of theirs who took shelter within there.  Correct?
17        A.    Correct.
18        Q.    And there was the use of PepperBall and
19   other gas outside of the house that evening.
20   Correct?
21        A.    Correct.
22        Q.    And despite all of those things, your
23   belief is there was never any communication on the
24   group chat about what occurred.  Is that your
25   testimony?
```

EXHIBIT 10 - PAGE 49

```
 1        A.    No.  I didn't say that.  I said I don't
 2   recall.  So I'm sure that there was something said
 3   on the group chat about it, but I don't remember
 4   what that would have been.  And since I believe
 5   those messages are set to disappear after a certain
 6   time, I don't think those would be available now.
 7        Q.    Have you checked to determine whether they
 8   are available or not?
 9        A.    Yes.
10        Q.    And were you able to find any messages?
11        A.    No.
12        Q.    No, you were not?
13        A.    No, I was not able to find any messages.
14        Q.    But in the several days preceding the
15   event when those communications would have occurred,
16   you had access to them.  Correct?
17        A.    Yes.
18        Q.    And what steps, if any, did you take to
19   preserve them?
20        A.    None.
21        Q.    You indicated that you drove down to
22   around the downtown area.  Do you remember who you
23   drove with?
24        A.    Yes.  I'm trying to remember.  Do you need
25   their names?  I'm trying to remember what their
```

EXHIBIT 10 - PAGE 50

Kiirus Ranesbottom

```
 1    actual full names are.
 2         Q.    The best you can.
 3         A.    Okay.  Well, I know Damon was with us and
 4    two friends of ours whose legal names I don't
 5    recall.  I know them only as Ash and Burtie
 6    (phonetic).
 7         Q.    So it was four of you then?
 8         A.    Yes -- no, there were five of us.  There
 9    was also another individual who I know only as
10    Grazie (phonetic).
11         Q.    And you said you went down and you parked,
12    it sounded like, near -- at a park somewhere, you
13    know, in the downtown area.
14         A.    That's correct.
15         Q.    And do you know approximately when you
16    would have arrived there and parked?
17         A.    Around 8:00.
18         Q.    And so from wherever that location is, you
19    then traveled to an area around the LTD bus station.
20    Do I have that correct?
21         A.    Yes.
22         Q.    Do you remember which street you were on?
23         A.    No, I don't.  I don't recall the names of
24    the streets.
25         Q.    Can you tell me by referencing any of the
```

EXHIBIT 10 - PAGE 51

Kirtis Ranesbottom

1    buildings, you know, approximately where you were

2    located in that area?

3        A.    Yes.  So on the opposite side of the

4    street from the LTD bus station and across the

5    corner from the library.  Does that make sense?

6        Q.    Yes.

7        A.    Okay.

8        Q.    So it sounds like -- I don't blame you if

9    you're bad at directions, but it sounds like you

10   were north of the LTD bus station.  Is that correct?

11       A.    I wouldn't be able to say for sure without

12   looking at a map.

13       Q.    Sure.  That's okay.  There's a building on

14   the northeast corner of the intersection that I

15   believe that you're describing called the Atrium

16   Building.  It's a City of Eugene building.  Are you

17   familiar with that?

18       A.    No.

19       Q.    All right.  And there's the -- at the

20   intersection I believe you're talking about, there's

21   the LTD station.  Immediately to the west of it is

22   the library.  Does that sound right?

23       A.    Sounds right.

24       Q.    And then north of the library is an LCC

25   building.  Are you familiar with that?

EXHIBIT 10 - PAGE 52

Kircus Ranesbottom

52

```
1        A.    No, but this is sounding right.

2        Q.    And so if I have this right, you weren't

3   on the sidewalk in front of any of those three

4   buildings or structures.  You were at the other one.

5        A.    Yes.

6        Q.    And do you remember which street you were

7   in front of?  In other words, from the location that

8   you were, could you look directly at the LTD bus

9   station or were you able to look north towards

10  Skinner's Butte?

11       A.    Yes.  Facing across the street, I'm

12  looking right at -- I was looking right at the bus

13  station.  And then looking to the right across the

14  street from that is the library.

