*Erin Grady*

*Boudjerada v City of Eugene*

*September 7, 2021*



CC REPORTING AND VIDEOCONFERENCING
101 East Broadway, Suite 300
Eugene, OR 97401
541-485-0111
www.ccreporting.com

EXHIBIT 11 - PAGE 1

                UNITED STATES DISTRICT COURT

            DISTRICT OF OREGON, EUGENE DIVISION


HASHEEM BOUDJERADA; DAMON      )

COCHRAN-SALINAS; ERIN GRADY; )

TYLER HENDRY; and KIRTIS       )No. 6:20-cv-1265-MK

RANESBOTTOM,                   )

            Plaintiffs,        )

      v.                       )

CITY OF EUGENE; SARAH          )

MEDARY; WILLIAM SOLESBEE;      )

SAMUEL STOTTS; BO RANKIN;      )

TRAVIS PALKI; MICHAEL CASEY; )

ANTHONY VIOTTO; and RYAN       )

UNDERWOOD,                     )

            Defendants.        )


                DEPOSITION OF ERIN GRADY

        Tuesday, September 7th, 2021; 10:00 A.M.


        THE DEPOSITION OF ERIN GRADY was taken at CC

Reporting & Videoconferencing, 101 East Broadway,

Eugene, Oregon, before Deborah M. Bonds, CSR, CCR,

RPR, Certified Shorthand Reporter in and for the

State of Oregon and Washington.

EXHIBIT 11 - PAGE 2

```
 1                    APPEARANCES

 2

 3  For the Plaintiffs:

 4       CIVIL LIBERTIES DEFENSE CENTER

 5       158 East 14th Avenue

 6       Eugene, Oregon 97401

 7       541/338-7072

 8       BY:  MS. MARIANNE G. DUGAN

 9       mdugan@mdugan.com

10

11  For the Defendants:

12       EUGENE CITY ATTORNEY'S OFFICE

13       940 Willamette Street, Suite 200

14       Eugene, Oregon 97401

15       541/682-8447

16       BY:  MR. BEN MILLER

17       ben.miller@ci.eugene.or.us

18

19  Also Present:  Jamie Iboa

20  Appearing by Zoom:  Lauren Regan

21                     Julia VanHorn, law clerk

22  Court Reporter:  DEBORAH M. BONDS, CSR, CCR, RPR

23

24

25
```

EXHIBIT 11 - PAGE 3

Erin Grady

3

```
1

2                              INDEX

3

4   WITNESS.......................................PAGE

5   ERIN GRADY

6        BY MR. MILLER                                4

7

8

9   EXHIBITS......................................PAGE
```

```
10  Exhibit 1    Plaintiff's Responses to         19
                 Defendant's First Request for
11               Production

12  Exhibit 2    Journal Entry                     28

13  Exhibit 3    Plaintiff Grady's Responses to    34
                 Interrogatories
14
    Exhibit 4    Plaintiff's Response to Second Set 38
15               of Interrogatories

16  Exhibit 5    First Amended Complaint           77

17  Exhibit 6    Probable Cause Affidavit          92
```

```
18

19

20

21

22

23

24

25
```

EXHIBIT 11 - PAGE 4

Erin Grady

4

```
 1                      ERIN GRADY,
 2   having been first duly sworn to testify the truth,
 3   the whole truth, and nothing but the truth, was
 4   examined and testified as follows:
 5
 6                      EXAMINATION
 7   BY MR. MILLER:
 8      Q.    All right.  Good morning -- is it
 9   Ms. Grady or do you have a preference on pronouns?
10      A.    Ms. Grady is fine.
11      Q.    Good morning.  I'm Ben Miller.  I'm one of
12   the attorneys for the City of Eugene, and I'm here
13   to take your deposition in this lawsuit.
14            Do you understand that?
15      A.    Uh-huh.
16      Q.    Is that a yes?
17      A.    Yes.
18      Q.    Okay.  And, you know, this is sort of my
19   opportunity to talk to you under oath.  You've been
20   put under oath.  It's the same oath that you'll be
21   put under if you testify at trial.
22            Do you understand that?
23      A.    Yes.
24      Q.    And so you'll notice that there's a court
25   reporter here.  Have you ever had a deposition taken
```

EXHIBIT 11 - PAGE 5

1  before?

2      A.    No.

3      Q.    All right.  So I'll be very brief with

4  just kind of some of the rules.  We want to be

5  careful not to talk over each other so that --

6  because there's a transcript that's going to come

7  out of this.

8          Does that make sense?

9      A.    Uh-huh.

10      Q.    Is that a yes?

11      A.    Yes.  Sorry.  I'll start saying the word

12  "Yes."

13      Q.    Okay.

14      A.    Yes.

15      Q.    And because there will be a transcript,

16  nods of the head and uh-huhs don't show up well, and

17  so I'll try to politely correct you if you do that.

18  It's just natural.  It's okay.

19      A.    Great.

20      Q.    And, you know, your deposition can be used

21  in a couple of different ways later in this case.

22  It can be used sort of as direct evidence, so rather

23  than calling you as a witness to have you repeat

24  your testimony, I could present the transcript.

25          Do you understand that?

EXHIBIT 11 - PAGE 6

1    A.    Yes.

2    Q.    And the other thing I could do is if you

3  testify later and you testify inconsistently with

4  your deposition testimony, I could point out that

5  inconsistency and ask a judge or a jury to

6  disbelieve you.

7         Do you understand that?

8    A.    Yes.

9    Q.    So today I just want your best answers to

10  my questions.  If you need me to clarify -- because

11  I'm an attorney, I'm going to ask poorly worded

12  questions or something that's confusing -- please

13  stop me and tell me, "Can you clarify that," or "Can

14  you break it down?"

15         Is that fair?

16    A.    That is fair.

17    Q.    All right.  Anything that would interfere

18  with your ability to participate in the deposition

19  today?

20    A.    No.

21    Q.    All right.  So just as an example -- I

22  mean, any sort of a medication that would impact

23  your ability to recall, anything like that?

24    A.    No.

25    Q.    Okay.  In general, tell me what you did to

EXHIBIT 11 - PAGE 7

1  prepare for your deposition today.

2      A.     I talked with Marianne.  We had two

3  different deposition prep meetings.  I thought a lot

4  in my own head.  I talked to myself and I talked

5  with my friend who I was arrested with, but that was

6  like probably two months ago I talked to her.

7      Q.     All right.

8      A.     That's what I did.

9      Q.     Okay.  Did you review any written

10 documents to prepare for your deposition?

11     A.     No.

12     Q.     All right.  Did you review any video to

13 prepare for your deposition?

14     A.     No.

15     Q.     All right.  Did you listen to any

16 recordings to prepare for your deposition?

17     A.     No.

18     Q.     Did you attend virtually any of the other

19 depositions that were taken in this case?

20     A.     No.  I wanted to, but I couldn't get into

21 the city manager one.

22     Q.     Okay.  Could you state your full name for

23 us?

24     A.     Erin Michelle Grady.

25     Q.     And for the court reporter's benefit,

EXHIBIT 11 - PAGE 8

1    would you just spell your first and last names.

2         A.    Oh, yeah.  E-R-I-N, G-R-A-D-Y.

3         Q.    Thank you.  Have you ever gone by any

4    prior names?

5         A.    Like nicknames?

6         Q.    Like if you had a name change really.

7         A.    Oh, no.

8         Q.    All right.  And what's your date of birth

9    and place of birth?

10        A.    7/7/87, Boulder, Colorado.

11        Q.    All right.  And just sort of in a general

12   sense, can you describe for me sort of where you

13   lived, where your residences are from kind of birth

14   to present?

15        A.    Oh, I grew in Boulder until I was 18, and

16   then I came here for college at the U of O.  And

17   then I have lived in Eugene ever since.  That was 15

18   years ago -- no.  16 years ago now -- in September

19   except for two years when I moved back to Colorado

20   to do a wilderness therapy job, and then I came back

21   to Eugene.

22        Q.    Okay.

23        A.    I lived in Durango for those two years.

24        Q.    Do you have a spouse or a significant

25   other?

EXHIBIT 11 - PAGE 9

1       A.     Nope.

2       Q.     All right.  And can you identify and give

3  me the whereabouts of your parents and any siblings?

4       A.     My parents live in Broomfield, Colorado,

5  which is like a suburb of Denver, and my sister

6  lives in Columbus, Ohio.  She just moved there.

7       Q.     Okay.  And what are your parents' names

8  and your sister's name?

9       A.     My dad's name is James Grady and my mom's

10  name is Leslie Grady, and my sister's name is Alison

11  Grady.

12             (Jamie Iboa now present.)

13  BY MR. MILLER:

14       Q.     Do you have any children?

15       A.     No.  I have a cat.

16       Q.     Do you currently live with anyone?

17       A.     Yeah.  I have three roommates.

18       Q.     What are their names?

19       A.     One's name is Nick, one's name is Danny,

20  and one's name is Israel.  I live with three boys,

21  which is not my favorite thing.

22       Q.     Do you know their last names?

23       A.     Yeah.  Israel's last name is Castro,

24  Nick's last name is Cervantes, and Danny's last name

25  is Noonan (phonetic).

EXHIBIT 11 - PAGE 10

Erin Grady

1    Q.    And have you lived with anybody else

2 besides those three between, say, May 29th of 2020

3 to the present?

4    A.    Yeah.  We had a different roommate last

5 summer whose name is Roo.  He ended up moving to

6 Miami, but I lived with Roo and then Danny came when

7 Roo left.

8    Q.    Do you know how to -- for our benefit to

9 spell Roo?

10    A.    R-O-O, I think.  His real name is Andrew.

11 We call him Roo.  His last name is Bandegrift.  Do

12 you want me to spell that?

13    Q.    Yes.

14    A.    B-A-N-D-E-G-R-I-F-T.

15    Q.    And I'm assuming in your phone you have

16 contact information for all these people at least

17 through a phone number?

18    A.    Yeah.

19    Q.    Yes?

20    A.    Yes.

21    Q.    Okay.  Anybody else that you've lived with

22 during that period of time May 29, 2020, to the

23 present?

24    A.    No.

25    Q.    Okay.  And where are you living at now?

EXHIBIT 11 - PAGE 11

```
1       A.    I live at 856 Almaden Street.

2       Q.    How long have you lived there?

3       A.    Since -- okay.  I suck at this.  I have

4   lived there for two years so I moved in there

5   October two years ago which would make it 2019,

6   2018.

7       Q.    Somewhere in there.

8       A.    I can't remember -- oh, wait.  Wait.

9   There was one more roommate also during that time

10  because Roo had subletter for a summer.  His name is

11  Alejandro, and I forget his last name.

12      Q.    Describe for me your level of education

13  and where -- what school you've attended?

14      A.    I have a bachelor's degree in

15  international studies.  I went to the U of O.  And

16  before that I went to high school at Fairview High

17  School and graduated with a normal high school

18  diploma.  And I went to middle school and elementary

19  school and preschool.

20      Q.    Do you have any professional

21  certifications?

22      A.    First aid and CPR.  I don't have like a

23  master's degree or anything.

24      Q.    Okay.  Other than this case have you ever

25  been arrested?
```

EXHIBIT 11 - PAGE 12

1    A.    Yes.

2    Q.    Okay.  And list for me all the arrests.

3    A.    I was arrested in 2013, I believe, for a

4  trespassing situation with regard to -- or related

5  to a forest fence, also an activist arrest.  And

6  that was in Salem, in Marion County.  And I was

7  arrested -- I wasn't -- when I was 17, I got a DUI

8  which I really regret -- and I don't think I was

9  really arrested.  They took me to the police station

10  and they called my parents.  There were handcuffs

11  involved but they took them off when my mom arrived.

12  Yeah.

13    Q.    All right.  And so for this 2013 arrest

14  did you end up being charged with a crime?

15    A.    Yes.  I was charged with like, I think,

16  three crimes to begin with.  It was trespassing and

17  disorderly conduct and maybe some other misdemeanor

18  that I can't remember, and then I was only convicted

19  of trespassing, I believe.  That is my understanding

20  of that situation.

21    Q.    And was that a conviction following a jury

22  trial or did you plead guilty to that offense?

23    A.    It was a plea deal, yeah.

24    Q.    And was this for occupation of a portion

25  of the Oregon legislature or the governor's office?

EXHIBIT 11 - PAGE 13

1    A.    No.   It was for rappelling off the

2  building at the Oregon State Capitol.

3    Q.    Okay.   Describe for me kind of your

4  employment history.

5    A.    Let's see.   I have worked in restaurants

6  in high school and college.   And then after college

7  I started doing trail crew with Northwest Youth

8  Corps.   I also got a job at the City of Eugene's

9  recreation program, the Riverhouse, so I worked

10 doing like recreational tree climbing and nature

11 education and outdoor education with them for like a

12 few years.   I can't remember how many years.

13        And then I got a job at Station 7, which

14 is the youth homeless shelter in Eugene.   And then

15 from Station 7, I found out about wilderness therapy

16 which is where you can live outside with youth who

17 are having a really rough time in their life.   And I

18 was like that's really cool, so I left, did that for

19 two years, then came back, worked for the CLDC with

20 these fine folks, and then transitioned to working

21 at White Bird.

22    Q.    Okay.   And how long have you worked for

23 White Bird?

24    A.    I have worked with White Bird since pretty

25 much I think when I moved into my house, so about

EXHIBIT 11 - PAGE 14

Erin Grady

14

1   two years, yeah.

2       Q.    And do you have a -- what's your job

3   title?