15       Q.    And on that block approximately there's --

16  there's the, you know, the intersection, the

17  sidewalk.  There's a building.  And then there's an

18  alleyway that comes out of that.  Does that sound

19  familiar?

20       A.    Yes.

21       Q.    Just approximately where were you along

22  the sidewalk between where it intersects the street

23  and that alleyway?

24       A.    I was right on the corner for most of it.

25  When they started shooting, I was closer to the
```

EXHIBIT 10 - PAGE 53

Kirtis Ranesbottom

53

```
 1    alley.  We had started walking down the street

 2    towards that alley.  And I was maybe a yard or two

 3    away from that alley.

 4        Q.    While you were in and around that

 5    location, did you observe anyone at any time

 6    standing in the road?

 7        A.    No.  Nobody besides the police.

 8        Q.    While you were at that location, did you

 9    observe anyone at any time throw anything at the

10    police?

11        A.    No, I did not.

12        Q.    While you were at that location, did you

13    observe anyone at any time run up and hammer a

14    police truck?

15        A.    No.  No, I did not.

16        Q.    And while you were there, did you observe

17    anyone at any time jump on the back of a police

18    officer?

19        A.    No, I did not.

20        Q.    So you're at this location.  The police

21    announce that a curfew is going to go into effect at

22    a later time.  Is that correct?

23        A.    Yes.

24        Q.    Did they -- did they make any other

25    announcements?
```

EXHIBIT 10 - PAGE 54

1     A.    They said that our protest was an unlawful

2   assembly and that we had to move.

3     Q.    In response to that, did you move?

4     A.    Yes.

5     Q.    From where we described that location kind

6   of at the corner, what direction did you move?

7     A.    Well, to my left.  So down the street,

8   like, following parallel to the bus station if that

9   makes sense.  I'm not sure exactly what direction

10  that is.

11    Q.    So I think that you are describing going

12  east, but you would be heading over towards the

13  Downtown Athletic Club.  Was that the direction that

14  you were headed?

15    A.    Towards Willamette.

16    Q.    And so you began to head towards

17  Willamette.  And at some point while you're moving

18  -- at that point are you -- are you facing towards

19  Willamette?

20    A.    Yes.

21    Q.    And at some point it sounds like you

22  become aware that foam or -- bullets or tear gas is

23  being deployed.  Is that correct?

24    A.    Yes.

25    Q.    All right.  And were you personally hit by

EXHIBIT 10 - PAGE 55

Kircus Ranesbottom

1   any foam bullets?

2        A.    No.

3        Q.    And do you know -- when you became aware

4   that was happening, did you turn around to observe

5   what the officers were doing?

6        A.    Yes.

7        Q.    What did you observe at that point in

8   time?

9        A.    I saw them firing at people with the foam

10  bullets at point-blank range and firing the tear gas

11  canisters at people -- not at the ground near them,

12  but actually at them at point-blank range.

13       Q.    How many foam -- what you're calling foam

14  bullets, how many of those did you observe fired?

15       A.    It's impossible to say.  Very many of

16  them.

17       Q.    Are you certain that those were foam

18  bullets as opposed to PepperBalls?

19       A.    I'm not aware specifically what they were.

20  My understanding is they were using the pepper

21  pellets or pepper bullets as well as what we were at

22  that time calling rubber bullets.

23             I only recently learned from watching some

24  of the depositions for this case with the police

25  that they were not technically called rubber

EXHIBIT 10 - PAGE 56

Kircus Ranesbottom

1    bullets.  That was something new to me that I

2    learned maybe a month -- a month or less ago when I

3    watched those depositions.

4         Q.    And the tear gas that you observed

5    deployed at -- you said at -- at people.  Is that

6    correct?

7         A.    Yes.

8         Q.    Were you one of those people it was

9    deployed at?

10        A.    Yes.  I turned around to -- so first --

11   when they first -- fired the first tear gas

12   canister, I ran with back to the corner, back the

13   way that I had come from.  And then I turned around

14   to look at what was happening behind me, and an

15   officer fired a tear gas canister directly at me.

16   We actually made eye contact, and then he fired at

17   me.

18        Q.    Where did the tear gas canister land?

19        A.    At my feet.  I jumped out of the way.

20        Q.    Do you know who that officer was?

21        A.    No.

22        Q.    Do you have any reason to think that it's

23   any of the individual defendants in this case?

24        A.    No.  It's impossible to say.  It was a

25   very chaotic moment.  There were people running and

EXHIBIT 10 - PAGE 57

1   panicked in all directions.  And the police were

2   firing at people so there was no way that I would be

3   able to approach and ask for a badge number or

4   anything like that.  He was wearing a face mask and

5   sunglasses so --

6       Q.    In response to the tear gas canister

7   landing at your feet, what did you do?

8       A.    I ran away.  And then I went back home.

9       Q.    And so were you -- were you impacted by

10  the tear gas?  In other words, did it deploy in time

11  such that you became overwhelmed by the gas?

12      A.    No.

13      Q.    Did you suffer any physical effects from

14  the gas?

15      A.    No.

16      Q.    So you went home.  I know you were heading

17  in the direction of Willamette Street.  Correct?

18      A.    Correct.

19      Q.    Do you know what route you took to then

20  get to the Campbell Club?

21      A.    I took Willamette most of the way back

22  home and then turned right on Alder, which is the

23  street that the Campbell Club is on.  I went

24  straight there.

25      Q.    And you indicated that you went up to your

EXHIBIT 10 - PAGE 58

Kirtis Ranesbottom