4       A.    I work -- I'm a crisis worker.  I work for

5   the crisis department at White Bird as a crisis

6   worker, which is the crisis line and walk-in crisis

7   center.  And I also work for the HOOTS program,

8   which is Helping Out Our Teens in Schools, which is

9   the high school program.  It's the newest White Bird

10  program.  It's been going on for about three years.

11      Q.    And approximately how many hours do you

12  work?

13      A.    I work 40 to 60 hours a week depending on

14  what is going on and how many shifts need to be

15  covered.  And I don't often work 60 hours a week, so

16  just so you know, I'm not -- it just happened

17  before.

18      Q.    Have you ever made a claim against an

19  employer?

20      A.    No.

21      Q.    Okay.  And other than this litigation have

22  you ever been a plaintiff in a lawsuit against

23  anyone?

24      A.    No.

25      Q.    I understand that you have been involved

EXHIBIT 11 - PAGE 15

Erin Grady

15

1   in an auto accident recently?

2       A.    Yeah.   I got in a car accident on December

3   26th up on McKenzie Pass in the snow.   And I was not

4   driving.   Me and my friends were hit by a vehicle

5   who lost control of their vehicle on the pass on

6   ice.   And we have lawyers.

7            The lawsuit has not begun yet because we

8   probably -- we are like -- they say that we can't

9   start the lawsuit until after we're done seeking

10  treatment for our injuries, so probably there will

11  be a lawsuit at some point in the future.

12      Q.    Okay.   Do you remember who your attorney

13  is in that case or that potential case?

14      A.    It's like Berkshire and -- I don't know.

15  I can look in my email.   It's this guy named Mark

16  who lives in Portland, who is a personal injury

17  lawyer who we were recommended.

18      Q.    And just in general terms, can you

19  describe sort of the type of treatment that you're

20  receiving as result of that accident?

21      A.    Yeah.   Well, I kind of stopped doing

22  treatment at the beginning of the summer because my

23  personal injury -- my PIP ran out, but I hope to

24  start again because it seems like my health

25  insurance can cover it, but yeah.   I was working --

EXHIBIT 11 - PAGE 16

1  or I was going to Well Balance Clinic on 7th --

2  which are lovely people, highly recommend -- and

3  doing physical therapy and massage for like --

4  basically just like really intense whiplash and I

5  had a broken rib.

6      Q.    Prior to that accident had you been going

7  to physical therapy or massage?

8      A.    Off and on.  I had a car accident like

9  probably two years before that also which I got

10  pretty bad whiplash, and that I didn't treat right

11  away, which I really regretted.  But then like in

12  the years after that, I did do some physical therapy

13  because I was hurting a lot and my neck was hurting

14  and still hurts.

15     Q.    And I'll cut to the chase.  Really what

16  I'm interested in is as a result of kind of your

17  arrest in this case, did you require any medical

18  treatment?

19     A.    No.  I mean, I don't know -- I don't -- I

20  have ongoing, like, pain in my neck and back from

21  car accidents and it is, as my physical therapist's

22  have taught me, it is oftentimes accelerated by

23  stress.

24          So I -- yeah, like I did -- I don't think

25  last summer I was seeking -- or the summer in

EXHIBIT 11 - PAGE 17

1  question, summer 2020, I was not seeking physical

2  therapy.  Probably should have been.  I was just

3  really busy and stressed out, but I don't think I

4  started getting physical therapy again until my car

5  accident -- my second car accident.

6         But in general, yeah, like I have a lot of

7  pain and I get more pain when stressful things

8  happen to me, and this was a stressful thing that

9  happened to me.  I did not go to the doctor though.

10 I was too stressed out to go to the doctor.

11    Q.    And without telling me anything that your

12 lawyers have talked to you about, is that a category

13 of damages though that you're seeking in this case?

14    A.    No.

15         Right?

16              MS. DUGAN:  It's not in the claim, no.

17              MR. MILLER:  Okay.  I've just --

18              MS. DUGAN:  Sorry.  I don't mean to --

19              MR. MILLER:  -- got to make sure.

20              MS. DUGAN:  I know.  I understand.

21              THE REPORTER:  Ms. Regan is trying to

22 join.  Can we go off the record?

23              MR. MILLER:  Yeah.

24              (Brief recess.)

25 BY MR. MILLER:

EXHIBIT 11 - PAGE 18

Erin Grady

1    Q.    Have you ever been a defendant in a

2  lawsuit or ever been sued by somebody else?

3    A.    No.

4    Q.    When did you first decide to sue in this

5  case?

6    A.    That is -- the timeline is a little hard

7  for me to remember but I think probably within a

8  couple months of this particular night was contacted

9  by the CLDC was made aware that a lawsuit was being

10  put together and expressed my interest and then

11  jumped on board.  I don't remember exactly what

12  month that happened.

13    Q.    Okay.  And without telling me anything you

14  discussed, do you know when you first contacted an

15  attorney for the CLDC?

16    A.    I do not remember when we first talked

17  about this case.

18    Q.    Okay.  What is your current phone number?

19    A.    303/905-8601.

20    Q.    And do you have any other phone numbers?

21    A.    No.

22    Q.    And I'm assuming that's a mobile phone?

23    A.    Yes.

24    Q.    And who is your mobile phone provider?

25    A.    Version.

EXHIBIT 11 - PAGE 19

Erin Grady

1    Q.    And do you know the brand and model of

2  your current phone?

3    A.    It's an iPhone, and it's old and crappy.

4  I don't know what number it is.

5    Q.    Okay.  How long have you had it?

6    A.    I do not know.  A few years.

7    Q.    Is it the phone that you would have had in

8  your possession on May 31st of 2020?

9    A.    Yes.

10    Q.    All right.  And do you still have that

11  phone?

12    A.    Yes.

13    Q.    And it's functional?

14    A.    Yes.

15    Q.    Okay.  We'll go ahead and mark this

16  Exhibit 1.

17              (Deposition Exhibit 1

18               marked for identification.)

19  BY MR. MILLER:

20    Q.    So, Ms. Grady, I'm handing you what's been

21  marked as Exhibit 1, which is your response to the

22  City of Eugene's first request for production.

23          Do you see that?

24    A.    Uh-huh.

25    Q.    Is that a yes?

EXHIBIT 11 - PAGE 20

Erin Grady

```
 1        A.     Yes.

 2        Q.     Okay.  And are you at least somewhat

 3   familiar with what this document is?

 4        A.     Yes.

 5        Q.     Okay.

 6        A.     This is what you all requested of me;

 7   right?

 8        Q.     Essentially.

 9        A.     Yeah.

10        Q.     And then the responses.

11               So I wanted to ask about a couple

12   questions in here just to clarify those.  The first

13   is on the second page, and that's Request for

14   Production Number 5.

15               Do you see that?

16        A.     Uh-huh.

17        Q.     Okay.  Would you just read that to

18   yourself and the response and let me know when

19   you're done.

20        A.     Like I read the part that's not in bold?

21   Oh, response (as read):  There are no such

22   documents.

23        Q.     Yeah.  But all you've got to do is read it

24   to yourself because I'm just going to --

25        A.     Okay.
```

EXHIBIT 11 - PAGE 21

Erin Grady

21

```
1        Q.    And just let me know when you're done.

2        A.    I am done.

3        Q.    So the response to Request for Production

4   Number 5 is there's no such documents that relate to

5   your claim of noneconomic damages.  Is that still

6   the case?

7        A.    I thought we turned in a journal entry.

8              MS. DUGAN:  Uh-huh.

9   BY MR. MILLER:

10       Q.    Okay.  So there's a journal entry --

11       A.    Uh-huh.

12       Q.    -- that would relate to that; is that

13  correct?

14       A.    Yes.

15       Q.    All right.  Any other documents?

16       A.    Not -- no.  No.

17       Q.    Okay.  On -- it looks like it's page 3.

18  It's Request Number 12.  And if you'd read that to

19  yourself and then let me know when you're done.

20       A.    Uh-huh.  I am done.

21       Q.    Okay.  Is it still the case that there are

22  no such documents in response to Request Number 12?

23       A.    Yes.

24       Q.    All right.  Have you given any statements

25  to media?
```

EXHIBIT 11 - PAGE 22

Erin Grady

1      A.     About my arrest?

2      Q.     Correct.

3      A.     Gosh, it's really hard to recall.  None

4  are coming to me, but it is possible that I might

5  have talked to media during that time.  I can't

6  really remember.

7      Q.     Okay.

8      A.     I don't remember giving any statements to

9  media, but it is possible it could have happened.

10     Q.     Have you ever texted a friend about your

11 arrest?

12     A.     I probably have -- I -- there was probably

13 a little texting about my arrest but not very much.

14     Q.     And do those text messages still exist?

15     A.     No.  I pretty much clean out text messages

16 on a regular basis from my phone so that they don't

17 build up.

18     Q.     And at what -- what text messaging either

19 apps or maybe it is just text messaging, what do you

20 use to communicate primarily with your friends and

21 family?

22     A.     I use SMS and Signal.

23     Q.     Okay.  And have you conducted a search

24 through SMS to determine if you have any responsive

25 text messages?

EXHIBIT 11 - PAGE 23

1       A.      Yeah.   I did look through SMS and found

2   nothing.

3       Q.      All right.

4       A.      Like I looked through all the SMS from

5   that time.

6       Q.      And Signal, as I understand it, is sort of

7   a secure communication platform or app?

8       A.      Encrypted, yeah.

9       Q.      And are you able to look at Signal and

10  look at old messages from yourself or to yourself?

11      A.      Yes.

12      Q.      And have you done that to determine if you

13  have responsive documents?

14      A.      Yes.

15      Q.      And do you have any responsive documents?

16      A.      No.   But, I mean, like, just so you know,

17  I routinely, like, clean out all of my messages on

18  Signal, and also many of them have disappearing

19  functions themselves, so yeah, just wanted you to

20  know that.

21      Q.      Between May 31st of 2020 and the time that

22  your lawsuit was filed, did you delete text messages

23  or Signal messages about your arrest?

24      A.      Between May 2020 and the time the lawsuit

25  was filed?

EXHIBIT 11 - PAGE 24

Erin Grady

24

```
 1        Q.    Yes.

 2        A.    Yes.

 3        Q.    Approximately how many?

 4        A.    That is -- I don't know.

 5        Q.    So, for example, I know that -- it wasn't

 6   about your arrest, but there was a message that

 7   prompted you to go to the location that you did.

 8        A.    Uh-huh.

 9        Q.    Right?

10        A.    Yeah.

11        Q.    And?

12        A.    Yes.

13        Q.    And that was sent to you on the Signal

14   app; correct?

15        A.    Yes.

16        Q.    But that no longer exists?

17        A.    Exactly.

18        Q.    All right.  How about emails?  Have you

19   ever emailed anybody other than your attorneys about

20   your arrests or the lawsuit?

21        A.    That is highly doubtful.  I don't really

22   use email that much.

23        Q.    Do you have an email account?

24        A.    I do have an email account.  I have two.

25        Q.    What are they?
```

EXHIBIT 11 - PAGE 25

1    A.    One is PennyRoyale07@gmail.com, and one is

2  Penny_Royale@riseup.net.

3    Q.    And have you --

4    A.    Oh, I also have my White Bird email

5  account.

6    Q.    Have you searched your email accounts to

7  determine if you have responsive communications

8  about your arrests?

9    A.    Yes.  I did because I -- Marianne told me

10  to, yes.

11    Q.    Any other methods of communication that

12  you use?  I mean, I'm assuming you probably don't

13  write -- well, maybe you do.  Do you write letters

14  to people?

15    A.    No, not really.

16    Q.    Okay.

17    A.    I talk on the phone.  That is -- yeah.

18  That's what I do.

19    Q.    Okay.  So Request Number 14, if you would

20  read that to yourself, and the response is on the

21  next page.  Just read that to yourself and let me

22  know when you're done.

23    A.    I am done.

24    Q.    Okay.

25    A.    I'm just letting it sink in.

EXHIBIT 11 - PAGE 26

1      Q.    Yeah.

2      A.    Yeah.  Done.

3      Q.    Is your response still that there are no

4  such documents in response to RFP-14?

5      A.    Yeah -- no.

6      Q.    Are there any photographs of you that

7  you're aware of whether in your possession or

8  somebody else's from May 31st of 2020?

9      A.    Not that I know of.

10     Q.    All right.  And are there any other --

11  besides some of the video that we've turned over,

12  are there any other recordings of you on May 31,

13  2020, that you're aware of, whether they're in your

14  possession or not?

15     A.    Sorry.  Of what day?

16     Q.    So May 31, 2020 -- primarily I'm

17  interested in any other video of your arrest.  Are

18  you aware of any?

19     A.    No.

20     Q.    And the subject matter of this lawsuit not

21  only includes your arrest but it also includes a

22  challenge to the City's imposition of a curfew.