```
1    room.  Correct?
2         A.    Uh-huh.  Correct.
3         Q.    And if I were on the street facing the
4    Campbell Club, where is your room located?
5         A.    It's on the second story and the furthest
6    window to the right facing the street, facing Alder.
7         Q.    So you were there until you heard -- you
8    said it sounded like shots fired outside of the
9    Campbell Club.  Is that correct?
10        A.    That's right.
11        Q.    And was that the first point that you knew
12   that there were police outside of the Campbell Club?
13        A.    Yes.
14        Q.    And how many shots did you hear fired?
15        A.    Dozens.  I would say about two dozen is
16   what it sounded like to me at the time anyway.  It
17   sounded like automatic firing.  It wasn't probably
18   that many.  I'm going to say I don't remember,
19   because it was alarming and it was a while ago.
20        Q.    And did you look out your window to
21   observe what was occurring?
22        A.    I did.
23        Q.    What did you see?
24        A.    I saw that there were police parked in
25   front of the house with their sirens on.  And then
```

EXHIBIT 10 - PAGE 59

1    that's when we went downstairs.

2         Q.    So when you went downstairs, Eric was

3    already in the house.  Correct?

4         A.    Correct.

5         Q.    Do you know who let him in?

6         A.    Yes.  Damon did.

7         Q.    And did you speak to Eric about what

8    occurred to him?

9         A.    I did.

10        Q.    Tell me what that conversation entailed.

11        A.    Okay.  I asked what was happening, both to

12   Eric and to Damon -- mostly to Damon.  And he

13   explained to me what had just occurred, that they

14   had shot at Eric and shot at him.  And I remember

15   being alarmed for the safety of everybody in the

16   house and being skeptical about letting Eric in.  I

17   know I said something to the effect of, "Your

18   presence here is endangering us," which I now feel a

19   little bit bad about.  I just -- I was scared for

20   the safety of my housemates and myself.

21             So I said that his presence was

22   potentially endangering us.  And he replied that he

23   was just trying to protect himself and that he was

24   hurt and that the police were shooting at him and he

25   didn't know what else to do, at which point I

EXHIBIT 10 - PAGE 60

Kirels Ranesbottom