23         Do you understand that?

24     A.    Yes.

25     Q.    And the justification for whether there

EXHIBIT 11 - PAGE 27

```
 1   should have been a curfew or its terms.

 2           Do you understand that?

 3       A.    Yes.

 4       Q.    And the City's use of force by police

 5   officers in enforcing the curfew and enforcing other

 6   laws.

 7           Do you understand that?

 8       A.    Yes.

 9       Q.    All right.  So that's all part of the

10   subject matter of the lawsuit.

11           Do you understand that?

12       A.    Yes.

13       Q.    So my question is:  Do you in your

14   possession have other video or photographs of

15   officers interacting with protesters or citizens

16   from May 29th, May 30, or May 31st of 2020?

17       A.    No.  No.  I mean, yeah.  I was not out on

18   the streets for very long, and I don't take a lot of

19   like photo or video on my phone when I do that.

20       Q.    Were you out on the streets on May 29th,

21   2020?

22       A.    Early in the night, yes.

23       Q.    Okay.  We'll get to that.

24           Were you out on the streets on May 30th of

25   2020?
```

EXHIBIT 11 - PAGE 28

Erin Grady

```
 1        A.    No.

 2        Q.    So next page, RFP-15, if you would read

 3   that to yourself and let me know when you're done.

 4        A.    I'm done.

 5        Q.    Okay.  And it indicates there are no such

 6   documents, but earlier you said there was a journal

 7   entry; correct?

 8        A.    Uh-huh, yes.

 9        Q.    Okay.  Besides that journal entry, are

10   there any other responsive documents to RFP-15?

11        A.    No.

12        Q.    All right.  We'll mark this as Exhibit 2.

13              (Deposition Exhibit 2

14                marked for identification.)

15   BY MR. MILLER:

16        Q.    I've handed you what's been marked as

17   Exhibit 2.  Do you recognize that document?  It's on

18   both sides of the paper.

19        A.    Yes.

20        Q.    Is that the journal entry that you just

21   referenced?

22        A.    Yes.  And I've just got to say very

23   embarrassing to turn in my journal to the City of

24   Eugene, so just want to name that.

25        Q.    So I want to direct your attention to the
```

EXHIBIT 11 - PAGE 29

```
 1   first page of it, and the paragraph that begins -- I

 2   think it's "@jailsupport."

 3           Do you see that?

 4       A.   Begins?  Oh, that's actually not an "at."

 5   That is a spiral doodle.

 6       Q.   Okay.  So it begins with "Jail Support."

 7   Do you see that?

 8       A.   Yeah.

 9       Q.   All right.  Would you just read that

10   paragraph into the record out loud for us?

11       A.   Oh, my God.  This is so embarrassing.

12   Okay.  Yeah.

13           (As read):  Jail Support on Sunday.

14       Queers, all black clothes and femme and a

15       little butch and pink duct tape.  Everyone

16       in the back of my truck being -- I'm so

17       embarrassed -- being bad ass bitches,

18       meeting the protest downtown head-on and

19       everyone cheers.  Many jokes.  Much

20       laughing.

21       Q.   When you refer to meeting the protest

22   downtown head-on, what did that mean?

23       A.   It meant like -- okay.  So that -- this

24   was just a really -- basically what I do in my

25   journal when things are really stressful is just
```

EXHIBIT 11 - PAGE 30

1    write down beautiful moments so that I can remember

2    them so I can feel good when life is hard.  So this

3    was just a special moment of that day.

4           We had been over at Alton Baker Park and

5    pretty much the protests -- like a huge group of

6    people had left Alton Baker Park to start marching

7    around downtown.  And I had Jail Support with me.

8           And I was driving my truck and they were

9    all in the back of the truck, which is just really

10   fun, like, when all of your friends are in the back

11   of your truck.  And a bunch of people were in the

12   front of my truck too wearing seatbelts.  All the

13   seats were full with seat belts.

14          And so we drove from Alton Baker Park back

15   to the protest.  And then there was just this really

16   cool moment where we were driving down, like, Oak

17   Street or something -- one of the downtown

18   streets -- and the whole protest was walking towards

19   us.  And then we pulled over, like, kind of to a

20   parking spot.  And then we all got out, and we all

21   had radios, and we all had Jail Support numbers on,

22   and everybody was really excited to see us.  And

23   there was just a big like, "Yay!"

24          And then they were happy and we were

25   happy.  And it was just a really sweet moment of

EXHIBIT 11 - PAGE 31

1   camaraderie and friendship and just like -- you

2   know, I wrote about it in my journal because it was

3   really special.  And we were all laughing and we all

4   felt really good and happy and strong.

5        Q.    Okay.  The paragraph below that references

6   someone named Arlo; is that correct?

7        A.    Yeah.

8        Q.    Who is Arlo?

9        A.    Arlo is my friend.  We do Jail Support

10  together, and they -- they were, like, the main

11  person that I -- well, they're the person that I

12  called from jail when I finally got a phone, which I

13  didn't get for a really long time, and they were the

14  main one who was kind of, like, coordinating my

15  release from jail.

16            Well, actually, I mean, jail just let me

17  out so they didn't really actually end up needing to

18  do much coordinating but they were standing by to

19  coordinate.

20       Q.    And is -- do you know Arlo's full name?

21       A.    Arlo Silver, I believe.

22       Q.    And is that somebody that lives in the

23  Eugene area?

24       A.    Uh-huh.

25       Q.    Is that a yes?

EXHIBIT 11 - PAGE 32

Erin Grady

32

```
 1       A.    Yes.

 2       Q.    Okay.  On the second page of Exhibit 2 is

 3  a reference to Dandy.

 4       A.    Uh-huh.

 5       Q.    Who is Dandy?

 6       A.    Dandy's my friend.

 7       Q.    And does -- what's Dandy's last name?

 8       A.    Colehour (phonetic) --

 9       Q.    And is --

10       A.    Their first name is Elise actually.  Dandy

11  is more of a nickname.

12       Q.    All right.  So Elise Colehour?

13       A.    Uh-huh.

14       Q.    And are they in the Eugene area?

15       A.    Uh-huh.

16       Q.    Is that a yes?

17       A.    Yes.

18       Q.    And there's a reference below that to

19  Cassidy?

20       A.    Cassidy is Dandy's three year-old.

21       Q.    Okay.

22       A.    He also lives in the Eugene area.

23       Q.    And below that, there's a reference to

24  Lucas.  Do you see that?

25       A.    Yes.
```

EXHIBIT 11 - PAGE 33

1     Q.    Who is Lucas?

2     A.    Lucas is my friend.

3     Q.    And what is Lucas's last name?

4     A.    Nebert (phonetic).

5     Q.    And for Arlo, Dandy, and Lucas, do you

6 have contact information for all these individuals

7 in your phone?

8     A.    I have contact information for all of

9 them.

10     Q.    Okay.  And I should have mentioned this at

11 the beginning.  It's not an interrogation.  If you

12 want to take a break at any point to get water or

13 stretch, you can just let me know.

14     A.    Okay.

15     Q.    Let's look at Request for Production

16 Number 25.  Just read that to yourself with the

17 response and let me know when you're done.

18            (Pause.)

19     A.    Okay.  I am done.

20     Q.    All right.  So the first question is:  Do

21 you maintain any accounts on any social media sites?

22     A.    Yeah.  I have a Facebook and I have an

23 Instagram.

24     Q.    And on either your Facebook or your

25 Instagram, have you made any posts about your

EXHIBIT 11 - PAGE 34

1    arrest?

2        A.    No.

3        Q.    All right.  Have you made any posts about

4    the impact of your arrest?

5        A.    No.

6        Q.    Have you made any posts about the protests

7    that occurred May 29 through June 1st, 2020, on

8    either of those accounts?

9        A.    No.

10       Q.    All right.

11       A.    I don't really post on either of them at

12   all, just so you know, like it's not that I just

13   didn't post about this.  I pretty much don't post

14   about anything.

15       Q.    That's fine.

16       A.    Okay.

17             MR. MILLER:  Let's mark this as

18   Exhibit 3.

19                  (Deposition Exhibit 3

20                   marked for identification.)

21   BY MR. MILLER:

22       Q.    All right.  Ms. Grady, we've handed you

23   what's been marked as Exhibit 3.

24             Do you generally recognize this document?

25       A.    Yes, generally.

Eric Grady

35

```
1       Q.    Okay.  And these were the first series of

2   written questions that the City posed to you and to

3   your attorney in -- I think it was back in the

4   winter if that rings a bell.

5       A.    Yeah.

6       Q.    Okay.  And I noticed that for whatever

7   reason you didn't sign these ones under oath.

8             Have you looked at these or would you mind

9   looking at this because I'll ask you later to affirm

10  that the answers are true and correct.  So take the

11  time you want to look through it and let me know

12  when you can --

13      A.    Okay.

14      Q.    -- whether they're true and correct or if

15  they need to be changed or supplemented.

16                  (Pause.)

17      A.    Okay.  Yep.  All of that is true.

18      Q.    Okay.  So just so we have a clear record,

19  Plaintiff Grady's Response to Interrogatories,

20  Exhibit 3, you reviewed those, and the answers to

21  those are true and correct?

22      A.    Yes.

23      Q.    All right.  Interrogatory 2, I just asked

24  you to state, you know, what you're seeking in terms

25  of noneconomic damages, and your attorney had some
```

EXHIBIT 11 - PAGE 36

Britt Grady

36

1  objections, but in your own words, can you describe

2  for me what it is you're seeking in noneconomic

3  damages?

4      A.    Like dollar amount-wise?

5      Q.    Either -- however you would articulate it.

6  So if it's a dollar amount, that's one thing.  If

7  it's for certain types of categories, that's okay.

8      A.    I mean, I think the main thing that --

9  like I think some amount of money would be warranted

10 considering the illegality and stress of the arrest,

11 but also the main thing that I personally am seeking

12 is kind of like accountability from the City of

13 Eugene for an outrageous display of force and very

14 unnecessary arrest on my part.

15         And if there is a dollar amount of money

16 that comes with that, that's great.  That's not why

17 I'm here.  I'm here to use the legal process to push

18 back on policing that felt out of control.  And I

19 would like to see, like, if there was -- I think

20 what I'm more interested in would be kind of limits

21 on things like curfews for protests, limits on

22 things like riot cop deployment for protesting and

23 things like that.

24     Q.    Okay.  What legal training, if any, do you

25 have?

EXHIBIT 11 - PAGE 37

1     A.     I have no formal legal training.

2     Q.     Okay.  What informal legal training do you

3 have?

4     A.     Like, I have Know Your Rights trainings.

5 I've learned and studied my rights and the

6 constitution and -- yeah.

7     Q.     Who put on the Know Your Rights trainings?

8     A.     Sometimes lawyers from the CLDC.

9 Sometimes other friends.  I've been trained to give

10 Know Your Rights trainings through the CLDC.  Yeah.

11 I have had lots of Know Your Rights trainings from

12 lots of different people.

13     Q.     On the second page of this exhibit,

14 Interrogatory Number 4 asks you to identify persons

15 with knowledge about the facts of the case

16 essentially, and you indicated Miriam Valentine.

17 That's the only person that's listed here at least.

18            Do you see that?

19     A.     Yep.

20     Q.     And her contact information was unknown at

21 the time at least that this document was created.

22            Do you see that?

23     A.     Uh-huh, yes.

24     Q.     Okay.  It sounds like you've spoken to her

25 more recently; is that correct?

EXHIBIT 11 - PAGE 38

```
1        A.    Yes.

2        Q.    And so do you have her contact information

3   now?

4        A.    Yes.

5        Q.    What is it?

6        A.    I would need to get out my phone.

7        Q.    You can do that.

8        A.    Okay.  She's a firefighter and she's

9   currently on a fire, but I -- she will be back, you

10  know, sometime when fire season is over probably.

11  Are you ready?

12       Q.    Yeah.

13       A.    530-598-3200.

14       Q.    Okay.  Thank you.

15             We'll mark that Exhibit 5.

16                  (Deposition Exhibit 4

17                   marked for identification.)

18  BY MR. MILLER:

19       Q.    So I've handed you what's been marked as

20  Exhibit 4.  And do you recognize this document at

21  least generally?

22       A.    Yes.

23       Q.    Okay.  And on the third page, is that

24  your -- it's a conformed signature, your electronic

25  signature?
```

EXHIBIT 11 - PAGE 39

1      A.    Yes.

2      Q.    All right.  So I know that for most of

3  these your attorneys didn't want to provide any

4  evidence of your claims but I'll go through them

5  anyway.

6            So Interrogatory 6, would you read that to

7  yourself along with the response and let me know

8  when you're done.

9            (Pause.)

10     A.    Okay.  I'm done.

11     Q.    Okay.  So my question is:  What has the

12  City done to prohibit and prevent mass protests and

13  other activity protected by the First Amendment?

14     A.    Are you asking me, like, about what this

15  interrogatory answer says or about my general

16  opinion?

17     Q.    It's -- well, really what I want to know

18  is, you know, what evidence supports the specific

19  claims that you make in this case.  And it may be

20  that you don't have anything that you can

21  supplement, that you're going to rely on your

22  attorneys.  That's fine.

23            I just want to be exhaustive so I know if

24  you're thinking of something specifically, that this

25  is what the City did that I'm suing them over,

EXHIBIT 11 - PAGE 40

1   that's what I'm trying to figure out.  The facts

2   that you're suing them over.

3       A.    I feel confused about whether I should

4   answer this from my own opinion or whether, like, my

5   -- this is asking about the specifics of what my

6   lawyer has put forward.

7       Q.    Okay.

8       A.    Because I have lots of opinions about that

9   question and lots of things that bring me to the

10  table about that question, but I'm curious, like,

11  I'm just -- I want to be in line with my lawyers in

12  terms of, like, what they have put forward is the

13  actual facts of the case.

14      Q.    Okay.

15      A.    So I guess I'm confused about what you

16  want from me in that question.

17      Q.    What I want to know is you've got a claim

18  that the City has a particular practice or a policy

19  of prohibiting and preventing mass protest or First

20  Amendment activity.

21          Do you agree that you have that claim?

22      A.    Yes.

23      Q.    All right.  What facts are you aware of --

24  without talking about what your attorneys have told

25  you, what facts are you aware of that support that

EXHIBIT 11 - PAGE 41

1  claim?