```
 1    realized he was right and there was nothing else we
 2    should have done but let him in because he was in
 3    danger.
 4              That's about all we said to each other.
 5         Q.   What -- what occurred after that?
 6         A.   We -- "we" being my housemates and I --
 7    sat around in the living room together for a while,
 8    kind of watching out the windows.  And all of us
 9    were feeling pretty paranoid and on edge thinking
10    that the cops might, I don't know, come back and
11    mess with us, because their behavior seems totally
12    irrational and violent.  So we kind of sat around
13    together in the living room, just keeping watch and
14    talking about what had occurred that day.
15         Q.   Did any officers approach the front door
16    of the Campbell Club to your knowledge?
17         A.   No.
18         Q.   No, you don't know?  Or no, none did?
19         A.   No, none did.
20         Q.   So after this encounter with Eric, the
21    police moved on.  Is that correct?
22         A.   Yes.
23         Q.   And then --
24         A.   They did sit in front of the house for
25    about five to ten minutes.  Just sitting there, not
```

EXHIBIT 10 - PAGE 61

Kirtis Ranesbottom

1    doing anything or saying anything.

2        Q.    And so did you witness the officer who

3    fired at Sergeant Solesbee -- or, excuse me -- the

4    officer that fired at Eric, did you witness that?

5        A.    No, I did not.

6        Q.    And I want to -- you weren't arrested that

7    night.  Correct?

8        A.    Correct.

9        Q.    Were you hit by anything?

10       A.    No.

11       Q.    For events at and around the Campbell

12   Club, knowing that officers were outside and seeing

13   them out there with I think you said sirens, did you

14   observe any officers do anything else to anyone

15   else?

16       A.    At that point at the Campbell Club?

17       Q.    Correct.

18       A.    I saw that there were protesters -- other

19   protesters that were running away from them, and I

20   could see them driving after them.  And I could hear

21   more gunfire further down the street.  That's all.

22   These being protesters that I didn't know.

23       Q.    And so to your knowledge, did you ever

24   speak with Sergeant Solesbee?

25       A.    No, not to my knowledge.  In fact I didn't

EXHIBIT 10 - PAGE 62

Kircus Ranesbottom

62

1  speak to any police officers individually that

2  night.

3      Q.   Let's -- we'll walk through some of the

4  photographic exhibits.  Do you have those?

5      A.   Yes.

6      Q.   All right.

7             MR. MILLER:  I'm probably not going to

8  introduce these.  I just want to go through them

9  with him.

10 BY MR. MILLER:

11     Q.   All right.  What I have in front of me is

12 a PDF that contains -- this one has 191 pages in it.

13 I'm only going to ask you about the beginning 40 or

14 so.  Is that the PDF that you think you have in

15 front of you?

16     A.   Yes, I believe so.  The document that I'm

17 looking at has 40 pages.  So you might be looking at

18 one that has more -- or it might just be the

19 configuration because of the browser I'm using or

20 something.  I'm not sure.

21     Q.   And if you look at the bottom right

22 corner, do you see where it says PLTFS and then

23 there's a number of zeroes followed by a number?

24     A.   Yes.

25     Q.   Does your first page start with a 1?

EXHIBIT 10 - PAGE 63

Kirtis Ranesbottom

```
 1        A.    Yes.

 2        Q.    All right.  So I want to start on what is

 3   Plaintiffs' 18, which is the -- it's the 18th page

 4   of the PDF.  Can you go to that?

 5        A.    Yes.  One moment.  Okay.

 6        Q.    You may need to zoom in on this, but it

 7   appears to be a Facebook posting by Kirtis Rane.  Is

 8   that what's on your page?

 9        A.    Yes.

10        Q.    Is this a posting that you made?

11        A.    It's a posting that I copied and pasted or

12   copied, pasted, and posted.

13        Q.    And so the posting that's described in

14   here where it begins, "I thought Eugene" -- do you

15   see that?

16        A.    Yes.

17        Q.    And so the language that's below there, is

18   that -- whose language is that?

19        A.    I'm not aware of whose language it is.

20        Q.    But Plaintiffs' 18 does not describe what

21   you were subject to.  Is that correct?