2     A.    Well, I think a citywide curfew or even a

3  downtown curfew is absolutely prohibiting First

4  Amendment activity.  I think that not -- that, like,

5  sidewalks, parks, and roads are public forums and

6  that is a place where, according to First Amendment,

7  people should be able to gather and protest, and

8  they were not able to.

9         And the curfew was -- felt extremely

10  limiting and, like, repressing of First Amendment

11  activity during a very important national moment to

12  protest and show up.  And yeah, that's -- I mean,

13  that's the main obvious one.

14     Q.    Okay.  Anything else?

15     A.    Police violence when people choose to

16  show -- when people choose to demonstrate and

17  protest in a public forum is also very limiting of

18  First Amendment rights, so shooting people with

19  rubber bullets, snatching people in the streets when

20  they're not doing anything illegal, riot cops

21  shooting rubber bullets into buildings, hurting

22  people.

23         I mean, yeah, there was just a lot going

24  on that night and that entire weekend that was

25  repressing of First Amendment activities.  Violence,

EXHIBIT 11 - PAGE 42

Eric Brady

42

1  riot cops, repression, drones flying over the city,

2  helicopters, riot cops everywhere, a tank driving

3  around, nonlethal ammunitions, downtown curfew and a

4  citywide curfew.  Need I go on?

5       Q.    I mean, I do want your comprehensive

6  answer, so if you have anything else, this is the

7  time.  I mean, it sounds like what you're describing

8  are activities and events that occurred on that

9  weekend of May 29 through approximately June 1st of

10  2020; is that correct?

11      A.    Yeah.  That is what I think about that

12  weekend.  Are you asking, like, larger scale in

13  general?

14      Q.    Yes.  I mean, it's -- if -- besides what

15  occurred that weekend, is there something else in

16  your mind that you're bringing a claim on that the

17  City has done or failed to do that is -- that caused

18  you damages for lack of protest or prohibiting or

19  preventing mass protest?

20      A.    Yeah.  I mean, I think the most egregious

21  incident of that was May 30, May 31st, and June 1st,

22  and so I'm going to leave it at that.

23      Q.    Okay.  Interrogatory Number 7 below there,

24  it has allegations about failed to properly train or

25  supervise.

EXHIBIT 11 - PAGE 43

Britt Grady

43

```
1          Do you understand that you're bringing a
2   claim that the City has failed to properly train or
3   supervise its employees?
4       A.    Yes.
5       Q.    All right.  And do you personally know
6   what training Eugene Police Department employees
7   receive?
8       A.    I don't have a lot of information about
9   that, no.
10      Q.    Do you have any information about it?
11      A.    No.  I mean, I know some of the trainings
12   that they got from CAHOOTS.  Yeah.  I don't have a
13   lot of information on that.
14      Q.    Do you have any information --
15      A.    It's not very readily available.
16      Q.    Do you have any information about how the
17   City of Eugene supervises its Eugene Police
18   Department employees?
19      A.    No.  Beyond knowing there's a chief of
20   police and a hierarchy within the police structure,
21   no.
22      Q.    All right.  So Interrogatory Number 8,
23   would you just read that to yourself, the answer,
24   and let me know when you're done.
25          (Pause.)
```

EXHIBIT 11 - PAGE 44

1      A.     Okay.  Done.

2      Q.     Are you aware of a written policy that

3  allows the use of chemical or impact munitions as

4  described in Interrogatory Number 8?

5      A.     It seems like the answer to the question

6  is the work of my attorneys.  I am not aware of the

7  official policy.  I have seen the effects of the

8  policy if -- or I've seen police using chemical and

9  impact munitions out on the street on crowds, so I

10  have been on the receiving end of that policy, yeah.

11      Q.     Okay.  And for interrogatory number -- the

12  allegations within there about use of these weapons

13  or chemical impact munitions on crowds, does that

14  involve, in your mind, any events other than that

15  May 29th through June 1st time period?

16      A.     Any other events in, like, the entire

17  history of Eugene?

18      Q.     So what I'm trying to determine really is

19  when you're saying that we have -- that the City has

20  a policy of doing these things, are you thinking of

21  what occurred that weekend or are you thinking of

22  something that occurred prior to that weekend?

23      A.     I mean, the lawsuit is about that weekend.

24  It has happened before.

25      Q.     Tell me all the times you're aware of it's

EXHIBIT 11 - PAGE 45

1    happened before.

2        A.    Well, I remember when my friend Iain Van

3    Ornum got tasered for walking across the street

4    during a protest downtown.

5            I, yeah, would probably need some more

6    time to think about other times that it's happened

7    but --

8        Q.    Go ahead and take a moment.

9        A.    Yeah.  Other times are not coming for me

10   right now -- to me right now.

11       Q.    All right.  Interrogatory Number 9, would

12   you read that to yourself and let me know when

13   you're done.

14                (Pause.)

15       A.    Okay.  So the defendants are the City and

16   the police.

17       Q.    The individual police officers -- well, in

18   this case it's asking about the individual

19   defendants, so the city manager and the named police

20   officers.

21       A.    Okay.

22       Q.    All right.  Can you supplement this

23   interrogatory response with any facts specific to

24   the individually named defendants?

25       A.    So specifically the city manager --

EXHIBIT 11 - PAGE 46

1     Q.   And the -- yeah --

2     A.   -- and the particular --

3     Q.   The first page of this has -- lists them

4 out.

5     A.   Sarah Medary, William Solesbee, Samuel

6 Stotts.  I mean, again I just go back to chemical

7 weapons and curfews and arrests, like all of those

8 things are, you know, retaliation for First

9 Amendment protest activity.

10    Q.   Can you be any more specific as to the

11 individuals?

12    A.   Well, Sarah Medary put the curfew on.  The

13 -- I don't recall which police officer arrested me

14 though at this moment I feel like I should know

15 that.  My understanding is that William Solesbee

16 shot nonlethal rounds into the Campbell Club.  Yeah.

17    Q.   Okay.  And Number 10, I think we've

18 gone --

19    A.   I guess, like, the officer that arrested

20 me -- I was out on the streets trying to support

21 people who were being arrested and were the subjects

22 of retaliation by police for their desire to go out

23 into the streets and protest the unfair and violent

24 behavior of the police, and then I became a target

25 of the police's retaliation and the City's

EXHIBIT 11 - PAGE 47

Brittany Grady

1   retaliation of that protest for just being out there

2   supporting people, so all of it feels a lot like --

3   I don't know if discrimination is exactly the word

4   that I would use, but definitely retaliation and

5   definitely repression and definitely harmful

6   violence to our bodies for the thoughts and opinions

7   that we had and the way that we chose to legally

8   express them.

9       Q.    Did Sergeant Stotts or any of the

10  individual officers say anything to you to indicate

11  they were targeting you because of your viewpoints?

12      A.    Like because of my viewpoints in terms --

13  like my political beliefs?

14      Q.    Your viewpoints.  It's the word that you

15  used in the lawsuit.

16      A.    I mean, viewpoints, I guess, like my

17  viewpoint they were not allowing me to -- like I

18  have a viewpoint that people should be supported

19  when they're being arrested during protests, and I

20  was expressing to him that I wanted to do that, and

21  they were not letting me, so yeah.

22      Q.    Anything else?

23      A.    No.

24      Q.    So Interrogatory 10, if you would read

25  that to yourself and let me know when you're done.

EXHIBIT 11 - PAGE 48

```
 1              (Pause.)

 2      A.    Okay.

 3      Q.    All right.  Having looked at

 4  Interrogatory 10 and the answer, are you able to

 5  supplement this any more with any other details of

 6  anything that's come to mind, you know, while we've

 7  been discussing this?

 8      A.    I don't have anything more to say than

 9  that.

10      Q.    Okay.  You still don't remember who the

11  message was from?

12      A.    No.  Definitely not.

13      Q.    All right.  Do you know how many people

14  were on this group thread?

15      A.    No idea.

16      Q.    And it indicates that you were driving

17  around.

18              Do you see where it says that?

19      A.    Uh-huh.

20      Q.    Do you remember where you were in the city

21  when you received this message?

22      A.    I feel like we were -- I mean, it wasn't

23  very long from when we left our house to -- Miriam

24  is my next door neighbor -- when we left our houses,

25  then when we were out in the street.
```

EXHIBIT 11 - PAGE 49

1          So we were -- I mean, I remember driving

2    over by, like, 6th and 7th Street.  I remember

3    driving a little bit through downtown.  So probably

4    somewhere over in the 6th/7th downtown area.

5          Q.    Do you remember where you parked your

6    vehicle before going to approximately 12th and

7    Patterson.

8          A.    Yeah.  We were parked like really close to

9    12th and Patterson, like on 12th.  Yeah.  On 12th

10   I'm pretty sure, kind of like halfway down the

11   block.  We, like, saw that they were being arrested,

12   pulled around the block, parked.  I don't know if

13   you want me to get into the whole story right now or

14   if that's going to be a different --

15         Q.    It will be coming up so --

16         A.    Yeah.  We can wait for --

17         Q.    Okay.  All right.

18               So I think we've talked about other than

19   the body-worn camera videos that we've produced to

20   your attorney, you're not aware of any other videos

21   that depict your contact with police or arrest; is

22   that correct?

23         A.    Yeah -- no.

24         Q.    Are you aware of any other witnesses

25   besides yourself and the officers there and Miriam

EXHIBIT 11 - PAGE 50

Erin Grady

```
 1    Valentine and the people who were arrested -- other

 2    than kind of that group, are you aware of any other

 3    witnesses to your arrest or contact with the police?

 4         A.    No.

 5         Q.    Okay.  Now, you indicated that you were

 6    out early in the night on May 29th, 2020; is that

 7    correct?

 8         A.    Yes.

 9         Q.    Describe in as much detail as you can what

10    you remember about what you did on that evening.

11         A.    We gathered, started marching, you know,

12    obviously people were -- like this was a huge

13    moment, you know, people were really -- like this

14    was a national psychic break of people coming

15    together to, like, express the feelings that they

16    felt about the police and policing in their

17    communities for a long time.  It was happening in

18    every single city all across the nation.

19              But yeah, gathered in the Free Speech

20    Plaza, people were hanging around, energy was

21    definitely really intense, started walking, started

22    marching, yelled a lot.  The energy was very

23    intense.

24              And then that went on for a couple hours.

25    And then I don't know.  There was -- I don't
```

EXHIBIT 11 - PAGE 51

1   remember every detail but there was a lot of walking

2   around, there was a lot of yelling, there was a lot

3   of holding signs, people talking to each other.

4          And then, you know, it kind of started

5   to -- like around -- it was getting -- it was dark.

6   It was, you know, an hour after dark or something.

7   And we were downtown, and it kind of like stagnated,

8   wasn't much moving anymore.

9          There was a lot of people coming out of

10  bars.  There was -- I remember some really angry,

11  like, you know, kind of far-right people who were

12  really like upset that there was protesting going

13  on, and so there was a lot of, like, yelling back

14  and forth between people who were -- there was,

15  like, some conflict with some bystanders pretty

16  much, which is, like, pretty common in protesting.

17         And I -- yeah.  Around like 10:00 -- a

18  little after 10:00, I was feeling kind of bored and

19  I went home because I go to bed early, and it seemed

20  like the energy was dying and it was turning into

21  fighting and arguing with like angry Republican-type

22  people.

23     Q.    Do you know -- do you remember

24  approximately what time you initially went down to

25  the Free Speech Plaza?

EXHIBIT 11 - PAGE 52

1    A.    Probably 7:30 or 8:00.

2    Q.    Okay.  It was still daylight?

3    A.    Yeah.

4    Q.    And you were there -- it's an estimate --

5    but approximately until 10:00 or so?

6    A.    Yeah.

7    Q.    Right.  And then you left and went back to

8    your house?

9    A.    Yep.

10   Q.    And so when did you first learn that there

11   had been some significant property damage in a

12   portion of the downtown area?

13   A.    I woke up at, like, 5:00 o'clock in the

14   morning, which I often do, looked at my phone, saw,

15   you know, like, something -- I don't even remember

16   what I saw, but I saw something on my phone that

17   alerted me to the fact that something really intense

18   had happened downtown.  And opened the internet,

19   looked at news apps -- or looked at the news.  There

20   was already news about it.  I was like, whoa, I did

21   not expect that to happen.

22         And then I probably tried to fall asleep

23   again for a couple hours, and then I woke up and

24   realized my community was in crisis and went into go

25   mode trying to figure out how to support and that's

EXHIBIT 11 - PAGE 53

1    when we started Jail Support was that day.

2        Q.    While you were out on the evening of May

3    29, that Friday, did you observe anyone cause any

4    property damage?

5        A.    No.

6        Q.    All right.  And talk to me a little bit

7    about starting up Jail Support.  What does that

8    entail?

9        A.    Jail Support is a pretty like longstanding

10   activist tradition.  It's like when people are

11   engaging in protests and they're going to jail, a

12   group of people who are not going to jail, you know,

13   gather together to support them in like gathering

14   together bail money, navigating the jail system,

15   talking to their family and friends, calling their

16   work so they don't get in trouble with work, feeding

17   their pets, making sure their children have

18   childcare, like whatever it is, helping them

19   navigate the fact that their life just went into

20   crisis because they went to jail and helping them

21   move through that.

22       Q.    And what Jail Support work did you do on

23   May 30th of 2020, so that's Saturday.

24       A.    That was probably like getting all the

25   people together for -- like, finding out who wanted

Erin Grady

1 to be in Jail Support, getting a group together,

2 figuring out what we wanted to do, figuring out how

3 we were going to get money.