22        A.    Let me read this over.  It is correct this

23   is somebody else's wording, not a person who I know

24   personally, but somebody who experienced something

25   similar and on the same night.
```

EXHIBIT 10 - PAGE 64

1    Q.    I'm sorry.  I couldn't tell if you were
2    still reading or not.
3    A.    Sorry.  I thought you knew that I was
4    done.
5    Q.    I apologize.
6    A.    Did I need to clarify my answer at all?
7    Q.    Well, only that Plaintiffs' 18 is a
8    copy-and-paste of somebody else's reported
9    experience; it's not your reported experience.  Is
10    that correct?
11    A.    Yes.  That's correct.
12    Q.    So we'll go to 21.  And let me know when
13    you're there.
14    A.    Okay.
15    Q.    And this appears to depict the, I think,
16    two foam heads and two cylinders from a
17    40-millimeter device.  Is that the photograph that
18    you have in front of you?
19    A.    Yes.
20    Q.    Did you take this photograph?
21    A.    No, I did not.
22    Q.    Do you know who did?
23    A.    I'm not exactly sure, but I believe it was
24    my housemate Jasmine Wood.
25    Q.    And just in your own words, what does this

EXHIBIT 10 - PAGE 65

1    photograph on 21 depict?

2         A.    Casings from a foam bullet -- from several

3    foam bullets that were fired at the Campbell Club.

4         Q.    And do you know where these were retrieved

5    from?

6         A.    Yes.  From our front porch and our yard.

7         Q.    So it appears to depict two casings and

8    two -- we'll call them foam heads.  Is that a fair

9    statement?

10        A.    Yes.

11        Q.    All right.  Do you know who retrieved

12   these from in front of the Campbell Club?

13        A.    I believe it was Jasmine Wood.

14        Q.    Other than these two, are you aware

15   whether any other heads or casings were retrieved

16   from in front of the Campbell Club?

17        A.    Not that I'm aware of.

18        Q.    So we turn to 26.

19        A.    After 20 the pages aren't numbered anymore

20   for me.

21        Q.    Yeah.  I think they are at the very bottom

22   in incredibly small type.  I know that's hard for

23   both of us.

24              MS. DUGAN:  Is it page number 26 of

25   the PDF though?  The counter at the top, Kirtis

EXHIBIT 10 - PAGE 66

Kirtis Ranesbottom

1    should show you.

2        A.    Is it a picture of the window?

3    BY MR. MILLER:

4        Q.    I believe so.

5        A.    Oh, it does say in very small print down

6    there.  Okay.  I'm looking at 26.

7        Q.    The question to you is:  What does this

8    depict?

9        A.    Let me look for a moment.  It depicts a

10    window of the front -- at the front, looking into

11    the living room of the Campbell Club.  And there is

12    a crack in it from being struck by some kind of

13    projectile from the police.

14        Q.    And so in what I have there's one full

15    windowpane that's in the photograph.  And it appears

16    a little above center and to the left there's a --

17    there's a crack in it.  Is that what you have?

18        A.    Yes.  That's correct.

19        Q.    And this is a window located on the

20    Campbell Club.  Correct?

21        A.    Yes.

22        Q.    And do you know how that damage was

23    caused?

24        A.    I believe that it was caused by a pepper

25    bullet.

EXHIBIT 10 - PAGE 67

1      Q.    And did you tell -- did you witness that

2    damage being caused?

3      A.    No.  As I stated before, I was upstairs in

4    my room.  However, I know that that crack wasn't

5    there prior to the night of May 31st.

6      Q.    Do you know which officer may have been

7    responsible for that damage?

8      A.    No, I'm not aware of -- of that.

9      Q.    Is 27 a picture of that same window?

10     A.    I don't believe so.  Judging by the

11   reflections, it appears to be one of the other

12   windows.

13     Q.    How many windows on the Campbell Club were

14   damaged on May 31st, 2020?

15     A.    I can't say for sure.  Not off the top of

16   my head.

17     Q.    Was it more than one?

18     A.    Yes.

19     Q.    Plaintiffs' 28, what does that depict?

20     A.    One moment here.  28.  Okay.  This is

21   another window of the Campbell Club.  I'm not sure

22   why she photographed this window.  I don't see any

23   cracks.  Oh, I see.  There's a -- in the top left

24   the pane has a crack in it.

25     Q.    Plaintiffs' 32, if you could go to that.

EXHIBIT 10 - PAGE 68

```
 1        A.     32?

 2        Q.     Yes.

 3        A.     Okay.  I'm looking at it.

 4        Q.     What does that depict?

 5        A.     A window frame of one of those windows or

 6    one of the front room windows.  And it looks like

 7    there's some powder residue at the bottom of the

 8    frame.  I'm not sure what that is.