4          You know, we knew the big Black Lives

5 Matter protest was going to happen on Sunday, so

6 getting together, like, communications, radios.  We

7 needed to get a phone because in Jail Support you

8 need a number for people to call, so we needed to

9 get a phone, we needed to get a number.  We needed

10 to get a social media account so we could blast out

11 the number to everyone.  There was a lot of work.

12          It was just a lot of organizing.  Pretty

13 much like right at the moment that I woke up on

14 whatever that was, the 30th -- morning of the 30th.

15    Q.    And so then did you go out and observe any

16 of the either protest activity or other activity in

17 downtown Eugene on May 30th of 2020?

18    A.    May 30th I stayed home.  I was feeling

19 really exhausted, and so -- and probably Jail

20 Support wasn't even up and running fully by May 30.

21 Like I think my memory is that we were still getting

22 stuff together on May 30th, and by May 31st Jail

23 Support was, like, full up and running, which yeah.

24 I've got to say pretty cool of me to get that all

25 together in, like, less than 48 hours.

EXHIBIT 11 - PAGE 55

Erin Grady

55

1    Q.    Were you aware that a curfew had been
2    placed on downtown for Saturday, May 30th, of 2020?
3    A.    Yes.  I was aware of that.
4    Q.    And when approximately did you become
5    aware that that was going to go into effect?
6    A.    It's really hard to know.  I mean,
7    sometime around dark probably.  I don't remember
8    exactly when I found out or when I knew, but I knew
9    that I knew people who were out there and I knew
10   that they were -- that there was, you know, a curfew
11   on and that it was dangerous to be out there.
12   Q.    Did you communicate that it was dangerous
13   to be out there to any of those people?
14   A.    I mean, people know.  I don't feel like I
15   had to.  I don't know.  I don't know the answer to
16   that question.
17   Q.    And were you aware that ultimately the
18   curfew was expanded to be citywide on Saturday, May
19   the 30th?
20   A.    I don't remember whether I knew that.  I
21   mean, I guess -- was it expanded to be citywide on
22   May 30th?  I thought that it wasn't until May 31st
23   that it was expanded to be citywide.
24   Q.    I just want your best recollection so -- I
25   don't want you to guess.  And it's okay.

EXHIBIT 11 - PAGE 56

```
1         A.    I don't know.

2         Q.    All right.

3         A.    My memory of the situation is there wasn't

4   a citywide curfew until May 31st but I guess I could

5   be wrong about my memory.

6         Q.    And when you were communicating either

7   through your Jail Support program or just

8   communicating with other folks who were out on the

9   street, how were you -- what sources were you using

10  to do that?

11        A.    Like sources about the curfew?

12        Q.    No.  I mean, you know, was it all on cell

13  phone, was it text message, was it Signal --

14  those -- what type of media?

15        A.    It was Signal.

16        Q.    Okay.  And you indicated that there had

17  been a -- that a social media something that was

18  sort of -- that was set up for the Jail Support; is

19  that correct?

20        A.    Yeah.  We have an Instagram.

21        Q.    Okay.  And so there was -- there is or was

22  a specific Instagram for that Jail Support

23  information; is that correct?

24        A.    Yeah.  There was a specific Instagram for

25  Jail Support information.  We were not like a
```

EXHIBIT 11 - PAGE 57

1    specific Instagram that was putting out like curfew

2    information or anything like that, but yes, we were

3    putting out information about our general, like,

4    services like how we can support people.

5         Q.    Does that still exist, to your knowledge?

6         A.    Yeah.

7         Q.    Okay.  And do you know -- I don't know if

8    it's a handle or an @ -- do you know what it's --

9         A.    I think it's EugeneJailSupport -- like

10   @EugeneJailSupport.  I don't remember exactly.  And

11   I deleted Instagram from my phone, but I can look it

12   up for you.  I'm pretty sure it's EugeneJailSupport.

13        Q.    And who was the -- I don't know if it's an

14   owner or a moderator.  Was there a person who

15   created that or was responsible for that?

16        A.    We shared it.  I don't -- I've been

17   part -- I've been in charge of it sometimes.

18        Q.    Okay.  So you had the capability of

19   posting on it.  You had those permissions.  Is that

20   accurate?

21        A.    Yes.  But sometimes yes, sometimes no, and

22   I don't remember exactly when I had it.

23              MR. MILLER:  All right.  Are we still

24   good?  Do you want to take a break or --

25              MS. DUGAN:  I'm good.  Are you good?

EXHIBIT 11 - PAGE 58

1          THE WITNESS:  I'll take some water.

2          (Recess: 11:12 to 11:19 a.m.)

3    BY MR. MILLER:

4      Q.    So big picture, I kind of want to have you

5    walk me through what happened on May 31st of 2020,

6    just starting with -- I mean, your role kind of

7    outside and the events and attending the march and

8    those activities that day leading up to -- and then

9    we'll get into the detail of your arrest.

10     A.    Yeah.  I, you know, woke up, went to -- I

11   don't really remember what happened in the morning.

12   Went to the Black Lives Matter march.  I'm trying to

13   remember.

14          I mean, like I participated in the march

15   but also we were -- like I didn't walk over the

16   bridge.  I drove to Alton Baker Park.  And then we,

17   yeah, were just generally doing Jail Support stuff,

18   like we were passing out the number.  We were

19   talking to people.  We were letting people -- we

20   had, like, flyers to give out.

21          We knew that -- yeah.  We were just like

22   doing outreach about what we were doing pretty much.

23   It didn't seem -- like people weren't getting

24   arrested at that point, so it seemed pretty okay.

25          And then -- yeah, spent time at Alton

EXHIBIT 11 - PAGE 59

1  Baker Park, listened to speeches, you know,

2  whatever, just took in the scene.

3          Then people left Alton Baker Park and

4  continued to protest, so then we -- as I've stated

5  before, like in the journal entry, we went over and

6  met them -- met the protest.  Continued to march

7  with people, protest with people, outreach with

8  people.  Definitely things were, like, starting to

9  get more tense, it seemed like, like there was way

10 more, like, right-wing agitator people showing up.

11         There was -- there was, like, incidents

12 with guns, from not protesters, like incidents with

13 guns from kind of -- I don't know what to call those

14 people to you guys, like, the -- let's just call

15 them Trump supporters for purpose of this -- like

16 Trump supporter people who were really angry about

17 it were coming to, like, start problems.  People

18 were working on de-escalating them.

19         I personally didn't do any of that work

20 because I think that's really scary.  And yeah,

21 like, the energy was definitely getting more, like,

22 angry, you know, like people were -- people were

23 upset in the streets, there was like -- there was

24 valid and righteous anger towards the things that

25 people were protesting about.

EXHIBIT 11 - PAGE 60

Erin Grady

60

```
1            And we had all this news coming in from
2   all these other cities, like, yeah, people had a lot
3   of passion and a lot of energy to burn and a lot
4   of -- yeah, a lot of righteous anger.
5            There was also a lot of things being
6   brought up from the past of Eugene Police
7   Department.  Like the people were starting to talk
8   about Charlie Landeros, people were starting to talk
9   about Stacy Kenny, people were starting to talk
10  about Eliborio Rodriguez.  People were starting to
11  talk about all the deaths that EPD and SPD have
12  caused.  So that was really, like, firing people up,
13  I think.
14           And I don't mean that in, like, a bad or
15  manipulative way.  I mean, people are fricking sad
16  about those things.  They're sad and they should be
17  sad and they're angry.  And so, yeah.  There was a
18  lot of like -- like I noticed that, like, the street
19  kids were getting involved, like they also were
20  impacted by police harassment and police violence,
21  like the kids at the LTD bus station were there.
22           You know, like people were -- people were
23  showing up because they feel impacted by the way
24  that Eugene Police Department treats them, and they
25  should because it's oftentimes really, really messed
```

EXHIBIT 11 - PAGE 61

Erin Grady

61

```
 1   up here.

 2            So yeah.  So like that was happening.  At

 3   some point I took a break and went and sat in a

 4   friend's yard for a while.  Then came back out to

 5   the streets.  Then I remember -- I remember very

 6   vividly like in the late afternoon, like, early

 7   evening kind of like EPD started to, like, take over

 8   the city.  Like I remember I was downtown.  There

 9   was lots of like -- the big vehicles with riot cops

10   on them were starting to drive into downtown.

11            The protest at that point -- maybe people

12   were still marching.  I don't know.  I had stopped

13   marching at that point.  I can't really remember

14   whether people were still marching but it was like

15   there was vehicles of riot cops coming in.  There

16   was helicopters.

17            There was -- I remember I was downtown and

18   I saw Emily Semple.  She, like, was downtown walking

19   around.  She had, like, her head in her hands.  She

20   was like what is going on, like, it was -- you know,

21   it was a scene out there.  It was very clear that,

22   like, the police were taking over the town.

23            And so I went up to Skinner's Butte and

24   watched it happen.  And I watched -- oh, we could

25   hear sirens.  There was like sirens everywhere.  It
```

EXHIBIT 11 - PAGE 62

1  was just -- it was a scary feeling.  So I went up to

2  Skinner's Butte and watched it all go down.  And

3  there was police lights.  There was red and blues.

4  There was drones flying around.  There was

5  helicopters.  There was like a huge ruckus.

6          Just, like, watched the city get, you

7  know -- for -- this is kind of an extreme word to

8  use, but like occupied pretty much.  And then spent

9  the whole time up there, just like watched the

10  sunset and watched nightfall and watched the lights

11  take over, and then went down to my house, and then

12  kind of like realized I probably need to go out onto

13  the streets.

14          And then me and Miriam decided to get

15  ready and go.  And then we left the house in my

16  truck.  And do you want me to continue?

17      Q.    However much detail -- I mean, I'll follow

18  up and go through it all so --

19      A.    Okay.  So let's see.  Me and Miriam took

20  off.  We probably ate dinner before.  It must have

21  been -- because I -- my understanding is that I was

22  arrested like a little bit after 11:00 o'clock.  So

23  we must have gone out at, you know, like 10:15 or

24  something like that maybe -- maybe even later.

25          I remember being actually, like, kind of

EXHIBIT 11 - PAGE 63

1  embarrassed about how short of time I lasted out on

2  the streets before I got arrested.  It was like not

3  very much time at all but -- so yeah.

4         We got in the car, started driving around.

5  There was -- it was pretty unclear to me what was

6  going on, like I didn't know about what was

7  happening downtown with the people who, to my

8  understanding, were peacefully protesting and had

9  their arms up and were, like, kneeling and sitting

10  on the ground and getting pretty, like, pummeled

11  like by riot cops.

12         I didn't know that that was happening,

13  probably would have gone there if I had known, but I

14  didn't.  So we were driving around, but then we got

15  a text that was, like, people are getting arrested

16  on 12th and Patterson.

17         And so we went to 12th and Patterson.  It

18  was all pretty simple.  We parked.  We got out of

19  the car.  We walked across the street.  You were

20  there apparently but I -- you had a lot of gear on,

21  so I didn't know it was you.

22         And there was -- my memory is like there

23  is a bunch of riot cops, like a lot of them, and

24  then a small group of people being arrested.  And

25  then an arrest van and some other police cars.

EXHIBIT 11 - PAGE 64

1          And that they were already in the process

2   of getting arrested when we showed up.  And then we

3   showed up and some cops who I don't know who they

4   were, probably one of them was Samuel Stotts.  And

5   they came up to us.  You couldn't even see their

6   faces.  Like I was feeling guilty that I didn't know

7   who arrested me, but like you could not tell who

8   these people were, like, they were in, like, full

9   face mask, like, combat gear, like, they did not

10  look like people that I could relate to.

11          And -- at least that's my memory.  If

12  that's wrong, I'm sorry.  And so then they were

13  like, "Hey, you all can't be here."

14          We were like, "We want to find out those

15  peoples' names.  We're here with Jail Support."

16          And they were like, "No.  You can't talk

17  to them.  You can't come near them.  You can't come

18  close."

19          And we -- we pushed back, like we were

20  being assertive.  We said, like -- we were not

21  saying like -- we were not cursing them out or being

22  mean to them, but we were being assertive and trying

23  to like push our boundaries and like push -- like,

24  hold the line that hopefully we could talk to these

25  folks.

EXHIBIT 11 - PAGE 65

1          And we saw a group of maybe like three or

2    four people getting arrested, and we were trying to

3    call to them.  And we're trying to say, "What's your

4    name?"

5          We were trying to explain to the police

6    officers that they have family members, that they

7    have people who are going to be worried about them,

8    that we want to find out their name, their phone

9    number, so we can try to, like, help them deal with

10   the fact that they're being arrested.

11          And then the cops were pretty much, like,

12   hard no, like, "No.  You cannot be here.  You need

13   to leave."

14          Nobody warned us that we were breaking a

15   curfew and we were on a public sidewalk.  Oh, there

16   was also this other weird thing that was happening.

17   There was like someone who worked at the hospital

18   there, like, a PeaceHealth guy and he -- or maybe it

19   wasn't PeaceHealth, but there was like somebody who

20   worked at the hospital who was yelling at me in my

21   side ear while the police were also there.

22          And he kept saying, "You can't be here.

23   This is a private sidewalk."

24          And I just looked at him and I said, "I

25   don't think there are private sidewalks."