 9        Q.     Do you know how it got there?

10        A.     No, I'm not sure.  I didn't take this

11    photo, so I'm not sure why it was taken.

12        Q.     Plaintiffs' 33?

13        A.     It's the next one?  Okay.  Yeah.

14        Q.     Do you know what this photograph depicts?

15        A.     Not exactly.  I'm thinking there must be

16    something on the ground I'm supposed to be seeing,

17    but I -- oh, I see.  There's a foam bullet on the

18    ground.

19               I believe this photo was taken to be

20    evidence that the foam bullets were fired at the

21    Campbell Club and not foam bullets that -- or

22    casings that we just found somewhere else off the

23    property.

24        Q.     Do you know whose feet are depicted in

25    that photograph?
```

EXHIBIT 10 - PAGE 69

1      A.    No.  I have no idea.

2      Q.    And is this at or near the front entrance

3  to the Campbell Club?

4      A.    Yes.  The door behind the person's feet,

5  that's the front door to the Campbell Club.

6      Q.    Was that door damaged?

7      A.    Yes, it was.  One of the hinges was

8  damaged.

9      Q.    Are there any photographs of that damage

10  to your knowledge?

11      A.    I thought I saw one.  Is it not in this

12  document?  I remember somebody taking a picture of

13  that hinge.  I don't recall who took that

14  photograph, and I don't know where it is now.  But I

15  do remember that one was taken.

16      Q.    We can jump ahead to 38.

17      A.    Okay.

18      Q.    The question is:  What does 38 depict?

19      A.    It depicts another of the Campbell Club's

20  windows.  And it looks like there's a mark on the

21  window where it seems to have been struck by another

22  pepper bullet.  And there's some more of that powder

23  residue around on the frame, which I believe is

24  residue from the pepper bullet.

25      Q.    And the pepper bullet that ultimately

EXHIBIT 10 - PAGE 70

1    struck the house, do you know what the officer fired

2    it at?

3        A.    I believe that he was firing at Damon and

4    at Eric.

5        Q.    Who do you think has a picture of the

6    hinge of that door?

7        A.    I don't know.

8        Q.    Now, your complaint talks about some

9    events that occurred around the Whole Foods a little

10   before 11:00.  Are you familiar with that aspect of

11   your lawsuit?

12       A.    Yes.  However, I was not present for the

13   events at the Whole Foods or by the Whole Foods.

14       Q.    Okay.

15       A.    At that point I had already walked home.

16       Q.    So even if your complaint says that you

17   were there, your testimony is you weren't there at

18   or around the Whole Foods.  Is that correct?

19       A.    Yes.

20       Q.    All right.  Do you recall any other

21   details about May 31st, 2020, that we haven't spoken

22   about yet?

23       A.    Let me think for a moment.  No.

24       Q.    Now, you said that it is the Student

25   Collective Association that owns the Campbell Club?

EXHIBIT 10 - PAGE 71