EXHIBIT 11 - PAGE 66

Erin Grady

66

1              And he said, "This is our sidewalk.  This
2    is my sidewalk.  This sidewalk belongs to the
3    police."  That's what I remember.
4              And I just didn't believe him because I
5    don't think sidewalks belong to hospitals.  And so
6    then they kind of told us we really needed to get
7    out of there.
8              And so we chose to leave, but, like, it
9    sucked to me that we were leaving and we didn't want
10   to leave and, you know, whatever, felt kicked out of
11   a place that we feel like we were totally allowed to
12   be.
13             And then Miriam turned around and yelled,
14   "What's your name?" as one last chance to get them
15   and also probably just like an act of resistance
16   that we were getting kicked off of a public
17   sidewalk.
18             And then she looked back and yelled that,
19   and then we kind of looked at each other.  And then
20   we saw that they -- the two cops were running
21   towards us.  And so then we, like, turned around to
22   start walking diligently to our cars, like, very
23   much showing that we were walking to our car, and
24   then they grabbed us.  And I just remember being
25   like, why are we being arrested, like, this is -- I

EXHIBIT 11 - PAGE 67

Erin Grady

67

```
 1  just, like, knew right away that it was so stupid
 2  and that we should not be getting arrested.
 3          And so I'm pretty sure -- Miriam was
 4  saying, "Why are we being detained?  Why are we
 5  being detained?"
 6          And I'm like, "Miriam, we're past
 7  detained.  We're arrested, like, we're in
 8  handcuffs," like -- but I was just like why, why,
 9  why, why.
10          Nobody ever told us about the curfew that
11  I remember.  We didn't know that we were violating
12  curfew by being there.  And then maybe after we got
13  arrested, someone told us about the curfew, but I
14  don't remember.
15          And then we were put in the paddy wagon
16  and then we started talking to those people, then we
17  went to jail.  I got a COVID test.  And then they
18  treated me really mean in jail, but we can get into
19  that later.
20     Q.    All right.  Thank you for that narrative.
21  That's helpful.  That kind of short-circuits having
22  to piece it out, so I really do appreciate that.
23     A.    Uh-huh.
24     Q.    So are you aware that there's body-worn
25  camera footage that shows what happened for your
```

EXHIBIT 11 - PAGE 68

Erin Grady

1  arrest and contact?

2      A.    Yeah.  And if I'm wrong about that stuff,

3  I apologize.  That's what I remember.  And totally

4  know that I'm -- that we were being filmed the

5  entire time so --

6      Q.    And have you ever seen those films?

7      A.    No.

8      Q.    Okay.  We'll play it a little bit later.

9      A.    Okay.

10     Q.    So I want to start with you participating

11 in or at least observing some of the marching that

12 was going on through downtown that you described.

13     A.    Uh-huh.

14     Q.    Do you remember talking about that?

15     A.    Uh-huh.

16     Q.    Yes?

17     A.    Yes.

18     Q.    And at that point -- I mean, people were

19 physically in the streets, blocking traffic,

20 marching in a group in various directions.  Is that

21 an accurate description?

22     A.    Yes.

23     Q.    Okay.  And at that point in time -- I

24 mean, were -- did you observe officers doing traffic

25 control around them?

EXHIBIT 11 - PAGE 69

1       A.      Yes.

2       Q.      Okay.  And did you observe officers going

3   in there and making arrests?

4       A.      No.

5       Q.      And did you observe officers going in and

6   using force against those people even though they

7   were occupying the street?

8       A.      No.

9       Q.      Okay.  So when is the first time that you

10  personally observed a police officer make an arrest

11  on May 31st of 2020?

12      A.      At 12th and Patterson.

13      Q.      Okay.  And when is the first time that you

14  personally observed a police officer utilize any

15  level of force on a person on May 31st of 2020?

16      A.      I did not -- I mean, other than arrests, I

17  didn't -- which I believe is a use of force -- I did

18  not observe, but also like I was -- I was not

19  downtown, like, there was obviously extreme use of

20  force going on.

21          So I'm allowed to speak about things that

22  I didn't see if you're asking me these questions

23  about larger scale, City of Eugene and police stuff,

24  but no, I didn't see -- other than the arrests, I

25  didn't see uses of forces happen.

EXHIBIT 11 - PAGE 70

1    Q.    Okay.  And that's what I'm interested in

2  is I'm trying to determine things that you learned

3  versus things what you personally saw.

4    A.    Yeah.  Which is like kind of why some of

5  these questions earlier were a little bit hard for

6  me to answer because they're sort of other peoples'

7  stories.  My story didn't include use of force stuff

8  other than arrest, but yeah.

9    Q.    Okay.  So when you earlier testified that

10  you went up to Skinner's Butte Park, and you were

11  there sort of as night was coming down, and you

12  could observe flashing lights and activity downtown,

13  could you -- from that vantage point -- I'm assuming

14  you didn't have binoculars or a spotting scope;

15  correct?

16    A.    No.

17    Q.    So could you tell what was occurring?

18    A.    I could tell that something that I've

19  never seen happen in Eugene before was happening.  I

20  could tell that the police were taking over the city

21  in a way that I've never seen happen in 15 years and

22  I could tell that like anyone out on the streets was

23  going to be in a lot of danger.

24    Q.    Okay.

25    A.    And I could not see individual people.

EXHIBIT 11 - PAGE 71

1    You've been to the top of Skinner's Butte.  You know

2    you can't see individual people.  So no, I couldn't

3    see, like, particular interactions between police

4    and protesters.  I could just see that, like, a

5    really big, bad, and scary and dangerous thing was

6    happening.

7        Q.    Okay.  Now, were you -- while you were up

8    there, were you getting communications through any

9    medium describing what was occurring on the ground?

10       A.    Probably, but I -- you know, there was

11   just a lot of pinball texting going around, and I

12   don't -- if you're going to ask me about the

13   specifics of those, just spoiler alert, I don't

14   remember a lot.

15       Q.    Okay.  How about were you watching any

16   live streams of events that were occurring?

17       A.    No.  I don't do that.  I don't have a

18   Twitter.  I don't watch live streams.  I just --

19   that's too techy for me.

20       Q.    Okay.

21       A.    But I knew -- like, in a way that is

22   nonspecific I knew people were in trouble.  And I

23   know that's not like an extremely specific thing to

24   say in a lawsuit, but there was enough texting going

25   on and I was -- like, could see over the city.  I

EXHIBIT 11 - PAGE 72

1    could see that, like, people were in trouble.  We

2    were in trouble.

3        Q.    Okay.

4        A.    And by in trouble, I do not mean we -- I

5    think we were doing something wrong.  I meant that,

6    like, we were going to be receiving repression and

7    violence that night.

8        Q.    But you also couldn't tell what protesters

9    were doing either.

10       A.    Yeah.  Yeah.  I couldn't tell what the

11   protesters were doing.

12       Q.    On May 31st --

13       A.    But okay.  Wait.  Let me just say

14   something about that.  I feel like I knew that the

15   protesting was going to be peaceful and non-property

16   destruction that night because it had been the night

17   before and because people were, like, really

18   overwhelmed from the amount of policing that was

19   happening to them.

20           So, like I -- I wasn't feeling like a riot

21   was about to occur.  I was feeling like the police

22   were about to crack down on us in a really, really

23   intense way that I've never seen happen before --

24   that I've heard of happening before at, like,

25   Standing Rock, but that I haven't seen happen here.

EXHIBIT 11 - PAGE 73

1    Q.    When were you aware that a downtown curfew

2    would go into effect for on May 31st, 2020?

3    A.    I don't really remember, but I think --

4    what my memory says is that the downtown curfew went

5    in at 9:00 and the citywide curfew went in at 11:00.

6    So we must have known about the downtown curfew

7    sometime after 9:00.

8         And my other memory is that these things

9    were getting posted on EPD's Facebook like as they

10    were happening, like, the decisions were being made

11    super fast and then they were posting on Facebook

12    and then people were just supposed to know.  And

13    that seems like a very ineffective way to tell

14    everyone that there's going to be a curfew.

15    Q.    Would it be more effective to broadcast it

16    through a loudspeaker that a curfew is going into

17    effect?

18    A.    Would that be more effective?  Yes.  Do I

19    want that to happen.  Because I've experienced that

20    loudspeaker before in Portland -- it sucks.  It's,

21    like, really, really loud and disruptive and

22    terrible.  So no, I don't want that to happen.  I

23    don't want there to be any curfews at all.

24         I think a curfew is completely unnecessary

25    for protesting.  Maybe if there was like a hundred

EXHIBIT 11 - PAGE 74

1  serial killers running mad through the streets that

2  wanted to kill children, I would think we should

3  have a curfew, but I don't think protesting is

4  dangerous to the point that everyone needs to stay

5  in their homes.

6          It also seems illegal to have that kind of

7  curfew.  So do I wish that they had broadcasted it

8  in a different way?  A loudspeaker would have been

9  helpful to understand the legal parameters of what I

10  was doing.  I think police using loudspeakers and

11  LRADs is another form of protest repression, and I

12  hate those things, so no, I don't wish that.  I wish

13  there had been no curfew.

14      Q.    Okay.  And so in response to the events of

15  May 29, 2020, and everything that happened there,

16  you don't believe that any curfew of any geographic

17  restriction or size or length would have been

18  justified; is that correct?

19      A.    No.  Absolutely not.

20      Q.    All right.  Now, you drove down onto 12th.

21  You parked and then you went up and people were

22  already in the process of being arrested or

23  processed; is that correct?

24      A.    Yes.

25      Q.    All right.  And you said that you had an

EXHIBIT 11 - PAGE 75

Erin Grady

1  encounter.  We've got video of that we'll play in a

2  minute where you spoke back and forth with the

3  officer and apparently a hospital employee of some

4  sort; correct?

5      A.    That is my memory.

6      Q.    Okay.  And I'm not trying to trick you.

7  We'll play it.  I mean, it is what it is.  And then

8  you guys crossed the street -- is that correct -- to

9  go back to your vehicle?

10     A.    We -- we were in the middle, like, we were

11  crossing the street.  When Miriam yelled back, my

12  memory is we were in the middle of the street, but

13  we were, like, significantly distanced between us

14  and officers.

15     Q.    Now, when you approached them, did you

16  recognize that they were Eugene Police officers?

17     A.    Yeah.  I think.  Oh, man.  You're making

18  me really question my memory right now but --

19     Q.    And when you approached them, your purpose

20  there was as part of this Jail Support volunteer

21  group to try to make contact with the people being

22  detained or arrested; is that correct?

23     A.    Yes.

24     Q.    And you were on a public sidewalk at the

25  time that you were talking to the officers --

EXHIBIT 11 - PAGE 76

Erin Grady

1  whoever -- whoever they would have been?

2      A.    We could have been partially in the street

3  too.  I mean, I remember sort of, like, public

4  sidewalk and street.  Like, it was, like, a cluster

5  of people that maybe was bigger than the sidewalk.

6      Q.    Okay.  But I just -- you weren't seeking

7  medical care; correct?

8      A.    No.

9      Q.    And you weren't traveling to or from

10  employment; correct?

11      A.    No.

12      Q.    And you weren't sheltering in place;

13  correct?

14      A.    No.

15      Q.    And you were not making commercial

16  deliveries; correct?

17      A.    No.

18      Q.    And you weren't fleeing dangerous

19  circumstances; correct?

20      A.    No.

21      Q.    And you weren't operating --

22      A.    It seems like other people were fleeing

23  dangerous circumstances who were arrested but we

24  were not.

25      Q.    You weren't operating as a credentialed

EXHIBIT 11 - PAGE 77

1  member of the media in that capacity; correct?

2      A.    Nope.

3      Q.    Okay.  And, like I said, we'll play the

4  video.  At some point though one of the officers

5  says you need to leave, you need to get out of here

6  essentially.

7      A.    Which I don't remember happening but I'm

8  sure it did happen because I can't imagine why we

9  would have left without a very serious, like, you

10  have to leave or, you know, we'll arrest you or

11  something like that.

12      Q.    Okay.

13      A.    I just don't think I would have left if it

14  went to that.

15              MR. MILLER:  We'll go ahead and mark

16  this Exhibit -- I think we're at 5.

17              THE REPORTER:  Yes.

18              (Deposition Exhibit 5

19               marked for identification.)

20  BY MR. MILLER:

21      Q.    So I'm handing you what's marked as

22  Exhibit 5.  Do you recognize at least generally this

23  document?

24      A.    Yes.  I mean, my lawyers wrote this

25  document, not me, but --

EXHIBIT 11 - PAGE 78

Erin Grady

78

1    Q.    But you understand that it's a -- it's a

2   lawsuit that you filed --

3    A.    Yes.

4    Q.    -- in the federal court.

5    A.    Yes.

6    Q.    And you agree that it makes public

7   allegations about certain police officers and the

8   City and city employees; correct?

9    A.    Yes.

10   Q.    And you understand by filing such a

11  complaint you've invoked the powers of the federal

12  court; correct?

13   A.    Yes.

14   Q.    And you're seeking, you know, in addition

15  to other remedies, money damages and punitive

16  damages against some of the individuals.

17          Do you understand that?

18   A.    Yes.

19   Q.    And in filing such a lawsuit, invoking

20  those federal powers, you agree it's important to be

21  accurate; correct?

22   A.    Yes.

23   Q.    Okay.  And you agree that it's important

24  to make sure there's nothing erroneous within the

25  lawsuit; correct?

EXHIBIT 11 - PAGE 79

Erin Grady

79

1      A.    Sure.

2      Q.    All right.  Did you review your lawsuit

3  before it was filed?

4      A.    I have lightly reviewed the lawsuit.  I

5  have not read every word.

6      Q.    But you wouldn't -- if you knew something

7  was erroneous, you wouldn't have allowed that to be

8  filed, would you?

9      A.    No.

10     Q.    All right.  Turn to paragraph 47 on

11  page 10.  And if you would read that to yourself and

12  let me know when you're done.