```
 1        A.    Students' Cooperative Association.
 2        Q.    And -- but you don't own that building.
 3   Correct?
 4        A.    I own a share of it.
 5        Q.    How so?
 6        A.    Everybody -- all of us members of the
 7   Students' Cooperative Association who sign the
 8   membership contract own an equal share of the
 9   organization.
10        Q.    And you own an equal share of the
11   organization's assets?
12        A.    Yeah.  More or less.  At least I have an
13   equal democratic say in how those assets are used.
14        Q.    And what has the SCA done to subrogate any
15   claim it has to you?
16        A.    Could you rephrase the question?  I don't
17   understand.
18        Q.    Sure.  Has the Student Collective
19   Association voted to allow you to bring a claim for
20   damages?
21        A.    No.
22        Q.    Have they given you, through a document,
23   the ability to bring a claim on their behalf?
24        A.    No.
25        Q.    Were you personally responsible for any
```

EXHIBIT 10 - PAGE 72

Kittels Ranesbottom

1    repairs that needed to occur on that property?

2        A.    No.

3        Q.    I think we know -- I think I know the

4    answers to all of these, but I need to have them on

5    the record.

6        A.    I understand.

7        Q.    Were you struck with a baton?

8        A.    No.

9        Q.    Were you tased?

10       A.    No.

11       Q.    Were you yourself struck with a

12   PepperBall?

13       A.    No.

14       Q.    Were you yourself struck with a

15   less-lethal munition?

16       A.    No.

17       Q.    Did you yourself -- were you impacted --

18   physically impacted by tear gas?

19       A.    No.  At least I wasn't harmed by it.  I

20   didn't get it in my face.

21       Q.    Right.  On May 30th, 2020, so that

22   Saturday, how did the curfew on that day impact you?

23       A.    It caused me to have to leave a protest.

24   Yeah.  I feel that it impeded my ability to practice

25   my right of free speech but -- well, yeah, that's my

EXHIBIT 10 - PAGE 73

1    answer.

2        Q.    I want to be careful about the dates

3    because I know we've been talking about the 31st,

4    which was the Sunday.  So what I'm interested in is

5    for May 30th, that Saturday, how did the curfews on

6    that day impact you?

7        A.    Okay.  Thank you for clarifying.  No.  The

8    curfew on that day did not impact me as I did not

9    leave the house.

10       Q.    And your prior answer, did that describe

11   how the curfew on the 31st impacted you?

12       A.    Yes.

13       Q.    What do you ordinarily do between 11:00

14   and 6:00 on your average day?

15       A.    11:00 a.m. and 6:00 p.m.?

16       Q.    11:00 p.m. and 6:00 a.m.

17       A.    Between watching television, playing video

18   games, and sleeping, I would say those are my usual

19   activities.

20       Q.    And how many marches have you attended

21   between 11:00 p.m. and 6:00 a.m.?

22       A.    In my life?

23       Q.    Yes.

24       A.    I don't know for sure, but I would -- I

25   think it's safe to guess between a dozen and two

EXHIBIT 10 - PAGE 74

1    dozen.

2         Q.    Were any of those in Eugene?

3         A.    No.  The only other protests that I've

4    attended in Eugene have been during the day, before

5    11:00.

6         Q.    After Eric got into the house, you

7    remained in the house for the rest of the night.  Is

8    that correct?

9         A.    That's correct.

10        Q.    Had you intended to go back out?

11        A.    No.

12                  MR. MILLER:  Let's take a break for a

13   minute so I can confer with my client, and I'll let

14   you know if we have other questions.  Okay?

15                  VIDEO TECHNICIAN:  We're off the

16   record.  The time is 11:53 a.m.

17                  (Recess:  11:53 to 11:56 a.m.)

18                  MR. MILLER:  Those are all the

19   questions that I have for you.

20                  If there is any other additional

21   discovery from you that ends up being produced, I'll

22   hold the deposition open to ask about those specific

23   documents or recording.  But otherwise I don't have

24   any questions for you.  Thank you for your time.

25                  THE WITNESS:  Thank you.  Have a good

EXHIBIT 10 - PAGE 75

1    rest of your day.

2                    MS. DUGAN:  Bye.

3                    THE WITNESS:  Bye.

4                    VIDEO TECHNICIAN:  We are off the

5    record.  The time is 11:56 a.m.

6                    (The deposition was adjourned

7                     at 11:46 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 10 - PAGE 76

```
1    State of Oregon    )
                        )        ss.
2    County of Lane     )

3

4        I, Eleanor G. Knapp, CSR-RPR, a Certified

5    Shorthand Reporter for the State of Oregon, certify

6    that the witness was sworn and the transcript is a

7    true record of the testimony given by the witness;

8    that at said time and place I reported all testimony

9    and other oral proceedings had in the foregoing

10   matter; that the foregoing transcript consisting of

11   75 pages contains a full, true, and correct

12   transcript of said proceedings reported by me to the

13   best of my ability on said date.

14       If any of the parties or the witness requested

15   review of the transcript at the time of the

16   proceedings, such correction pages are attached.

17       IN WITNESS WHEREOF, I have set my hand this 28th

18   day of September 2021, in the City of Eugene, County

19   of Lane, State of Oregon.

20

21

22   Eleanor G. Knapp, CSR-RPR

23   CSR No. 93-0262

24   Expires:  September 30, 2023

25
```

EXHIBIT 10 - PAGE 77