13     A.    Paragraph what?

14     Q.    47.

15     A.    Okay.

16     Q.    All right.  This -- I'll go ahead and read

17  it into the record (as read):  Immediately

18      thereafter, at 10:57 p.m., City of Eugene

19      officers informed protesters, including

20      Plaintiffs, via loudspeaker announcement of

21      the citywide administrative curfew that was

22      set to take effect three minutes later at

23      11:00 p.m.  This was the first notice of the

24      unconstitutional curfew given to people in

25      the area.

EXHIBIT 11 - PAGE 80

1           Did I read that correctly?

2      A.     Uh-huh -- yes.

3      Q.     All right.  So it indicates that

4  protestors, including the plaintiffs, of which you

5  are one, received an announcement via loudspeaker of

6  a citywide curfew administrative curfew at 10:57.

7           Is that what it says.

8      A.     Yes.  That's what it says.

9      Q.     And is that accurate or not?

10      A.     I mean, I'm guessing it's accurate

11  because, like, it's not my memory, but I also want

12  to defend my memory by saying that, you know, being

13  in streets with lots of chaos going around is

14  sometimes -- like, you don't know everything that's

15  going on.

16      Q.     Okay.  If we could turn to page 13,

17  paragraph 67.

18      A.     Oh, yeah.  Okay.  So this is saying

19  that --

20      Q.     So the second sentence of paragraph 67

21  I'll read out loud (as read):  Defendants

22     Stotts, Palki, and/or Casey then told Grady

23     that a citywide curfew was in effect and

24     that she and the other volunteers needed to

25     leave immediately.

EXHIBIT 11 - PAGE 81

Erin Grady

```
 1            Did I read that sentence of paragraph 67
 2   correctly?
 3        A.    Uh-huh.
 4        Q.    Is that a yes?
 5        A.    Yes.
 6        Q.    Okay.  And did that occur?
 7        A.    I don't know.  I'd really like to see the
 8   video.  I haven't seen the video.
 9        Q.    Okay.
10        A.    I mean, that's not what my memory says,
11   but also like that's -- like, I get what you're
12   saying, like, this is my lawsuit, my lawyer made
13   this lawsuit.  I just said something different about
14   my knowledge of the curfew.  I guess we're not on
15   the same page about that, but my memory says I
16   didn't know about the curfew, but according to this,
17   I probably did.
18        Q.    Okay.
19        A.    And also, we're talking about literally
20   three minutes, which is not a very long time.
21        Q.    I know.  Okay.  We'll get back away from
22   the complaint for a moment.
23            Do you wear glasses or contacts or
24   prescriptions?
25        A.    Yeah.
```

EXHIBIT 11 - PAGE 82

1      Q.    And were you wearing them the night of May

2    31st?

3      A.    I don't think I was because I don't think

4    I had glasses last May.  I do have classes now.

5      Q.    Okay.  I'm just -- I'm more interested in,

6    you know, if there's something that would impair

7    your perception.  So, for example, do you wear a

8    hearing aid?

9      A.    No.

10      Q.    Okay.  Had you taken any drugs or

11    medication that night before you went out as Jail

12    Support?

13      A.    No.

14      Q.    So and again, this is just about

15    perception.  I'm not judging anybody, but had you

16    smoked any marijuana earlier in that day?

17      A.    No.

18      Q.    Had you drunk any alcohol earlier in that

19    day before going out as Jail Support?

20      A.    I probably had one beer earlier in the

21    day.

22      Q.    Okay.  When you said Miriam was in at

23    least the street or part of the street crossing over

24    when she yelled something about, you know, what are

25    your names.

1       A.      Uh-huh.

2       Q.      Is that right?

3       A.      Yeah.   I mean, my memory is we were

4   together.

5       Q.      Okay.   Were you in the street when that

6   occurred?

7       A.      My memory is yes.

8       Q.      Okay.   And you observed officers then

9   approaching you?

10      A.      Yeah.

11      Q.      And did they say something, to your

12  memory?

13      A.      In my memory, no, but we did like realize

14  that they were coming and started moving quickly to

15  our cars.

16      Q.      You could perceive that they were walking

17  over to contact you at least.

18      A.      Yeah.   It's like they were walking really

19  fast suddenly, like, they were kind of like walking

20  or walk running over to us, and then we needed to

21  get to our car.

22      Q.      Okay.   And do you remember them saying

23  anything to you prior to making physical contact?

24      A.      I don't -- I don't know.

25      Q.      All right.

Erin Grady

84

```
1        A.      Maybe.  Maybe.

2        Q.      Okay.  Are you aware of anyone else who

3   was provided a warning about the curfew that then,

4   you know, wasn't arrested or was allowed to leave?

5        A.      I don't know.

6        Q.      And the officers contact you.  They bring

7   you over.  They eventually put you in handcuffs and

8   go through process, all that.  You're placed in the

9   back of a jail van; is that correct?

10       A.      Uh-huh.

11       Q.      Yes?

12       A.      Yes.

13       Q.      And then transported to the Lane County

14  Jail?

15       A.      Yes.

16       Q.      And you said that you had problems at the

17  Lane County Jail, and that's the sheriff's office

18  that handles that.  Describe for me what -- what the

19  issues are that the sheriff's office did to you at

20  the jail, what the problem was.

21       A.      Well, I mean, they're really mean there.

22  Everybody knows that.  I mean -- okay.  Let's see.

23  The problems.

24               We got COVID tests and then we went in the

25  jail.  And then I'm pretty sure we went into booking
```

EXHIBIT 11 - PAGE 85

1    pretty quickly and they're just so mean during

2    booking.  You know, they, like, put your hands up

3    against a wall, make you face a wall and then they

4    start asking you questions about whether you're

5    suicidal or not.

6            And that is so -- to me that was just such

7    a, like, poorly handled -- like, they're doing this

8    really like cruel mental health evaluation, which I

9    tried to give them feedback on because I'm a social

10   worker.  And they were basically like we don't care.

11   So that was pretty offensive to me.

12           Then they put me in a room alone which

13   seems like a holding cell not like a -- okay.

14   Sorry.

15           I don't know all the jail lingo.  I don't

16   think we were getting booked.  We never got booked.

17   Booked means when you go and you like get jail

18   scrubs and go into your own jail room.  That didn't

19   happen.

20           We were getting, like, brought in the

21   entrance process to jail during the offensive and

22   very rude and dehumanizing questioning about all

23   different sorts of things including my mental health

24   which is just, like, why would I tell you that when

25   I'm facing a wall and my hands are facing a wall and

EXHIBIT 11 - PAGE 86

1    my hands are up on a wall.

2              And then got put in the room by myself

3    and -- yeah.  That just really was awful in every

4    sensory way all night.  Like it was freezing cold in

5    the room.  The lights were on the entire time.  The

6    phones were not working.  I could not use the phone.

7    I had no idea what time it was.  No one would tell

8    me what time it was.

9              Any time an officer came to my door, which

10   was pretty rarely, they were super rude to me, and

11   they wouldn't answer any of my questions about like:

12   Will I be arraigned in the morning?  What time is

13   it?  Like how long is this process going to be?

14   When do I get my phone call?

15             Just like shut the door, like no one will

16   talk to you.  You know, I'm not trying to be a

17   crybaby, but, like, the food sucked.  It was really

18   gross.  And yeah, it was just like a long freezing

19   cold -- oh, and I had like no comfortable place to

20   be, like, I was in a tee shirt and shorts.  I had no

21   blanket.

22             It was like full freezing air

23   conditioning, and I was curled into a little ball on

24   a bench, next to a cement wall, and I was freezing,

25   and, like, I couldn't touch the wall because the

EXHIBIT 11 - PAGE 87

```
 1   wall was cold and the bench was uncomfortable.  No
 2   pillow.
 3          I don't remember if I had like a sweater
 4   or something, but probably didn't have a sweater.
 5   It just -- I was just like curled up in a ball in
 6   pain, like, I told you I have like neck pain,
 7   whiplash stuff, like whatever.  I was like in pain
 8   on a bench, freezing, miserable, sad, in the lights.
 9   No idea what time it was, can't use the phone.  Like
10   why did I deserve that?  I did not.  Like that was
11   super -- like, I -- sorry.
12          Like being out on the streets three
13   minutes after a curfew does not mean that I needed
14   to sit in that much like painful, physical misery
15   with no access to the outside world in the middle of
16   my town about ten blocks away from my house for an
17   entire night.  I should have been home in bed.
18      Q.   What did Officer Casey do to you?
19      A.   I don't know who that is.
20      Q.   What did Officer Palki do to you?
21      A.   I mean, one of these people arrested me.
22   They were in riot gear like -- I think.  Now I'm
23   questioning my own memory a lot, I know, but I don't
24   know these people's names.
25          They did not identify themselves.  Like I
```

1  did not clearly see any place where I could read

2  their names.  They did not say, "Hi, I'm Officer

3  Stotts.  I'm Officer Palki.  I'm here to arrest you

4  today."

5          They were just like figures of scariness

6  in the night, and I do not know who they were.

7      Q.    Okay.

8      A.    I'm sorry I don't know their names, but

9  they did not make their names clear.

10     Q.    And so you earlier indicated that two

11 officers came up and approached you and Ms.

12 Valentine; is that correct?

13     A.    There was a lot of police around, but

14 yeah, probably, maybe not.

15     Q.    Well, how many officers approached you to

16 take the two of you into custody?

17     A.    Oh, I think it was two.  I --

18     Q.    And one of them was Sergeant Stotts.

19 We've admitted to that.  We know that.

20     A.    Okay.

21     Q.    You also sued Officer Palki and Officer

22 Casey.  Do you think that other officer was one of

23 them, and if so, why are you suing both of them if

24 it could only be one?

25     A.    Maybe it was three.

EXHIBIT 11 - PAGE 89

```
1              MS. DUGAN:  It's five to noon.  I
2    don't know if you want to put money in your meter or
3    move your car.
4              THE WITNESS:  Yeah.  I probably
5    should.
6              MS. DUGAN:  Okay.  We can take a
7    break.
8              (Recess:  11:56 to 12:07 P.M.)
9    BY MR. MILLER:
10      Q.    So it sounds like after consulting with
11   your attorney you want to clarify an answer?
12      A.    Well, also after walking to my car and
13   getting a moment to, like, think because that
14   questioning was coming on pretty, like, hard and
15   fast.  And it was a good time, moment to think.
16           I don't remember who the police were that
17   arrested me because they didn't introduce
18   themselves, and it was a chaotic situation, and they
19   were also dressed in, like, a not easy way to see
20   their faces and names.  I mean, like maybe -- I just
21   wasn't paying attention to their names.  There was a
22   lot going on.
23           And also, the reasons I don't know what
24   all these police officers did and who arrested me is
25   because my lawyers decided who we were going to sue
```

EXHIBIT 11 - PAGE 90

1    presumably by reading police reports and stuff.  It

2    was not obvious to me who arrested me and who I was

3    talking to.  And that's why I don't know.

4            So when you're framing this whole thing

5    like you don't have any idea what happened, I don't

6    really think that the particular names of people

7    were easily available to me or easy for me to

8    remember considering the circumstances.

9    Q.    Okay.  Would you agree that if Officer

10   Palki or Officer Casey did not in fact arrest you,

11   that you shouldn't be suing them?

12   A.    Unless they did other stuff to other

13   people -- I mean, like, if they're part of other

14   peoples' lawsuits, but it -- I mean, I don't know.

15   They were also part of the whole -- if they were on

16   the ground that night, they were part of this whole

17   thing.

18           Like I said, this lawsuit for me is about

19   what happened to me personally, but it's also about

20   what happened to my town and what happened to all

21   these other plaintiffs and what happened to, like,

22   the city that I love and care about and the people

23   who chose to stand up for what they believe in that

24   weekend, which was a completely valid thing for them

25   to do.

EXHIBIT 11 - PAGE 91

1          So, like, do I think they shouldn't be

2    sued?  I don't know.  But, like, legally if they

3    really weren't part of my situation, then they --

4    their names probably shouldn't be on my complaint.

5         Q.    Do you recall any other details from the

6    police encounter on May 31st, 2020, that we have not

7    discussed yet?

8         A.    No.  I just remember having the distinct

9    impression that I was arrested because I annoyed

10   some riot cops which is not a crime.

11        Q.    Did anyone say that to you?

12        A.    No.  It was just an impression that I felt

13   -- I felt like they got annoyed with us because we

14   yelled something that annoyed them and we weren't

15   leaving as quickly as they wanted us to.  And I

16   did -- I got the distinct impression that they were

17   just irritated with us, and that's why they arrested

18   us.

19        Q.    And after your first contact, you do agree

20   that the police allowed you to leave?

21        A.    Yeah.  But we also were not -- like, when

22   Miriam turned around to yell, "What is your name,"

23   we weren't like staying.  We were on our way to our

24   car and she just decided to make one last attempt,

25   and that annoyed them.  And that was really the

1    thing; we annoyed them.

2        Q.    That's your belief.

3        A.    That is my belief.

4        Q.    All right.  We'll go ahead and mark this

5    as Exhibit 6, I believe.

6                    THE REPORTER:  Uh-huh.

7                    (Deposition Exhibit 6

8                     marked for identification.)

9    BY MR. MILLER:

10       Q.    So, Ms. Grady, I'm handing what's been

11   marked as Exhibit 6, which is the probable cause

12   affidavit for your arrest.

13               Have you ever seen this document before?

14       A.    Not to my knowledge.

15       Q.    Okay.  I'd like you to read the middle

16   paragraph that begins on 5/31/2020.  Do you see

17   that?

18       A.    Uh-huh.

19       Q.    Just read that to yourself and let me know

20   when you're done.

21                   (Pause.)

22       A.    I read it.

23       Q.    Okay.  In that paragraph that I just had

24   you read, do you see anything inaccurate in there?

25       A.    I mean, I guess I -- it's -- I don't know

EXHIBIT 11 - PAGE 93

Erin Grady

1  how to say inaccurate because this is all, like, a

2  stressful situation that happened many months ago --

3  no, many -- like a year and change ago, but my

4  impression is that I was arrested like not at 23:25,

5  that I was arrested more at like 23:05, but again,

6  could be wrong about that.

7      Q.    Okay.

8      A.    I obviously was not, like, taking notes on

9  exactly what time it was the whole time.

10     Q.    Other than potentially the times, is there

11  anything else about this paragraph that strikes you

12  as inaccurate?

13     A.    Just that I thought that the citywide

14  curfew didn't go into place until 11:00 p.m.  But

15  yeah -- no.  I was -- the rest is accurate.

16     Q.    Okay.  So how close of a relationship do

17  you have with -- is it Miriana -- is that --

18     A.    Miriam?

19     Q.    Miriam.  Excuse me.  Miriam Valentine,

20  just describe how close of a relationship you have

21  with her.

22     A.    We're friends.  We are next-door

23  neighbors.  We don't hang out like a ton but we hang

24  out.  She was helping with Jail Support at the time.

25  We have a sweet but casual friendship.

EXHIBIT 11 - PAGE 94

Erin Grady

94

1      Q.    And how long have you known her?

2      A.    Probably two years.

3      Q.    And have you ever discussed the arrest and

4    what happened with her?

5      A.    Yeah.  I mean, after the arrest we

6    probably discussed it, like, whoa, that was crazy.

7    I can't believe that happened.  Oh, my gosh.  Do you

8    want some soup?

9            And a couple months ago when we were

10   talking about -- or whenever these interrogatories

11   were coming through, we sat down and talked about

12   how -- because of me being in this lawsuit, like,

13   she might be a part of it.

14     Q.    And do you know whether she has any

15   recordings on her phone from the night of May 31st,

16   2020?

17     A.    I do not think so, but I can't say for

18   sure.

19     Q.    Okay.  Other than Miriam and the

20   individuals we talked about earlier in this case

21   when you were describing people in your journal

22   notes and obviously your attorneys, is there anyone

23   else that you've discussed your case with?

24     A.    Like my -- that I discussed the arrest

25   with or that I discussed the case with?

EXHIBIT 11 - PAGE 95

1       Q.    Right.  Discussed -- well, let's start

2   with the arrest itself.

3             Have you discussed sort of what occurred?

4   I mean, I don't -- I'm not interested in sort of a

5   casual, oh, yeah, I'm arrested.  I'm unhappy about

6   it.  I really am -- and just is there anybody else

7   you've discussed in detail this is what happened?

8       A.    Probably not really besides like my

9   roommates.

10      Q.    Okay.

11      A.    My work didn't make me fully describe it.

12  They were -- yeah.

13      Q.    Okay.  How well, if at all, do you know

14  any of the other plaintiffs in this lawsuit?

15      A.    Not very well.

16      Q.    Okay.  Did you know any of them before you

17  were brought together for purposes of this lawsuit?

18      A.    No.  I feel like I have casually been

19  introduced to Curtis before, but I did not know the

20  others, but besides that we met in a paddy wagon.

21      Q.    Yeah.  And do you text or communicate with

22  any of them?

23      A.    No.

24      Q.    So there's no group texts amongst all the

25  plaintiffs?

EXHIBIT 11 - PAGE 96

Erin Grady

```
 1        A.     No.   There's like a -- our lawyers send us
 2   group emails.
 3        Q.     Yeah.  I don't want to know about that.
 4        A.     Oh, sorry.
 5        Q.     No.  It's okay to say the existence, yeah,
 6   but I'm not --
 7        A.     Oh, yeah.  Attorney-client privilege.
 8        Q.     Yeah.  I think -- I just have some kind of
 9   check-off stuff, I guess.
10               So, you know, were you hit by anything on
11   May 31, 2020?
12        A.     Hit by an object or projectile?
13        Q.     Yeah.
14        A.     No.
15        Q.     Were you struck with a baton?
16        A.     No.
17        Q.     Were you Tased?
18        A.     No.
19        Q.     Were you struck with a pepper ball?
20        A.     No.
21        Q.     Were you struck with a less-lethal
22   munition?
23        A.     No.
24        Q.     Were you subject to tear gas?
25        A.     No.
```

EXHIBIT 11 - PAGE 97

1      Q.    Okay.  Any evidence that any of the

2   officers knew that you had been an organizer with

3   the Civil Liberties Defense Center?

4      A.    No.

5      Q.    Does your opinion of law enforcement

6   generally differ from your opinion of the Eugene

7   Police?

8      A.    No.

9      Q.    Okay.  Do you have an equally -- I don't

10  know how you'd describe it, if it's an unhappy view

11  of both of them?

12     A.    Yeah, yes.  I feel opposed to the way that

13  policing in this country, including in my town, is

14  impacting vulnerable populations including poor

15  people, people experiencing poverty, unhoused

16  people, black people, brown people, indigenous

17  people, activists, and many more kinds of people.

18           I feel like policing is doing a whole lot

19  of harm in this world and a lot of harm in this

20  town.  And I see it in my job as a social worker.

21  Oh, also mentally ill people.  I have parents

22  calling me all the time on the crisis line who are

23  like, "My son is mentally ill.  He's having a

24  psychotic episode.  Last time I called dispatch,

25  even trying to get CAHOOTS, police came.  They beat

1  him up.  He went to jail.  They made everything

2  worse.  Or he just went to jail and it made

3  everything worse."

4          Like policing is impacting this community

5  deeply and this community is hurting for so many

6  other resources.  We have no public housing.  We

7  have no free childcare even though schools are

8  closed.  We have like not enough mental health

9  services, not enough harm reduction drug services.

10 Looking around our city, we have major, major

11 problems.  And policing is not solving it.  Policing

12 is making it worse.

13         Also, the Eugene Police have killed

14 multiple people, and I care for those people.  I did

15 not know all of them personally, but I care for them

16 and for their families and the people that continue

17 to survive in the wake of their loss.

18     Q.   Do you care about the families of the

19 officers who had to use deadly force?

20     A.   Yes.  I care about the families of

21 officers and I care about the officers.  Like I love

22 people.  That is why I care about this.  That is why

23 I do work like this.

24         I acknowledge that it must be very

25 difficult for police to go into scary environments

1   and not know what to do, and I acknowledge that

2   after police murder someone, that their life is

3   probably never the same after that.  Mine would

4   never be.  Like that is -- I don't understand why we

5   have this system because I think it's terrible for

6   everyone, police included.

7           And I think that the police in Eugene --

8   like I think it's really cool we have White Bird and

9   I think it's really cool we have CAHOOTS, but it

10  seems like police are having to bear the burden of

11  so many problems for which we are -- they are not

12  given enough resources, like, I don't think the

13  police like that there are 5,000 homeless people in

14  Lane County.

15          I don't think the police like that they

16  have to deal with the fact that there are people

17  experiencing extreme mental health issues and drug

18  addiction issues just living on the streets

19  everywhere, like I don't like that.  I don't think

20  the police like it either.

21          And I think that the whole point of last

22  year's protest movement was a defund the police

23  movement, and that was like actually a real ask,

24  that we want safer and healthier communities where

25  there is housing and where there is access to the

EXHIBIT 11 - PAGE 100

Erin Grady

100

```
 1  things that people need to survive when they are
 2  poor and experiencing poverty.  And that all the
 3  money going to the police is not giving this
 4  community what we need and not creating safety at
 5  all.
 6          And so our community is like -- like, I
 7  love this city.  I'm going live here forever
 8  probably, and I really, really care about how this
 9  city turns out.  And I feel like right now we are
10  facing a lot of different crisises from wildfires to
11  COVID to homelessness -- I'm going to start
12  crying -- I'm just like so sad about this.
13          And I just feel like the purpose of the
14  protest movement last summer was saying like we need
15  more money, more city money, more government money,
16  more state money to go to these things that all
17  these people need and less money to go to policing
18  because the whole concept of police will solve all
19  the problems in the world is not working.
20          And so I just feel like we have -- we have
21  a choice here and it's really the City of Eugene's
22  choice.  Like it's y'all's choice.  Like we can
23  speak up about things, but it's like y'all have the
24  onus on you of, like, are you going to put the money
25  towards policing or are you going to put the money
```

EXHIBIT 11 - PAGE 101

1  towards things that we need, towards like literally

2  housing, number 1, to help deal with the fact that

3  we are facing economic crisis.

4          We are facing an eviction crisis coming

5  up.  There's going to become way more people on the

6  streets and, like, what kind of community are we

7  going to live in in 20 years?  Are we going to live

8  in a safe one, or are we going to live in one that's

9  full of crime, full of suffering, full of drug

10  addiction, full of misery?

11          And I actually, truly believe that less

12  policing and more money towards housing and

13  resources that lift people up out of poverty will

14  make this community a safer place.

15          Like, no offense, like, seriously, none at

16  all, like, I get you're out there doing a hard job

17  and doing your best, but, like, we need different

18  resources here.

19          I've had three friends come visit me from

20  New York this summer that have walked around Eugene

21  and been like, what the hell is going on here?  Like

22  this is messed up.  And in New York and on the East

23  Coast they have public housing.  Like, they've spent

24  decades building housing.

25          And I know there's huge critiques of that

EXHIBIT 11 - PAGE 102

1  public housing for lots of reasons, including racism

2  and redlining, but, like, the fact is that public

3  housing is better than tents in W-J and, like, tents

4  on random side streets and RVs on random side

5  streets in West Eugene.

6          And, like, yeah, I think that y'all,

7  including you, should get on board with this defund

8  the police thing because we could have a way better

9  community if we had more money for the things that

10  people need, and that is, like, ultimately what I

11  care about.

12          And so do I feel critical of the Eugene

13  Police Department?  Hell, yes -- excuse me.  I'm

14  sorry.  But is it for, like, reasons that I feel,

15  like, are truly based on what I think needs to

16  change about my community for true safety and like a

17  true, like, harmony and happiness to happen here?

18  Yes.

19          Do I hate police officers individually?

20  No.

21     Q.    How did the May 30th, 2020, curfew impact

22  you?

23     A.    I don't know.  I was really angry about

24  its existence.  I was very tired and overwhelmed and

25  I stayed home.  I mean, like, you have heard my

EXHIBIT 11 - PAGE 103

Erin Grady

1  values.  Obviously I was upset about that curfew,

2  not just because of how it impacted me, but in

3  general.

4      Q.    How did the June 1st, 2020, curfew impact

5  you?

6      A.    I had just gotten out of jail.  I went

7  home and I ate food and I went to bed.  And I was

8  mad about the curfew then.  I would have been mad

9  about any curfew.

10     Q.    Did you ever observe anyone throw anything

11  at the police officers on -- from May 29th through

12  June 1st, 2020?

13     A.    I don't think so.  Maybe.  I don't --

14  probably not.

15     Q.    Since May 31st of 2020, have you had any

16  other interactions with Eugene Police Department

17  employees?

18     A.    Yeah.  I sometimes interact with Mozan

19  -- and I obviously suck at remembering police

20  officer names, but the police officers who deal

21  with sweeps.  I sometimes help out unhoused folks

22  and sometimes show up to record and support

23  during the sweep.

24     Q.    And how often are those interactions

25  occurring?

EXHIBIT 11 - PAGE 104

1    A.    Not very often.  I mean, I'm a busy lady.

2  I work, as I said, 40-plus hours a week.  So I wish

3  I could be out there more, but I'm not as much.

4    Q.    Any interactions with any other police

5  officers not from the Eugene Police Department?

6    A.    No.  I'm trying to think about work.

7  Like, sometimes I interact with police at work, but

8  since we've been in COVID, we haven't been in

9  schools and I don't -- I haven't really seen any

10  police since then.

11    Q.    Okay.  I think that may be what I have,

12  but let me talk to them out there.  I'm trying to

13  keep it short so we can kind of get you cut loose.

14  So we'll take quick break.

15             MS. DUGAN:  Okay.

16             (Recess:  12:27 to 12:30 p.m.)

17             MR. MILLER:  I don't have anything

18  else for you, Ms. Grady.  Thank you for your time

19  today.

20             THE WITNESS:  Thank you.

21             (The deposition was concluded

22              at 12:30 p.m.)

23

24

25

Erin Grady

105

```
 1  STATE OF OREGON      )

 2                       )   ss.

 3  County of Lane       )

 4

 5       I, Deborah M. Bonds, CSR-RPR, a Certified

 6  Shorthand Reporter for the State of Oregon and

 7  Washington, certify that the witness was sworn and

 8  the transcript is a true record of the testimony

 9  given by the witness; that at said time and place I

10  reported all testimony and other oral proceedings in

11  the foregoing matter; that the foregoing transcript

12  consisting of 104 pages contains a full, true and

13  correct transcript of the proceedings reported by me

14  to the best of my ability on said date.

15       If any of the parties or the witness requested

16  review of the transcript at the time of the

17  proceedings, correction pages have been inserted.

18       IN WITNESS WHEREOF, I have set my hand and CSR

19  seal this 22nd day of September 2021, in the City of

20  Eugene, County of Lane, State of Oregon.

21

22

23  Deborah M. Bonds, CSR, CCR, RPR

24  Oregon CSR No. 01-0374, Expires September 30, 2023

25  Washington CCR No. 21014344, Expires May 5, 2022
```

EXHIBIT 11 - PAGE 106